# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
CONSIST SOFTWARE SOLUTIONS, INC., :
f/k/a CONSIST INTERNATIONAL, INC., :
                                   :
                Plaintiff,       :      Index No: 602644/2007
                                     :      DATE PURCHASED: 8/3/07
             - against -       :      **COMPLAINT**
                                     :
SOFTWARE AG, INC. and SOFTWARE AG, :
                                     :
               Defendants.       :
------------------------------------------------------------X

       Plaintiff Consist Software Solutions, Inc., formerly known as Consist International, Inc.

("Consist"), by its attorneys, Duane Morris LLP, as and for its Complaint against Software AG,

Inc., formerly known as Software AG Americas, Inc. ("SAGA"), and Software AG ("SAG",

together with its affiliates, "SOFTWARE AG"), alleges as follows:

NEW YORK
COUNTY CLERK'S OFFICE

AUG - 3 2007

NOT COMPARED
WITH COPY FILE

## THE NATURE OF THE ACTION

    1.      This is an action primarily for equitable relief relating to an exclusive

Distributorship Agreement between Consist and SAGA dated September 9, 1997 and effective

on January 1, 1998, as amended (the "Agreement"), as well as for damages for breach of contract

and related torts. Consist is the exclusive distributor of SAG computer software products within

its territory in South America. Consist and its affiliate companies in the Territory (hereinafter

called "CONSIST"), and SOFTWARE AG, have maintained a mutually beneficial distribution

relationship for more than 30 years. CONSIST has always fully and faithfully performed its

obligations as SOFTWARE AG's exclusive distributor pursuant to its agreements, and

CONSIST's distribution efforts have been successful. Despite this longstanding, mutually

beneficial relationship, SOFTWARE AG has sought to illicitly confiscate for itself the fruits of

CONSIST's decades-old efforts to develop customers for SAG's products, by claiming the right to terminate the Agreement at the end of 2007 despite the fact that CONSIST has fully performed its obligations thereunder. More recently, SOFTWARE AG has sought to manufacture sham "breaches" by CONSIST in a bad faith, and contractually flawed, effort to terminate the Agreement even earlier. In truth, it is SOFTWARE AG that is in flagrant breach of the Agreement, by directly concluding agreements with customers within the Territory for which CONSIST is the exclusive distributor. All of SOFTWARE AG's efforts to terminate the Agreement are contractually defective and factually spurious. Because SOFTWARE AG has failed to provide a contractually proper and permissible basis to terminate the Agreement on December 31, 2007 – namely, through a timely notice of termination specifying an uncured failure to perform a material condition of the Agreement – the Agreement has been automatically renewed for another five years beginning in 2008. Notwithstanding this, Software AG has disrupted and spoiled the market in the Territory by announcing to CONSIST's customers that the Agreement is not being renewed at the end of 2007, causing widespread concern and confusion among CONSIST's customers. The loss by Consist of its exclusive distribution rights would cause it immediate and irreparable injury not adequately compensable by money damages alone. Through this action, Consist seeks declaratory, injunctive and other relief with respect to renewal of the Agreement and Consist's performance thereunder, as well as damages for breaches of the Agreement to date by SOFTWARE AG.

## THE PARTIES

2.      Consist is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Delaware. It maintains a New York office at 10 East 53rd Street, New York, New York, 10022. Consist is qualified to do business in the State of New York.

2

3.     Upon information and belief, SAGA is a Virginia corporation with its principal place of business at 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190. SAGA conducts business in New York and maintains an office at Two Penn Plaza, Suite 1500, New York, New York 10121.

4.     SAG is the parent corporation of SAGA. Upon information and belief, it is a foreign corporation with headquarters in Darmstadt, Germany, and does business in the State of New York.

## FACTS

### Consist

5.     Consist is a Delaware corporation in good standing with its principal place of business in Delaware, an office in New York, New York, and subsidiaries in Germany, Israel, Spain and Mexico. CONSIST develops, sells, maintains, supports and services computer software systems. CONSIST's business goes far beyond the mere licensing of software systems to end-users; it also provides critical support for the software products it distributes and helps its customers develop software applications and solutions tailored to each customer's needs. CONSIST has a wide customer base, including major financial institutions and various government entities. CONSIST also develops business software solutions based on SAG technology including ConsistGEM, ConsistERPlus, ConsistGRP, ConsistGPA and ConsistHR, among others, which has served to increase the credibility of SAG technologies.

6.     CONSIST is the exclusive distributor of all SAG technology products in South American markets, and has been so for over 30 years – since 1975. As a distributor of SAG products for the last 30-plus years, CONSIST has devoted a substantial portion of its business to SAG, with several of CONSIST's largest and most prestigious clients utilizing SAG technologies. For the past 30-plus years, CONSIST has committed enormous resources to

3

training its employees with respect to the sale, maintenance and support of SAG products. CONSIST currently has over 700 professionals devoted to these efforts in the South American countries in which it is SOFTWARE AG's exclusive distributor.

7.    The requirements of CONSIST's banking and financial clientele are equally demanding. For example, CONSIST has contracts with several of Brazil's largest banks, and thus must provide services for these institutions to process and report staggering numbers of transactions daily to one of the most advanced centralized banking systems in the world.

8.    Many of CONSIST's maintenance and support contracts require around the clock service for major financial institutions and other entities whose clients rely on 24/7 availability of electronic services. Among CONSIST's largest clients is Brazil's Federal Service of Processing of Data ("SERPRO"), which provides extensive information technology services for various federal, state and municipal entities throughout Brazil. SERPRO processes many billions of transactions annually, covering a diverse range of services from Brazilian citizens' processing of income tax returns to tracking the nation's budget. This contract requires CONSIST personnel to be available at all times to handle maintenance and servicing, as well as to assist in troubleshooting and the development of new applications.

9.    CONSIST also has contracts with approximately 300 entities to service their SAG products. These service contracts comprise a significant portion of CONSIST's annual revenues. Moreover, CONSIST and SAG's names are intertwined in the Territory.

**The Exclusive Distributorship Agreement**

10.    CONSIST's longstanding exclusive distribution relationship for SAG's products in South America is currently governed by an exclusive Distributorship Agreement, effective January 1, 1998, between Consist and SAGA (the "Agreement"). This Agreement is the latest in

a succession of agreements for distribution of SAG products between CONSIST, on the one

hand, and SOFTWARE AG on the other.  Under the current Agreement, CONSIST has

exclusive rights to distribute SAG's products in seven South American countries (Argentina,

Bolivia, Brazil, Chile, Paraguay, Peru and Uruguay) which together comprise the "Territory"

defined in the Agreement.  In addition to distributing SAG's products, CONSIST is also

responsible for supporting those products as they are further developed with new versions and

systems.  As set forth in Annex A of the Agreement, SAGA – the SAG subsidiary that is

Consist's counterpart in the Agreement – itself is the exclusive distributor of its parent's products

in many territories around the world, including the Territory for which it, in turn, appointed

CONSIST as exclusive distributor.  Pursuant to Paragraph 10 of the Agreement, it is subject to

New York Law, without regard to New York's conflict of laws provisions.  (A copy of the

Agreement is annexed hereto as Exhibit 1).

    11.    Pursuant to Paragraph 1 of the Agreement,

    SAGA appoints Consist the exclusive distributor of the SYSTEMS in the
TERRITORY for the period of January 1, 1998 through December 31, 2007.  The
parties understand and agree that at the end of the first ten (10) year period of this
Agreement, this Agreement shall automatically renew for successive five (5) year
periods, unless either party shall decide to terminate this Agreement upon the
giving of eighteen (18) months prior written notice to the other party.

The termination referred to in Paragraph 1 is the only termination event identified in the

Agreement.

    12.    Paragraph 7 of the Agreement states:

    Before any termination of this Agreement shall become effective, the terminating
party shall give written notice to the other party describing in detail what material
conditions the other party has failed to perform, and the other party shall have
sixty (60) days in which to perform such conditions.

13.    Paragraphs 1 and 7 are the only two provisions in the Agreement that refer to termination.

14.    The "Systems" referred to in the Agreement are SAG software packages and updates for which SAGA is the exclusive distributor, as well as certain products for which SAGA pays a royalty to others. In Paragraph 1 of the Agreement, SAGA has appointed CONSIST to be the exclusive distributor of these products within the Territory. As noted, the "Territory" in which CONSIST enjoys exclusive distribution rights is comprised of Argentina, Brazil, Chile, Bolivia, Paraguay, Uruguay and Peru.

15.    Paragraph 2 of the Agreement authorizes CONSIST to enter into customer agreements in the Territory for licensing, installing, technical assistance, training and maintenance of the software packages for which SAGA granted it exclusive distribution rights. However, CONSIST is authorized to grant customers only non-transferable "use-licenses" for such packages. Thus, CONSIST may not grant sublicenses or distribution rights to any third party, or contract for installations of the software packages outside of the Territory, without SAGA's written consent.

16.    Paragraph 3 of the Agreement grants CONSIST, as exclusive distributor, the right to grant both perpetual or time-limited licenses and/or maintenance agreements, in exchange for quarterly payments to SAGA computed on the basis of Exhibit A to the Agreement. Exhibit A, in turn, requires Consist to pay SAGA a fixed cash lump sum payment quarterly according to a table set forth therein. The baseline annual royalty that Consist is required to pay is fixed in cash, with no credit for tax receipts.

17.    All adjustments to this annual royalty required by the Adjustment Table of Exhibit A are predicated upon the Audited SAGA Product/License Revenue – which revenue

measures <u>SAGA</u>'s success in areas for which it is exclusive distributor of SAG products in its complete Territory – with a maximum adjustment in royalty, up or down, of twenty percent (20%), except if Consist has declined one or more products from SAGA, in which case the maximum decrease is ten percent (10%).

18. As a result of Exhibit A, then, Consist's annual royalty payment to SAGA is dependent solely upon <u>SAGA's own</u> Product/License Revenue and <u>is totally independent of</u> Consist's activities or success in the Territory. In other words, the annual royalty is predicated upon <u>SAGA's</u> success in its <u>own</u> territory (other than Consist's territory), rather than upon <u>Consist's</u> success in the Territory. Moreover, the Agreement does not require Consist to inform SAGA of the number of licenses Consist has granted or to identify in any way who Consist's customers are. The only exception to this is with respect to so-called "Special Products" set forth in Annex B, as updated from time-to-time, for which SAGA itself pays royalties to third parties; as to these, Consist must report its sales on a report form developed by SAGA.

19. Paragraph 5 of the Agreement sets forth Consist's obligations under the Agreement. Pursuant to Paragraph 5(3), Consist "agrees to make all <u>reasonable</u> efforts to successfully market" SAGA's systems in the Territory (emphasis added). Moreover, Consist must provide SAGA with a written quarterly report of all installations and de-installations of Special Products made in the quarter, including, among other things, product name, operating system, customer name and customer address. These quarterly royalty reports relating to Special Products are identified by the Agreement as a "material requirement" thereof, and state that Consist's failure to provide such reports "may be deemed by SAGA to be a material breach condition of this Agreement." This requirement is the only requirement expressly identified in the Agreement as giving rise to a possible "material breach" of the Agreement by Consist.

20.    The termination provision of Paragraph 7, consistent with the mutual right to terminate set forth in Paragraph 1, requires 18 months' notice and also requires the terminating party to give notice "in detail" of "material conditions" the non-terminating party has failed to perform. It further provides that the receiving party shall have 60 days to perform the material conditions identified in the notice.

21.    Pursuant to Paragraph 7, then, before any termination of the Agreement – which may occur only on one of the anniversary dates set forth in Paragraph 1 (the only paragraph of the Agreement specifying a termination event) – the terminating party must give notice, "in detail," at least 18 months prior to the termination date, of the material conditions that the other party has failed to perform. Such a notice triggers a 60-day period in which the other party must perform such conditions. As referenced above, if there is no timely identified, uncured failure to perform a material condition of the Agreement, it automatically renews. The Agreement thus stands in bold contrast to the preceding exclusive distribution agreement between SAG and Consist's affiliate, which expressly permitted SAG alone to terminate the Agreement for failure to perform "any" of the "stated conditions" of the Agreement upon 60 days' notice and failure to cure. (A copy of the exclusive distribution agreement covering the period January 1, 1992 through December 31, 1997 is annexed hereto as Exhibit 2).

22.    Consist's Agreement with SAGA was negotiated and drafted in this way – as an "evergreen" contract terminable only at limited times, for specific reasons, with detailed notice requirements – intentionally. The reason is simple and straightforward, and is designed, from Consist's viewpoint, to prevent SAGA from doing exactly what it is trying to do here – converting to itself the customer relationships that CONSIST has developed over the years, for which CONSIST has employed the efforts of thousands of professionals and spent many millions

8

of dollars. Indeed, starting after the Agreement was executed, and in reliance on its evergreen nature, CONSIST began to build up a network of hundreds of professionals whose exclusive function was to work with CONSIST's customers in order to service and maintain SAG products and to assist clients in developing solutions with them so as to further integrate and entrench SAG products into their businesses.

23.    Furthermore, after the Agreement was executed, CONSIST allocated its most skilled and experienced professionals to work as consultants to assist CONSIST's clients in expanding the use of SAG's proprietary programming language and database software. CONSIST provides these consultants free of charge to its clients. In conjunction with CONSIST's creative pricing, this effort has made CONSIST's clients further dependent upon SAG technology. In Brazil alone, CONSIST currently has over 100 such consultants working to assist clients using SAG technology.

24.    The Agreement as intentionally drafted thus protects CONSIST from having its customer development efforts expropriated by limiting termination to specific times, which also takes away the incentive to seek termination for pretextual or bogus claims of breach. From SAGA's viewpoint, the Agreement prevents Consist from precipitously terminating the Agreement without affording SAGA the ability to transition the customers either to it or a new distributor, which would be disastrous for the markets in which SAGA operates as well as for the customers involved. In short, limiting the available termination times and reasons protects both parties and provides order and predictability to the relationship.

25.    Consist is further protected from attempts by SAGA to take over its distribution network in that the Agreement does not require Consist to identify its customers, or even the number of licenses it has granted or the details thereof (except for "Special Products," for which

9

Consist reimburses SAGA for payments that SAGA must make to third parties). Finally, as noted, the Agreement does not peg the royalty fees that Consist pays to SAGA to Consist's success or lack thereof, but rather, to <u>SAGA's</u> <u>own</u> success in distribution in its exclusive Territory. This method of royalty computation makes perfect sense: it assumes that, if SAGA itself is successful in marketing its products in its market, the products must be good products and, therefore, Consist (or any other distributor) should be able to distribute those products successfully in their own markets. The contrary is also true: if SAGA is not doing well, it presumptively is due to the fact that the products are not well-received by the marketplace for their intended purpose, and therefore other distributors will likewise have difficulty selling.

**The Distributorship Agreement Has Been Automatically Renewed as of January 1, 2008**

26.    The current Agreement runs for a term of ten years and is automatically renewed by the parties for successive five year terms unless either party gives written notice of termination of the contract at least 18 months in advance of the renewal date. Specifically, pursuant to Paragraph 1, the Agreement "shall automatically renew for successive five (5) year periods, unless either party shall decide to terminate this Agreement upon the giving of eighteen (18) months prior written notice to the other party." The first automatic renewal date for the Agreement is January 1, 2008.

27.    The Agreement specifies how to effectuate a termination pursuant to Paragraph 1. Paragraph 7 of the Agreement states that, before "any termination" is effective, the terminating party must give the other party a detailed written notice of the material conditions it has allegedly failed to perform. The non-terminating party then has a 60-day period in which it must perform the identified conditions or risk termination pursuant to Paragraph 1. Critically, however, the failure to perform the identified conditions does not give rise to a right to an immediately exercisable right to terminate the Agreement; that may be achieved only on the dates specified in

10

Paragraph 1 of the Agreement and upon meeting the requirements set forth therein and in Paragraph 7.

28.     At no point prior to June 30, 2006 (i.e., 18 months prior to the effective renewal date) did SAGA ever provide Consist with written notice, detailed or otherwise, of any material conditions that Consist had allegedly failed to perform, as Paragraph 7 of the Agreement specifically requires. Rather than provide the requisite notice, SAGA sent a purported notice of termination that failed to set forth any allegations as to what material conditions Consist was supposedly failing, or had failed, to perform that would provide a putative basis for termination on December 31, 2007.

29.     Thus, on March 30, 2006, SAG sent a letter to Consist stating that it had instructed SAGA to give notice of termination of the Agreement effective December 31, 2007. On April 6, 2006, SAGA sent notice to Consist purporting to terminate the contract as of December 31, 2007. However, neither SAGA nor SAG provided Consist with a notice describing in detail what material conditions Consist allegedly failed to perform as required by Paragraph 7 – there were none in any event – nor did they provide Consist with 60 days to perform any such conditions. Because SAGA's purported notice of termination failed to do what the Agreement plainly requires, it was defective and ineffective under the Agreement. As a result, the Agreement was automatically renewed, pursuant to Paragraph 1, for a five year term commencing on January 1, 2008. (Copies of the March 30 and April 6 letters are annexed hereto as Exhibits 3 and 4, respectively).

30.     Apparently recognizing that SAGA's notice was deficient, on July 4, 2006, Karl-Heinz Streibich, CEO of SAG, sent an email to Consist's president, Mr. Natalio S. Fridman, stating: "We consider the none [sic] utilized market potential for our products in your territory,

11

especially Paraguay, Peru, Argentina, Bolivia, Chile, Uruguay, as a breech [sic] of our contract."
(the "July 4 Email") (A copy of the July 4 Email is annexed hereto as Exhibit 5). Notably, the
July 4 Email was the first time since the inception of the current Agreement in 1998 that SAGA
or SAG had claimed that Consist's performance under the Agreement was at all deficient.

31.    The July 4 Email was sent by SAG's CEO, not by SAGA, and was sent in a
manner which is not an authorized method under the Agreement (See Agreement, Par. 8). It did
not state "in detail" what condition of the Agreement Consist supposedly was not performing, or
in what way, nor did it give any indication that it even purported to be a "notice" under the
Agreement, let alone a notice of termination. Even if such email correspondence were proper
and sufficient notice pursuant to Paragraph 7 of the Agreement – which it was not – it was
untimely because it was not given together with SAGA's April 6 putative notice of termination.
In fact, it was not even given at least 18 months in advance of the December 31, 2007 putative
termination date.

**The Threatened September 3, 2006 Termination**

32.    On July 28, 2006, Consist's attorneys, Duane Morris LLP, sent a letter to SAGA,
copied also to SAG, that rejected SAGA's putative termination of the Agreement as of
December 31, 2007 on the grounds set forth above, and alerted SAGA and SAG of claims that
Consist intended to advance concerning their violations of Consist's exclusive distributorship
rights. (A copy of this letter is annexed hereto as Exhibit 6).

33.    Having received no response from SAGA or SAG, Duane Morris sent a follow-up
letter to SAGA and SAG on August 11, 2006. (A copy of this letter is annexed hereto as Exhibit
7).

34.     By letter dated August 16, 2006 (the "August 16 Letter"), Baker & McKenzie

LLP, attorneys for SOFTWARE AG, responded and rejected the assertion that termination of the

Agreement was available only upon notice given 18 months prior to the December 31, 2007

termination date, which notice also identified the condition or conditions that Consist allegedly

was not performing and giving a 60-day cure period. Instead, SOFTWARE AG's attorneys

stated that the July 4 Email not only constituted a proper notice under the Agreement, but that

SAGA intended to terminate the contract 60 days after the date of that purported notice, on

September 3, 2006, unless the putative non-performance was cured. Thus, despite the fact that

the Agreement states as a termination event only the expiration of its original (or renewal) term,

SOFTWARE AG took the position that any claimed failure to perform a condition that was

uncured for 60 days gave rise to an immediately effective right to terminate, rather than, for

example, giving rise to a suspension of performance or a claim for breach of contract. (A copy

of the August 16 Letter is annexed hereto as Exhibit 8).

35.     Furthermore, the August 16 Letter claimed four additional supposed breaches of

the Agreement, and stated that Consist had 60 days to cure those supposed breaches. The letter

claimed:

- In breach of Paragraph 5(11), Consist has acted and is acting as a distributor, agent, reseller or marketing representative for system software products which compete with SAGA and without SAGA's approval. Among such products are Attunity.Connect. [sic]

- In breach of Paragraph 5(3) in addition to those breaches detailed in Mr. Streibich's July 4, 2006 letter [sic], Consist refused and continues to refuse to bid on software products for Cementos Bio Bio in Chile pursuant to a request in an email from Tomas Figueroa to Excequiel Matamalaon, dated July 10, 2006.

- In breach of Paragraph 5(4), Consist has failed to provide satisfactory technical assistance and support in the Territory for customers of SAGA products including HSBC and the Pao de Acucar Group.

13

- In breach of Paragraphs 1 and 5(4) and the duty of good faith and fair dealing which is part of every contract made under New York law, Consist has misrepresented to ABN that it has renewed the Agreement for an additional five year term.

36.     As September 3 approached, attorneys for Consist and SOFTWARE AG agreed to a tolling of the 60-day "cure" period as to the July 4 Email to give the parties time to discuss the issues. On August 28, 2006, the parties agreed to extend the 60-day "cure" period for the claimed breaches set forth in the August 16 Letter and to a litigation "standstill" pending discussions scheduled for the week of September 25, 2006. Thereafter, the parties agreed to successive extensions of the tolling of the 60-day "cure" period, as well as to extend the litigation standstill. Under the current agreement, the earliest time that SOFTWARE AG may purport to terminate the Agreement for a claimed failure to cure the supposed breaches identified in the July 4 Email and the August 16 Letter is August 31, 2007. The litigation standstill may be terminated at any time upon five business days' notice. On July 26, 2007 Consist gave notice of its intention to terminate the litigation standstill, and it thus terminated on August 2, 2007. Each of these agreements was concluded "without prejudice to any and all claims, rights, defenses and remedies of the parties, all of which are expressly reserved," except as set forth in the agreements.

37.     On September 11, 2006, Duane Morris responded to the August 16 Letter, and rejected any claim that these new allegations were adequate or timely under the Agreement, or that the alleged breaches were even factually or legally correct. Similarly, Duane Morris rejected any assertions that the July 4 Email was adequate or timely under the Agreement so as to terminate the Agreement even as of December 31, 2007, let alone earlier. (A copy of this letter is annexed hereto as Exhibit 9).

## Consist Has Not Breached the Distributorship Agreement

### I. The Putative July 4, 2006 Notice

38.     Even if the communications from SAG and Baker & McKenzie discussed above
had been timely and sufficient under the Agreement to permit termination, they would have to be
rejected for the simple reason that they are false.  Put differently, Consist has not failed to
perform any material conditions of the Agreement.  SAG's July 4 Email to Consist's president
stated that it considered the "none [sic] utilized market potential for our products in [Consist's]
territory, especially Paraguay, Peru, Argentina, Bolivia, Chile, Uruguay, as a breech [sic] of our
contract."  Notably, this supposed breach was raised for the first time in the July 4 Email, and
thus some 8 ½ years since the inception of the current Agreement.  More importantly, Paragraph
5(3) of the Agreement provides only that Consist "agrees to make all reasonable efforts to
successfully market" SOFTWARE AG's systems in the Territory (emphasis added).  Consist
rejects the assertion that it breached the Agreement, as its marketing efforts in the Territory have
been more than reasonable, and hence have at all times been in accordance with the Agreement's
requirements.

39.     Indeed, the Agreement requires only that Consist use "reasonable efforts" to
successfully market SOFTWARE AG's products in the Territory as a whole.  The Agreement
does not define the Territory as each individual country within the Territory, as SOFTWARE
AG seems to claim, but rather as the collective of seven nations.  The Agreement nowhere
requires success at any particular level within any particular country in the Territory, nor does it
require that Consist have a presence in each country – even though Consist does have a presence
in each.  Accordingly, the "reasonable" effort to distribute SAG's products, and the presence
required to do so and support the distribution network and licensees, will vary based on the

15

potential size of the market and the success rate in achieving licenses and maintenance and support contracts.

40.    CONSIST employs over 700 professionals in the Territory for the purpose of distributing, training and supporting SAG's products. It has offices in 18 cities in Brazil alone and another three offices in Argentina. Sales of software within Brazil and Argentina comprise approximately 87% of purchases of overall software sales within the seven countries comprising the Territory, and the large number of CONSIST's own customer contracts in those countries account for the relatively large number of its employees there. Consist also maintains local companies in Chile, Uruguay, Paraguay and Bolivia, and has a presence in Peru, which are all far smaller markets, and thus in which CONSIST has been able to conclude fewer contracts.

41.    CONSIST's efforts over the past nine and one-half years – building upon and expanding its overall distribution efforts since 1975 – have yielded wide success in the Territory as a whole. Apart from its great success in Brazil and Argentina, CONSIST has certainly used "reasonable" efforts to market the software in a much smaller part of the market in the Territory. Although CONSIST has had some success in Chile, there is no question that SOFTWARE AG has been more effective there than CONSIST – all in violation of Consist's exclusive distribution rights – but there is very good reason for that success. Roberto Duran, SAG's Director of Institutional Relations for Latin America, is the brother-in-law of the most recent ex-President of Chile, who left office in 2006. Indeed, President Ricardo Lagos participated in an inauguration ceremony in 2005 for the opening of a SOFTWARE AG factory in Chile. It is a fact, and perhaps should be no surprise, that the lucrative software contracts for various Chilean government entities were awarded to Software AG Chile in "tenders" in which CONSIST was not invited to participate despite its known exclusive distributor rights. Upon information and

belief, the awarding of some of these contracts is the current focus of a scandal in Chile and ongoing investigation into corruption.

42.    Indeed, the transcript from a January 23, 2007 presentation at the SOFTWARE AG Investors Conference reveals SOFTWARE AG's own explicit acknowledgement of the fact that Consist has been highly successful in Brazil – the country that embodies the largest segment of the Territory.  It also states SOFTWARE AG's intention to take over the Brazilian market in 2008 and notes that SOFTWARE AG's "real ramp up regarding the sales force plan will take place in the second half of 2007."  Relevant to Consist, it further states:

> **Question:** And Brazil--the number of customers there?
> **Answer:** Huge. We don't have a transparency. We don't have a transparency because of the nature of the deal [with Consist] is that the partner must not disclose the information about the customers. But, it's a big amount, big amount. Is probably the country with the highest penetration of Natural/Adabas. . . .
>
> Based on what we know we believe that margin will be affected positively and also it will be impacting positively because if you just look to the maintenance part of the story. We have three levels of support. First level which is just answering very easy questions. Tech level is more detailed questions where you have to really understand the set up, platform the customer has and the third level goes into R&D. Based on the current contract [with Consist], second level and third level is already provided for the Brazilian customers. Which means, in return, that we don't have any extra cost for delivering this kind of support when we enter in to the market so the only thing that we have to consider is how do we deal with the first level of support.

(A copy of the relevant excerpts from this conference in Frankfurt, Germany on January 23, 2007 is annexed hereto as Exhibit 10).

43.    Thus, in this single response, SAG revealed the reason for its bad faith efforts to terminate the Agreement even prior to December 31, 2007 as well as gave the lie to its assertion that Consist had not made reasonable marketing efforts in the Territory as a whole.  By any reasonable measure, Consist has faithfully and diligently performed its part of the Agreement

17

over the past nine and a half years, as it has done as an exclusive distributor of SAG technology

products since 1975.

## II. The Putative Breaches Identified in the August 16 Letter

44.    Additionally, the four supposed breaches first alleged in the August 16 Letter are

wholly spurious, and are part and parcel of SOFTWARE AG's bad faith efforts to convert

Consist's customer base.  The first allegation – that Consist has breached Paragraph 5(11) of the

Agreement by distributing, reselling or marketing products that compete with SAGA, including

Attunity Connect, without SAGA's approval – is at worst totally false and at best wholly

unsubstantiated and lacking in detail.  Directly contradicting the claim in the August 16 Letter,

SAGA has explicitly consented to Consist's sale of the Attunity Connect product, the only one

actually identified by it in the August 16 Letter.  In an email to Natalio S. Fridman dated January

10, 2002, Trevor Williams, SAGA's Vice President, Sales, stated: "I agree that the Attunity

Connect product may be sold by Consist."  (A copy of this email is annexed hereto as Exhibit

11).

45.    The second allegation, that Consist has breached Paragraph 5(3) of the Agreement

by refusing to bid on software products for Cementos Bio Bio, is also false.  Contrary to what the

August 16 Letter claims, the request to bid did not even come from Cementos Bio Bio, but rather

from a branch of SAG itself.  Tellingly, this peculiar request from SOFTWARE AG came only

after Consist notified SOFTWARE AG that it was aware of SOFTWARE AG's activities in

Chile and that such activities violated the Agreement.  CONSIST did not respond to this request

for a bid because, pursuant to Paragraph 2 of the Agreement, CONSIST cannot have a reseller of

its products.  Because this SAG branch would, in turn, have sold the products to Cementos Bio

Bio, CONSIST would have been appointing a reseller in violation of the Agreement.  Thus, had

18

CONSIST consented to this sort of arrangement, SAGA would have been in a position to argue that CONSIST had tacitly approved all transactions conducted by SOFTWARE AG in violation of Consist's exclusive distribution rights under the Agreement. CONSIST did not approve any such illegal transactions – tacitly or otherwise – and its actions in refusing to bid were in all events in accordance with the Agreement.

46.    Similarly, the third allegation that CONSIST breached Paragraph 5(4) of the Agreement, by failing to provide satisfactory technical assistance and support for customers, is at best wholly unsubstantiated and at worst totally false. CONSIST has no record of receiving, nor has it ever received, any complaints from HSBC or the Pao de Acucar Group – the only two customers identified in the letter – regarding CONSIST's technical assistance or support. Pao de Acucar has been CONSIST's client for SAG technology products since January 1, 1988, and HSBC is a successor of Bamerindus Bank, which is a client of CONSIST dating back to July 1, 1983. (HSBC has a perpetual license but had not renewed the maintenance and support contract after December 31, 2006 because, according to HSBC, Brazil was the last country that converted to the HSBC corporate software that is based on another technology). Given the absence of complaints, CONSIST believes that these customers are fully satisfied. To the best of CONSIST's knowledge, this purported breach is entirely fabricated.

47.    Finally, the fourth allegation, that CONSIST breached Paragraphs 1 and 5(4) of the Agreement and the duty of good faith and fair dealing by misrepresenting to ABN that it has renewed the Agreement for an additional five year term, is equally meritless. First, even if CONSIST did make such a representation to ABN – which to its knowledge it did not – it would have no effect on the relationship between the parties because ABN has a perpetual license for the software. Second, even if some unidentified representative of CONSIST had made this

statement, nothing he or she said was false. It is CONSIST's view that the Agreement has in fact been renewed for another five year period in accordance with the terms of the Agreement. This action in fact seeks a declaration to that effect.

## SAG and SAGA Improperly Market their Products in Violation of the Agreement

48.     Furthermore, during at least the last two years, SOFTWARE AG has engaged in a pattern of bad faith conduct in an effort to terminate CONSIST's rights under the Agreement. SOFTWARE AG also apparently seeks to destroy a substantial portion of CONSIST's business and to seriously and irreparably impair CONSIST's reputation with its customers and employees and in the marketplace generally. Thus, even before its April 2006 purported notice of termination of the Agreement as of December 31, 2007, SOFTWARE AG had directly contacted several of CONSIST's customers and informed them that CONSIST would soon no longer be an authorized SAG distributor and blatantly sought to postpone and interfere with any prospective new contracts for SAG products until 2008, so as to cut CONSIST out. These efforts have intensified more recently, now that SOFTWARE AG's intention to take over CONSIST's clients in January 2008 has been publicly stated.

49.     For example, in September 2005, SOFTWARE AG employees visited with certain of CONSIST's clients and informed them that the exclusive Distributorship Agreement between SAGA and CONSIST would not be renewed as of January of 2008. In response, Natalio Fridman wrote a letter to Karl-Heinz Streibich, dated September 30, 2005, in which Mr. Fridman cited the havoc this type of conduct would wreak on CONSIST's business. He wrote: "This has created fear, uncertainty and doubt in our market. Our clients are concerned about the future and some are contemplating moving out of [SAG] technology." (A copy of this letter is annexed hereto as Exhibit 12).

50.    Additionally, in conjunction with SOFTWARE AG's opening of an office in Sao Paulo, Brazil in October 2005 – a territory exclusively assigned to CONSIST in the Agreement – SOFTWARE AG issued a press release on May 19, 2006 announcing that its exclusive Agreement with CONSIST would soon terminate.  It stated: "The largest and most important market on the [South American] continent is Brazil which is currently subject to an exclusive distribution agreement with a sales partner.  This agreement will expire at the end of 2007 when distribution rights will revert to Software AG Brazil."  SOFTWARE AG's opening of an office in Sao Paulo, as part of an effort to sell other SAG products in the Brazilian market for which CONSIST has exclusive rights, undermines CONSIST's rights and is at very least a breach of the implied covenant of good faith and fair dealing which is present in every contract governed by New York law, if not an outright breach of contract.  (A copy of this press release is annexed hereto as Exhibit 13).

51.    Furthermore, SAG's website does not list CONSIST as the exclusive distributor for SAG products in three countries within the Territory exclusively assigned to Consist in the Agreement.  In contrast to the listing in Brazil, where CONSIST is at least named as the "Local Representative" for SAG products, Internet users browsing SAG's site – some of whom may include CONSIST's current and potential clients – find that SOFTWARE AG entities alone are named as the local contacts for SAG in Argentina, Paraguay and Chile.  CONSIST is not even mentioned, and other countries in the Territory are not listed on the SAG website at all.  SAG's failure to list CONSIST as the exclusive distributor of SAG products in these three countries is a further breach of the implied covenant of good faith and fair dealing.  (Copies of the relevant web pages are annexed hereto as Exhibit 14).

21

52.    Finally, Consist has documentation that trumpets SOFTWARE AG's marketing successes, plainly admitting that it had won contracts in Chile using software for which Consist is the exclusive distributor – thus violating Consist's distribution rights – including contracts with Servicio de Impuestos Internos de Chile (a Chilean governmental agency of internal taxation), the Ministerio de Obras Publicos, La Direccion General de Aguas (the Public Waterworks), Fondo National de Salud - Fonasa (National Health), and the municipality of Florida. These software agreements included Tamino, and EntireX and Turcana (software packages that incorporate Tamino), products for which Consist has exclusive distributorship rights. (Copies of documents taken from Software AG Chile's website reflecting this fact, with the relevant paragraphs translated to English, are annexed hereto as Exhibit 15). These releases have since been pulled from the website.

**SAGA's Threat to Terminate and SOFTWARE AG's**
**Misconduct Are Causing Irreparable Harm To CONSIST**

53.    The injuries that CONSIST is suffering and will continue to suffer as a result of SOFTWARE AG's improper actions cannot fully be quantified by money damages. As noted above, SOFTWARE AG's actions are jeopardizing and will jeopardize CONSIST's contracts with its many customers. As a result, CONSIST stands to lose a significant portion of its customer base and any potential future business from such customers. Due to SOFTWARE AG's misconduct, CONSIST is faced with the destruction of its business as it now functions, such that the nature of its operations will be materially and adversely altered as a direct result of SOFTWARE AG's conduct.

54.    Due to CONSIST's exclusive rights to distribute SAG's unique, high-quality software products, customers have come to associate the good names and reputations of SAG and CONSIST, which has benefited both companies. Because of SAG and SAGA's actions,

CONSIST stands to lose that business reputation, along with the goodwill that it had built up with its customers through its marketing and support of the SAG products.

55.     In addition, CONSIST may not be able to confine the damage to its reputation to its sale of SAG products. Thus, as a result of SOFTWARE AG's actions, many of CONSIST's customers that have a high dependency on the SAG technology licensed to them by CONSIST are trying to convert their applications to other technologies. For example, in Brazil, Banco de Brasil has announced a tender for bids in an effort to start such a conversion project.

56.     Furthermore, SOFTWARE AG's threatened termination of the Agreement subjects CONSIST to significant litigation risks involving its current customers. CONSIST's clients have contracted with Consist for 24/7 software maintenance and support, and the improper threat to terminate the Agreement will jeopardize CONSIST's related contractual obligations with its own customers. In the event that CONSIST cannot perform under its contracts because it no longer has access to SAG products and training, CONSIST faces litigation on a massive scale by its customers, who, as noted, include many of the largest banking and financial institutions and governmental agencies in the Territory, particularly in Brazil and Argentina. The termination of the Agreement would likely wreak havoc on these customers' business functions if CONSIST cannot provide maintenance and support.

57.     Additionally, CONSIST may have to retrain or terminate a large number of its employees who were dedicated to the service and maintenance of SAG products. This will not only cause significant economic damage, but will also negatively affect CONSIST's reputation with its employees.

58.     There is a further dimension to the reputational damage that will be suffered by CONSIST that should not be overlooked. Many of CONSIST's customers, particularly the

larger ones, have been customers for years, if not decades. Their investment in SAG products distributed and priced by CONSIST is enormous – so much so that, as a practical matter, their computer functions are totally beholden to SAG products, applications and solutions, that they have developed in conjunction with CONSIST. Put differently, any effort to switch software away from SAG would require in several instances years of work and many millions of dollars, if it could be achieved at all. These customers rely on CONSIST, which, because of its unique knowledge of their needs and ability to price software and support under the Agreement, provides a buffer between SAG and these customers. If CONSIST is taken out of the equation, SOFTWARE AG will be able to increase the pricing to these customers without effective restraints, and the customers will be forced to pay or risk the impairment of their computer systems while they transition to new software. Given the functions of many of these customers – as financial institutions, banks and governmental agencies – the results of removing CONSIST and its pricing ability would be nothing short of calamitous.

59.    Accordingly, for all of the reasons set forth above, the irreparable injury faced by CONSIST is a direct result of SOFTWARE AG's misconduct and threatened termination of the Agreement.

**The Balance of Equities Tips Directly in Consist's Favor**

60.    The harm CONSIST faces is immediate, palpable, and likely to be calamitous for CONSIST, both financially and reputationally. By contrast, there is absolutely no harm to SAGA or SAG from the granting of relief that will preserve the parties' obligations under the Agreement indefinitely. That is because, as noted above, SAGA's royalties are not pegged to CONSIST's efforts, but to SAGA's own success in licensing SAG products in territories which are not within Consist's Territory.

24

## COUNT I

## PERMANENT INJUNCTION

(Renewal Post-12/31/07)

61.    Consist re-alleges each of the foregoing allegations as though fully set forth herein.

62.    CONSIST has fully performed its obligations under the Agreement and remains ready, willing and able to perform its obligations under the Agreement.

63.    SAGA did not have grounds under Paragraphs 1 or 7 to terminate the Agreement.

64.    On April 6, 2006, SAGA, at SAG's behest, sent a putative notice of termination of the Agreement as of December 31, 2007. Such notice did not identify in detail a material condition of the Agreement that Consist was not performing or had failed to perform after 60-day notice to cure. At no time prior to June 30, 2006 did SOFTWARE AG send Consist such a notice. As a result, the Agreement automatically renews as of January 1, 2008 for a five-year period.

65.    SAGA's threatened termination of the Agreement on December 31, 2007 is improper and constitutes an anticipatory breach of the Agreement.

66.    Consist is the exclusive distributor of SAG's products within the Territory defined in the Agreement. Unless SOFTWARE AG is enjoined from terminating the Agreement on December 31, 2007, Consist will suffer substantial and irreparable harm which cannot be quantified by money damages alone.

67.    Consist has no adequate remedy at law.

## COUNT II

## DECLARATORY JUDGMENT

### (Renewal Post-12/31/07)

68.     Consist re-alleges each of the foregoing allegations as though fully set forth herein.

69.     An actual controversy exists between Consist and SOFTWARE AG regarding the Agreement's automatic renewal for another five-year term commencing January 1, 2008.

70.     Consist seeks a declaration from this Court that SOFTWARE AG's purported termination of the Agreement as of December 31, 2007 is ineffective pursuant to the terms of the Agreement and that the Agreement has been automatically renewed for another five-year term commencing January 1, 2008.

## COUNT III

## SPECIFIC PERFORMANCE

### (Post-12/31/07)

71.     Consist re-alleges each of the foregoing allegations as though fully set forth herein.

72.     SOFTWARE AG is fully capable of performing its remaining obligations under the Agreement.

73.     Consist does not have an adequate remedy at law for SOFTWARE AG's threatened termination of the Agreement and refusal to perform under the Agreement after December 31, 2007.  SAG's products are unique, and Consist is the exclusive distributor thereof within the Territory and a party to numerous service and maintenance agreements with end-users of SAG's products.

74.      CONSIST cannot effectively perform its service and maintenance contracts with its existing customers, nor will it be able to distribute SAG products within the Territory, if SOFTWARE AG terminates the Agreement as of December 31, 2007, and is not required to perform thereunder.  CONSIST cannot otherwise mitigate its damages.

75.      As a result, SOFTWARE AG should be ordered to specifically perform the Agreement for the remainder of its renewed term through December 31, 2012.

## COUNT IV

## BREACH OF CONTRACT

### (Termination as of 12/31/07)

76.      Consist re-alleges each of the foregoing allegations as though fully set forth herein.

77.      The Agreement is a contract entered into by Consist and SAGA.

78.      Consist has fully performed its obligations under the Agreement and remains ready, willing and able to perform its obligations under the Agreement.

79.      SOFTWARE AG did not have grounds to terminate the Agreement under Paragraphs 1 and 7.

80.      The Agreement automatically renewed according to its terms for another five-year term beginning January 1, 2008.

81.      SOFTWARE AG's purported termination of the Agreement as of December 31, 2007 constitutes an anticipatory breach of the Agreement.  As a result, Consist is threatened with substantial and irreparable harm that cannot be compensated by money damages alone.

## COUNT V

## PERMANENT INJUNCTION

(Threatened Termination Absent Cure Pursuant to July 4 Email and August 16 Letter)

82.    Consist re-alleges each of the foregoing allegations as though fully set forth herein.

83.    On July 4, 2006, SAG's President, Karl-Heinz Streibich sent an email to Natalio S. Fridman, President of Consist, stating that "We consider the none [sic] utilized market potential for our products in your territory, especially Paraguay, Peru, Argentina, Bolivia, Chile, Uruguay, as a breech [sic] of our contract." (A copy of the July 4 Email is annexed hereto as Exhibit 4).

84.    SOFTWARE AG has claimed that it has the right to terminate the Agreement if Consist's alleged failure to perform the Agreement set forth in the July 4 Email is not cured within 60 days thereof, as extended.

85.    On August 16, 2006, Baker & McKenzie, counsel to SOFTWARE AG, sent a letter to Duane Morris, LLP, counsel to Consist, stating that, in addition to the supposed failure to perform identified in the July 4 Email, SOFTWARE AG claimed four additional supposed breaches of the Agreement. These additional supposed breaches are:

- In breach of Paragraph 5(11), Consist has acted and is acting as a distributor, agent, reseller or marketing representative for system software products which compete with SAGA and without SAGA's approval. Among such products are Attunity.Connect. [sic]

- In breach of Paragraph 5(3) in addition to those breaches detailed in Mr. Streibich's July 4, 2006 letter [sic], Consist refused and continues to refuse to bid on software products for Cementos Bio Bio in Chile pursuant to a request in an email from Tomas Figueroa to Excequiel Matamalaon, dated July 10, 2006.

- In breach of Paragraph 5(4), Consist has failed to provide satisfactory technical assistance and support in the Territory for customers of SAGA products including HSBC and the Pao de Acucar Group.

- In breach of Paragraphs 1 and 5(4) and the duty of good faith and fair dealing which is part of every contract made under New York law, Consist has misrepresented to ABN that it has renewed the Agreement for an additional five year term.

86.    SOFTWARE AG has claimed that it has the right to terminate the Agreement if Consist's alleged failure to perform the Agreement set forth in the August 16 Letter is not cured within 60 days thereof, as extended.

87.    Pursuant to the Agreement of the parties, the earliest date that SOFTWARE AG may invoke its purported right to terminate the Agreement for any uncured supposed breaches identified in the July 4 Email and the August 16 Letter is August 31, 2007.

88.    On May 31, 2007, Natalio S. Fridman, President of Consist, sent an email to Karl-Heinz Streibich, President of SAG, inquiring whether SOFTWARE AG was claiming a purported right to terminate the Agreement at any time before December 31, 2007. On June 5, 2007, Mr. Streibich replied that SOFTWARE AG intended to reserve all of its rights under the Agreement. (Copies of these Emails are annexed as Exhibits 16 and 17.)

89.    Pursuant to agreement between the parties, the earliest date on which SOFTWARE AG may exercise it purported right to terminate the Agreement for the supposed breaches set forth in the July 4 Email and the August 16 Letter is August 31, 2007. Thus, pursuant to its reservation of rights SOFTWARE AG may purport to terminate the Agreement at any time after August 31, 2007.

90.    Pursuant to Paragraph 1 and 7 of the Agreement, the Agreement may be terminated only at specified times, and provided that 18 months' prior notice is given specifying in detail the conditions of the Agreement that the terminating party claims are not being fulfilled after 60 days' notice to cure.

91.    The first possible termination date under the Agreement is December 31, 2007.

92.    SOFTWARE AG failed to give timely and contractually sufficient notice of termination as of December 31, 2007. As a result, the Agreement has renewed for another five years, beginning January 1, 2008.

93.    SOFTWARE AG's assertion of a purported right to terminate the Agreement at any time prior to December 31, 2012 constitutes an anticipatory breach and/or repudiation of the Agreement.

94.    Unless SOFTWARE AG is enjoined from terminating the Agreement on the basis of the July 4 Email and August 16 Letter, Consist will suffer substantial and irreparable harm that cannot be compensated for by money damages alone, through the loss of its exclusive distributorship.

95.    Consist has no adequate remedy at law.

## COUNT VI

## PERMANENT INJUNCTION

(July 4 Email and August 16 Letter)

96.    Consist re-alleges each of the foregoing allegations as if fully set forth herein.

97.    In addition to being contractually faulty, the purported breaches of the Agreement identified by SOFTWARE AG in the July 4 Email and the August 16 Letter are spurious and factually false.

98.    Unless SOFTWARE AG is promptly enjoined from terminating the Agreement after August 31, 2007, when it claims a purported right to terminate the Agreement on the basis of the July 4 Email and the August 16 Letter, Consist will suffer substantial and irreparable injury that cannot be compensated for by money damages alone, through loss of its exclusive distributorship.

99.    Consist has no adequate remedy at law.

30

## COUNT VII

### DECLARATORY JUDGMENT

(July 4 Email and August 16 Letter)

100.   Consist re-alleges each of the foregoing allegations as though fully set forth herein.

101.   An actual controversy exists between Consist and SOFTWARE AG regarding SOFTWARE AG's purported right to terminate the Agreement at any time prior to December 31, 2012.

102.   Consist seeks a declaration from this Court that SOFTWARE AG's threat to terminate the Agreement at any time prior to December 31, 2012 because of the breaches claimed in the July 4 Email and the August 16 Letter is contractually impermissible and an anticipatory breach of the Agreement. Consist seeks a further declaration that the purported breaches of the Agreement by Consist identified in the July 4 Email and the August 16 Letter are in all events pretextual, factually false and insufficient to justify termination of the Agreement as of any permissible termination date.

## COUNT VIII

### SPECIFIC PERFORMANCE

(July 4 Email and August 16 Letter)

103.   Consist does not have an adequate remedy of law for SOFTWARE AG's threatened termination of the Agreement at any time after August 31, 2007, on the basis of the purported breaches set forth in the July 4 Email and the August 16 Letter. SAG's products are unique, Consist is the exclusive distributor thereof within the Territory and a party to numerous service and maintenance agreements with end-users of SAG's products.

31

104.    Consist cannot effectively perform its service and maintenance contracts with its existing customers, nor will it be able to distribute SAG products within the Territory, if SOFTWARE AG terminates the Agreement at any time after August 31, 2007 and is not required to perform thereunder thereafter, on the basis of the July 4 Email and the August 16 Letter. Consist cannot otherwise mitigate its damages.

105.    As a result, SOFTWARE AG should be ordered to specifically perform the Agreement until such time as it or Consist validly terminate the Agreement.

## COUNT IX

## BREACH OF CONTRACT

(July 4 Email and August 16 Letter)

106.    Consist re-alleges each of the foregoing allegations as though fully set forth herein.

107.    SOFTWARE AG's threat to terminate the Agreement at any time after August 31, 2007 on the basis of the July 4 Email and August 16 Letter constitutes an anticipatory breach of the Agreement. As a result, Consist is threatened with substantial and irreparable harm that cannot be compensated by money damages alone, through loss if its exclusive distributorship.

## COUNT X

## PERMANENT INJUNCTION

(Violations of Exclusive Distribution Rights – Chile)

108.    Consist re-alleges each of the foregoing allegations as though fully set forth herein.

109.    SAGA's marketing of its software products in nations in the Territory contractually assigned to CONSIST constitutes a breach of the Agreement. Specifically,

SOFTWARE AG has been marketing their software products in Chile in violation of CONSIST's exclusive distribution rights.

110.   Additionally, lucrative software contracts for various Chilean government entities were awarded to Software AG Chile in "tenders" in which CONSIST was not invited to participate despite its known exclusive distributor rights.

111.   CONSIST's exclusive distribution rights are unique and irreplaceable.  Unless SOFTWARE AG is directed promptly to cease marketing its software products in nations in the Territory contractually assigned to CONSIST and to perform its contractual obligations, CONSIST will suffer substantial and irreparable harm which cannot be quantified by money damages alone.

112.   Consist has no adequate remedy at law.

## COUNT XI

## BREACH OF CONTRACT

### (Chile)

113.   Consist re-alleges each of the foregoing allegations as though fully set forth herein.

114.   The Agreement is a contract entered into by Consist and SAGA.

115.   Consist has fully performed its obligations under the Agreement and remains ready, willing and able to perform its obligations under the Agreement.

116.   SOFTWARE AG's marketing of its software products in nations in the Territory contractually assigned to Consist, including Chile, is improper and constitute a breach of the Agreement.

117.   As a result of SOFTWARE AG's breaches Consist has been damaged in an amount to date not currently ascertainable, but believed to be in excess of $10 million.

33

## COUNT XII

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

118.    Consist re-alleges each of the foregoing allegations as though fully set forth herein.

119.    SOFTWARE AG owes Consist duties under an implied covenant of good faith and fair dealing in connection with the Agreement.

120.    SOFTWARE AG violated its duties of good faith and fair dealing.  SOFTWARE AG'S violations of the covenant of good faith and fair dealing include, but are not limited to, SOFTWARE AG's opening of an office in Sao Paulo, Brazil; its press release announcing termination of its contract with Consist; its website listing SOFTWARE AG as the distributor for Chile and Paraguay; its marketing of software products in Chile, and its improper communications with CONSIST's clients.

121.    SOFTWARE AG's conduct has caused and will cause substantial and irreparable harm to CONSIST which cannot be quantified by money damages alone.

34

## PRAYER FOR RELIEF

WHEREFORE, Consist demands as follows:

(a)    Judgment in its favor and against SAG and SAGA;

(b)    Temporary, preliminary and permanent injunctive relief to prevent SAGA from breaching its obligations under the Agreement during the pendency of this action; and

(c)    Damages, to the extent determinable, in an amount to be proven at trial;

(d)    Declaratory judgment that Consist has not breached the Agreement and that SAGA has breached the Agreement, and that the Agreement has been automatically renewed for another five-year term commencing January 1, 2008;

(e)    Specific performance of the Agreement after December 31, 2007;

(f)    Pre-judgment interest as allowed by law;

(g)    Post-judgment interest as allowed by law;

(h)    Attorneys' fees and costs of court;

(i)    Such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
         August 3, 2007

DUANE MORRIS LLP

By: _Hyman Schaffer_

Hyman L. Schaffer
Fran M. Jacobs
Brian Damiano
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020
*Attorneys for Plaintiff*
*Consist Software Solutions, Inc.*