UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONSIST SOFTWARE SOLUTIONS,
INC. f/k/a CONSIST INTERNATIONAL,
INC.,

                         Plaintiff,

            -against-

SOFTWARE AG, INC. and SOFTWARE
AG,

                       Defendants;

AND RELATED COUNTERCLAIMS

Case No. 07-CV-7047 (CM)(FM)

**DEFENDANTS SOFTWARE AG, INC. AND SOFTWARE AG'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
FOR DECEMBER 12, 2007 BENCH TRIAL**

James David Jacobs
Frank M. Gasparo
Marcella Ballard
John A. Basinger*
BAKER & McKENZIE LLP
1114 Avenue of the Americas
New York, New York 10036-7703
Tel: (212) 626-4100
FAX: (212) 310-1600
*Admitted pro hac vice

## FINDINGS OF FACT

### Background

1.      Defendant Software AG, Inc. ("SAGA") is a Reston, Virginia company and a wholly owned subsidiary of Defendant Software AG ("SAG") (collectively "Software AG") located in Darmstadt, Germany. Software AG has offices in 50 countries and over 4,000 customers in 70 countries and is the third largest integration software vendor in the world.

2.      Plaintiff Consist Software Solutions, Inc. f/k/a Consist International Inc. ("Consist") is a Delaware corporation located in New York, New York with subsidiaries around the world. Consist was earlier known as Pan American Computer Systems, Inc. ("PACS").

3.      Consist distributes computer software systems providing support and maintenance for the software products it distributes. Consist also develops and distributes its own software applications some of which use SAG technologies, and some of which do not.

4.      In the 1970's SAG developed a mainframe computer database program ADABAS, which along with a proprietary programming language NATURAL and other software programs are referred to as the "Systems". SAGA is the exclusive licensee from SAG of the Systems worldwide.

5.      SAGA and Consist entered into a distributorship agreement dated September 9, 1997 and effective January 1, 1998 (the "Agreement") granting to Consist the exclusive right to distribute the Systems in a 7 country territory in South America comprised of Argentina, Brazil, Bolivia, Chile, Uruguay, Paraguay and Peru (the "Territory").

6.      The parties have a relationship dating back to the mid-70's. Consist has been the exclusive distributor of SAG Systems in various countries in South America since about 1975. Various agreements have governed the parties' relationship concerning Consist's distribution of the Systems in South America.

7.    The only prior agreement between the parties that is relevant to this dispute is the parties' 1995 Agreement in place prior to the Agreement and which differed in notable respects from the Agreement.

8.    Consist seeks a declaratory judgment that the Agreement has not been terminated and has automatically renewed for a successive five year term.  Consist uses the terms "evergreen" or "perpetual" to characterize that the Agreement is virtually perpetual:  contending that it is terminable only at limited times (18 months prior to the end of the Agreement's Term), for specific reasons (the existence of a material breach), with detailed notice requirements.

9.    Software AG has sought a declaratory judgment that the Agreement has been terminated properly.  Software AG contends that, provided notice is given 18 months prior to the end of the Term that a party is not renewing the Agreement, it will end at the completion of the Term.  Software AG asserts the 18 month notice does not require the existence of a material breach to end the contract.

10.    The parties stipulated to, and the Court held on December 12, 2007, a bench trial at which the parties tried for binding determination only the declaratory judgment counts set forth in Consist's Complaint (Counts I, II) and Software AG's Counterclaims (Counts II, III).

**The Two Clauses of the Agreement At Issue in This Case**

11.    The Agreement commenced on January 1, 1998 and is operative for an initial term of 10 years up to and including December 31, 2007 which is automatically renewed for additional five year terms unless either party gives written notice of termination at least 18 months before the end of a term.  DX-1, Tab 1.

12.     Paragraph 1 of the Agreement sets forth the Term and provides:

SAGA appoints CONSIST the exclusive distributor of the SYSTEMS in the TERRITORY for the period of January 1, 1998 through December 31, 2007.  The parties understand and agree that at the end of the first ten (10) year period of this Agreement, this Agreement shall automatically renew for successive five (5) year periods, unless either party shall decide to terminate this Agreement upon the giving of eighteen (18) months prior written notice to the other party.

13.     The language of this paragraph is clear and straightforward.  The parties agreed that their relationship would last 10 years and would automatically renew unless  either party gave a generous advance notice that it no longer wished to continue the relationship.

14.     The language of this paragraph also differs considerably from the 1995 Agreement which contained a fixed 3 year term, no automatic renewal or 18 month exit provision, and had an express reference in the Paragraph 1 term provision to the Paragraph 7 material breach provision and read:

SAG may terminate this Agreement as to Chile only in accordance with Paragraph 7. [If Consist failed to meet yearly royalty quotas for Chile].

 The explicit reference in the 1995 Agreement to the material breach provisions of Paragraph 7 in Paragraph 1 was removed from the Agreement.  DX-1, Tab 2; DX-1, Tab 1 at Paragraph 1; Statement of James H. Daly at ¶ 11 ("Daly ¶ 11"); Statement of Neil Rothberg at ¶ 13 ("Rothberg ¶ 14").

15.     Software AG's witnesses testified that there was no longer an explicit tying of Paragraph 1's method of ending the contract (without cause) to Paragraph 7 (with cause) like there had been in the 1995 Agreement and that this is one reason the provisions of the two Paragraphs are not to be read together in order to end the Agreement. Daly ¶ 11; Rothberg ¶ 13.

16.    SAGA served a written notice of non-renewal on Consist pursuant to Paragraph 1 of the Agreement by certified letter dated April 6, 2006 (the "Non-Renewal Notice").  DX-65; Statement of Karl-Heinz Streibich ¶ 15("Streibich ¶ 15").

17.    SAGA served the Non-Renewal Notice timely on Consist under the Agreement *i.e.,* within the 18-month time frame required under Paragraph 1.

18.    There is no indication in Paragraph 1 that the Agreement had to be renewed in perpetuity unless one party committed a material breach of the Agreement, *i.e.,* it does not contain a "for cause" requirement as a condition precedent for a notice not to renew.  DX-1, Tab 1 at Paragraph 1.

19.    Consist has not denied receiving the Non-Renewal Notice but contends that the Non-Renewal notice was ineffective and defective because it did not also include detailed written notice pursuant to Paragraph 7 of the Agreement of a material breach committed by Consist.  Complaint ¶ 29.

20.    Paragraph 7 of the Agreement governs termination for cause and provides:

Before any termination of this Agreement shall become effective, the terminating party shall give written notice to the other party describing in detail what material conditions the other party has failed to perform, and the other party shall have sixty (60) days in which to perform such conditions.

21.    Consist has provided parol evidence in the form of two earlier contracts (DX-1, Tab 2) that Software AG signed with Consist's predecessor (PACS) and in each one a paragraph similar to the above paragraph was preceded by a sentence that reads:

SAGA reserves the right to terminate this Agreement should PACS fail to perform any of the stated conditions of this Agreement.

Consist has argued that the removal of the above sentence and the language "any termination of this Agreement" found in Paragraph 7 of the Agreement compels a reading of the Agreement

that only allows a party to end the Agreement upon both 18 months notice of non-renewal and detailed notice of a material breach.

22.     Software AG presented testimony concerning the removal of the above sentence from Paragraph 7, among other things, from the two individuals who negotiated the Agreement on behalf of SAGA, James H. Daly, General Counsel and Vice President International Operations and Neil Rothberg, Director of Business Management.  Consist presented testimony from its President, Natalio Fridman on this point.

23.     Neither Mr. Daly nor Mr. Rothberg have an association with SAGA any longer and I find their testimony to be credible in every respect.

24.     The testimony of Mr. Daly and Mr. Rothberg was persuasive regarding the intended effect of Paragraph 7 and the fact it was drafted to provide the parties a mutual right for termination as a result of an uncured material breach.

25.     Mr. Daly and Mr. Rothberg both testified that SAGA clearly expressed the intent to Mr. Fridman in negotiating the Agreement that the sentence in Paragraph 7 was removed only to make the express reservation of the right to terminate for material breach mutual, rather than reserving the right only to SAGA.   Daly ¶ 4, ¶¶ 37-39; Rothberg ¶¶ 39-42.

26.     Mr. Fridman never expressed that the removal of the first sentence of Paragraph 7 was to obtain an Agreement terminable only for material breach at the end of the 10 year term. *Id*.

27.     It is customary in software distribution agreements to include two ways to end a contract: (1) at the end of the contract term; and (2) if one  party fails to cure a material breach. Daly ¶ 42; Rothberg ¶ 46; Streibich ¶ 8; DX-38 MacSwain Report.

28.     Mr. Fridman never expressed that he intended to vary this custom by choosing certain phrases or language in the Agreement.  Daly ¶ 42; Rothberg ¶ 46.

29.    Nothing in the testimony established that the parties ever expressed that the omission of the first sentence of Paragraph 7 was intended to vary New York law that permits a party to terminate a contract for a material breach.  *Id.*

30.    Mr. Fridman initially requested a perpetual agreement and both Mr. Daly and Mr. Rothberg laughed at that proposal.  Daly ¶ 16; Rothberg ¶ 17.

31.    Mr. Daly testified that during negotiations over the Agreement he clearly rejected Consist's request for a perpetual term and Mr. Fridman's subsequent fall-back request for a term of 25 years.  Rather Mr. Daly expressed to Mr. Fridman that SAGA would only accept a clause where it could choose not to continue the distributorship at substantially shorter intervals than 25 years.  Daly ¶ 20-21; Rothberg ¶ 23.

32.    At the time of the negotiations over the Agreement, SAGA was in the process of preparing for an IPO and wanted to lock in a stable stream of revenue to enhance the value of the IPO.  SAGA was not willing to enter a perpetual agreement because that would not have benefited the IPO.  Daly ¶ 24.

33.    Mr. Daly sent a proposal to Mr. Fridman on August 4, 1997 (DX-26) repeating Consist's fall-back request for a 25 year term and including SAGA's counter-proposals.  One counter-proposal was SAGA's suggestion to chop up the 25 year term into 5 year terms, each with an exit provision on 18 months notice.  Daly ¶ 20-21; Rothberg ¶ 22-23; DX-26.

34.    The August 4, 1997 proposal expressed to Consist SAGA's intent with regard to Paragraph 1 and states on page two: "At the end of the first 5 years of the Agreement either party can terminate with 18 months notice."  DX-26 at SAG 003790, Item 4; Daly ¶ 20; Rothberg ¶ 23.

35.    Mr. Fridman had a strong negative reaction to chopping up the 25 year term at 5 year renewable increments to which Mr. Daly told Mr. Fridman that there were some things

which were just not going to be doable and that some of Mr. Fridman's demands could not be acceded to by SAGA. Daly ¶ 21.

36.    After SAGA rejected Consist's initial request for a perpetual agreement Mr. Fridman never expressed that the Agreement could only be terminated for cause. Daly ¶ 29; Rothberg ¶ 18.

37.    Mr. Fridman testified that in fact he hid his true intent from SAGA "for [a] purpose" both during the negotiations over the language in the Agreement and in the time period after Software AG's CEO told him that SAGA would not be renewing the Agreement as of January 1, 2008. *See* Nov. 5, 2007 Deposition of Natalio Fridman ("Fridman Depo.") at p. 76, ll. 3-25; p. 77, ll. 2-9; p. 150 ll. 5-13.

38.    Mr. Daly clearly expressed that with regard to Paragraph 1 there are points at eight-and-half years and thereafter at every five years where either party could give notice to the other party to end the Agreement without cause, without breach, without anything, for whatever reason. Daly ¶ 29.

39.    The Court finds that Consist did not express during the negotiations that the Agreement could only be terminated for cause because SAGA would not have accepted that language. SAGA repeatedly expressed its intent to Mr. Fridman not to accept a provision requiring both material breach and 18 months notice to end the relationship. Daly ¶ 44.

40.    The dropping of the first sentence in Paragraph 7 from earlier contracts to the Agreement does not support Consist's view that the Agreement may only be terminated upon 18 months notice and a material breach. The reading that Consist now gives to the Agreement was not one that was expressed during the negotiations nor is it clear on the face of the Agreement.

41.     Mr. Fridman's only expressed intent regarding the removal of the first sentence in Paragraph 7 was so that Consist would also have the express right to terminate for an uncured material breach.  Daly ¶¶ 37-41; Rothberg ¶¶ 38-41.

42.     The Software AG witnesses testified that they would also have never agreed to the language in Paragraph 7 if it was expressed by Consist that it required a material breach to end the Agreement because it would lead to illogical and absurd consequences contrary to reasonable business practices.  For example if a material breach were to occur on day one of the Agreement and if a party sent the 60 day notice letter and it went uncured, the non-breaching party would have to wait 10 years for the distributorship to end.  Daly ¶ 44; Streibich ¶ 19.  A delay of that length would create an unacceptable threat to the protectability of Software AG's intellectual property, which depends in good part upon the adherence of SAGA's distributors to their agreements.  Daly ¶ 44.

43.     The documentary evidence regarding negotiations over the final language found in the Agreement lends further support to the expressed intent that Paragraphs 1 and 7 provide separate and distinct mechanisms for ending the parties' relationship. DX-27.

44.     The Court credits Software AG's witnesses' testimony and evidence that shows, right after rejecting Mr. Fridman's request for a perpetual term, and his fall-back request for 25 years, SAGA proposed the Term of the Agreement as 10 years with automatic renewal "unless one of us chooses to terminate after 10 years and 18 months notice." DX-26; DX-27.

45.     The use of the word "chooses" in the proposal from SAGA conveyed that either party had the option to end the Agreement without the necessity of a material breach.  Daly ¶ 26.

46.     The final language in Paragraph 1 allowing either party to "decide" to terminate upon 18 months notice is consistent with SAGA's emphasis during negotiations that either party could "choose" not to renew and could end the relationship without the necessity of a material

breach.  SAGA testimony and documentary evidence demonstrates SAGA expressed this intent and that Software AG never budged from this position throughout the negotiations over the Agreement. Daly ¶ 26, ¶ 36; DX-26; DX-27; DX-28.

47.    The movement by Consist from a perpetual contract to a 25-year deal, down to a 10-year deal with an 18-month exit provision, particularly in view of Mr. Daly's and Mr. Rothberg's explanations to Mr. Fridman for SAGA's insistence on the shorter term, expressed the parties' intent to provide in Paragraph 1 of the Agreement that Paragraph 1 provided for ending the distributorship without the occurrence of material breach.  Daly ¶ 42; Rothberg ¶ 48.

48.    The parties did not intend that Paragraphs 1 and 7 of the Agreement be read together to require that non-renewal could be effected only if there was an uncured material breach.  Mr. Fridman never expressed at any time during the negotiations that his suggested language changes were meant to effectuate a reading of the Agreement that would permit a termination only upon the occurrence of event in both Paragraph 1 and 7.  Daly ¶ 41; Rothberg ¶ 41.

49.    The Cooperation Agreement between SAG and SAGA which predated the final Agreement and in which SAGA obtained the "perpetual irrevocable" rights to the Systems from SAG also demonstrates that the parties to this case did not intend to enter into a virtually perpetual Agreement terminable only for material breach and after a 10 year term.  If that were the case, the Agreement would contain similar language to the SAG/SAGA Cooperation Agreement but it does not.  Daly ¶ 48- 49 Rothberg ¶ 55-56.

50.    Consist's argument that the revision to ANNEX A to the Agreement providing that SAGA was the perpetual, exclusive distributor in the TERRITORY" for SAG products means that Consist too was a perpetual exclusive distributor under the Agreement is not

persuasive.  To the contrary there is nothing in the Agreement language that provides Consist is the perpetual distributor of the Systems. DX-30; Daly ¶ 45-47; Rothberg ¶ 50-53.

51.    To the extent there is any ambiguity in the language, Paragraph 7 should be read to mean that "Before any termination [*for material breach*] of this Agreement may occur…either party has to give the 60 days written, detailed notice…"  Rothberg ¶ 46; Daly ¶ 40.

**Consist's Breaches**

52.    In letters dated July 4, 2006; August 16, 2006; October 9, 2008 [sic]; and October 10, 2008 [sic] Software AG set forth detailed notice of numerous alleged material breaches of the Agreement by Consist.  Streibich ¶ 20; DX-165; DX-166; DX-55; DX-56.

53.    Software AG presented evidence on three separate material breaches committed by Consist, namely that Consist (i) failed to use all reasonable efforts to successfully market the Systems in the Territory; (ii) failed to make all reasonable efforts to market Special Products; and (iii) failed to truthfully state that Software AG was the owner of the trademarks for the Systems in applying for and obtaining a trademark registration within the Territory.

**The Failure to Make Reasonable Efforts in the Territory**

54.    Paragraph 5(3) of the Agreement requires Consist "to make all reasonable efforts to successfully market the SYSTEMS in the TERRITORY."

55.    Consist testified through Mr. Fridman that it had only one customer in Paraguay, one customer in Peru, and "nothing" of substance in Chile and Uruguay.  Nov. 5, 2007 Fridman Depo. at pp. 110-111.

56.    Software AG testified that its LATAM marketing group explored the market in South America and determined that Consist failed to exploit markets in the Territory other than Brazil and Argentina.  Streibich ¶ 23; DX-38: MacSwain Report.

57.    Software AG has successfully marketed in territories similar to Boliva, Paraguay, Peru, Chile and Uruguay.  *Id.*

58.    Consist was the exclusive distributor in the Territory for decades, and under the Agreement, for the past 10 years.

59.    Consist's efforts in the Territory as a whole do not satisfy the "all reasonable efforts" requirement under Paragraph 5(3) because the Systems shall be marketed in each country throughout the Territory, not just one or two.

60.    Software AG has presented undisputed and credible expert testimony on the South American market through a witness who is familiar with the Territory and the SAG Systems.  Mr. MacSwain testified that there was a market to exploit during the Term for the Systems.  Streibich ¶ 23-24; DX-38 MacSwain Report.

61.    Software AG notified Consist of this breach in its Counterclaims on September 21, 2007 and in the October 9, 2007 Default Notice. Counterclaim ¶ 138; DX-55.

62.    Consist has failed to cure the material breach in the 60 days from either of the above dates.

63.    Consist's failure to exploit the available market in the Territory as a whole constitutes an uncured material breach giving rise to an independent means for Software AG to terminate the Agreement under Paragraph 7.

**The Failure to Make All Reasonable Efforts to Sell Special Products**

64.    Paragraph 5(3) of the Agreement requires Consist "to make all reasonable efforts to successfully market the SYSTEMS", which specifically includes "Special Products" as listed in ANNEX B and updated from time to time at SAGA's option.  Paragraph 5(3) also requires that Consist "shall, at its expense, provide SAGA with a written quarterly report of all installations and de-installations of the Special Products" in the Territory.  Streibich ¶ 25-28.

65.     Mr. Fridman for Consist testified that in the 10 year Term of the Agreement it has never sold "any" Special Products. Fridman Depo at p. 46 ll. 23-25.

66.     SAGA sent updated lists of Special Products periodically to Consist. DX-18-23; Linda Kibblewhite Statement ("Kibblewhite"). Mr. Fridman expressed to SAGA (i) that he would not recognize any of the updated Special Products other than those listed on ANNEX B to the Agreement; and (ii) that his sales people would not have "any interest" in selling Special Products presumably because they did not make commissions on them. Kibblewhite ¶ 17; Nov. 5, 2007 Fridman Depo. at p. 68 ll. 6-16.

67.     Consist has neither sold Special Products in the Territory nor reported on any installations or de-installations of Special Products to SAGA. Kibblewhite ¶ 18.

68.     Consist's total failure to sell a single Special Product for the duration of the term is not "reasonable".

69.     Software AG presented both documentary evidence and unrebutted expert testimony that it has been successful in marketing Special Products throughout the world, DX-39, DX-40, DX-41, and that the market in South America is not demonstrably different from other countries with respect to these products. DX-38: MacSwain Report; Streibich ¶ 27.

70.     Software AG notified Consist in its September 21, 2007 Counterclaims and in the October 9, 2007 Default Notice of this alleged material breach.

71.     Consist has failed to cure in the 60 days since receipt of the Default Notice.

72.     Consist's failure to exploit the available market in the Territory for Special Products constitutes an uncured material breach giving rise to an independent means for Software AG to terminate the Agreement under Paragraph 7.

**The Failure to Protect Software AG's Intellectual Property**

73.    Paragraph 5(1) of the Agreement provides that Consist "acknowledges the SYSTEMS as trade secrets of SAGA…and undertakes to…protect the SYSTEMS as well as their copyrights and trademarks and to prevent them from unauthorized use."

74.    Consist applied for and received trademark registrations for the SYSTEMS in Brazil and had done so at the time of entering into the Agreement.  Software AG learned of this fact only recently and notified Consist on October 10, 2007.  Streibich ¶ 30; DX-56.

75.    Consist's statement that it owned the rights to the Systems is false.

76.    Consist failed to cure this false statement within the time provided after receiving the October 10, 2007 Default Notice.  Streibich ¶ 31.

77.    Consist breached Paragraph 5(1) of the Agreement and this provides a distinct means for Software AG to end the relationship under Paragraph 7 of the Agreement.

## CONCLUSIONS OF LAW

**Interpretation of the Agreement**

78.    The Agreement states that it is governed by New York law, and neither party has argued otherwise.  The court properly applies New York law.  *See Collins v. Harrison-Bode*, 303 F.2d 429, 433 n.1 (2d Cir. 2002).

79.    The question of whether a contract is ambiguous is a question of law.  *See Am. Bldg. Maint. Co. of N.Y. v. Acme Property Servs., Inc.*, 2007 U.S. Dist. LEXIS 64051 *22 (S.D.N.Y. Aug. 29, 2007), *citing South Road Assocs, LLC v. Int'l Bus. Machs. Corp.,* 4 N.Y.3d 272, 278, 826 N.E.2d 806, 793 N.Y.S.2d 835 (2005).  The court previously determined that the Agreement is ambiguous.

80.    Under New York law contractual interpretation is a question of fact when there is ambiguity on the face of a contract and the fact finder must determine what the parties' intent

was based on the credibility of extrinsic evidence or on a choice among reasonable inferences. *Am. Bldg. Maint. Co.*, 2007 U.S. Dist. LEXIS 64051 at *21, *citing Brinson v. Kulback's & Assoc.* 744 N.Y.S.2d 621, 623, 296 A.D.2d 850 (App. Div. 4th Dep't 2002). Having determined that the Agreement is ambiguous, the court considers extrinsic evidence of the parties' intent.

81.    Furthermore, the party who sues for enforcement of a contract in accordance with its own meaning bears the burden of proving (i) that the other party knew what the claimant's meaning was and (ii) that the claimant did not and had no reason to know that the other party gave the words a different meaning. *E&K Success Import Export Ltd. v. Geha GMBH*, 1985 U.S. Dist. LEXIS 12637 *5-7 (S.D.N.Y. Dec. 18, 1985); *Murphy v. Gutfreund, Schmeelk, et al.*, 583 F.Supp. 957, 961 (S.D.N.Y. 1984).

82.    Consist has sued for a declaration that the Agreement binds Software AG, at least for the next five years. Consist fails to bear its burden of proving that SAGA knew what Consist's meaning of Paragraphs 1 and 7 and that Consist did not and had no reason to know that SAGA gave those provisions a different meaning. The testimony of Consist's own President establishes that Consist knew and had reason to know of SAGA's interpretations and that SAGA had no reason to know of Consist's meaning.

83.    The court concludes that Consist understood or had reason to understand that SAGA gave these provisions a different meaning than the meaning Consist now indicates it intended.

84.    The court further concludes that SAGA neither knew nor had reason to know that Consist gave the provisions a different meaning than the meaning attached by SAGA.

85.    "It is the parties' 'intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour.'" *Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*,

2007 U.S. Dist. LEXIS 55855 (S.D.N.Y. July 31, 2007), *quoting New England Merch. Nat'l Bank v. Iran Power Gen. & Transmission Co.*, 502 F. Supp. 120, 127 (S.D.N.Y. 1980), *abrogated on other grounds*, 646 F.2d 779 (2d Cir. 1981).

86.    "When interpreting the meaning of a contract, it is the objective intent of the parties that controls.  The secret or subjective intent of the parties is irrelevant."  *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)(citations omitted).  *See also Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 301-02 (S.D.N.Y. 1997), *aff'd* 166 F.3d 1201 (2d Cir. 1998); *Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 U.S. Dist. LEXIS 55855 *37 (S.D.N.Y. July 31, 2007) ("Indeed, 'the subjective but unexpressed intentions of the parties [can not] be considered.'" *Id.*, *quoting Baum v. Rockland Cmty. Coll.*, 299 F. Supp.2d 172, 175 n.1 (S.D.N.Y. 2003)).  *See also Sally v. Sally*, 225 A.D.2d 816, 818, 638 N.Y.S.2d 832, 834 (3rd Dep't 1996).

87.    Accordingly, the court will examine the objective manifestations of the parties' intent at the time they entered the Agreement.

88.    Mr. Daly and Mr. Rothberg both testified that Consist initially requested that the Agreement be perpetual, but that on behalf of SAGA they refused.  They further testified that Consist then sought a term of 25 years, and SAGA again refused.  Ultimately, as reflected in the correspondence and the Agreement, the parties stipulated to an initial term of 10 years.  Consist did not meaningfully contest this evidence of the parties' expressions.

89.    Further both Paragraph 1 of the Agreement and Mr. Daly's August 21 letter indicate that termination, in the sense of non-renewal, at the end of the term was something that either party could "decide" or "choose" to bring about.  DX-1. Tab 1 at p. 1; DX -27.

90.    SAGA expressed the intent that the Agreement would have a fixed term and either party could end the relationship without cause at the end of a term under Paragraph 1.

These expressions further indicate that SAGA did not intend the Agreement to be perpetual or evergreen.

91.    Mr. Fridman of Consist on the other hand testified that he did not express Consist's intent that Paragraphs 1 and 7 were to be read together in order to require a material breach to end the Agreement.  Consist's unexpressed intentions have no relevance to the proper interpretation of the Agreement.

92.    Mr. Daly and Mr. Rothberg both testified that the first sentence of Paragraph 7 of the 1995 Agreement was removed from the Agreement because Consist expressed that it desired to make mutual the express right to terminate for material breach.

93.    There is no evidence that any party expressed that removal of the first sentence of the 1995 Agreement would make Paragraph 1 of the 1998 Agreement subject to the material breach provision of Paragraph 7.

94.    The court thus concludes that the intent of the parties in removing the first sentence of Paragraph 7 of the 1995 Agreement from Paragraph 7 of the Agreement was to make the right to terminate for breach expressly mutual and not to make Paragraph 1 subject to Paragraph 7.

95.    In short, SAGA expressed its intention that the Agreement would not be perpetual and that non-renewal under Paragraph 1 would not require a material breach as set forth in Paragraph 7.  In absence of any expressed intention to the contrary by Consist, SAGA's expressions of intent govern.

96.    The separation of the termination provisions in paragraph 1 and paragraph 7 supports interpretation of the termination requirements of paragraph 7 as applying only to termination under that paragraph, and not leapfrog fashion to the ability to terminate under paragraph 1.  *Revson v. Cinque & Cinque, P.C.,* 221 F.3d 59, 67 (2d Cir. 2000).  *See also*

*Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, 2007 U.S. Dist. LEXIS 55855 *38 (S.D.N.Y. July 31, 2007), *quoting  Reda v. Eastman Kodak Co., 233 A.D.2d 914, 914-15, 649 N.Y.S.2d 555, 557 (4th Dep't 1996)* ("[T]he court should give effect to the intent of the parties as revealed by the language and structure of the contract and should ascertain such intent by examining the document as a whole. Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms." (internal citations omitted)).

97.     Interpreting Paragraph 1 and Paragraph 7 as setting forth distinct and unrelated forms of termination best gives effect to the structure of the Agreement, as the provisions are separated by the bulk of the Agreement.

98.     Interpreting Paragraph 1 and Paragraph 7 as unrelated also gives meaning to every term of the Agreement.  The Agreement contains two separate paragraphs allowing the parties to end the Agreement.  Paragraph 1 requires 18 months notice, with no requirement of specificity. Paragraph 7 requires 60 days notice, but demands that notice be "detailed" to allow a breaching party the opportunity to cure.  To give effect to both of these notice requirements at wildly different locations in the document requires that the two provisions must be interpreted as separate forms of termination.

99.     Paragraph 1 uses the word "terminate" in the same sense as the phrase to end a contract "otherwise than for its breach."  *See* UCC § 2-106.

100.     Paragraph 7, on the other hand, uses the word "termination" in another sense: there, termination means ending a contract prematurely due to a material breach.  *See* Black's Law Dictionary (6th Ed. 1990), p. 147 (termination defined separately as ending without contract being broken, *citing* UCC § 2-106, or as exercise of remedy due to default of other party).

101.     Parties are deemed to contract with knowledge of the law.  *See Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384-85, 92 L. Ed. 10, 68 S. Ct. 1 (1947).  *See Norfolk & W. Ry.*

*Co. v. Am. Train Dispatchers' Ass'n,* 499 U.S. 117, 130, 113 L. Ed. 2d 95, 111 S. Ct. 1156 (1991) ("Laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms."); *Dolman v. U.S. Trust Co. of N.Y.,* 2 N.Y.2d 110, 138 N.E.2d 784, 787, 157 N.Y.S.2d 537 (N.Y. 1956) ("[U]nless a *contract* provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein.")(emphasis added); *Stahlex-Interhandel Trustee v. Western Union Fin. Servs. Eastern Europe Ltd.*, 279 F.Supp.2d 221, 226 (S.D.N.Y. 2003), *aff'd* 115 Fed. Appx. 462 (2d Cir. 2004) (*quoting Dolman, supra*).

102.    The law in force at the time of contracting may be varied only by an explicit statement in the contract.  *Pryor v. USX Corp.,* 806 F.Supp. 460, 469 (S.D.N.Y. 1992).  Where existing law can be read as internally consistent with the provisions of a contract, the contract should not be interpreted to contradict existing law.  *See id.* at 470.

103.    The common law of New York has long permitted a party to a contract to terminate the contract before the end of its term based upon the other party's uncured material breach, and New York law continues to do so.  *See Apex Pool Equipment Corp. v. Lee,* 419 F.2d 556, 562 (2d Cir. 1969), *quoting Emigrant Industrial Savings Bank v. Willow Builders, Inc.,* 290 N.Y. 133, 145, 48 N.E.2d 293, 299 (1943).  *See also Sinco, Inc. v. Metro-North Commuter R.R. Co.*, 133 F.Supp.2d 308, 311 (S.D.N.Y. 2001).

104.    The Agreement does not explicitly disclaim the common law right to terminate based upon uncured material breach.

105.    The Agreement is internally consistent with the common law right to terminate for uncured material breach by reading Paragraph 7 as providing a defined period for cure of a curable material breach and as separate from termination at the end of a term under Paragraph 1.

106.    It is immaterial that the Agreement did not include the first sentence of Paragraph 7 of the '95 Agreement that gave SAGA the affirmative right to terminate for material breach. New York law reads into the Agreement that provision, the inclusion of which does not create any inconsistency with the remainder of the Agreement. *See Pryor, supra,* 806 F.Supp. at 469 (where contract omitted form of delivery available under statute but did not explicitly reject statutory method, contract was interpreted as allowing method under statute).

107.    "[I]f the parties intend that the obligation be perpetual they must expressly say so." *See Boyle v. Readers' Subscription, Inc.*, 481 F. Supp. 156, 158 (S.D.N.Y. 1979). The Agreement contains no clear expression that it cannot be terminated except for material breach, so is intended to be essentially perpetual. In absence of such expression, the Agreement is terminable without cause under Paragraph 1.

108.    Furthermore, under New York law, where a contract's termination clause is silent on whether cause is required, the contract is terminable without cause. *See Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F.Supp. 347, 352 (S.D.N.Y. 1996). Paragraph 1 of the Agreement does not reference Paragraph 7; in fact, a reference to Paragraph 7 from Paragraph 1 of the 1995 Agreement was not included in the Agreement. Since the phrase "either party shall decide to terminate" in Paragraph 1 is silent concerning whether cause is required, it permits termination without cause.

109.    The reasonable expectations of the parties are a factor to be considered in addressing ambiguous language as a matter of law. Banks, *New York Constract Law* § 10.1. *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697 (2d Cir. 1998).

110.    The reasonable expectations of the parties, consistent with business realities and the course of negotiations between the parties, allow either party to terminate the Agreement at the end of the initial 10 year term without cause upon 18 months' notice.

111.    Reasonable expectations of the parties would also permit either party to terminate the Agreement upon reasonable notice – such as the 60 day period set forth in Paragraph 7 – based upon the other party's uncured material breach, in accordance with common law.

112.    Moreover, contracts are to be construed to avoid absurd results. *See Lee v. Marvel Enters., Inc.*, 386 F. Supp. 2d 235, 244 (S.D.N.Y. 2005). *See also C.P. Apparel Mfg. Corp. v. Microfibres, Inc.*, 210 F.Supp.2d 272, 275 (S.D.N.Y. 2000). Construing the Agreement in the manner urged by Consist would yield the absurd result that one party could materially breach the Agreement, but the other party could not terminate for up to ten years.

113.    It is appropriate to consider expert testimony of industry custom and usage to inform the interpretation of a contractual term. *See Lee, supra,* 386 F.Supp. at 245 n.5.

114.    Software AG's expert witness Mr. MacSwain testified on the basis of his experience with software distributorship agreements that it is customary in software distributorship agreements to have separate termination provisions for material breach and for termination without cause. He further testified that it is customary to provide a lengthy notice period of 12 months, or perhaps more, only for termination without cause. Mr. MacSwain's testimony is relevant to establish industry custom.

115.    Mr. Daly, who likewise has extensive experience with software distributorship agreements, testified to the same effect.

116.    The testimony of Mr. MacSwain and Mr. Daly establishes that interpretation of Paragraph 1 and Paragraph 7 as separate and unrelated provisions is in accord with industry custom and supports the conclusion that the parties intended them to be interpreted in that fashion.

117.    The Court finds *Apex Pool Equipment Corp. v. Lee,* 419 F.2d 556 (2d Cir. 1969), materially on point. As does the Agreement, the contract in *Apex Pool* had both an automatic

renewal clause and a termination for cause clause. It also provided in yet another clause that "In the event of termination by either party [for] *any* reason" the Distributor would not sell competing pools for two years. *Id* at 559 (emphasis added).

118.    Although Judge Feinberg recognized that the phrase "termination for any reason" was broad, he nevertheless held that giving notice of non-renewal was not a "termination". He reasoned that "it can be said that bringing the relation to an end would not be termination at all, *as the word is used in the contract,* unless it was for one of the enumerated reasons [of cause]." *Id* at 560 (emphasis in original).

119.    Similarly, either party "decid[ing] to terminate" at the end of a term under Paragraph 1 is not a termination at all for purposes of the "any termination" language in Paragraph 7 of the Agreement.

120.    Paragraph 1 is clear on its own and considered in the context of the Agreement. It permits either party to decide to terminate – or more specifically not renew – without cause at the end of a term simply by giving 18 months written notice.

121.    SAGA sent Consist notice more than 18 months in advance of the end of the Agreement's term that it will not renew the Agreement.

122.    SAGA has effectively ended the Agreement without cause under Paragraph 1 effective December 31, 2007.

123.    Paragraph 7 separately provides either party the option to terminate the Agreement upon 60 days notice for the other party's uncured material breach.

**Consist's Breaches: All Reasonable Efforts**

124.    Under New York law, a contract need not explicitly define "best efforts" for its "best efforts" provision to be enforceable. *See Bloor v. Falstaff Brewing Corp.,* 454 F. Supp. 258, 266-67 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609, 613 n.7, 614 (2d Cir. 1979).

125.    Whether or not an obligation to use best efforts or all reasonable efforts has been fulfilled is a question of fact for the court. *US Airways Group, Inc. v. British Airways PLC, et al*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997)

126.    "Best efforts" or "all reasonable efforts" clauses include a duty to expand the supplier's market share, to promote it vigorously, and not merely to keep it alive. *Joyce Beverages of NY v. Royal Crown Cola*, 555 F. Supp. 271, 276 (S.D.N.Y. 1983).

127.    Consist's efforts to sell products in nations in the Territory outside of Brazil and Argentina failed to meet the "all reasonable efforts requirement of the Agreement and constitute a material breach. *See Bloor,* 601 F.2d at 614.

128.    Consist's efforts to sell Special Products in the Territory failed to meet the "all reasonable efforts requirement of the Agreement and constitute a material breach. *See Bloor,* 601 F.2d at 614.

**Consist's Registration of Software AG Trademarks**

129.    Consist's registration of the trademarks for the terms NATURAL and ADABAS in Brazil without informing Software AG that it was doing so constitute a material breach of the Agreement.

130.    Consist's registration of the trademarks for the terms NATURAL and ADABAS in Brazil without informing Software AG that it was doing so and its subsequent equivocation regarding whether it would transfer such trademarks to Software AG constitute a breach of Consist's duties of good faith and fair dealing under the Agreement. *See U.S. Airways, supra*, 989 F.Supp. at 491 ("New York law implies duty of good faith and fair dealing in all contracts.").

**Notices**

131.    Strict compliance with the notice provisions of a contract is not required when the opposing party does not claim that they did not receive actual notice or that they were prejudiced as a result. *Suarez v. Ingalls*, 282 A.D.2d 599 (2d Dept. 2001); *Dellicarri v. Hirschfeld*, 210 A.D.2d 584, 585 (3d Dept. 1994)(failure to send notice by registered or certified mail did not render it ineffective).

132.    It is immaterial whether the notices sent by Software AG and its counsel dated March 30, 2006, April 6, 2006, July 4, 2006, September 16, 2006, October 9, 2007 and October 10, 2007 strictly complied with the notice provisions stated in the Agreement.

133.    The evidence is clear that Consist or its counsel seasonably received each of the notices.

134.    The April 6, 2006 notice of non-renewal sent by Software AG is effective to terminate the Agreement effective December 31, 2007, in accordance with the terms of the Agreement.

Dated: New York, New York
        December 3, 2007

BAKER & McKENZIE LLP

By:    */s James David Jacobs*
        James David Jacobs
        Frank M. Gasparo
        Marcella Ballard
        John A. Basinger*
        1114 Avenue of the Americas
        New York, New York 10036
        (212) 626-4100
        Attorneys for Defendant/Counter-Plaintiff
        Software AG, Inc. and Defendant Software
        AG

        *Admitted pro hac vice*