DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Consist Software Solutions, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CONSIST SOFTWARE SOLUTIONS, INC.,      :
f/k/a CONSIST INTERNATIONAL, INC.,      :
     :     07 CV 7047 (CM) (FM)
            Plaintiff,      :
    -against-      :     STATEMENT OF
     :     DIRECT TESTIMONY OF
SOFTWARE AG, INC. and SOFTWARE AG,      :     NATALIO S. FRIDMAN
     :
            Defendants.      :
------------------------------------------------------------------x

Pursuant to the Court's September 26, 2007 Scheduling Order and Rule I of the Court's

Individual Practices, plaintiff submits the following as its narrative statement of the direct

testimony of Natalio S. Fridman:

A.     Background

1.      I am the President of Consist Software Solutions, Inc. f/k/a Consist International,

Inc. which, with its affiliate companies (together referred to as "Consist"), provides technology

products for development and integration of financial applications, business management and

mission-critical solutions. Consist also provides consulting services to commercial, public

sector, and multinational organizations, and business solutions developed mostly with Software

AG ("SAG") proprietary language primarily in our Territory in South America. Consist is a

corporation organized and existing under the laws of the State of Delaware, with its principal

place of business in Delaware.  It maintains a New York office at 10 East 53rd Street, New York, New York, 10022.

2.      Although I have lived in the United States for many years, I grew up in Argentina where I studied engineering.  In 1972, I started Consist which initially did business in only Brazil and later in Argentina.  Consist started with me, and today has over eight-hundred employees in South America.  While Consist does business in other countries, most of our business continues to be in Brazil and Argentina.

3.      Consist specializes in supporting large-scale organizations in the financial sector, governmental agencies, public utilities, and leading industrial and commercial groups which need data management systems to handle enormous amounts of information.  Consist sells technology to a specific and distinct market – large organizations that have a need for complex systems developed for their particular needs.  Once an organization has invested in a technology that includes a proprietary programming language, such as SAG's Natural, it has made a commitment of cost and resources that makes converting to another technology unlikely.

4.      For the past 32 years, Consist has been the exclusive distributor of technology developed by SAG.  The territory in which Consist was appointed the exclusive distributor of SAG technology initially included only Brazil.  (PX 111.[1])  It was subsequently expanded to cover other countries in South America and today includes, in addition to Brazil, Argentina, Bolivia, Chile, Paraguay, Peru, and Uruguay (the "Territory").  (PX 1 at p.1.)  However, Brazil has by far the largest market for software technology in South America, and it remains the country in which Consist does most of its business.

---

[1]      All references to Consist's trial exhibits are noted parenthetically in the text as follows: "PX __."

5.      Over the years, Consist's rights and obligations as an exclusive distributor of

SAG technology have been memorialized in a series of distributorship agreements. (See, e.g.,

PX 1, 2, 18, 60, 105, 106, 108, 111-114.) The current agreement became effective January 1,

1998 (the "Agreement"). The parties to the Agreement are Consist and Software AG, Inc.

("SAGA").[2] At the time the Agreement was signed, SAGA was an independent company and

was itself an exclusive distributor of SAG technology. Since 2000, SAGA has been a wholly-

owned subsidiary of SAG. SAG was not a party to the Agreement and did not participate in its

negotiation.

B.      The Negotiations Leading Up to the Agreement

6.      The distributorship agreement that preceded the Agreement was dated as of

January 1, 1995 (the "1995 Agreement"). (PX 2.) It had a fixed term: January 1, 1995 through

December 31, 1997. (Id. at ¶ 1.) But it provided that, "[d]uring the third year (1997) of this term

the parties agree to negotiate, in good faith, a new agreement." (Ibid.) Based on this provision,

in the second half of 1997, I began negotiating a new exclusive distributorship with James Daly

("Daly"), who was then SAGA's General Counsel and Vice President for International

Operations.

7.      At the outset of our negotiations, I told Daly that, after 22 years as the exclusive

distributor of SAG technologies in the Territory, I was no longer happy with some of the terms

that had been in our prior distributorship agreements. Specifically, I did not want to have to

negotiate new distributorship agreements every few years. While a short-term agreement may

have been appropriate before Consist had an established track record as a distributor, Consist had

---

[2]      SAG and SAGA are together referred to as "Defendants."

been selling SAG technologies in South America for more than two decades and had been highly successful.

8.      I also explained to Daly that, as long as the distributorship agreement was for a fixed term and did not have to be renewed by SAGA, Consist was at SAGA's mercy: SAGA could end the relationship and walk away with our business because the agreements had required Consist to provide reports identifying our customers and the terms of our contacts with our customers. After building up the market for SAG technologies in South America, I did not think Consist should be exposed to the risk that SAGA would try to cut us out and appropriate our customer base for itself. I therefore told Daly that there were two things Consist had to have in the new distributorship agreement: the agreement had to be perpetual and it could not require Consist to report customer identities or contract terms.

9.      Following my initial discussion with Daly, he sent me a proposal for a new distributorship agreement dated August 4, 1997. (PX 40.) Daly's cover letter said that he had attempted "to incorporate the ideas from our last meeting in New York." (Ibid. at SAG 3788.) Although SAGA still sought to have Consist report on its customer base, SAGA did accept another proposal that I made. Instead of paying SAGA a royalty based on Consist's sales, as Consist had done in the past, SAGA's proposal called for a fixed payment with a base-year amount that was to be adjusted annually based upon the increase or decrease in SAGA's own audited product/license revenue in its own territory. This meant that SAGA would be paid based on its own success in selling SAG technologies in the United States. If Consist's sales failed to keep pace with SAGA's, Consist would still have to pay according to the success of SAGA.

10.      In response to my other demand – that the new agreement be perpetual – SAGA's proposal included a 25-year term. (PX 40 at SAG 3789.) But the proposal also stated that, "[a]t

the end of the first 5 Years of this Agreement either party can Terminate this Agreement with 18 months notice." (PX 40 at SAG 3790.) I told Daly that this aspect of SAGA's proposal was completely unacceptable because the new agreement would have to be a long-term one that automatically renewed, and one that the parties could not terminate at will for no cause.

11.     On August 21, 1997, Daly sent me a draft agreement. (PX 41.) Although the draft no longer provided that SAG could terminate Consist's distributorship on 18 months' notice at the end of the first five years, as the earlier proposal had, Daly had revised it to provide that: "The Initial Term during which SAGA can not terminate this Agreement is set to ten (10) years with automatic renewal for five (5) years, unless one of us chooses to terminate after 10 years and 18 months notice." (PX 41 at CSS 54.) Daly stated in the cover letter that accompanied the draft that "SAGA is ready to execute this deal" and that he would send me a signed copy if I gave him my approval. (PX 41 at CSS 55.)

12.     Not only did the draft give SAGA the right to terminate the distributorship at the end of ten years, it also still required Consist to account to SAGA for all installations and de-installations of SAG products and Special Products within the Territory (PX 41 at CSS 56, 58), as had the 1995 Agreement (PX 2 at ¶ 5(3)). Under the terms of the 1995 Agreement, as well as the August 21 draft, Special Products are defined as those for which SAG itself pays royalties. The draft contained other terms that were unacceptable to Consist because Daly had used the 1995 Agreement as a template and picked up terms to which Consist continued to object. For example, Paragraph 8 of the draft was substantially the same as Paragraph 7 of the 1995 Agreement. (Compare PX 2 and PX 41.) It stated:

> SAGA reserves the right to terminate this Agreement
> should PACS [now Consist] fail to perform any material condition
> of this Agreement.

> Before any such termination shall become effective, SAGA shall give written notice to PACS describing in detail what material conditions PACS has failed to perform, and PACS shall have sixty (60) days in which to perform such conditions.

(PX 41 at CSS 60.)

13.    Essentially the same language had appeared in the distributorship agreement in effect from January 1, 1991 through December 31, 1994.  (PX 60.)

14.    After reviewing the draft, I told Daly that Consist would not sign it because its term was unacceptable, it could be terminated in two ways and because it continued to impose reporting obligations on Consist.  The draft would have allowed SAGA to terminate the distributorship agreement two ways:  (a) SAGA could give Consist notice of termination 18 months prior to the tenth anniversary of the agreement (PX 41, CSS 00056) or (b) it could terminate at any time if Consist failed to cure a material breach 60 days after receiving notice of the breach. (Id., at CSS 000060).

C.    The Agreement

15.    Following our conversation, Daly made further revisions.  Since Daly is a lawyer – he was also SAGA's General Counsel throughout – and I am not, Daly did all of the drafting and supplied all of the language in the Agreement; I only reviewed the proposals and drafts Daly prepared, and told him whether they were acceptable.

16.    On September 9, 1997, Daly sent me the revised agreement which he had already signed on behalf of SAGA.  (PX 42.)  The Agreement changed the draft in a number of key respects.  First – and most importantly from my point of view – in response to my continued insistence on a perpetual contract, Daly deleted the entire first sentence in Paragraph 8 of the August 21 proposal (which became Paragraph 7 of the Agreement ) which had provided that SAGA reserved the right to terminate the Agreement at any time if Consist failed to perform a

material condition, after 60 days' notice and failure to cure. (PX 42 at CSS 000087). It also changed the sole remaining sentence in Paragraph 7 so that it now provided that, before "any" termination of the Agreement could be effective, there would have to be a notice of which material condition had not been performed and an opportunity to cure. The prior proposal had referred to "any such" termination – clearly referencing a termination for failure to perform "any material condition." Finally, and clearly referencing the termination set forth in Paragraph 1, which was available to both parties of the Agreement, Paragraph 7 too was made mutual. That is, whereas Paragraph 8 of the August 21 proposal gave only SAGA a right to terminate for failure to perform material conditions after notice and failure to cure, Paragraph 7 of the Agreement was made available to both parties, just like Paragraph 1's 18 month termination provision was.

17.     As a businessman, I regarded these changes as responsive to my demand that the Agreement be perpetual. Since the only place "termination" was mentioned in the Agreement was in Paragraph 1, I understood "any termination" in Paragraph 7 to mean a termination of the Agreement under Paragraph 1, which could not occur unless the requisite notice were given 18 months prior to December 31, 2007. Thus, SAGA could only terminate the Agreement if it gave Consist notice 18 months before December 31, 2007 and specified a material breach which Consist had failed to cure within 60 days. This language satisfied my demand for a perpetual agreement because I believed that, as long as Consist performed under the Agreement – or cured any breach within 60 days of receiving an appropriate notice – SAGA could not terminate. Moreover, I believed that, although the agreement could not be terminated, other remedies were available to the party claiming the default. For example, Consist could go to court to force SAGA to perform its obligations so long as Consist paid its obligations to SAGA or into the

7

court. Conversely, SAGA could force Consist to perform its obligations if Consist had breached. In short, my understanding from my dealings with Daly is that the changes he made to Paragraph 7 of the Agreement from Paragraph 8 of the August 21 proposal clearly intended to make the procedure in Paragraph 7 applicable to Paragraph 1, which stood alone as the only "termination" event set forth in the Agreement.

18.    Had the document that Daly sent me on September 9, 1997 continued to include a sentence stating that SAGA reserved the right to terminate if Consist failed to perform a material condition, and had the phrase "such termination" in the following sentence of Paragraph 8 of the draft (PX 41 at CSS 60) not been replaced in Paragraph 7 of the Agreement with the phrase "any termination" (PX 42 at CSS 87), I would not have signed the Agreement. I did not tell Daly how to word the Agreement; I simply continued to negotiate for a perpetual agreement. If Daly was not trying to satisfy my demand for a perpetual agreement, I do not know why he would have deleted the provision that "SAGA reserves the right to terminate this Agreement should [Consist] fail to perform any material condition of this Agreement" or changed "such termination" to "any termination." Plainly put, the wording of the August 21 proposal, which Daly changed in the September 9 proposal that became the Agreement, had unquestionably provided for the interpretation that SAG here urges, and that proposal was intentionally and affirmatively changed by SAGA in response to Consist's position.

19.    The other change that Daly made in the Agreement was that he eliminated Consist's reporting obligation for SAG products, while maintaining the obligation to report only on Special Products. (PX 1 at ¶ 5(3).[3]) This was acceptable to Consist, because unlike SAG

---

[3]    At the time the Agreement was signed, there were only two Special Products and, with respect to those products, we agreed to work out the reporting requirements in the future. (PX 1 at ¶ 5(3).)

products covered by Annex A, SAGA itself had to pay royalties to third parties on these products. (See First WHEREAS clause of PX 42).

20.     When Daly conveyed the signed proposal to me, I believed that I now had what was in effect a perpetual agreement. Because of that, Consist insisted on an additional change – this one to the wording of Annex A of the Agreement. In this Annex, I requested that SAGA state that it, too, was able to agree to an Agreement which granted Consist the right to distribute and license SAG's products in the Territory. On September 18, 1997 Daly sent me a revision to Annex A and told me that, if Consist, agreed, I should initial all pages, and execute and return the signature pages. The revision to Annex A states: "SAGA is the perpetual, exclusive distributor in the TERRITORY for all of the products of Software AG of Darmstadt, Germany." (PX 44). This statement gave Consist the assurance that SAGA had the ability to enter into the 1998 Agreement, which I viewed as perpetual and terminable only at specific identified times for material, uncured failure to perform.

21.     I signed the Agreement only because Daly made these changes. Daly was the only person at SAGA with whom I spoke in the course of negotiating the Agreement.

22.     Consist had not set September as the deadline for signing the Agreement. (Although Consist was interested in concluding a new Agreement promptly, the timetable for completing the Agreement was set by SAGA.) I would have continued negotiating with Daly had I not believed that the changes he made were intended to give – and gave – Consist the two things I told Daly that Consist had to have in a new agreement: a perpetual term and no reporting with respect to SAG products. The reason for the timing and course of the drafting process became clear to me shortly after I signed the Agreement. Although I did not know it at

the time, while Daly and I were negotiating the Agreement, SAGA, which had been a privately-held corporation, was in the process of making an initial public offering.

D.    The New Management Team at SAG

23.    In late 2003, Karl-Heinz Streibich ("Streibich") became the Chief Executive Officer of SAG. Since Streibich did not arrive at SAG until 2003, he had nothing to do with the Agreement or its negotiation. In fact, SAG itself was not involved in the negotiations, since SAGA was an independent company at the time and only became a wholly-owned subsidiary of SAG in 2000.

24.    In May 2005, Streibich told me that SAG was no longer interested in having exclusive distributors and accordingly was planning to terminate the Agreement as of December 31, 2007. At that time, I did not explain that Consist's Agreement was an evergreen one, nor did I say anything to suggest that I did not believe the Agreement to be a perpetual contract. The last thing I wanted to do was tell Streibich something that would precipitate the filing of a pretextual notice of breach under Paragraph 7 of the Agreement, as later happened once Consist's views became known to SAGA and SAG. While I proposed to Streibich on September 30, 2005 that Consist and SAG enter into a new agreement with similar terms to our current contract to be effective January 1, 2008 (PX 29), I did so in an effort to continue, without acrimony, Consist's longstanding and mutually beneficial distributorship relationship with SAG.

25.    Put differently, I am a businessman who is interested in long-term good relations with my vendor. If my vendor is unhappy with our arrangement, I as a businessman would be willing to negotiate an adjustment to the terms of our relationship. This typically entails increasing the money that the vendor receives. However, it soon became clear to me that SAG would insist on a fundamentally different relationship between us, rather than a simple increase

in money. Such a radical change was not something I was willing to accept. Nonetheless, throughout the course of discussions with SAG concerning our relationship after December 31, 2007, I hoped that we would be able to negotiate an arrangement and would not find ourselves in litigation over the meaning of the Agreement.

E.    The Agreement Has Been Renewed

26.    When I signed the Agreement, I believed that it ran for an initial term of ten years and would automatically be renewed by the parties for successive five year terms unless either party sent an appropriate notice of termination – meaning one that identified an uncured material failure to perform – at least 18 months in advance of the renewal date. The first automatic renewal date for the Agreement is January 1, 2008.

27.    The Agreement specifies how to effectuate a termination pursuant to Paragraph 1. (PX 1.) As Daly drafted it, Paragraph 7 of the Agreement states that before "any termination" is effective, the terminating party must have given the other party a detailed written notice of the material conditions it has allegedly failed to perform. The non-terminating party then had a 60-day period in which it must perform the identified conditions or risk termination pursuant to Paragraph 1. Critically, however, the failure to perform the identified conditions does not give rise to an immediately exercisable right to terminate the Agreement; that could occur only on the dates specified in Paragraph 1 of the Agreement and upon meeting the requirements set forth there and in Paragraph 7.

28.    At no point prior to June 30, 2006, which was 18 months prior to the effective renewal date (December 31, 2007), did SAGA ever provide Consist with written notice, detailed or otherwise, of any material conditions that Consist had allegedly failed to perform, as Paragraph 7 of the Agreement explicitly requires. Rather than provide the requisite notice,

SAGA sent a purported notice of termination that failed to set forth any allegations as to what material conditions Consist was supposedly failing, or had failed, to perform that would provide the necessary basis for termination on December 31, 2007.

29.    Thus, on March 30, 2006, SAG sent a letter to Consist stating that it had instructed SAGA to give notice of termination of the Agreement effective December 31, 2007. (See PX 3). On April 6, 2006, SAGA sent notice to Consist purporting to terminate the contract as of December 31, 2007. (See PX 4). However, neither SAGA nor SAG provided Consist with a notice describing in detail what material conditions Consist allegedly failed to perform, as required by Paragraph 7 – there were none in any event – nor did they provide Consist with 60 days to perform any such conditions. Because SAGA's purported notice of termination failed to do what the Agreement plainly requires, it was defective and ineffective under the Agreement. As a result, the Agreement was automatically renewed, pursuant to Paragraph 1, for a five year term commencing on January 1, 2008.

30.    It was not until July 4, 2006 that either SAG or SAGA ever even purported to claim that Consist had failed to fulfill its obligations under the Agreement. (See PX 5). Between January 1, 1998, when the Agreement went into effect, and July 4, 2006 – a period of eight and one-half years – they never claimed that Consist had failed to perform a material condition of the Agreement. By the time SAG for the first time claimed on July 4, 2006 that Consist had breached the Agreement, less than 18 months remained until December 31, 2007. Defendants thus did not give Consist notice that it had breached the Agreement at least 18 months prior to December 31, 2007 and, even then, they did not contend that Consist had breached a material condition of the Agreement which it had 60 days to cure.

31.    On July 4, 2006, Streibich sent me an e-mail (the "July 4 E-mail") in which he asserted that Consist had breached the Agreement. The July 4 E-mail was sent by Streibich, SAG's CEO, not by SAGA – in contrast to the purported letter of termination that SAG obviously recognized SAGA, and not SAG, must send – and was sent in a manner which is not an authorized method under the Agreement. It did not state "in detail" what condition of the Agreement Consist supposedly was not performing, or in what way, nor did it give any indication that it purported to be a "notice" under the Agreement, let alone a notice of termination. Even if the July 4 E-mail were proper and sufficient notice pursuant to Paragraph 7 of the Agreement – which it was not – it was untimely because it was not given together with SAGA's April 6 putative notice of termination. In fact, it was not even given at least 18 months before the December 31, 2007 putative termination date. In any event, to the extent the July 4 E-mail purported to use as a basis for terminating the Agreement a supposed failure by Consist to use "all reasonable efforts" to successfully market SAGA products, it rested on a false premise, as set forth at length below.

F.    Consist Never Received Proper Notice that It Failed to Perform a Material Condition Under the Agreement, Was Not Given an Opportunity to Cure and Did Not Breach the Agreement.

(1)    The July 4 E-mail

32.    When SAG for the first time claimed on July 4, 2006 that Consist had breached the Agreement, the claim appears to have been made for retaliatory purposes, and not because SAG or SAGA actually had a basis to believe that Consist had committed a breach which they wanted Consist to cure. In June 2006, I had complained to Streibich that SAG was actively attempting to sell its software products in Chile in violation of Consist's exclusive rights under the Agreement. (See PX 13.) Streibich responded to my legitimate complaint in the July 4 E-

mail. (PX 5.) The subject line of Streibich's e-mail, which Defendants now claim was intended

as a Notice of Termination under Paragraph 7 of the Agreement, is "Cooperation Agreement."

33.    The July 4 E-mail does not purport to be a termination notice under the

Agreement; it does not refer to Paragraph 7 of the Agreement, nor does it state that Consist has

60 days to cure or SAG will seek to terminate the Agreement. Paragraph 7 of the Agreement

provides:

> Before any termination of this Agreement shall become
> effective, the terminating party shall give written notice to the
> other party <u>describing in detail what material conditions the other
> party has failed to perform</u>, and the other party shall have sixty
> (60) days in which to perform such conditions.

(Emphasis added.)

34.    To the extent that the July 4 E-mail mentions anything that Consist supposedly

did or failed to do under the Agreement, it states only:

> We consider the none [sic] utilized market potential for our
> products in your territory, especially in Paraguay, Peru, Argentina,
> Bolivia, Chile, Uruguay, as a breech [sic] of our contract.

35.    Consist has no reason to think that the July 4 E-mail was intended as a Notice of

Termination under Paragraph 7 of the Agreement, and it properly regarded Streibich's complaint

about Consist's performance as baseless.

36.    Paragraph 8 of the Agreement states that "[a]ll legal notices hereunder shall be in

writing and shall be deemed properly delivered and effective when duly sent by Certified Mail,

Postage Prepaid, telex or cable, or delivered by hand" to Consist at 10 East 53rd Street, New

York. The July 4 E-mail was sent to me by e-mail, which is not an authorized method for

transmitting legal notices under the Agreement. Streibich himself had no right to send Consist a

notice under the Agreement. He is not an officer of SAGA, and SAG, the company of which

Streibich is Chief Executive Officer, is not a party to the Agreement.

37.    The statement about Consist's performance that Streibich made in the July 4 E-mail had no factual basis.  Indeed, it does not appear that even Streibich believed what he wrote.  In a letter that Streibich sent me earlier this year, he praised Consist, saying that it "has made an excellent job in Brazil with Software AG products, probably better than any other Software AG country.  My personal admiration to you Natalio for this success."  (PX 117; see also PX 10.)

38.    The Agreement did not require Consist to tap undeveloped markets for Software AG's products.  Rather, Paragraph 5(3) of the Agreement provides that "CONSIST agrees to make all reasonable efforts to successfully market the SYSTEMS in the TERRITORY."  (PX 1 at ¶ 5(3).)  The Territory includes seven different countries with varying markets for the kinds of products Software AG sells, which are targeted at governmental agencies and large companies with mainframe computers.  The Agreement does not define the Territory as each individual country within the Territory, as Defendants seem to claim, but rather as the collective of seven countries.  The Agreement nowhere requires success at any particular level within any particular country in the Territory, nor does it require that Consist have a presence in each country – even though Consist has a presence in each and maintains websites for each country.  (PX 1.)

39.    The Agreement provides that Consist has to "make all reasonable efforts to successfully market" Defendants' products.  (PX 1 at ¶5(3).)  It does not define "reasonable efforts."  The test of what constitutes "reasonable efforts" should be determined by what reasonable business people would do under the circumstances, taking into account the size of the market and likely return.  By any measure, Consist has more than satisfied this standard of reasonableness.

40.    The demand for computer software is very different from country to country within the Territory.  The computer software market in Brazil is many times the size of the

market in any of the other countries in the Territory. As SAG itself wrote in a press release that pre-dated the July 4 E-mail by just two months, "[t]he largest and most important market on the continent is Brazil . . . ." (PX 93.) No one can seriously contend that it was unreasonable for Consist to focus on Brazil and Argentina. In marketing Defendants' products, Consist was aware of – and relied on – industry studies which show that, in 2006, Brazil alone accounted for more than 77% of the market in the Territory and, together with Argentina, accounted for nearly 90% of the Territory. (PX 116.)

41.    Defendants did not suddenly discover in July 2006 that Consist was doing most of its business in the two countries within the Territory with the largest market for computer software. Consist had by then distributed SAG's technologies for more than thirty years. For as long as Consist has done so, we have marketed the products based on the same common sense business practices that we are still following. Thus, Consist has offices in 18 cities in Brazil alone and another three offices in Argentina. Consist also maintains local companies in Chile, Uruguay, Paraguay and Bolivia, and has a presence in Peru, which are far smaller markets than Brazil and Argentina.

42.    It is, of course, in Consist's financial self-interest to maximize sales of SAG's products. If Consist believed it could do more business in other parts of the Territory, it would do so. But there are a limited number of new customers for the kind of technology Consist sells, and few of those customers are located outside Brazil and Argentina.

43.    While the Agreement could have established revenue or other benchmarks for each country in the Territory, it does not.[4] Instead, it requires only that Consist make "all

---

[4]    An earlier distribution agreement with SAGA imposed certain revenue thresholds for Chile. (PX 2 at ¶ 1.) The Agreement establishes no such thresholds.

reasonable efforts to successfully market the SYSTEMS in the Territory." (PX 1 ¶ 5(3); emphasis added.) Consist has done so by making marketing efforts commensurate with the likely return. Accordingly, it has used all <u>reasonable</u> efforts to successfully market the Systems in the Territory as a whole.

     (2)    <u>The August 16 Letter</u>

     44.    Following Consist's receipt of the July 4 E-mail, our attorneys sent two letters to SAG and SAGA in which our attorneys stated that the July 4 E-mail was improper and insufficient. (PX 6; <u>see also</u> PX 7.) In response, Baker & McKenzie, on behalf of SAG and SAGA, sent our outside counsel a letter on August 16, 2006 (the "August 16 Letter") which retroactively characterized Streibich's July 4 E-mail as a notice of material breach under Paragraph 7 of the Agreement, which had to be cured by September 3, 2006. (PX 8.)

     45.    Like the July 4 E-mail, the August 16 Letter was procedurally improper and substantively baseless. It was not sent to Consist at the address specified in Paragraph 8 of the Agreement; did not state "in detail what material conditions the other party has failed to perform," as required by Paragraph 7 of the Agreement; and made allegations which are demonstrably baseless.

     46.    In the August 16 Letter, Defendants' counsel made an after-the-fact attempt to turn the July 4 E-mail into a Notice of Termination under Paragraph 7 of the Agreement. To this end, the August 16 Letter states that Streibich's "letter <u>effectively</u> put your client on notice under Paragraph 7 of the Agreement that it was in material breach of the Agreement and that it had sixty days to cure the defaults therein detailed." (PX 8; emphasis added.) In addition to retroactively pronouncing the July 4 E-mail a Notice of Termination, the August 16 Letter asserts that Consist had breached other obligations which "include[d] the following": (a) the sale

of a competing product – Attunity.Connect – in violation of ¶ 5(11) of the Agreement; (b) the refusal to bid on Software products for a Chilean company – Cementos Bio Bio – in violation of ¶ 5(3) of the Agreement; (c) the failure to provide satisfactory technical support to two customers (HSBC and Pao De Acucar Group) in violation of ¶ 5(4) of the Agreement; and (d) the representation to ABN that the Agreement had been renewed which supposedly violated ¶ 5(3) of the Agreement and the implied covenant of good faith and fair dealing under New York law. (PX 8.)

47.    The four new alleged breaches in the August 16 Letter are all specious. Even if the claims had some basis in fact – which they do not – none would constitute a breach of a material condition of the Agreement.

48.    The first alleged breach – that Consist sold a Software product (Attunity.Connect) which competed with SAGA's products without SAGA's approval – is contradicted by documentary evidence. On January 10, 2002, an officer of SAGA notified Consist in writing that "the Attunity Connect product may be sold by Consist." (PX 11.)

49.    Defendants' counsel's next allegation – that Consist breached Paragraph 5(3) of the Agreement by refusing to bid on Software products for Cementos Bio Bio – is also baseless. Consist did not receive a request to bid from Cementos Bio Bio. The request to bid came from a branch of SAG Spain which was operating in Chile and wanted information for SAG to make a bid to this customer. Defendants' complaint appears to be that Consist did not submit a price that would have allowed the SAG branch in Chile to sell Defendants' product there in violation of the terms of the Agreement. Nothing in the Agreement required Consist to respond to such a request from a SAG branch to facilitate a bid to its own prospects or clients in violation of Consist's exclusive rights.

18

50.     The third allegation in the August 16 Letter was that Consist failed to provide satisfactory technical assistance and support to customers in the Territory, including HSBC and the Pao De Acucar Group.  Consist has no record of any complaints from either of these customers, and Defendants have never provided us with any evidence supporting this allegation. Pao De Acucar has been a Consist customer for nearly 20 years and it continues to be a Consist customer.  HSBC is the successor to a Consist customer, Bamerindus Bank.  Following HSBC's acquisition of Bamerindus Bank, HSBC started to adapt the software HSBC uses elsewhere, which is not based on SAG's technologies, for use in Brazil and thus did not renew the maintenance contract for SAG software for 2007.  While I have no reason to believe that either HSBC or Pao De Acucar Group ever complained about the level of technical assistance and support Consist provided – we have no record of this – even if they had, there is no evidence that they continued to complain after the August 16 Letter.

51.     Finally, Defendants assert in the August 16 Letter that Consist made a misrepresentation to ABN that the Agreement had been renewed for another five years. According to Defendants, this alleged representation violated Paragraphs 1 and 5(4) of the Agreement and the "covenant of good faith and fair dealing implied under New York law." Nothing in the Agreement bars Consist from sharing with its customers its views about the term of the Agreement.  For their part, Defendants have made repeated public statements that the Agreement will terminate on December 31, 2007, and in fact, opened a Brazilian office. (PX 10.)  There is no reason why such statements by Defendants are permitted, but comparable statements by Consist are not.  In any event, even if Consist had made a representation to ABN – and Consist is not aware that such a statement was made – it would not constitute a failure to perform any material condition of the Agreement.

52.     On September 11, 2006 Consist's counsel advised Defendants' counsel that
Consist did not believe the August 16 Letter was "adequate or timely for any purpose under the
Agreement, that the breaches are either factually or legally correct, are material to the Agreement
or are breaches of any sort thereunder." (PX 9.)

(3)     The October 9 and 10 Letters

53.     Defendants made no further complaints about Consist's performance under the
Agreement for more than a year.  Then, on October 9, 2007,[5] Defendants' counsel sent Consist's
counsel a new letter which purported to be a termination notice under the Agreement (the
"October 9 Letter").  (PX 124.)  By the time the October 9 Letter was sent, Consist had already
filed this action seeking, among other things, a declaration that Defendants could not terminate
the Agreement.

54.     One day after Defendants' counsel sent their October 9 Letter, they sent another
"notice" (the "October 10 Letter") which purported to provide "further" detail concerning two of
the defaults alleged in the October 9 Letter.[6]  (PX 125.)

55.     The October 9 and 10 Letters suffered from the same procedural and substantive
defects as the August 16 Letter:  they were not sent to Consist as required by Paragraph 8 of the
Agreement, did not describe in detail the material conditions that Consist supposedly failed to
perform, and were factually baseless.

56.     The October 9 Letter listed seven supposed breaches, four of which had never
been the subject of any notice in the nearly ten years between January 1, 1998 (when the

---

[5]     The letter that Defendants' counsel sent on October 9, 2007 is actually dated October 9,
2008.

[6]     The October 10 Letter is also dated 2008.

Agreement commenced) and October 2007 (when the notice was mailed to Consist's counsel at

an old address), and the three of which represented modifications of claims previously asserted

in the July 4 E-mail and August 16 Letter.

57.     The first claim in the October 9 Letter is that Consist breached Paragraph 5(1) of

the Agreement by failing to show SAG's authorship, copyright, and trademark in written

materials for marketing or support of the Systems.  On November 2, 2007, Consist responded to

this allegation, stating:

> a disclosure concerning copyrights and trademarks appears on the
> "legal" page of Consist's websites in the Territory.  Please inform
> us immediately if you do not believe that the website disclosure is
> sufficient, and, if so, in which specific ways.  As to user and
> technical manuals, Consist reproduces them precisely as Software
> AG provides them.

> (PX  19.)

58.     If Defendants were not satisfied with Consist's response to their claim, they said

nothing, as evidenced by the November 6, 2007 letter from Defendants' counsel to Consist's

counsel which failed to substantively respond to the November 2, 2007 letter, claiming that these

issues "are not suitable for debate by letter."  (See PX 129.)  Defendants thus prevented us from

taking further steps to cure and cannot complain.

59.     The next claim made in the October 9 Letter appears to be a variation of the claim

made in the July 4 E-mail.  Defendants now contend that Consist breached Paragraph 5(3) of the

Agreement by "fail[ing] to reasonably market the SYSTEMS in Chile, Bolivia, Paraguay,

Uruguay and Peru.  There are few if any Consist customers of Software AG technology in Chile,

Bolivia, Paraguay, Uruguay or Peru." (PX 124.)  In their reformulation of the allegation made in

the July 4 E-mail, Defendants eliminated the reference to Argentina, apparently because they

recognize that Consist has had success in marketing SAG products there.  For the same reasons

that Defendants' July 4 E-mail was factually baseless, their October 9 Letter is also baseless:
Consist's marketing efforts throughout the Territory have been reasonable. We asked
Defendants to provide us with evidence to the contrary so that we could investigate their breach
claim (PX 19), and they have not done so.

60.    Paragraph 3 of the October 9 Letter alleges that Consist breached Paragraph 5(3)
of the Agreement "by failing to make all reasonable efforts to market Special Products."
(PX 124.) After learning of this allegation which was first made in the October 9 Letter, I asked
Defendants to provide Consist with, among other things, an updated list of all Special Products
included under the Agreement, the international pricelist for these products, the marketing
materials for these products, the user, training, and technical manuals for these products, and the
latest version of the software. (PX 130.) Consist requested an updated list because of SAG's
recent acquisition of webMethods, Inc. The integration of webMethods into SAG would, in our
estimation, clearly result in a reformulation of the Special Products list, particularly because
many of the former Special Products would now become SAG's own products, and thus included
under Annex A of the Agreement and not Annex B governing Special Products. Without the
information we requested, Consist cannot sell Special Products; it does not even have Special
Products software to sell. In response to my request for information on Special Products, SAGA
stated on October 31, 2007 that they had forwarded it to their attorneys at Baker & McKenzie
and stated that "it would be best for our counsel and yours at Duane Morris discuss the request
and determine whether and how it can be fulfilled." (Ibid.) Consist's counsel also made
multiple requests that Defendants' counsel provide them with the same material. (PX 19 at p. 2,
PX 132). In fact, however, Baker & McKenzie responded to Consist's and our counsel's
requests by stating that "your requests for documents and other evidence are also improper; they

should be embedded in document requests or other discovery mechanisms in order that they are subject to established rules and future objections and rulings." (PX 129). Thus, Consist has been told by SAGA to address requests for business information to Baker & McKenzie through our counsel. Baker & McKenzie itself, on three occasions (August 16, 2006 and October 9 and 10, 2007) purported to send "default" letters as a business matter pursuant to the Agreement (i.e., not in this lawsuit), announcing that Consist has 60 days to cure; yet, when Consist and its counsel follow SAGA's direction, and request appropriate and necessary business information under the Agreement, Baker & McKenzie refuses to provide it other than within this lawsuit. Baker & McKenzie cannot both send default notices under an Agreement as a business matter and then refuse to respond in a business manner. To date, no updated Special Products list, with appropriate supporting material, has been provided to Consist. The last such list, dated March 2007, predated the webMethods acquisition. In any event, none of Consist's customers has, to date, purchased any Special Products.

61.     In Paragraph 4 of the October 9 Letter, Defendants complained that Consist breached Paragraph 5(3) of the Agreement "by failing to provide written quarterly reports of all installations and de-installations of Special Products." (PX 124.) This claim is baseless. As a factual matter, there have been no contracts for Special Products, and thus, nothing to report. The form that SAGA itself created for such reports requires reporting of contracts (PX 20) and there are none.

62.     Defendants do not have any basis for their allegation that Consist should have provided quarterly reports. Our counsel asked Defendants' counsel to let us know if Defendants were aware of any sales of Special Product by Consist. (PX 19 at p. 3.) To date, they have

identified none. Since Consist had nothing to report, it was not required to submit quarterly reports, and its failure to do so therefore cannot constitute a material breach of the Agreement.

63.    Paragraph 5 of the October 9 Letter is a new version of the claim in the August 16 Letter that Consist failed to provide satisfactory technical assistance and support to customers of SAGA products in the Territory, this time substituting HP in place of the two customers identified in the August 16 Letter. On November 2, 2007, Consist's counsel notified Defendants' counsel that HP was not a Consist customer in the Territory. (PX 19.) Consist's counsel further stated: "Please provide us with any further details concerning this claim and any other purported failure to provide the technical support that your clients are relying on in support of this assertion." (PX 19.) Without this information, if there had actually been any complaints about the technical support Consist provided, Consist would have been unable to address such complaints and could not cure. No information has been provided by Defendants.

64.    Paragraph 6 of the October 9 Letter repeats the claim made in the August 16 Letter that Consist breached Paragraph 5(11) of the Agreement by marketing Attunity – a product that Defendants claim competes with one of SAGA's products. Since Consist had previously pointed out to Defendants that it obtained SAGA's permission to sell Attunity, Defendants abandoned their claim that Consist was selling Attunity without their permission and replaced it with a new claim that SAG's approval was "hereby revoked." (PX 124.) Even though Consist was aware of nothing in the Agreement that authorized Defendants to revoke their prior authorization, our counsel informed Defendants' counsel that Consist would stop selling Attunity in the Territory. (PX 19.) Thus, if there had been a breach – and there was none – it was cured.

65.    Finally, in Paragraph 7 of the October 9 Letter, Defendants make another claim relating to SAG's copyrights and trademarks. They expanded on this claim in their October 10 Letter, where they allege that, in 1986, Consist applied for and was granted trademarks for ADABAS and Natural in Brazil. (PX 125.) The fact of the matter is that Consist did so with Defendants' knowledge, the trademarks have been a matter of public record for more than 20 years, and it was not until after Consist commenced this action that Defendants took any steps of their own to protect their intellectual property in the Territory. Put differently, SAG and SAGA themselves have done absolutely nothing to protect their own trademarks in the Territory for over 25 years. Their assertions concerning steps that Consist took or did not take to protect them are disingenuous in the extreme.

66.    Consist thus has not breached any material condition of the Agreement and, if it had, Defendants did not give Consist an opportunity to cure. Accordingly, Defendants cannot terminate the Agreement under any theory.

I hereby declare that the foregoing is true to the best of my knowledge and belief.

Dated: New York, New York
        December 3, 2007

_____
NATALIO S. FRIDMAN