DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Consist Software Solutions, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

CONSIST SOFTWARE SOLUTIONS, INC.,  :
f/k/a CONSIST INTERNATIONAL, INC.,  :
                                :  07 CV 7047 (CM) (FM)
                 Plaintiff,  :
    -against-  :  STATEMENT OF
                                  :  DIRECT TESTIMONY
SOFTWARE AG, INC. and SOFTWARE AG,  :  OF JAMES DALY
                                  :
               Defendants.  :

---------------------------------------------------------------------X

       Pursuant to the Court's September 26, 2007 Scheduling Order and Rule I of the Court's

Individual Practices, plaintiff submits the following as its narrative statement of the direct

testimony of James Daly, as excerpted from Mr. Daly's November 13, 2007 deposition in this

action:

| | | |
|---|---|---|
| [4:16] - [4:17] | 11/13/2007 | James Daly |

```
page 4
16    Q    And how many times have you been deposed?
17    A    Oh, I would say about three or four.
```

| | | |
|---|---|---|
| [5:1] - [5:17] | 11/13/2007 | James Daly |

```
page 5
1     Q    Okay.  Now, would you state your full
2  name and your address for the record, please.
3     A    Okay.  My full name is James Henry Daly,
4  D-A-L-Y, and my address is 2465 Centreville, that's
5  C-E-N-T-R-E-V-I-L-L-E, Road in Herndon, Virginia
6  20171.
7     Q    Thank you.
8          Now, have you done anything to prepare
9  for your deposition here today?
10    A    I had one meeting with Mr. Basinger a
11 week ago today, and other than that, I haven't done
12 anything.
13    Q    Did Mr. Basinger show you any documents?
14    A    Yes, we reviewed some letters --
```

```
15      Q    Okay.
16      A    -- between myself and Consist or
17   Mr. Fridman.
```

[6:15] - [6:17]          11/13/2007   James Daly

```
page 6
15      Q    What year did you get your JD degree --
16      A    '81.
17      Q    -- from George Mason?   1981?
18      A    1981, right.
```

[13:18] - [14:7]         11/13/2007   James Daly

```
page 13
18      Q    Okay.  And after you departed from MITRE
19   Corporation, what did you then do?
20      A    That's when I arrived at Software AG.   I
21   was at MITRE from around April of '88 through
22   almost the end of the year '91.
page 14
 1          The November, December time frame of '91
 2   I was called by Mr. King, the then president of
 3   Software AG North America, who asked me if I would
 4   come in on an hourly basis and help him out.   He
 5   had to just let his prior general counsel go,
 6   terminate him, so he asked me if I would come in on
 7   an hourly basis.
 8          Mr. King and I had worked together at the
 9   Martin Marietta Data Systems division, and he knew
10   my work very well and I knew him very well, so he
11   called me when he needed someone.
```

[14:12] - [18:17]        11/13/2007   James Daly

```
page 14
12      Q    And Mr. King asked you to come in on an
13   hourly basis to function as general counsel?
14      A    No.  They had some important transactions
15   in the works and they were lawyerless, so he asked
16   me if I would come in and just help out on a few
17   transactions.  So I came in and, on an hourly
18   basis, and worked on those transactions.  They were
19   either civilian contracts between nongovernmental
20   entities or they were government -- responses to
21   government requests for proposals or the filing of
22   government schedules.
page 15
 1          Martin Marietta had a, what's referred to
 2   as a schedule contract with the government, and
 3   that's where you have a permanent contract with the
 4   government and they -- the government can sort of
 5   buy from a menu.
 6          They had a number of these transactions
 7   in process when he was forced to let his prior
 8   general counsel go, and so he asked me to come in
 9   and help on those, get them finished up, completed,
10   concluded, whatever the proper term is.
11      Q    Well, is it fair to say that your job
12   there at that point was contract negotiation and
13   drafting?
14      A    Yes, that was -- that was most of it,
15   yes.
16      Q    Okay.  And the company that you were
17   actually asked to come in to work for was Software
18   AG North America; is that right?
19      A    Right, Software AG of North America, Inc.
20      Q    Now, what was the legal status of
21   Software AG North America at that point?  Was it an
22   independent company or was it a subsidiary of
page 16
```

2

1  another company?
2      A    No, it was -- it was an independent
3  company.
4      Q    Okay.
5      A    It was at that time a Virginia
6  corporation and it had the exclusive
7  distributorship in its territories for these
8  Software AG products from the owner of those
9  products, Software AG of Darmstadt, Germany.
10     Q    And the exclusive distributorship that
11 Software AG of North America held comprised which
12 territories to your recollection?
13     A    Okay.  It consisted of all of North
14 America, so Canada, the U.S., Mexico, all of
15 Central America and all of South America.  It
16 included territories in the Far East, so it
17 included Japan, and it included in the Mid East
18 just Israel.  Due to the politics, you either
19 worked with the Israelis or you worked with the
20 others, but you didn't work with both.  So the U.S.
21 was responsible just for Israel.  And then in
22 addition to Japan, in Asia we had the
page 17
1  responsibility for the Philippines, for
2  Singapore -- of course at that time Hong Kong was a
3  British colony -- Hong Kong, Malaysia, and I think
4  I've -- oh, and Australia, of course, the
5  Australia/New Zealand territory.
6      Q    Okay.  And at that time when you were
7  first employed by Software AG North America, did
8  you learn that Software AG North America had given
9  or assigned exclusive distributorships to other
10 companies with respect to certain segments of its
11 territory?
12     A    When I first came to Software AG as an
13 employee, which would have been after New Year's in
14 '92, yes, I did quickly learn that they had
15 distributorships with distributors in the -- in
16 various portions of their territory other than the
17 United States, yes.
18     Q    And did you learn at that point the name
19 of the company that was the exclusive distributor
20 for a certain segment of the territory in South
21 America?
22     A    Well, there was more than one distributor
page 18
1  in South America.
2      Q    Okay.  Which ones do you know or can you
3  recall sitting here today?
4      A    I was on a very good basis with the
5  distributor in Venezuela, which was a territory
6  unto itself.  And then, of course, Consist, the
7  plaintiff in this action, had a -- at the time I
8  joined Software AG they had six countries that they
9  were responsible for, the biggest being Brazil and
10 Argentina, and they had Uruguay, Paraguay, Chile
11 and I think they had Peru.  I -- ten years I'm
12 remembering there.
13     Q    You're correct, eventually it did include
14 Peru but it --
15     A    I think that was --
16     Q    -- was Bolivia.
17     A    Bolivia.  I'm sorry.

[18:21] - [24:14]        11/13/2007  James Daly

page 18
18     Q    Okay.  So the six would have been --
19     A    Without --
20     Q    -- without --
21     A    -- Peru and then Peru was later added as

3

22    a seventh I remember, yes.
page 19
1         Q      Now, do you remember whether the company
2    that held the distributorship was, in fact, called
3    Consist at that point or did it have a different
4    name?
5         A      It -- it might have been working under a
6    different name.  At one time it functioned under
7    the name PACS, P-A-C-S, which I believe, if I
8    recollect correctly from ten years ago, was a New
9    York entity, but I -- I for most of my career heard
10   it described as -- as PACS.  But in legal documents
11   its name may have been...
12        Q      Well, if I told you that the company's
13   name was Pan American Computer Systems, Inc., would
14   that refresh your recollection?
15        A      That would be PACS, P-A-C-S.
16        Q      That would be PACS, correct.
17        A      Right.
18        Q      And did you learn at that point or at any
19   point thereafter how long PACS had been the
20   exclusive distributorship for Software AG products
21   in the countries that you just named in South
22   America?
page 20
1         A      I knew of their existence as the
2    distributor certainly for the time that I was at
3    Software AG and I later learned that they had been
4    the distributor -- the only distributor that had
5    ever been in that territory and that they went back
6    very far with Software AG as distributor in that
7    territory, they were the original distributor and
8    they had been continuously the distributor for
9    Software AG in that territory, that it went back
10   very far.
11        Q      Did you ever hear that it went back to
12   1975?
13        A      I -- I might have heard that.  I'm not a
14   hundred percent sure.
15        Q      But that's not a date that would surprise
16   you?
17        A      No, no, it would not surprise me.
18        Q      Okay.  And did you also know that PACS
19   was the exclusive distributor for Software AG
20   products in its territory?
21        A      Oh, I certainly knew that, right.
22        Q      Okay.
page 21
1         A      That was a very important element of the
2    relationship.
3         Q      Now, you were telling us about your
4    career and you got up to being on an hourly basis
5    with Software AG North America.
6              Why don't you tell us what next happened
7    in your career.
8         A      Okay.  Around the holidays of '91,
9    Christmas, I was working at Software AG and we had
10   one of our, or they had one of their executive
11   meetings.  And I was making a presentation on
12   several deals and one of the people made a
13   suggestion that I be brought on permanently, they
14   needed someone in that position, and sort of a job
15   offer occurred in realtime while I was making a
16   presentation to the executives at Software AG and
17   Mr. King later made it official.  And I had a great
18   deal of admiration for Mr. King and respect for
19   Mr. King and -- and couldn't have asked for a
20   better person to be my boss.  So that was a big
21   factor in accepting.  It was the kind of work that
22   I -- I did.  And what I had learned so far about
page 22

4

```
 1   the company I liked, and the people, so there was
 2   no reason -- it was a great, fortuitous
 3   opportunity, so I -- I jumped on it.
 4        Q    And you said that was around the holidays
 5   of 1991?
 6        A    The end of the year '91.
 7        Q    Okay.
 8        A    So I started in '92 as an employee.
 9        Q    And your title at that point was what?
10        A    Again, it was, you know, attorney or
11   general attorney and then it became, within a year
12   or so, general counsel and then vice-president and
13   general counsel.
14        Q    When you were the general attorney, were
15   you functioning alone or were you in an office?
16        A    Alone, but in an office.
17        Q    Okay.  You had no subordinates or
18   associates to do other work for you?
19        A    Not --
20        Q    No lawyers?
21        A    No lawyers.  I -- I just had one admin
22   and -- myself and the admin.
```

page 23

```
 1             Now, at that time Software AG had a
 2   contracts department that worked quite actively on
 3   negotiating the standard preprinted form contracts.
 4   So the legal department at that time didn't do as
 5   much of the face-to-face with customer contract
 6   negotiations, it was handling mainly the legal
 7   issues, and the contracts department in
 8   consultation with the businesspeople would "close
 9   the deal" as far as getting a form contract either
10   signed or modified and signed.
11        Q    Now, do you recall having negotiated and
12   drafted nonstandard form contracts?
13        A    Oh, yes.  That's mostly -- was mostly
14   what I would do.  I would say it would be -- about
15   two-thirds to three-quarters of my work would be
16   the drafting, negotiation, modification, and
17   finally approval for execution of nonstandard
18   contracts.
19             The rule at Software AG was standard
20   preprinted contracts unmodified could be signed and
21   accepted by any salesmen or, you know,
22   representative of the company.
```

page 24

```
 1        Q    And do you recall having reviewed the
 2   standard form contracts at any point in your
 3   career?
 4        A    Oh, yes, it was a continual process of,
 5   you know, review, update and, you know,
 6   modification if necessary.
 7             If a customer suggested some language in
 8   a negotiation which we thought was particularly
 9   good for the market and the marketplace, and the
10   salespeople agreed it was good for the market and
11   the marketplace, we would revise, when necessary,
12   the standard form contracts to take into account
13   such, you know, customer-friendly or
14   customer-acceptable changes.
15        Q    Now, you told us before that when you
16   first came on board, Software AG of North America
17   was an independent company.
```

[28:6] - [28:11]                 11/13/2007   James Daly

page 28

```
 6        Q    Can you fix a date, Mr. Daly, on when you
 7   received the title general counsel of Software AG
 8   North America?
 9        A    The exact date would be in the corporate
```

5

```
10   minutes.  I don't know.  Any -- any date I gave at
11   this point in time would be a guess.
```

[28:17] - [29:1]        11/13/2007   James Daly

```
page 28
17       Q    And maybe you can tell us when you
18   stopped working for Software AG.
19       A    In April of '98.
20       Q    Okay.  So from the time that you were
21   named as general counsel until you left you
22   consistently held the position of general counsel
page 29
 1   of Software AG North America; is that correct?
 2       A    Yes, I did.
```

[33:20] - [34:8]        11/13/2007   James Daly

```
page 33
20       Q    Now, Mr. Daly, were you the primary
21   person responsible for drafting and negotiating the
22   stand-alone contracts, and by that I mean nonform
page 34
 1   contracts, throughout your tenure?
 2       A    I would say yes, I had the -- I had the
 3   full responsibility for them.  I frequently got
 4   help from either Bob or Karl.
 5       Q    But you were ultimately responsible for
 6   --
 7       A    Yes, I ultimately reviewed the final work
 8   product before it went out.
```

[37:1] - [38:5]        11/13/2007   James Daly

```
page 37
 1       Q    Can you just give us an estimate of how
 2   many contracts you've drafted over your career?
 3       A    Oh, my goodness.  Starting with Martin
 4   Marietta?
 5       Q    Yeah.
 6       A    Let's see.  It's hundreds.  I would say
 7   it's easily 500.
 8       Q    Okay.  That you personally drafted or at
 9   least had primary responsibility?
10       A    My fingerprints are on them and I had the
11   ultimate responsibility in most cases for the
12   contents.
13       Q    Before I asked you about dealings with
14   Natalio Fridman and then you started to answer.
15   Could you tell us the first time you recall
16   anything having to do with Natalio Fridman?
17       A    Well, as we mentioned earlier, for the
18   entire time I was there Natalio was Software AG's
19   exclusive distributor in the countries we
20   identified.  We associate him primarily with
21   Brazil, but it was true he had the rest of the
22   territory.  And so I'm sure early in my first year
page 38
 1   I was made aware by the then VP of international
 2   operations, a man named Phillipe Kuperman, of
 3   Natalio and his relationship with Software AG of
 4   North America, and I was certainly given a copy of
 5   his Distributorship Agreement.
```

[39:12] - [39:21]        11/13/2007   James Daly

```
page 39
12       Q    Okay.  Did Mr. Kuperman negotiate any of
13   the contracts with Mr. Fridman, as far as you know?
14       A    Yes, he did.
```

6

```
15        Q    Which ones can you recall now are the
16  ones that Mr. Kuperman negotiated?
17        A    To the best of my knowledge, Kuperman and
18  King negotiated the terms of the contracts prior to
19  the one that I worked on in -- prior to the '98 one
20  that's, I understand, to be the subject of the
21  litigation.
```

[41:2] - [42:8]        11/13/2007   James Daly

```
page 41
 2        Q    Okay.  Fine.
 3             Are you aware of any problems that
 4  Software AG of North America had with Natalio
 5  Fridman in 1992?
 6        A    Specific -- I know of the problem --
 7  problems we had with Natalio from the very
 8  beginning until the end.  They -- the problems were
 9  the same.
10        Q    And what were those problems?
11        A    Okay.  He did not want to enter into a
12  standard Distribution Agreement similar to the ones
13  which we used with all of our other distributors.
14  He refused to accept some of the terms of our
15  standard, if you can call it such, a standard
16  Distribution Agreement.  Obviously they were
17  individually negotiated.
18        Q    And what were some of the provisions that
19  Mr. Fridman refused to accept in the standard
20  Distribution Agreement?
21        A    Well, his two primary complaints were,
22  one, he did not want to report the names and
page 42
 1  addresses and other information related to the
 2  licensees in his territory, his customers.  He did
 3  not want us to have that.  And, number two, he was
 4  always very concerned that at the end of one of
 5  these three-year cycles, or even in the middle of
 6  one of them, that Software AG would terminate his
 7  distributorship and then effectively, you know,
 8  close down his business.
```

[80:6] - [80:9]        11/13/2007   James Daly

```
page 80
 6        Q    Did you ever hear in words or substance
 7  anyone say that Natalio was making too much money
 8  in the territory?
 9        A    It's -- it's long again.  I'm sorry.
```

[80:17] - [80:18]        11/13/2007   James Daly

```
page 80
14  question did you ever hear anyone say --
15             THE WITNESS:  Yes, there was.
16  BY MR. SCHAFFER:
17        Q    And what did you hear and from whom did
18  you hear it?
19             MR. BASINGER:  And there I would just
20  caution you, to the extent you're revealing
21  attorney/client information, don't do that.
```

[81:3] - [81:8]        11/13/2007   James Daly

```
page 80
22             MR. SCHAFFER:  That's a standing
page 81
 1  instruction.
 2             MR. BASINGER:  Right.
 3             THE WITNESS:  Okay.  The part that's not
```

7

```
 4    privileged, there were discussions not privileged
 5    about whether Natalio and Software AG had a fair
 6    agreement, which in your words means were we
 7    receiving adequate compensation for our product in
 8    the territory.  Yes, those conversations occurred.
 9    BY MR. SCHAFFER:
10         Q    And what can you report about those
11    conversations in detail?
```

[82:15] - [82:20]        11/13/2007   James Daly

```
page 82
15         Q    But let me understand the business view
16    that you expressed.  You expressed to Software AG
17    that Software AG was going to incur a high expense
18    to go into the territories that PACS --
19         A    Those six which later became seven
20    countries, yes.
```

[82:22] - [83:3]        11/13/2007   James Daly

```
page 82
19         A    Those six which later became seven
20    countries, yes.
21         Q    Okay.
22         MR. BASINGER:  And just object as vague,
page 83
 1    and the comment on that is do we need to make a
 2    distinction between Software AG and SAGNA or
 3    whatever the North American name is?
 4    BY MR. SCHAFFER:
 5         Q    Is there a distinction with respect to
 6    this between SAGNA and SAG?
```

[83:5] - [84:4]        11/13/2007   James Daly

```
page 83
 5         Q    Is there a distinction with respect to
 6    this between SAGNA and SAG?
 7         A    I can answer that without giving away any
 8    privileged information.  Software AG Germany looked
 9    upon it as our problem.  They would just
10    essentially mock us for letting Natalio get away
11    with something.  In other words, North America,
12    we've given you the territory.  That piece you
13    should be getting a hell of a lot more out of than
14    you are getting.  So it was a business criticism.
15         Q    Okay.
16         A    Okay.  Natalio's ripping you off.
17         Q    Okay.  Do you know who at Software AG in
18    Germany expressed that view?
19         A    Who did I hear express it?
20         Q    Yes.
21         A    I -- I hate to give out names.  I mean it
22    was my legal superior, his name was
page 84
 1    Dr. Strickstrock, and I heard Peter Schnell say it
 2    in conversation to Mike King.
 3         Q    And can you put a general date on when
 4    you heard that?
 5         A    I can't recall an exact date.  We're ten
 6    years or -- 1995, we're 12 years from it.
```

[84:8] - [84:9]        11/13/2007   James Daly

```
page 84
 7         Q    I understand.
 8         A    What I can remember is that it occurred
 9    at the time of contract renewal or renegotiation.
```

[84:15] - [85:14]      11/13/2007   James Daly

page 84
```
15        Q     Okay.  Now, you saw in Defendant's
16   Exhibit 4 that in paragraph one there was an
17   obligation that in the third year of this
18   agreement, 1997, the parties agreed to negotiate in
19   good faith a new agreement.  Did that ever occur?
20        A     Oh, yes.  I mean I think there's an
21   exchange of letters between me and Natalio in 1997
22   negotiating a follow-on agreement.
```
page 85
```
1         Q     Okay.  And in 1997, when a new agreement
2    was being negotiated, you were the individual who
3    was in charge of those negotiations?
4         A     By that time I was wearing both hats.
5         Q     So you were general counsel and --
6         A     Vice-president of international --
7         Q     -- vice-president?
8         A     -- operations.
9         Q     And you performed both functions in
10   negotiating a new agreement with --
11        A     Right, with the understanding, of course,
12   that on something that big I would never conclude
13   it without a discussion with Mike King or -- or Dan
14   Gillis, whoever was then president.
```

[88:10] - [88:15]      11/13/2007   James Daly

page 88
```
8         Q     Mid '97 meaning June, July, somewhere in
9    that --
10        A     May.  April, May might be the earliest.
11        Q     Do you recall actually having written a
12   letter that says we need to begin negotiating?
13        A     I believe so, yeah.
14        Q     Okay.  With whom did you negotiate?
15        A     I always dealt directly with Natalio.
```

[90:17] - [91:7]      11/13/2007   James Daly

page 90
```
17        Q     We're going to tentatively call this Daly
18   Exhibit 1 and I'm going to ask you whether you've
19   seen this document before.
20        A     Oh, yeah, I'm sure I saw it right before
21   I signed it.
22        Q     And that's your signature on page --
```
page 91
```
1         A     It is.
2         Q     -- 3788?  And this is a document which
3    bears identification numbers SAG 3788 through 3792,
4    and, Mr. Daly, can you tell us what this document
5    is?
6         A     Well, as it says in the first sentence,
7    it's our proposal of August 4th, 1997 for a new
8    Distributorship Agreement with Consist and --
9    without reading it verbatim, but as it says, it was
10   the culmination of a series of meetings which had
11   occurred in New York where PACS maintained an
12   office, and talks about some of the issues that we
13   were -- we had on the table --
```

[91:12] - [91:14]      11/13/2007   James Daly

page 91
```
2         Q     -- 3788?  And this is a document which
3    bears identification numbers SAG 3788 through 3792,
4    and, Mr. Daly, can you tell us what this document
5    is?
6         A     Well, as it says in the first sentence,
```

```
 7    it's our proposal of August 4th, 1997 for a new
 8    Distributorship Agreement with Consist and --
 9    without reading it verbatim, but as it says, it was
10    the culmination of a series of meetings which had
11    occurred in New York where PACS maintained an
12    office, and talks about some of the issues that we
13    were -- we had on the table --
14         Q    Okay.
15         A    -- to wrap up the agreement.
```

[92:21] - [93:18]      11/13/2007   James Daly

```
page 92
21         Q    Can you tell us, Mr. Daly, what the
22    primary points of the negotiation were that you had
page 93
 1    with Mr. Fridman in the time period leading up to
 2    the August 4th letter?
 3         A    Okay.  Yes, I can.
 4         Q    Please tell us what you can recall about
 5    it.
 6         A    The two key issues are -- contained the
 7    two that were important towards the conclusion of
 8    the agreement.  We -- there is another letter that
 9    talks about the term of the agreement.  That was a
10    major issue, so I should correct myself and say
11    there were at least three; the term of the
12    agreement, which is contained in another letter,
13    and the two issues here, one of which was
14    significant and the other are minor details.
15         We were always suspicious of Natalio's
16    utilization of tax receipts because he was so close
17    to the government authorities in Brazil, and I -- I
18    think they were one of his biggest customers.
```

[95:14] - [96:17]      11/13/2007   James Daly

```
page 95
14         Q    And you said before that you recalled a
15    letter that spoke about the term of the agreement.
16         What was the issue with respect to the
17    term of the agreement?
18         A    To the best of my recollection now 11
19    years later or ten years later, Natalio was asking
20    for an agreement that went on forever.  He wanted a
21    perpetual agreement.  He wanted to stop the three,
22    three, three, three, three and having to come back
page 96
 1    and having to renegotiate with people like me.  And
 2    we took his request -- I took his request for 25
 3    back, and I -- I have to respect Natalio, so if he
 4    made a request, even if I thought it was
 5    ridiculous, I would take it back, okay, to the
 6    powers that be and -- well, got the obvious result.
 7    So I went back to him and said, you know, the most
 8    we can do is -- the best we can do is chop the 25
 9    up.
10         Q    So is it your recollection that
11    Mr. Fridman wanted a perpetual agreement or --
12         A    Yes.
13         Q    -- a 25-year term?
14         A    Well, he talked professional (sic) first.
15         Q    Perpetual?
16         A    Right.  When that was laughed at, he said
17    well, 25.
```

[97:22] - [100:16]      11/13/2007   James Daly

```
page 97
22         Q    So please tell us about the second point.
page 98
```

10

```
 1        A    And the second one starts there on the
 2   third line with the "Also in line with our
 3   discussion in New York."   There had been a
 4   perennial complaint by Natalio that he was doing
 5   the better job selling in his territory than the
 6   Americans were in theirs.   So in addition to
 7   getting a longer term agreement, he wanted to do
 8   something about the automatic escalation clause.
 9             The original proposal was so much per
10   year and then the second year it goes up by this
11   percent, goes up by this percent, goes up by this
12   percent.  And he said well, you're not doing as
13   well in your territory as I'm doing in mine, why
14   should I go up and you don't have to.  So after
15   much haggling and discussion and argument he
16   requested that we adjust each year his payment by
17   the increase in revenues in the United States -- by
18   the percentage increase in revenues in the United
19   States, essentially calling our bluff on gaining
20   more business in the United States, showing him
21   that we were effective.
22             Now, in our mind the argument didn't make
```
page 99
```
 1   any sense, but the management in Virginia was
 2   willing to accept it.
 3        Q    Okay.  Now --
 4        A    So you see it starting on the third line
 5   with the "Also."  "We have proposed an annual
 6   increment or decrement based on the increase or
 7   decrease in SAGA's," that's North America's,
 8   "product revenue."
 9        Q    Okay.
10        A    And then Peru pops up, which is another
11   minor point.
12        Q    And why is Peru being added to this
13   agreement?
14        A    There had been a distributor in Peru who
15   was not Natalio, and that distributor had basically
16   done nothing with the territory, not built up a
17   staff, not built up a sales base or a customer
18   base, and just was doing nothing with the
19   territory, and Natalio asked for it.
20        Q    So you recall that Natalio asked for Peru
21   to be included in the territory?
22        A    To be added, yes.
```
page 100
```
 1        Q    Okay.
 2        A    And we were having problems with the
 3   existing distributor, so we didn't have a -- too
 4   much of an issue with it -- with adding it to his
 5   territory because he made his usual promise to, you
 6   know, serve it and take care of it and grow it.
 7        Q    Do you know why the existing distributor
 8   at the time did not succeed in Peru?
 9        A    I think it was just a lack of diligent
10   effort on his part, investment and effort.  These
11   distributorships take a substantial investment
12   because you have to hire highly-skilled people and
13   the equipment that this software runs on is not
14   cheap.  It's mainframe computer equipment usually.
15   So the hardware is expensive and the people who
16   know how to work with it are very expensive.
```

[104:1] - [104:18]        11/13/2007   James Daly

page 103
```
21        Q    And the term there is listed as 1/1/98
22   through 12/31/22, which is 25 years?
```
page 104
```
 1        A    That's the -- that's the 25-year
 2   out-of-the-starting-blocks number.
```

11

```
 3      Q      And this was something that Software AG
 4  North America was willing to offer Natalio?
 5      A      No, this was Natalio's request
 6  regurgitated to Software AG.
 7      Q      Well, on page 3788 of Daly Exhibit 1 the
 8  first sentence says, "Attached is our proposal for
 9  the new Consist Distributor Agreement."
10      A      Right.
11      Q      So isn't the proposal that's stated in II
12  your proposal to Natalio?
13      A      Well, it's repeating back to him his --
14  his request, so, yes, at that particular point we
15  had this August letter, right, offered that.
16      Q      So Software AG North America was offering
17  to Natalio a 25-year term?
18      A      Uh-huh, at that point in time yes.
```

[106:14] - [106:22]    11/13/2007   James Daly

```
page 106
14      Q      Okay.  Take a look at page 3790, if you
15  would.
16      A      Okay.
17      Q      And look, if you would, at number four.
18      A      Right.
19      Q      That says, "At the end of the first five
20  years of this agreement either party can terminate
21  this agreement with 18 months' notice."
22      A      Right.
```

[107:1] - [109:21]    11/13/2007   James Daly

```
page 107
 1      Q      What does that mean?
 2      A      It means that at the three and-a-half
 3  year point either party, if they don't want to
 4  continue, can notify the other that they're going
 5  to terminate the agreement at the end of the
 6  five-year term.
 7      Q      Does it require any cause to terminate?
 8      A      No, just notice saying I don't want to go
 9  on anymore.
10      Q      And that is the right that was available
11  within the first five-year segment; is that
12  correct?
13      A      In this document here, yes.
14      Q      Okay.  And do you recall what
15  Mr. Fridman's reaction to SAGA -- I think at this
16  point we actually changed the name from Software AG
17  North America to SAGA; is that right?
18      A      Right.
19      Q      So I'll refer to it now as SAGA.
20      A      Sure.
21      Q      Is that okay?
22      A      Sure.
page 108
 1      Q      What was Mr. Fridman's reaction to SAGA's
 2  proposal, as reflected in Exhibit 29?
 3      A      Well, I mean his -- his reaction was
 4  pretty strong.
 5      Q      And what did he say to you and what did
 6  you say to him?
 7      A      He didn't want it.  He wanted it taken
 8  out.  He said I don't want there to be any
 9  termination right until the end of the 25 years, so
10  it will be over in 25 years.  And we said we can't
11  live with that.  We need this type of check and
12  balance in the -- in the contract that if for any
13  reason, not necessarily a material breach, we want
14  to terminate at the end of any five-year period,
15  we'll give you 18 months; notice so you have plenty
```

12

16    of time to wrap up your customers and your affairs
17    with your customers and then we'll take over at the
18    end of the five-year period. This is pretty
19    standard in the industry.
20        Q    Okay.
21        A    And he said well, five years, Natalio, a
22    little bit of flamboyance thrown in there, and he
page 109
1    said he couldn't live with it. And that's why
2    after discussion and negotiation you wind up with
3    the final result that was signed.
4        Q    Okay. Do you recall, by the way, at this
5    point, meaning in 1997, how long a company that was
6    affiliated with Natalio had been the exclusive
7    distributor of Software AG products in the
8    territory?
9        A    What year are we in here?
10        Q    We're 1997 at this point.
11        A    1997. He would have started right after
12    the company was -- I would subtract 75 from 97 and
13    say 22.
14        Q    So your best recollection --
15        A    That's my -- that's my best estimate.
16    Now, I don't know if he started in '75 or '76.
17    There might be a little --
18        Q    In any event, that's --
19        A    -- movement in the joints there.
20        Q    Okay. Over 20 years? Let's put it that
21    way.
22        A    Yes.

[112:8] - [113:1]    11/13/2007   James Daly

page 112
8        Q    Okay. To your knowledge Mr. Fridman is
9    not a lawyer, is he?
10        A    No, he's not.
11        Q    Okay.
12        A    He's not.
13        Q    And to your best recollection he was the
14    only one who was negotiating this agreement with
15    you; is that correct?
16        A    He was the only one at the meeting, so I
17    don't know who he consulted for advice.
18        Q    Okay. But he certainly in face-to-face
19    discussions with you and the discussions on the
20    telephone, as best you knew, he was the only one
21    who was doing the negotiations on behalf of
22    Consist; is that correct?
page 113
1        A    Yes.

[113:9] - [114:4]    11/13/2007   James Daly

page 113
9        Q    Mr. Daly, Exhibit 30 is a document which
10    bears Bates stamp numbers CSS-53 through 65, and I
11    ask you whether you have ever seen this before.
12        A    Yes, I -- I have. That's my signature on
13    0055.
14        Q    And tell us what this document is.
15        A    Well, the -- we had just looked at the
16    letter on August 4th --
17        Q    And that was Exhibit 29?
18        A    Right -- which, as it's indicated in the
19    first sentence, was a reaction to the last meeting
20    in New York.
21            We then had further discussions on the,
22    basically the attachment to Exhibit 29 as well as
page 114
1    the contents of the cover letter and we then --

13

2  that resulted in my next letter to Natalio, which I
3  believe was this August 21st, '97 letter, which is
4  CSS-54.

[118:21] - [122:2]    11/13/2007   James Daly

page 118
21      Q    At the point that you were negotiating
22  this agreement with Mr. Fridman you were at that
page 119
1  point the vice-president in charge of international
2  operations; is that correct?
3      A    I believe so.  I believe I still was,
4  yes.
5      Q    Can you tell me succinctly or in whatever
6  length you need to tell me how one goes about
7  marketing a special product in general?  Well, let
8  me withdraw that question and ask a different one.
9          Can you tell me, as the vice-president of
10  international operations, what Mr. Fridman's
11  company would need to market and sell a special
12  product?
13          MR. BASINGER:  Object to the form.  You
14  may answer to the extent you're able.
15          THE WITNESS:  They -- well, the first
16  thing they would need is training on the product;
17  what does the product do, how does it do it, and
18  why would anyone want to buy it.
19  BY MR. SCHAFFER:
20      Q    Okay.
21      A    Okay?  Which we provided.
22      Q    Okay.
page 120
1      A    There was a gentlemen who worked for me,
2  David Riddick, he and a couple of assistants that
3  he had would go down there and conduct a training
4  program on these third-party products sometimes
5  with, sometimes without the true authors of the
6  third product to help them out.  In addition, they
7  would need demonstration and installation copies of
8  the products as well as literature.
9          Now, it wasn't that simple unless they
10  were going to use the products in English.  In
11  these particular cases these three products would
12  be used as they came out of the box in English.
13          Sometimes products and the documentation
14  that went along with them have to be what we call
15  localized, that is, put into the language of the
16  country, which in the case of Brazil is Portuguese,
17  and then, as you know, in Latin America there are
18  variants on Spanish that are used in the various
19  countries, and for sales and marketing purposes
20  they have to use the proper variant.  So there was
21  some work to do.  The most egregious example, of
22  course, is the Japanese where they have to convert
page 121
1  all of the external displays and documentation into
2  the native language.
3          So he would attend the training classes,
4  get the demonstration and installation products, do
5  whatever localization he felt was necessary to both
6  the documentation and the products, and then hold a
7  sales seminar for his salespeople to explain to
8  them who the target audience was, what the pricing
9  was, and how to sell it.
10      Q    Okay.  And simply having a price list
11  itself would not in any way assist in the sale or
12  marketing of special products; is that correct?
13          MR. BASINGER:  Object to the form.  You
14  may answer.
15          THE WITNESS:  Sometimes if he was very

14

```
16    familiar with the product, it was just a new
17    version or a new variant of an existing product, he
18    didn't need any training.  All he needed was the
19    price list.  In rare cases that occurred.
20    BY MR. SCHAFFER:
21         Q    But in the usual case he would require
22    training user manuals, demonstration copies and
page 122
 1    sales copies; is that right?
 2         A    Right.
```

[123:9] - [123:12]    11/13/2007   James Daly

```
page 123
 9         Q    Okay.  Finally, point six says that SAGA
10    is ready to execute the deal and if you give me
11    your approval, I will send you a signed copy?
12         A    Right.
```

[124:15] - [124:18]    11/13/2007   James Daly

```
page 124
12         Q    Okay.
13         A    And then he and I would -- would talk if
14    it got too legalese.
15         Q    Okay.  Let's turn to the draft agreement
16    that's behind Exhibit 30, and can you show me in
17    this draft agreement where it is that you are
18    presenting a non-cancelable ten-year contract?
19             MR. BASINGER:  Object to the form.  You
20    may answer.
21    BY MR. SCHAFFER:
```

[124:22] - [126:22]    11/13/2007   James Daly

```
page 124
22         Q    That is --
page 125
 1         A    Let me see here.  Okay.  I would -- I see
 2    it immediately in paragraph one.
 3         Q    And can you read the language that --
 4         A    Sure.
 5         Q    -- refers to a ten-year non-cancelable
 6    contract?
 7         A    Okay.  "SAGA appoints PACS the exclusive
 8    distributor of the systems in the territory," and
 9    systems and territory are all caps, "for the period
10    of January 1, '98 through December 31, 2007."  I
11    believe that's ten years.  "During the last year of
12    this term (2007) the parties agree to negotiate in
13    good faith a new agreement."  So normally that's a
14    signal to me that the prior agreement has ended if
15    they're going to begin negotiating a new agreement.
16    You wouldn't negotiate if you were, you know,
17    continuing uninterrupted.  "The parties understand
18    and agree that at the end of the first ten-year
19    period of this agreement, this agreement shall
20    automatically renew for successive five-year
21    periods" -- so that's an initial ten with follow-on
22    fives.  And there's the lawyer's favorite term,
page 126
 1    "Unless either party shall decide to terminate this
 2    agreement upon the giving of 18 months' prior
 3    written notice to the other party."
 4         Q    Okay.
 5         A    So I read that last lengthy sentence to
 6    say that the agreement is not cancelable for the
 7    first ten years, so you've got ten years for sure.
 8    It will be renewed for successive five-year periods
 9    unless terminated by one of the parties giving 18
10    months' prior written notice to the other party.
```

11  So there are points, eight and-a-half years and
12  then after that every three and-a-half years, where
13  either party by notice to the other can say without
14  cause, without breach, without anything, for
15  whatever reason I don't want to go on anymore.
16      Q    Okay.
17      A    So-called, you know, termination without
18  cause.
19      Q    Okay.
20      A    If it's not given, then there's --
21  another five-year period would start after the
22  initial ten-year period.

[143:11] - [143:21]        11/13/2007   James Daly

page 143
11      Q    Okay.  Now, is the 18-month notice that
12  is available under paragraph one of the proposed
13  Distributorship Agreement that's annexed to
14  Exhibit 30 the only way in which the parties to
15  this agreement can terminate it?
16          MR. BASINGER:  Object to the form.  You
17  may answer.
18          THE WITNESS:  Okay.  There -- the answer
19  is paragraph one is the termination without cause
20  provision.  Paragraph, I believe it's seven, is a
21  second method different from paragraph one.
22  BY MR. SCHAFFER:
page 144
1       Q    And could you read paragraph seven into
2   the record, please.
3       A    Okay.

[144:7] - [145:21]         11/13/2007   James Daly

page 144
7       Q    Okay.  Would you read paragraph eight of
8   the proposed Distributorship Agreement annexed to
9   Exhibit 30 into the record?
10      A    Okay.  "SAGA reserves the right to
11  terminate this agreement should PACS fail to
12  perform any material conditions of this agreement.
13          "Before such termination shall become
14  effective, SAGA shall give written notice to PACS
15  describing in detail what material conditions PACS
16  has failed to perform, and PACS shall have 60 days
17  in which to perform such conditions."
18      Q    Now, can you explain for us what that
19  paragraph, as a contract draftsman, is intended to
20  mean?
21      A    Okay.  That's the termination with cause
22  and includes a repair period of 60 days in which
page 145
1   the breaching party can repair the breach and avoid
2   the termination.
3       Q    And paragraph eight is a right that's
4   granted only to SAGA under this proposal; is that
5   correct?
6           MR. BASINGER:  Object to form.  You can
7   answer.
8           THE WITNESS:  Paragraph eight, yes, is --
9   is SAGA has reserved the right to terminate.
10  BY MR. SCHAFFER:
11      Q    And so paragraph eight explicitly says in
12  its first sentence that "SAGA reserves the right to
13  terminate this agreement should PACS fail to
14  perform any material conditions of this agreement"
15  --
16      A    Right.
17      Q    -- and then provides a cure provision,
18  correct?

16

```
19    A    Right.
20    Q    Okay.
21    A    Sixty days in which to...
```

[158:17] - [158:19]        11/13/2007   James Daly

```
page 158
17        Q    Now, you said that Mr. Fridman had
18    acceded to the ten-year term that you described as
19    being reflected in paragraph one.
20        A    (Nodding.)
```

[159:4] - [160:9]          11/13/2007   James Daly

```
page 159
4         Q    Well, are you saying that he did not
5    still insist on having an evergreen contract?
6             MR. BASINGER:  Object to the form.  You
7    may answer.
8             THE WITNESS:  He -- okay.  The semantics
9    are difficult here.  He may have requested and said
10    he would still prefer, but he accepted that all he
11    could get was what was in the agreement.
12    BY MR. SCHAFFER:
13        Q    But I think it's important that you try
14    to tell us exactly what he said to you with respect
15    to --
16        A    I can't remember his exact words after 12
17    years or 11 years.
18        Q    Well, are you saying that he gave up the
19    notion of having a perpetual agreement?
20        A    Gave up.  My only recollection is he
21    agreed to the language which made its way into the
22    agreement.  That's all I can remember after ten
page 160
1    years.  I can't remember his exact emotional
2    response or his -- even his verbal response, but I
3    do remember that the one that I signed and sent
4    back to him contained the -- the language that we
5    agreed was going to be in the final agreement.
6         Q    Okay.
7         A    But I can't remember his, you know, the
8    verbals or the communications that led up to that.
9    After ten years I can't, no.
```

[161:2] - [161:22]          11/13/2007   James Daly

```
page 160
21    contract before I signed it and sent it back to him
22    for his signature.
page 161
1    BY MR. SCHAFFER:
2         Q    But let me be very specific.  You do not
3    have any recollection that Mr. Fridman said to you
4    that he was either giving up a perpetual agreement
5    or was acceding to the notion that you had a right
6    to terminate the contract after ten years for any
7    reason that you wanted or that he had the right to
8    terminate the contract after ten years for any
9    reason that he wanted?
10        A    I -- the only thing I can recollect is
11    reading paragraph one to him, telling him that's
12    what I'm going to send him, I will sign it.
13    It's -- it's what Software AG can do.
14        Q    Okay.  Did you --
15        A    If you want to, you know, look it over,
16    or discuss it or anything, you know, I always left
17    the door open for Natalio to call me and talk.
18        Q    Did you read paragraph seven to him?
19        A    Yes, I'm sure I did because paragraph
20    seven I think changed.
```

17

```
21          MR. BASINGER:  Object to the form of the
22  question by the way.
page 162
 1          THE WITNESS:  I did.  Well, it wouldn't
 2  have been seven, it would have been eight I think.
 3  I think we had seven twice in the agreement there.
```

[162:19] - [164:11]        11/13/2007   James Daly

```
page 162
19      Q    And when you say that Mr. Fridman acceded
20  to the version of the contract that you read to
21  him, were you referring to the one that he
22  ultimately signed or are you referring to
page 163
 1  Exhibit 30?
 2      A    No.  I would have -- I would have --
 3  before I would have sent him a signed contract,
 4  having dealt with him as much as I had, I knew that
 5  unless he knew everything that was in that contract
 6  I was wasting bits on the fax machine, paper and
 7  ink sending him anything.  So I talked to him about
 8  it, all the changes that were made between the last
 9  one he had seen and the one I was sending him, and
10  I probably told him that I had gotten the most I
11  could out of the top management in Germany and the
12  U.S. --
13      Q    Okay.
14      A    -- and this was the deal that SAGNA was
15  willing -- ready, willing and able to sign and
16  here's a signed copy.
17      Q    I'm going to ask the reporter to mark
18  this document as Exhibit 31.
19          (Daly Exhibit Number 31 was
20          marked for identification.)
21  BY MR. SCHAFFER:
22      Q    Have you ever seen Exhibit 31 before,
page 164
 1  Mr. Daly?
 2      A    Yes, I must have.  That's my signature --
 3      Q    Okay.
 4      A    -- at the bottom of the cover letter.
 5      Q    And you signed as vice-president,
 6  international operations; is that correct?
 7      A    Which I was at that time.
 8      Q    And you were also still the general
 9  counsel at that time, correct?
10      A    I was the general counsel for the whole
11  time I was there.
```

[165:13] - [166:10]        11/13/2007   James Daly

```
page 165
13      Q    Mr. Daly, are you the draftsman of the
14  agreement that's annexed to the letter that is
15  Exhibit 31?
16      A    Yeah, I have to take credit for creating
17  the final version.
18      Q    And is it about this agreement that, or
19  this proposed agreement that you testified to
20  earlier that you read to Natalio Fridman and that
21  he said that he acceded to its terms?
22      A    Yeah, and when I say I read it to him,
page 166
 1  I -- I might have faxed it to him, okay, for him to
 2  see it and -- on paper.  Okay?
 3      Q    Okay.
 4      A    The fax machine was going back and forth
 5  quite frequently on -- on things so that he
 6  wouldn't -- I wouldn't have to, you know, he
 7  wouldn't have to take down dictation.  When I read
```

```
 8   him clauses in a contract, I would send it to him
 9   and he would look it over.  But by the time it went
10   up to him for signature that would have happened.
```

**[167:8] - [167:22]**    11/13/2007  James Daly

```
page 167
 8      Q    Okay.  And then you close your letter by
 9   saying, "Thank you again and SAGA looks forward to
10   a continuing, successful relationship with Consist.
11   Best regards," and then there's your signature.
12           Now, take a look, if you would, at
13   Exhibit 31's Distributorship Agreement.  This is
14   the one that you signed?
15      A    Uh-huh.
16      Q    And one of the things that we see
17   immediately is that PACS, Pan American Computer
18   Systems, is changed to Consist International.  Do
19   you see that?
20      A    That would have been at his request.
21      Q    That would have been at his request.
22           And SAGA is described as the exclusive
page 168
 1   distributor of certain software packages in the
 2   territory.
 3      A    Yes.
```

**[168:8] - [169:8]**    11/13/2007  James Daly

```
page 168
 8      Q    -- or you were appointing Consist to be
 9   the exclusive distributor of the systems in the
10   territory?
11           Now, paragraph one in the agreement that
12   is annexed to Exhibit 31 has a difference from the
13   agreement that we saw annexed to Exhibit 30.
14      A    Right.
15      Q    And do you see that the sentence that we
16   had spoken about before that said "During the last
17   year of this term (2007) the parties agree to
18   negotiate in good faith a new agreement," and that
19   sentence has been taken out of this version.  Do
20   you see that?
21      A    Uh-huh.
22      Q    Do you know why that was?
page 169
 1      A    Immediately the only comment I would
 2   have -- I would have is I don't recall the specific
 3   reason it was removed, but it must have been as a
 4   result of either a request from Software AG or from
 5   Consist.
 6      Q    But you don't remember which one?
 7      A    I don't remember which one, no.  I can't
 8   recall which one.
```

**[169:22] - [170:16]**    11/13/2007  James Daly

```
page 169
22      Q    Take a look at that subparagraph and
page 170
 1   compare it to the version that's reflected in
 2   Exhibit 30.
 3      A    Okay.  Right.  Yes, I understand that.
 4      Q    And do you see what the difference is
 5   between those two?
 6      A    The difference is the reporting only on
 7   special products on the annex versus all products
 8   installed in the territory, and I'm sure, from the
 9   nature of it, that it came from Natalio.
10      Q    And you say that it came from Natalio
11   because of the nature of it?
```

```
12      A      Right.
13      Q      Why do you conclude that?
14      A      Because of his general allergic reaction
15   to any request for reports, details of the
16   installations within his territory.
```

[171:13] - [172:5]      11/13/2007   James Daly

```
page 171
13      Q      Okay.  Did you ever hear Natalio say that
14   the reason he didn't want to report customers to
15   Software AG was because he was afraid that Software
16   AG would then try to take customers away in words
17   or substance?
18      A      I believe that thought was expressed to
19   me, yes.  When I -- when I would push him on why he
20   didn't want to report, I believe at -- at some
21   particular point in time I heard him misstate that,
22   and I told him that that was, you know, ridiculous
page 172
 1   paranoia, yeah.
 2      Q      And you felt it was ridiculous paranoia
 3   because why?
 4      A      Because Software AG didn't "steal"
 5   customers from its distributors.
```

[174:16] - [175:21]      11/13/2007   James Daly

```
page 174
13   only a small fraction of his customer base, we
14   weren't even receiving what we should under a
15   normal, plain vanilla Distributorship Agreement.
16      Q      Well, was the Distributorship Agreement
17   that you had with Natalio at the time that you're
18   speaking a plain vanilla Distributorship Agreement?
19      A      No.
20              MR. BASINGER:  Object to the form of the
21   question.
22              THE WITNESS:  No.  To the best of my
page 175
 1   knowledge we never had a, what we referred to as a
 2   standard, which I just referred to as a plain
 3   vanilla Distributorship Agreement with Natalio.
 4   BY MR. SCHAFFER:
 5      Q      And, in fact, isn't it true that Software
 6   AG North America or SAGA simply got a lump-sum
 7   payment from Natalio and that the payments that
 8   were due to you were not at all dependant on how
 9   many installations he, in fact, made?
10              MR. BASINGER:  Object to the form of the
11   question.  At what time?
12   BY MR. SCHAFFER:
13      Q      You can answer that question.
14      A      The calculation I'm talking about was the
15   calculation under the standard Distributorship
16   Agreement versus what Natalio was paying.  I
17   thought that was your question.  If I got it wrong,
18   I'm sorry.
19      Q      No.  I'm sorry.  I'm asking you while the
20   answer that you gave me before may have related to
21   or affected SAGA with respect to a standard
22   distributorship agreement, in fact, the number,
page 176
 1   magnitude of installations that Natalio had on
 2   behalf of PACS did not have any effect whatsoever
```

[176:9] - [177:13]      11/13/2007   James Daly

```
page 176
 6   question.  If we're talking about under a specific
 7   agreement, let's show him the agreement.
```

20

```
 8   BY MR. SCHAFFER:
 9        Q    Well, take a look at Exhibit 4.
10        A    The Defendant's 4 one, right.  I mean
11   I -- I recall that --
12        Q    And I'll --
13        A    -- I had never seen a standard
14   Distribution Agreement between Natalio and Software
15   AG, one which contained the standard payment
16   language where there was a royalty paid to Software
17   AG equal to 50 percent of the amount charged to the
18   customer.
19        Q    So when you say that you were suspicious
20   that Natalio had far more installations than he was
21   reporting or that you knew about, that, in fact,
22   had no monetary effect on SAGA whatsoever, did it?
page 177
 1             MR. BASINGER:  Object to the form of the
 2   question.
 3             THE WITNESS:  No, no, its only impact was
 4   in comparing the deal we gave him versus the deal
 5   everybody else had.
 6   BY MR. SCHAFFER:
 7        Q    Okay.  So it's a question of he may have
 8   been making too much money because he had a better
 9   deal than other exclusive distributors; is that --
10        A    Exactly.
11             MR. BASINGER:  Object to the form of the
12   question.  Let me get that out, please.
13             THE WITNESS:  I'm sorry.
14             MR. SCHAFFER:  Excellent, Mr. Basinger.
15   Excellent.  There was nothing wrong with the form
16   of that question and your agitation is noted.
```

[177:18] - [184:8]        11/13/2007   James Daly

```
page 177
15   Excellent.  There was nothing wrong with the form
16   of that question and your agitation is noted.
17   BY MR. SCHAFFER:
18        Q    Take a look at paragraph seven of the
19   agreement annexed to Exhibit 31.
20             Now, that paragraph as presented is
21   different from the paragraph eight that was
22   contained in the proposed agreement that was
page 178
 1   annexed to Exhibit 30, is it not?
 2        A    The -- the two paragraph eights -- well,
 3   the seven in Exhibit --
 4        Q    Thirty-one.  I'm asking you to --
 5        A    -- 31, right, compared to paragraph --
 6        Q    Eight.
 7        A    -- eight of 29, right, or 30?
 8        Q    Of 30.
 9        A    Of 30.  Okay.  Yes.
10        Q    Now, I'm asking you --
11        A    They are different.
12        Q    And how are they different?
13        A    Do you want me to read them?
14        Q    I do.
15        A    Okay.  Paragraph eight in Exhibit 30,
16   "SAGA reserves the right to terminate this
17   agreement should PACS fail to perform any material
18   condition of this agreement."
19        Q    Now, do you see that sentence in
20   Exhibit 31?
21        A    That does not appear in paragraph seven
22   of 31.
page 179
 1        Q    Okay.  And are there any other
 2   differences between Exhibit 30 and 31?
 3        A    Well, I'd have to read the second
```

21

4    paragraph.
5        Q    Please do.
6        A    "Before such termination shall become
7    effective, SAGA shall give written notice to PACS
8    describing in detail what material conditions PACS
9    has failed to perform, and PACS shall have 60 days
10   in which to perform such conditions."
11       Q    Now, you were just reading from
12   Exhibit 30, correct?
13       A    Yes.
14       Q    Paragraph eight of Exhibit 30?
15       A    Paragraph seven of 31 says, "Before any
16   termination of this agreement shall become
17   effective, the terminating party shall give written
18   notice to the other party describing in detail what
19   material conditions the other party has failed to
20   perform, and the other party shall have 60 days in
21   which to perform such conditions."
22       Q    Okay.  Now, why is it that the first
page 180
1    sentence of paragraph eight in Exhibit 30 was
2    deleted from paragraph seven of Exhibit 31?
3        A    Well, paragraph seven of Exhibit 31
4    applies to either party.  It's -- either party
5    could terminate under paragraph seven.  There's the
6    terminating party and the other party.
7        Q    Yes.
8        A    There is no specific designation of SAGA
9    as the only one who can terminate in seven of 31,
10   so there was no need for the first sentence, that
11   SAGA reserves the right to terminate this
12   agreement.
13       Q    Well, let me understand this correctly.
14   You're saying that the first sentence was taken out
15   because the first sentence simply referred to SAGA?
16       A    In paragraph eight of Number 30 the first
17   sentence gives SAGA the right to terminate should
18   PACS fail to perform.  That's not a condition in
19   paragraph seven of 31 --
20       Q    Okay.
21       A    -- because 31 --
22       Q    Both parties have the right to terminate?
page 181
1        A    Under paragraph seven of 31.
2        Q    Both parties have the right to terminate?
3        A    There's a terminating party and an other
4    party.
5        Q    Okay.  Now, is there any reason why
6    paragraph seven of Exhibit 31, to make it parallel
7    to that thought, did not say each party reserves
8    the right to terminate this agreement should the
9    other party fail to perform any material conditions
10   to this agreement?
11       A    Well, it doesn't use your exact words,
12   but it comes very close.  "The terminating party
13   shall give notice to the other party" --
14       Q    Where does --
15       A    -- "describing in detail what material
16   conditions the other party has failed to perform."
17       Q    Where does paragraph seven of Exhibit 31
18   say that any party has the right to terminate on 60
19   days' notice for material breach?
20            MR. BASINGER:  Object to the form.  You
21   may answer.
22            THE WITNESS:  It's -- if it's not stated
page 182
1    explicitly, it's there in the language of paragraph
2    seven.
3    BY MR. SCHAFFER:
4        Q    Point me to the language.
5        A    Okay.  "Before any termination of this

22

6    agreement shall be become effective" -- "any
7    termination of this agreement shall become
8    effective, the terminating party," the one who's
9    choosing to terminate, "shall give written notice
10   to the other party," the one who's not choosing,
11   "describing in detail what material conditions the
12   other party," the nonterminating one, "has failed
13   to perform, and the other party shall have," the
14   non -- the party not asserting termination, the one
15   being terminated, "shall have 60 days in which to
16   perform such conditions."  So its entire
17   description is implying either party can play
18   either role, as terminating party or as other
19   party.
20       Q    Now, you described paragraph eight of
21   Exhibit 30 as being a termination for cause.  Do
22   you remember that?
page 183
1        A    Yes, uh-huh.
2        Q    And paragraph eight of Exhibit 30
3    explicitly said that SAGA reserves the right to
4    terminate this agreement should PACS fail to
5    perform any material conditions of this agreement?
6        A    Right.
7        Q    Right?  That's an explicit statement of
8    cause; is that correct?
9        A    Right.
10       Q    Now, is it your testimony that that
11   sentence was taken out simply because both parties
12   now had the right to terminate for material breach?
13       A    Right.
14       Q    And can you explain to me why it is that
15   you didn't change the first sentence of what was
16   paragraph eight in Exhibit 30 to say that either
17   party reserves the right to terminate this
18   agreement should the other party fail to perform
19   any material conditions of this agreement?
20            MR. BASINGER:  Objection.  Asked and
21   answered.  You may answer.
22            THE WITNESS:  Okay.  Because I felt that
page 184
1    it was redundant giving -- given paragraph seven
2    because paragraph seven allows either party to
3    perform either role --
4    BY MR. SCHAFFER:
5        Q    Okay.  Now --
6        A    -- as long as they can describe in detail
7    what material conditions the other party has failed
8    to perform.
9        Q    I'll ask you to take a look, and take
10   your time, go through Exhibit 31 and I'll ask you
11   to find all of the termination events that are

[186:8] - [195:22]    11/13/2007  James Daly

page 186
5        A    The one we were just -- I just read from
6    when you asked me the question, I meant paragraph
7    seven.
8        Q    Okay.  Now, paragraph eight of the
9    version proffered with Exhibit 30 --
10       A    Right.
11       Q    -- explicitly said that if there was a
12   material breach condition, that there could be a
13   termination by SAGA, didn't it?
14       A    Yes.
15       Q    Now, that's not contained in paragraph
16   seven of the version that you signed in Exhibit 31,
17   correct?
18            MR. BASINGER:  Object to the form of the
19   question.  You may answer.

23

20          THE WITNESS:  Okay.  It is.  And I read
21   it a couple times already and I'll try again.
22   Okay?  We may disagree over whether I've read it or
page 187
 1   not, but here it is.  "Shall give written notice to
 2   the other party describing in detail what material
 3   conditions the other party has failed to perform."
 4          In other words, paragraph seven requires
 5   that the terminating party, whether it's SAGA or
 6   Consist, describe to the other party, whether
 7   that's SAGA or Consist, exactly what material
 8   conditions of the contract -- and material
 9   conditions of the contract is a term of art here,
10   it's got a small M and a small C, okay, and I've
11   told you what at least one of them was starting at
12   the beginning of the contract.  There are others
13   and there are a bunch that are implied by American
14   contract law.
15   BY MR. SCHAFFER:
16       Q    Well, explain to me, Mr. Daly, why then
17   paragraph eight of the version annexed to
18   Exhibit 30 has its first sentence whatsoever.
19       A    In here, the old one (indicating)?
20       Q    Yes.  Why does the first sentence exist
21   in paragraph eight?
22       A    It was probably carried forward from an
page 188
 1   earlier version.
 2       Q    Is that a standard Software AG contract?
 3       A    The contract with Natalio was never a
 4   standard form.
 5       Q    So --
 6       A    You can see that it was modified,
 7   paragraphs were inserted and deleted.  The fact
 8   that paragraph six and seven are duplicates is a
 9   fact that it was a work in progress.
10       Q    Okay.
11       A    But it wasn't presented to Software AG --
12   to Consist for signature.
13       Q    Okay.  So take a look again at paragraph
14   seven of Exhibit 31.
15       A    Got it.
16       Q    And it says, "Before any termination of
17   this agreement shall be effective, the terminating
18   party shall give written notice."  Do you see that?
19       A    Uh-huh.
20       Q    And when I asked you for the termination
21   events that are explicitly stated in this contract,
22   you skipped over paragraph one, didn't you?
page 189
 1          MR. BASINGER:  Object to the form of the
 2   question.  You may answer.
 3          THE WITNESS:  Yes.
 4   BY MR. SCHAFFER:
 5       Q    Why is that?
 6       A    Because paragraph one's termination is
 7   not for material breach.  Seven doesn't apply to
 8   one.  They're not connected.  They're not the same
 9   thing.
10       Q    Doesn't paragraph seven say "any
11   termination"?
12       A    Yes.
13       Q    And isn't the only termination that's
14   explicitly referenced in this agreement the
15   termination that's contained in paragraph one?
16          MR. BASINGER:  Object to the form of the
17   question.  You may answer.
18          THE WITNESS:  No.  No, there's a
19   termination in paragraph seven of 31 and there's a
20   termination in paragraph one.  Paragraph one is
21   termination without cause, paragraph seven is

```
22      termination with cause due to the breaching of a
page 190
 1      material condition that you failed to perform and
 2      after 60 days you still didn't get it right.
 3      BY MR. SCHAFFER:
 4           Q     Does paragraph seven of Exhibit 31 say
 5      anything about termination for material breach?
 6           A     That's exactly what it covers.  "The
 7      terminating party shall give written notice to the
 8      other party" -- for there to be a terminating party
 9      there has to be a termination.  Before the
10      termination can become effective, you have to give
11      written notice to the other party describing in
12      detail what material conditions -- so you've got to
13      have a material condition --
14           Q     Now --
15           A     -- the other party has failed to perform,
16      and then the other party will have the 60-day cure
17      period.
18           Q     Now, paragraph seven refers to any
19      termination, does it not?
20                 MR. BASINGER:  Objection.  Asked and
21      answered.  You may answer.
22      BY MR. SCHAFFER:
page 191
 1           Q     Isn't that what the words say?
 2           A     The -- the -- the phrase taken out of
 3      context says that, but in context it doesn't, no.
 4           Q     In context of -- well --
 5           A     Of paragraph seven.
 6           Q     Take a look at paragraph eight of
 7      Exhibit 30.
 8           A     Okay.  Right.  "Before such termination
 9      shall become effective."
10           Q     Now, the word "such" refers to material
11      breach, doesn't it --
12                 MR. BASINGER:  Objection.
13      BY MR. SCHAFFER:
14           Q     -- that's referred to in the first
15      sentence that's been taken out of Exhibit 31?
16                 MR. BASINGER:  Object to the form of the
17      question.  You may answer.
18                 THE WITNESS:  It -- it appears to, yeah.
19      BY MR. SCHAFFER:
20           Q     Okay.
21           A     I mean that -- that's one interpretation
22      you can make, yes.
page 192
 1           Q     Okay.  And it's quite clear under that
 2      version that paragraph eight is referring to cause,
 3      whereas paragraph one is not referring to cause;
 4      isn't that right?
 5           A     The situation is the same in both.
 6           Q     But in one there's a sentence that
 7      appears that makes it very, very clear and in the
 8      second version there's one that refers to any
 9      termination.  Do you see that?
10                 MR. BASINGER:  Object to the form of the
11      question.  You may answer.
12                 THE WITNESS:  I -- I see it, but I think
13      we're speaking past each other.
14      BY MR. SCHAFFER:
15           Q     Okay.
16           A     Okay?  This one which was not signed did
17      not get finalized, 30, okay, has an explicit right
18      for SAGA, in paragraph eight, to terminate, it's
19      unilaterally --
20           Q     Correct.
21           A     -- for material breach.
22           Q     Correct.  And that version was not
page 193
```

1   accepted, correct?
2         A    This one over here is bilateral.  Either
3   one can terminate for material breach.  Okay?  So
4   they both, except for the bilateral nature of this
5   one, say the same thing.
6              Could the wording -- could -- could there
7   be an improvement?  There's always room for --
8   after a case arises, there's always room for
9   improvement.
10        Q    Okay.  Well --
11        A    But this contract says that material
12  breach conditions can be terminated differently.
13  It makes no reference -- there's no reference in
14  paragraph seven to one, paragraph one.
15        Q    This agreement, you're pointing to
16  Exhibit 31?
17        A    Is 31.
18        Q    You also agree with me that paragraph
19  seven says "any termination," and it doesn't say
20  other than the termination set forth in paragraph
21  one, does it?
22              MR. BASINGER:  Objection to the form of

page 194
1   the question.  You may answer.
2              THE WITNESS:  Literally it doesn't say
3   that, but it's not necessary to say it if it's in
4   the same paragraph defining the termination.  So
5   it's a -- it's a choice in drafting that doesn't
6   affect the meaning in paragraph seven.
7   BY MR. SCHAFFER:
8         Q    Well, you've been drafting contracts
9   since you got out of law school, Mr. Daly, right?
10        A    Uh-huh.
11        Q    And you view yourself as being a careful
12  draftsman --
13        A    Right.
14        Q    -- a good draftsman?
15             Don't you think that that paragraph can
16  reasonably be read as saying that the termination
17  that's contained in paragraph one is governed by
18  the procedure that's set forth in paragraph seven?
19        A    No.
20        Q    You don't believe that?
21        A    No.
22        Q    Okay.

page 195
1         A    In my mind that's an -- that's an
2   impossible construction.
3         Q    And would it have been an impossible
4   construction had you left in the sentence that was
5   deleted from paragraph eight of Exhibit 30, which
6   said that SAGA reserved the right to terminate for
7   failure to perform material conditions of the
8   agreement, and simply had made that a bilateral
9   provision and, therefore, both parties would have
10  clearly had the right to terminate after 60 days of
11  noncure of a material condition as well as for no
12  reason at all under paragraph one?
13             MR. BASINGER:  Objection to the form of
14  the question.  Calls for speculation.  You may
15  answer to the extent you're able.
16             MR. SCHAFFER:  Well, Mr. Daly is an
17  experienced contract draftsman.  He said he's
18  drafted over 500 contracts or been responsible for
19  them.  I want to get his view as to whether that
20  would have not been a very clear way of saying what
21  he now says this contract says.

page 196
1   answer.
2             THE WITNESS:  Yeah.  I -- I don't think I
3   agree for the reason I stated previously.

26

[199:11] - [201:4]          11/13/2007   James Daly

page 199
11        Q     Now, take a look at paragraph seven of
12    Exhibit 31.
13        A     I'm there.
14        Q     And we determined before that paragraph
15    seven to Exhibit 31 changed the previous draft,
16    paragraph eight of Exhibit 30, by saying "before
17    such termination shall be effective" to "before any
18    termination."
19            Do you agree that what you've just told
20    me would have been perfectly clear if you had said
21    in paragraph seven of Exhibit 31 "before any
22    termination for failure to perform a material
page 200
1     condition of this agreement is effective," et
2     cetera, continuing on the paragraph, and that would
3     have made it very clear that the termination right
4     was available for failure to perform material
5     condition after only 60 days of noncure?
6            MR. BASINGER:  Objection to the form of
7     the question.  You may answer.
8            THE WITNESS:  The -- the only agreement I
9     can give to your statement is that knowing what has
10    transpired between the parties could I improve this
11    language to remedy this situation.  In my mind
12    every contract is always improvable.  I do not
13    think that the way this is written it precludes the
14    termination I described.
15    BY MR. SCHAFFER:
16        Q     But it doesn't compel it either?
17            MR. BASINGER:  Objection to form.  You
18    may answer.
19            THE WITNESS:  It doesn't compel it unless
20    they fail to correct in 60 days.
21            MR. BASINGER:  Clarification.  I think by
22    compel it he means your understanding.
page 201
1     BY MR. SCHAFFER:
2        Q     Is your understanding compelled by the
3     reading of this contract?
4        A     No.

[202:12] - [203:22]          11/13/2007   James Daly

page 202
12        Q     Okay.  Now, you testified earlier that
13    one of the things that Mr. Fridman was quite
14    insistent about was obtaining, as you described it,
15    a perpetual agreement; is that correct?
16        A     (Nodding.)
17            MR. BASINGER:  Object to the form.  You
18    may answer.
19    BY MR. SCHAFFER:
20        Q     Do you remember that testimony?
21            MR. BASINGER:  Same objection.
22            THE WITNESS:  I remember our discussion,
page 203
1     questions and answers, yes.
2     BY MR. SCHAFFER:
3        Q     Yeah, you remember the discussion about
4     that.
5            Do you believe that Mr. Fridman's reading
6     of this contract as being perpetual is an
7     unreasonable reading given that you've I think
8     testified that he did not ever say to you that he
9     was giving up on his insistence that the agreement
10    be a perpetual agreement?
11            MR. BASINGER:  Object to the form.  You
12    may answer.

27

```
13          THE WITNESS:  Well, you know, did he ever
14   agree to it?  My answer would have to be yes, he
15   agreed to the language because I believe there's a
16   copy executed by him which contains this language.
17   BY MR. SCHAFFER:
18       Q    Yes.
19       A    So I do believe, therefore, I think
20   there's only one legal conclusion, was that he
21   consented it to because I believe it has an
22   integration clause.
```

[205:14] - [207:11]      11/13/2007   James Daly

```
page 205
14       Q    Before when you were describing to me why
15   you believed that a reading of the contract which
16   would provide for termination only at specific
17   times and only for an uncured material breach was
18   unreasonable was a situation where there could be a
19   material failure to perform a condition or, better
20   put, a failure to perform a material condition of
21   the contract left uncured at the very outset of the
22   term of the contract and the other party would be
page 206
 1   unable to terminate the contract until the next
 2   termination date, which, in the example that you
 3   were describing, could have been nine and-a-half
 4   years later.  Do you remember saying that?
 5          MR. BASINGER:  Objection to the form.
 6   You may answer.
 7          THE WITNESS:  The example I gave, yes.
 8   BY MR. SCHAFFER:
 9       Q    That's the example you gave.
10          Now, you're very familiar with contracts,
11   are you not, Mr. Daly?
12          MR. BASINGER:  Objection to form.  You
13   may answer.
14          THE WITNESS:  I like to think of myself
15   as being very familiar in American contract law.
16   BY MR. SCHAFFER:
17       Q    And after having contracted and
18   negotiated over 500 of them, I think you would
19   probably qualify as a contract expert.
20          Is termination of a contract the only
21   contract remedy that a party has if there is a
22   material failure to perform a condition?
page 207
 1          MR. BASINGER:  Object to the form.  You
 2   may answer.
 3          THE WITNESS:  No.  Our hope, expectation
 4   and language wished for a repair hopefully within
 5   60 days to incentivize some movement.  So we were
 6   eternal optimists that if there was a material
 7   breach, we notified the other side that termination
 8   would be the most unlikely event, that what would
 9   be likely is by sitting down, reasoning we would
10   come to a 60-day solution and we would proceed
11   onward.
12   BY MR. SCHAFFER:
13       Q    And let's assume for the moment that --
14       A    That was our thinking.
```

[214:4] - [217:22]      11/13/2007   James Daly

```
page 214
 4       Q    Withdrawn.
 5          The nonbreaching party would bear the
 6   burden of demonstrating that there is a material
 7   failure to perform a condition of the contract; is
 8   that correct?
 9          MR. BASINGER:  Objection to the form.
```

```
10   You may answer.
11           THE WITNESS:  That's right, and I believe
12   that's what the intent of seven is.
13   BY MR. SCHAFFER:
14       Q     Okay.
15       A     "The terminating party shall give written
16   notice to the other party describing in detail what
17   material conditions the other party has failed to
18   perform, and the other party shall have 60 days in
19   which to perform such conditions."
20       Q     What does "in detail" mean in your view?
21       A     Sufficient detail to give notice of what
22   is wrong.  In other words, what has been done wrong
page 215
 1   and what needs to be done to rectify it.
 2       Q     And if the nonbreaching party fails to
 3   give notice in that detail such that the
 4   nonbreaching party cannot determine what it is that
 5   the nonbreaching party is claiming is wrong with
 6   their performance, that would be insufficient
 7   notice under paragraph seven in your view?
 8           MR. BASINGER:  Objection to the form.
 9   You may answer.
10   BY MR. SCHAFFER:
11       Q     Did you understand the question?
12       A     I understand your question.  You're
13   saying if --
14           MR. BASINGER:  Same objection.
15           THE WITNESS:  -- I give you notice and
16   it's inadequate or unintelligible to you, then it
17   doesn't work.  And my response to that is let's be
18   real, let's be business like.  If I send you a
19   notice of material breach of a contract and I say
20   you have 60 days in which to repair it and you
21   don't understand it, your response is not to sit
22   back 59 days, your response is to send me a letter
page 216
 1   back saying dear, Mr. Daly, I received your notice,
 2   I wish to repair, I need further information on A,
 3   B, C, D.
 4   BY MR. SCHAFFER:
 5       Q     And if the nonbreaching party or the
 6   notifying party fails to give a response to that,
 7   what conclusion would you draw --
 8           MR. BASINGER:  Objection to the form.
 9   You may answer.
10   BY MR. SCHAFFER:
11       Q     -- under the contract -- what conclusion
12   would you draw under the contract?
13           MR. BASINGER:  Same objection.
14           THE WITNESS:  I -- I think you're asking
15   me what if the nonbreaching party didn't give it --
16   even on the second attempt doesn't give the right
17   information.
18   BY MR. SCHAFFER:
19       Q     Or refuses to give information.
20       A     That's one example of not giving adequate
21   information, is to give zero information, it's a
22   null case.  But I would say that the -- the
page 217
 1   exchange would -- would continue until they got the
 2   information.
 3           With major corporations -- we're not
 4   dealing with individuals here.  We're dealing with
 5   major corporations -- an exchange of information
 6   like that reaches an executive.  You -- you climb
 7   the management tree and find someone who does
 8   respond.  You don't just say well, 58 days and I
 9   got these guys, all I got to do now is sit back and
10   wait.  You don't do that.  Reasonable businessmen
11   at this level, multi, multi-million dollar
```

```
12  corporations, don't behave childishly or
13  irrationally.
14       Q    Now --
15       A    They pursue.
16       Q    Now, have you ever seen in your career an
17  intellectual software contract or license which is
18  perpetual and which cannot be terminated even for
19  material breach?
20       A    I have never in my career, 1981 until
21  today, 26 years, seen a contract that cannot be
22  terminated for a true material breach.
```

[229:10] - [235:14]        11/13/2007   James Daly

```
page 229
 7  BY MR. SCHAFFER:
 8       Q    Okay.
 9       A    -- to...
10       Q    Okay.  I'm going to ask the reporter to
11  mark this document as Exhibit 34.
12            (Daly Exhibit Number 34 was
13            marked for identification.)
14  BY MR. SCHAFFER:
15       Q    Have you ever seen Exhibit 34 before,
16  Mr. Daly?
17       A    Yeah.
18       Q    What is Exhibit 34?
19       A    That's the signed, executed by both
20  parties copy of the distributorship agreement in
21  question.
22       Q    Now, Exhibit 33 asks Mr. Fridman to sign
page 230
 1  the revised Annex A and to initial all pages and
 2  then return them to you for a fully executed
 3  version; is that correct?
 4       A    And I believe we had that Annex A in
 5  here, yes.
 6       Q    Okay.  Can you explain to us why you
 7  asked Mr. Fridman to initial each page and sign and
 8  date the signature page in the cover letter to
 9  Exhibit 33?
10       A    Let's see.  Thirty-three.
11       Q    Page CSS-92.
12       A    Yeah.  I would have asked him to --
13  well -- okay.  This 33 would have gone with 31.
14  This is the also included letter.  Okay?  So I
15  would have asked him to, you know, sign both
16  original agreements.  And then the -- and -- and replace
17  originals.  And then the -- and -- and replace
18  Annex A, as I said in the -- in the transmittal
19  letter on -- on 34.  So make this your Exhibit A
20  instead of the one in 31 of September 9th, or this
21  is September 18th rather.  And then after that's
22  finished, on both originals initial each page, sign
page 231
 1  and date the signature page and return both
 2  originals to me.
 3       Q    Okay.  And Exhibit --
 4       A    So it was executional instructions.
 5       Q    And Exhibit 31, by the way, on page nine,
 6  Exhibit A also changed the baseline year royalty to
 7  7 and-a-half million dollars from $8 million,
 8  didn't it?
 9            MR. BASINGER:  Object to the form.  You
10  may answer.
11            THE WITNESS:  I don't have an Exhibit A
12  on my --
13  BY MR. SCHAFFER:
14       Q    Exhibit --
15       A    -- 34.
16       Q    I'm sorry.  It's Exhibit 31.  Annex A to
```

```
17    Exhibit 31.
18         A    Exhibit 31 has Exhibit A.
19         Q    And Exhibit A, paragraph three --
20         A    Right.
21         Q    -- establishes a baseline royalty of 7
22    and-a-half million dollars, correct?
page 232
 1         A    Right.
 2         Q    Which was a compromise between the
 3    position that Mr. Fridman was advocating and the
 4    position that Software AG was advocating; is that
 5    correct?
 6         A    Well, it conceded to Mr. Natalio's
 7    request for 7 million because he was going to pay 7
 8    and-a-half, but he was going to receive a one-time
 9    credit of 500,000 towards his year 2000 Toolkit
10    payments.  So, in effect, he was paying for two
11    things with the 7 and-a-half million.  He was
12    paying 7 million for the agreement and he was
13    getting a half a million credit to the Year 2K
14    usage.
15         Q    Okay.
16         A    So he got his 7 million in the end.
17         Q    And we saw that Exhibit 33 is dated
18    September 18th, correct?
19         A    September 18th is 33, yes.
20         Q    Okay.  Now, were you, as the negotiator
21    for SAGA of the agreement reflected in Exhibit 34,
22    under any time pressure to conclude that agreement
page 233
 1    with Mr. Fridman?
 2         A    Well, the only time pressure was we
 3    wanted to have an agreement in place on January 1
 4    of '98.  We wanted to be under agreement by
 5    January 1 of '98.
 6         Q    Well, isn't it a fact, Mr. Daly, that at
 7    around this time, meaning August, September of
 8    1997, there was an IPO underway for SAGA's stock?
 9         A    I agree -- I believe that was true, yes.
10         Q    And was it important for SAGA to have the
11    Distributorship Agreement with Consist in place for
12    purposes of the IPO?
13         A    It was considered -- it was considered
14    positive, not -- not a drop-dead condition, but --
15    but very much desired that it be in place because
16    it was mentioned in the prospectus that it was
17    being negotiated.
18         Q    And who was it that viewed it as a
19    positive?  Was it something that the investment
20    bankers wanted or was it something --
21         A    Right.  Thayer Capitol wer the investment
22    bankers and the, as you know, in an IPO it's not
page 234
 1    just the -- the banker for the firm, but it's the
 2    coalition that they put together of other bankers
 3    who all contribute to reviewing and perfecting the
 4    prospectus.
 5         Q    And --
 6         A    And they all felt as a group, I remember,
 7    that the agreements with the affiliates were an
 8    important part of the company's bottom line.
 9         Q    Okay.
10         A    If not top line, bottom line.
11         Q    Okay.  And was it important for the IPO
12    process to have in place a distributorship
13    agreement that had a predictable stream of revenue
14    for SAGA?
15         A    That was considered a very important
16    asset, yes.
17         Q    And the predictable stream of revenue in
18    particular that's reflected in Exhibit A to --
```

31

```
19      A    I have an Annex A and B.  I don't have
20 the exhibit on mine.  Is it -- and this is a new
21 Annex A in 33, so it's not there.  But there's a --
22 there's a page -- yeah.  "Make payments to SAGA as
page 235
1 provided in Exhibit A hereto."  So there's an
2 Exhibit A somewhere.
3      Q    We had just actually looked at Exhibit A,
4 but I can't find it now.  But in any event, the
5 revenue stream that was reflected in Exhibit A to
6 the Distributorship Agreement, which we looked at a
7 few moments ago, was an important feature of the --
8      A    Oh, yeah.
9      Q    -- IPO process; is that correct?
10      A    The revenue -- the revenues to be paid by
11 Consist to Software AG?
12      Q    Yes.
13      A    Yes.
14      Q    Okay.
15      A    We have one in 39 as the -- but it was,
16 as you say, we have an Exhibit A, but it's to --
17 it's not the signed version.  It's Number 31.
```

[258:21] - [259:12]      11/13/2007   James Daly

```
page 258
18            THE WITNESS:  It's not an end to the
19 entire agreement between us.  It's -- it's
20 conceivably remediable.
21 BY MR. SCHAFFER:
22      Q    Mr. Daly, will you be at trial in this
page 259
1 matter on December 12th?
2      A    I will be instructed by Mr. Basinger or
3 by Baker & McKenzie where to show up if I'm needed.
4            (Brief recess.)
5            MR. SCHAFFER:  I have no further
6 questions, Mr. Daly, and I thank you very much for
7 your time today.
8            MR. BASINGER:  I have no questions at
9 this time.
10            (Whereupon, at 5:00 p.m., the
11            deposition of JAMES H. DALY
12            was concluded.)
13                 *   *   *   *   *
14
15
```

[260:1] - [260:19]      11/13/2007   James Daly

```
page 259
20
21
22
page 260
1            CERTIFICATE OF NOTARY PUBLIC
2      I, SHARI R. BROUSSARD, the officer before whom
3 the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears in
5 the foregoing deposition was duly sworn by me; that
6 the testimony of said witness was taken by me in
7 stenotypy and thereafter reduced to typewriting
8 under my direction; that said deposition is a true
9 record of the testimony given by said witness; that
10 I am neither counsel for, related to, nor employed
11 by any of the parties to the action in which this
12 deposition was taken; and, further, that I am not a
13 relative or employee of any counsel or attorney
14 employed by the parties hereto, nor financially or
15 otherwise interested in the outcome of this action.
16
```

```
17
18                         SHARI R. BROUSSARD
                      Notary Public in and for the
19                       District of Columbia
20
21   My commission expires:
22   July 14, 2010
```

[261:4] - [261:10]        11/13/2007  James Daly

```
page 261
 1   A C K N O W L E D G E M E N T   O F   D E P O N E N T
 2
 3
 4   I, JAMES H. DALY, do hereby acknowledge I
 5   have read and examined the foregoing pages of
 6   testimony, and the same is a true, correct and
 7   complete transcription of the testimony given by me,
 8   and any changes or corrections, if any, appear
 9   in the attached errata sheet signed by me.
10
11
12
13
```

Dated: New York, New York                DUANE MORRIS LLP
       December 3, 2007

                                         By:    /s Hyman L. Schaffer
                                              Hyman L. Schaffer
                                              Fran M. Jacobs
                                              Brian Damiano
                                         1540 Broadway
                                         New York, New York 10036
                                         Telephone: (212) 692-1000
                                         Facsimile: (212) 692-1020
                                         *Attorneys for Plaintiff*
                                         *Consist Software Solutions, Inc.*

33