DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Consist Software Solutions, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| CONSIST SOFTWARE SOLUTIONS, INC., f/k/a CONSIST INTERNATIONAL, INC., | : : : |
| Plaintiff, | : 07 CV 7047 (CM) (FM) : |
| -against- | : : |
| SOFTWARE AG, INC. and SOFTWARE AG, | : PLAINTIFF'S PROPOSED : FINDINGS OF FACT AND : CONCLUSIONS OF LAW |
| Defendants. | : |

-------------------------------------------------------------------x

Plaintiff Consist Software Solutions, Inc. f/k/a Consist International, Inc., by its attorneys Duane Morris LLP, submits the following proposed findings of fact and conclusions of law:

## I. PROPOSED FINDINGS OF FACT

### A. Procedural Background

1. Plaintiff Consist Software Solutions, Inc. f/k/a Consist International, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Delaware. It maintains a New York office at 10 East 53rd Street, New York, New York, 10022.

2. Defendant Software AG, Inc. ("SAGA") is a Virginia corporation with its principal place of business at 11700 Plaza America Drive, Suite 700, Reston, Virginia 20190.

3.    Defendant Software AG ("SAG") is a foreign corporation with headquarters in Darmstadt, Germany.  SAG is the parent corporation of SAGA.  (SAG and SAGA are together referred to as "Defendants.")

4.    Consist commenced this action in the Supreme Court of the State of New York for the County of New York on August 3, 2007.  On August 7, 2007, Defendants removed this action to federal court based on diversity of citizenship.

B.    <u>Factual Background</u>

5.    Consist Software Solutions, Inc. f/k/a Consist International, Inc. is a company which, with its affiliate companies (together referred to as "Consist"), provides technology products for development and integration of financial applications, business management and mission-critical solutions.  Consist also provides consulting services to commercial, public sector, and multinational organizations, and business solutions developed mostly with SAG proprietary language primarily in Consist's Territory in South America.

6.    Consist was started in 1972 by Natalio S. Fridman ("Fridman") who is now Consist's President.

7.    Although Consist initially did business only in Argentina and Brazil, it now does business throughout South America.

8.    Consist specializes in supporting large-scale organizations in the financial sector, governmental agencies, public utilities, and leading industrial and commercial groups which need data management systems to handle enormous amounts of information.  Consist sells technology to a specific and distinct market – large organizations that have a need for complex systems developed for their particular needs.  Once an organization has invested in a technology

that includes a proprietary programming language, such as SAG's Natural, it has made a commitment of cost and resources that makes converting to another technology unlikely.

9.      For the past 32 years, Consist has been the exclusive distributor of technology developed by SAG. The territory in which Consist was appointed the exclusive distributor of SAG technology at first included only Brazil. (PX 111.[1]) It was subsequently expanded to cover other countries in South America and today includes, in addition to Brazil, Argentina, Bolivia, Chile, Paraguay, Peru, and Uruguay (the "Territory"). (PX 1 at p.1.) However, Brazil has by far the largest market for software technology in South America, and it remains the country in which Consist does most of its business.

10.      Over the years, Consist's rights and obligations as an exclusive distributor of SAG technology have been memorialized in a series of distributorship agreements. (PX 1, 2, 18, 60, 105, 106, 108, 111-114.) The current agreement became effective January 1, 1998 (the "Agreement"). The parties to the Agreement are Consist and SAGA. At the time the Agreement was signed, SAGA was an independent company and was itself an exclusive distributor of SAG technology. Since 2000, SAGA has been a wholly-owned subsidiary of SAG. SAG was not itself a party to the Agreement and did not participate in its negotiation.

C.      The Negotiations Leading Up to the Agreement

11.      The distributorship agreement that preceded the Agreement was dated as of January 1, 1995 (the "1995 Agreement"). (PX 2.) It had a fixed term: January 1, 1995 through December 31, 1997. (Id. at ¶ 1.) But it provided that, "[d]uring the third year (1997) of this term the parties agree to negotiate, in good faith, a new agreement." (Ibid.) Based on this provision,

---

[1]      All references to Consist's trial exhibits are noted parenthetically in the text as follows: "PX __."

3

in the second half of 1997, Fridman began negotiating a new exclusive distributorship with

James Daly ("Daly"), who was then SAGA's General Counsel and Vice President for

International Operations.

12.     At the outset of their negotiations, Fridman told Daly that, after 22 years as the

exclusive distributor of SAG technologies in the Territory, he was no longer happy with some of

the terms that had been in their prior distributorship agreements.  Specifically, he did not want to

have to negotiate new distributorship agreements every few years.  While a short-term agreement

may have been appropriate before Consist had an established track record as a distributor,

Consist had been selling SAG technologies in South America for more than two decades and had

been highly successful.

13.     Fridman also explained to Daly that, as long as the distributorship agreement was

for a fixed term and did not have to be renewed by SAGA, he viewed Consist as at SAGA's

mercy:  SAGA could end the relationship and walk away with Consist's business because the

agreements had required Consist to provide reports identifying its customers and the terms of its

contacts with its customers.  After building up the market for SAG technologies in South

America, Fridman did not think Consist should exposed to the risk that SAGA would try to cut it

out and appropriate Consist's customer base for itself.   Fridman therefore told Daly that there

were two things Consist had to have in the new distributorship agreement:  the agreement had to

be perpetual and it could not require Consist to report customer identities or contract terms.

14.     Following Fridman's initial discussion with Daly, Daly sent Fridman a proposal

for a new distributorship agreement dated August 4, 1997.  (PX 40.)  Daly's cover letter said that

he had attempted "to incorporate the ideas from [their] last meeting in New York."  (Ibid. at

SAG 3788.) Although SAGA still sought to have Consist report on its customer base, SAGA did

accept another proposal that Fridman made. Instead of paying SAGA a royalty based on Consist's sales, as Consist had done in the past, SAGA's proposal called for a fixed payment with a base-year amount that was to be adjusted annually based upon the increase or decrease in SAGA's own audited product/license revenue in its own territory. This meant that SAGA would be paid based on its own success in selling SAG technologies in the United States. If Consist's sales failed to keep pace with SAGA's, Consist would still have to pay according to the success of SAGA.

15.    In response to Fridman's other demand – that the new agreement be perpetual – SAGA proposed a 25-year term. (PX 40 at SAG 3789.) But the proposal also stated that, "[a]t the end of the first 5 Years of this Agreement either party can Terminate this Agreement with 18 months notice." (PX 40 at SAG 3790.) Fridman called Daly and told him that this aspect of SAGA's proposal was unacceptable because the new agreement would have to be an "evergreen" – something that SAGA could not terminate at will.

16.    On August 21, 1997, Daly sent Fridman a draft agreement. (PX 41.) The draft that Daly sent to Fridman was not a standard form contract.

17.    Although the draft no longer provided that SAG could terminate Consist's distributorship on 18 months' notice at the end of the first five years, as the earlier proposal had, Daly had revised it to provide that: "The Initial Term during which SAGA can not terminate this Agreement is set to ten (10) years with automatic renewal for five (5) years, unless one of us chooses to terminate after 10 years and 18 months notice." (PX 41 at CSS 54.) Daly stated in the cover letter that accompanied the draft that "SAGA is ready to execute this deal" and that he would send Fridman a signed copy if he gave Daly his approval. (PX 41 at CSS 55.)

18.     Not only did the draft give SAGA the right to terminate the distributorship at the end of ten years, it also required Consist to account to SAGA for all installations and de-installations of SAG products and Special Products within the Territory (PX 41 at CSS 56, 58), as had the 1995 Agreement (PX 2 at ¶ 5(3)).  Under the terms of the 1995 Agreement, as well as the August 21 draft, Special Products are defined as those for which SAG itself pays royalties.  The draft contained other terms that were unacceptable to Consist because Daly had used the 1995 Agreement as a template and picked up terms to which Consist continued to object.  For example, Paragraph 8 of the draft was substantially the same as Paragraph 7 of the 1995 Agreement.  (Compare PX 2 and PX 41.)  It stated:

> SAGA reserves the right to terminate this Agreement should PACS [now Consist] fail to perform any material condition of this Agreement.
>
> Before any such termination shall become effective, SAGA shall give written notice to PACS describing in detail what material conditions PACS has failed to perform, and PACS shall have sixty (60) days in which to perform such conditions.

(PX 41 at CSS 60.)

19.     Essentially the same language had appeared in the distributorship agreement in effect from January 1, 1991 through December 31, 1994.  (PX 60.)

20.     After reviewing the draft, Fridman told Daly that Consist would not sign it because its term was unacceptable, it could be terminated in two ways and because it continued to impose reporting obligations on Consist.  The draft would have allowed SAGA to terminate the distributorship agreement two ways:  (a) SAGA could give Consist notice of termination 18 months prior to the tenth anniversary of the agreement (PX 41, CSS 00056) or (b) it could

terminate at any time if Consist failed to cure a material breach 60 days after receiving notice of the breach. (Id., at CSS 000060).

D.    The Agreement

21.    Following their conversation about the August 21, 1997 draft, Daly made further revisions. Since Daly is a lawyer – he was also SAGA's General Counsel throughout – and Fridman is not, Daly did all of the drafting and supplied all of the language in the Agreement; Fridman only reviewed the proposals and drafts that Daly prepared, and told him whether they were acceptable.

22.    On September 9, 1997, Daly sent Fridman the revised agreement which he had already signed on behalf of SAGA. (PX 42.) The Agreement changed the draft in a number of key respects. First, in response to Fridman's continued insistence on a perpetual contract, Daly deleted the entire first sentence in Paragraph 8 of the August 21 proposal (which became Paragraph 7 of the Agreement ) which had provided that SAGA reserved the right to terminate the Agreement at any time if Consist failed to perform a material condition, after 60 days' notice and failure to cure. (PX 42 at CSS 000087). It also changed the sole remaining sentence in Paragraph 7 so that it now provided that, before "any" termination of the Agreement could be effective, there would have to be a notice of which material condition had not been performed and an opportunity to cure. The prior proposal had referred to "any such" termination – clearly referencing a termination for failure to perform "any material condition." Finally, and clearly referencing the termination set forth in Paragraph 1, which was available to both parties of the Agreement, Paragraph 7 too was made mutual. That is, whereas Paragraph 8 of the August 21 proposal gave only SAGA a right to terminate for failure to perform material conditions after

notice and failure to cure, Paragraph 7 of the Agreement was made available to both parties, just like Paragraph 1's 18 month termination provision was.

23.    Fridman regarded these changes, which are otherwise inexplicable, as responsive to his demand that the Agreement be perpetual.  Since the only place "termination" was mentioned in the Agreement was in Paragraph 1, Fridman understood "any termination" in Paragraph 7 to mean a termination of the Agreement under Paragraph 1, which could not occur unless the requisite notice were given 18 months prior to December 31, 2007.  Thus, Fridman believed that SAGA could only terminate the Agreement if it gave Consist notice 18 months before December 31, 2007 and specified a material breach which Consist had failed to cure within 60 days.  This language satisfied Fridman's demand for a perpetual agreement because he believed that, as long as Consist performed under the Agreement – or cured any breach within 60 days of receiving an appropriate notice – SAGA could not terminate.  Moreover, Fridman believed that, although the agreement could not be terminated, other remedies were available to the party claiming the default.  For example, Consist could go to court to force SAGA to perform its obligations so long as Consist paid its obligations to SAGA or into the court.  Conversely, SAGA could force Consist to perform its obligations if Consist had breached.  In short, Fridman's understanding from his dealings with Daly is that the changes he made to Paragraph 7 of the Agreement from Paragraph 8 of the August 21 proposal clearly intended to make the procedure in Paragraph 7 applicable to Paragraph 1, which stood alone as the only "termination" event set forth in the Agreement.

24.    Had the document that Daly sent Fridman on September 9, 1997 continued to include a sentence stating that SAGA reserved the right to terminate if Consist failed to perform a material condition, and had the phrase "such termination" in the following sentence of

8

Paragraph 8 of the draft (PX 41 at CSS 60) not been replaced in Paragraph 7 of the Agreement with the phrase "any termination" (PX 42 at CSS 87), Fridman would not have signed the Agreement. He did not tell Daly how to word the Agreement; he simply continued to negotiate for a perpetual agreement. If Daly was not trying to satisfy Fridman's demand for a perpetual agreement, there is no reason why he would have deleted the provision that "SAGA reserves the right to terminate this Agreement should [Consist] fail to perform any material condition of this Agreement" or changed "such termination" to "any termination." Plainly put, the wording of the August 21 proposal, which Daly changed in the September 9 proposal that became the Agreement, had unquestionably provided for the interpretation that SAG here urges, and that proposal was intentionally and affirmatively changed by SAGA in response to Consist's position.

25.     Fridman did not tell Daly how to word the Agreement to achieve what Consist wanted; he simply told Daly why his August 21,1997 draft was unacceptable to Consist. In deleting the provision that "SAGA reserves the right to terminate this Agreement should [Consist] fail to perform any material condition of this Agreement" and changing "such termination" to "any termination," Daly was apparently trying to address Fridman's concerns.

26.     The other change that Daly made in the Agreement was that he eliminated Consist's reporting obligation for SAG products, while maintaining the obligation to report only on Special Products. (PX 1 at ¶ 5(3).[2]) This was acceptable to Consist, because unlike SAG products covered by Annex A, SAGA itself had to pay royalties to third parties on these products. (See First WHEREAS clause of PX 42.)

---

[2]     At the time the Agreement was signed, there were only two Special Products and, with respect to those products, Daly and Fridman agreed to work out the reporting requirements in the future. (PX 1 at ¶ 5(3).)

27.    When Daly conveyed the signed proposal to Fridman, he believed that he now had what was in effect a perpetual agreement. Because of that, Consist insisted on an additional change – this one to the wording of Annex A of the Agreement. In this Annex, Fridman requested that SAGA state that it, too, was able to agree to an Agreement which granted Consist the right to distribute and license SAG's products in the Territory. On September 18, 1997 Daly sent Fridman a revision to Annex A and told him that, if Consist, agreed, Fridman should initial all pages, and execute and return the signature pages. The revision to Annex A states: "SAGA is the perpetual, exclusive distributor in the TERRITORY for all of the products of Software AG of Darmstadt, Germany." (PX 44). This statement gave Consist the assurance that SAGA had the ability to enter into the 1998 Agreement, which Fridman viewed as perpetual and terminable only at specific identified times for material, uncured failure to perform.

28.    Fridman signed the Agreement once he saw that Daly made these changes. Daly and Fridman were the only people involved in negotiating the Agreement.

29.    To the extent that there is any ambiguity in the Agreement, Daly is responsible for it. He appears to have been trying to finalize the Agreement as early as possible because SAGA was in the process of making an initial public offering in connection with which the steady and predictable stream of revenue that SAGA could expect from Consist under the Agreement was important.

30.    Consist had not set September 9, 1997 as the deadline for signing the Agreement. The timetable for completing the Agreement was set by SAGA. (Although Consist was interested in concluding a new Agreement promptly, the timetable for completing the Agreement was set by SAGA.) Fridman would have continued negotiating with Daly had he not believed that the changes Daly made were intended to give – and gave – Consist the two things he told

Daly that Consist had to have in a new agreement: a perpetual term and no reporting with respect to SAG products. The reason for the timing and course of the drafting process became clear to Fridman shortly after he signed the Agreement. Although Fridman did not know it at the time, while Daly and Fridman were negotiating the Agreement, SAGA, which had been a privately-held corporation, was in the process of making an initial public offering. The form S-1 for the SAGA IPO was filed with the Securities and Exchange Commission on September 26, 1997. (PX 48).

F.    The New Management Team at SAG

31.    In late 2003, Karl-Heinz Streibich ("Streibich") became the Chief Executive Officer of SAG. Since Streibich did not arrive at SAG until 2003, he had nothing to do with the Agreement or its negotiation. In fact, SAG itself was not involved in the negotiations, since SAGA was an independent company at the time and only became a wholly-owned subsidiary of SAG in 2000.

32.    In May 2005, Streibich told Fridman that SAG was no longer interested in having exclusive distributors and accordingly was planning to terminate the Agreement as of December 31, 2007. During Fridman's business discussions with Streibich, he did not explain that Consist's Agreement was an evergreen one, nor did he say anything to suggest that he did not believe the Agreement to be a perpetual contract. The last thing Fridman wanted to do was tell Streibich something that would precipitate the filing of a pretextual notice of breach under Paragraph 7 of the Agreement, as later happened once Consist's views became known to SAGA and SAG. While Fridman proposed to Streibich on September 30, 2005 that Consist and SAG enter into a new agreement with similar terms to their current contract to be effective January 1,

2008 (PX 29), he did so in an effort to continue, without acrimony, Consist's longstanding and mutually beneficial distributorship relationship with SAG.

33.    Put differently, Fridman is a businessman who is interested in long-term good relations with his vendor. If the vendor is unhappy with their arrangement, Fridman as a businessman would be willing to negotiate an adjustment to the terms of their relationship. This normally entails increasing the money that the vendor receives. However, it soon became clear to Fridman that SAG was proposing a fundamentally different relationship between them, rather than a simple increase in money. Such a radical change was not something Fridman was willing to accept. Nonetheless, throughout the course of discussions with SAG concerning their relationship after December 31, 2007, Fridman hoped that we would be able to negotiate an arrangement and would not find ourselves in litigation over the meaning of the Agreement.

G.    The Agreement Has Been Renewed

34.    When Fridman signed the Agreement, he legitimately believed that it ran for an initial term of ten years and would automatically be renewed by the parties for successive five year terms unless either party sent an appropriate notice of termination – meaning one that identified an uncured material failure to perform – at least 18 months in advance of the renewal date. The first automatic renewal date for the Agreement is January 1, 2008.

35.    The Agreement specifies how to effectuate a termination pursuant to Paragraph 1. (PX 1.) As Daly drafted it, Paragraph 7 of the Agreement states that before "any termination" is effective, the terminating party must have given the other party a detailed written notice of the material conditions it has allegedly failed to perform. The non-terminating party then had a 60-day period in which it must perform the identified conditions or risk termination pursuant to Paragraph 1. The failure to perform the identified conditions does not give rise to an

immediately exercisable right to terminate the Agreement; that could occur only on the dates specified in Paragraph 1 of the Agreement and upon meeting the requirements set forth there and in Paragraph 7.

36.    At no point prior to June 30, 2006, which was 18 months prior to the effective renewal date (December 31, 2007), did SAGA ever provide Consist with written notice, detailed or otherwise, of any material conditions that Consist had allegedly failed to perform, as Paragraph 7 of the Agreement explicitly requires.  Rather than provide the requisite notice, SAGA sent a purported notice of termination that failed to set forth any allegations as to what material conditions Consist was supposedly failing, or had failed, to perform that would provide the necessary basis for termination on December 31, 2007.

37.    On March 30, 2006, SAG sent a letter to Consist stating that it had instructed SAGA to give notice of termination of the Agreement effective December 31, 2007.  (See PX 3). On April 6, 2006, SAGA sent notice to Consist purporting to terminate the contract as of December 31, 2007.  (See PX 4).  However, neither SAGA nor SAG provided Consist with a notice describing in detail what material conditions Consist allegedly failed to perform, as required by Paragraph 7 – there were none in any event – nor did they provide Consist with 60 days to perform any such conditions.  Because SAGA's purported notice of termination failed to do what the Agreement requires, it was defective and ineffective under the Agreement.  As a result, the Agreement was automatically renewed, pursuant to Paragraph 1, for a five year term commencing on January 1, 2008.

38.    It was not until July 4, 2006 that either of Defendants claimed that Consist had failed to fulfill its obligations under the Agreement.  Between January 1, 1998, when the Agreement went into effect, and July 4, 2006 – a period of eight and one-half years – Defendants

never claimed that Consist had failed to perform a material condition of the Agreement. By the time SAG for the first time claimed on July 4, 2006 that Consist had breached the Agreement, less than 18 months remained until December 31, 2007. Defendants thus did not give Consist notice that it had breached the Agreement at least 18 months prior to December 31, 2007. As such, nothing Defendants sent Consist on July 4, 2006 could be effective to terminate the Agreement.

39.    On July 4, 2006, Streibich sent Fridman an e-mail (the "July 4 E-mail") in which he asserted that Consist had breached the Agreement. The July 4 E-mail was sent by Streibich, SAG's CEO, not by SAGA – in contrast to the purported letter of termination that SAG obviously recognized SAGA, and not SAG, must send – and was sent in a manner which is not an authorized method under the Agreement. It did not state "in detail" what condition of the Agreement Consist supposedly was not performing, or in what way, nor did it give any indication that it purported to be a "notice" under the Agreement, let alone a notice of termination. The July 4 E-mail was ineffective as a termination notice under the Agreement. It was not even given at least 18 months before the December 31, 2007 putative termination date and was factually baseless.

H.    Consist Never Received Proper Notice that It Failed to Perform
      a Material Condition Under the Agreement, Was Not Given an
      Opportunity to Cure and Did Not Breach the Agreement.

(1)    The July 4 E-mail

40.    When SAG for the first time claimed on July 4, 2006 that Consist had breached

the Agreement, the claim appears to have been made for retaliatory purposes, and not because

SAG or SAGA actually has a basis to believe that Consist had committed a breach which they

wanted Consist to cure. In June 2006, Fridman had complained to Streibich that SAG was

actively attempting to sell its software products in Chile in violation of Consist's exclusive rights

under the Agreement. (See PX 13.) Streibich responded to Consist's complaint in the July 4 E-

mail. (PX 5.) The subject line of Streibich's e-mail, which Defendants now claim was intended

as a Notice of Termination under Paragraph 7 of the Agreement, is "Cooperation Agreement."

41.    The July 4 E-mail does not purport to be a termination notice under the

Agreement; it does not refer to Paragraph 7 of the Agreement, nor does it state that Consist has

60 days to cure or SAG will seek to terminate the Agreement. Paragraph 7 of the Agreement

provides:

> Before any termination of this Agreement shall become effective,
> the terminating party shall give written notice to the other party
> describing in detail what material conditions the other party has
> failed to perform, and the other party shall have sixty (60) days in
> which to perform such conditions.
>
> (Emphasis added.)

42.    To the extent that the July 4 E-mail mentions anything that Consist supposedly

did or failed to do under the Agreement, it states only:

> We consider the none [sic] utilized market potential for our
> products in your territory, especially in Paraguay, Peru, Argentina,
> Bolivia, Chile, Uruguay, as a breech [sic] of our contract.

15

43.    Consist has no reason to think that the July 4 E-mail was intended as a Notice of Termination under Paragraph 7 of the Agreement, and it was justified in regarding Streibich's complaint about Consist's performance as baseless.

44.    Paragraph 8 of the Agreement states that "[a]ll legal notices hereunder shall be in writing and shall be deemed properly delivered and effective when duly sent by Certified Mail, Postage Prepaid, telex or cable, or delivered by hand" to Consist at 10 East 53rd Street, New York. The July 4 E-mail was sent to Consist by e-mail, which is not an authorized method for transmitting legal notices under the Agreement. Streibich himself had no right to send Consist a notice under the Agreement. He is not an officer of SAGA, and SAG, the company of which Streibich is Chief Executive Officer, is not a party to the Agreement.

45.    The statement about Consist's performance that Streibich made in the July 4 E-mail had no factual basis. In a letter that Streibich sent Fridman in April 2007, he praised Consist, saying that it "has made an excellent job in Brazil with Software AG products, probably better than any other Software AG country. My personal admiration to you Natalio for this success." (PX 117; see also PX 10.)

46.    The Agreement did not, by its terms, require Consist to tap undeveloped markets for Software AG's products. Rather, Paragraph 5(3) of the Agreement provides that "CONSIST agrees to make all reasonable efforts to successfully market the SYSTEMS in the TERRITORY." (PX 1 at ¶ 5(3).) The Territory includes seven different countries with varying markets for the kinds of products Software AG sells, which are targeted at governmental agencies and large companies with mainframe computers. The Agreement does not define the Territory as each individual country within the Territory, as Defendants seem to claim, but rather as the collective of seven countries. The Agreement nowhere requires success at any particular

level within any particular country in the Territory, nor does it require that Consist have a presence in each country – even though Consist has a presence in each and maintains websites for each country. (PX 1.)

47.     The Agreement provides that Consist has to "make all <u>reasonable efforts</u> to successfully market" Defendants' products. (PX 1 at ¶5(3); emphasis added.) It does not define "reasonable efforts." The test of what constitutes "reasonable efforts" should be determined by what reasonable business people would do under the circumstances, taking into account the size of the market and likely return. By any measure, Consist has more than satisfied this standard of reasonableness.

48.     The demand for computer software is very different from country to country within the Territory. The computer software market in Brazil is many times the size of the market in any of the other countries in the Territory. As SAG itself wrote in a press release that pre-dated the July 4 E-mail by just two months, "[t]he largest and most important market on the continent is Brazil . . . ." (PX 93.) Defendants cannot seriously contend that it was unreasonable for Consist to focus on Brazil and Argentina. In marketing Defendants' products, Consist was entitled to rely on industry studies which show that, in 2006, Brazil alone accounted for more than 77% of the market in the Territory and, together with Argentina, accounted for nearly 90% of the Territory. (PX 116.)

49.     The timing of the July 4 E-mail makes it appear to be pretextual. Defendants did not suddenly discover in July 2006 that Consist was doing most of its business in the two countries within the Territory with the largest market for computer software. Consist had by then distributed SAG's technologies for more than 30 years. For as long as Consist has done so, it marketed the products primarily in Brazil and Argentina. While Consist also maintains local

17

companies in Chile, Uruguay, Paraguay and Bolivia, and has a presence in Peru, the markets in those countries are far smaller markets than Brazil and Argentina, and, in using "reasonable efforts," Consist was justified in focusing on the parts of the Territory with the largest markets.

50.     It was in Consist's financial self-interest to maximize sales of Defendants' products. If Consist believed it could do more business in other parts of the Territory, it had every reason to do so.

51.     While the Agreement could have established revenue or other benchmarks for each country in the Territory, it does not.[3]  Instead, it requires only that Consist make "all reasonable efforts to successfully market the SYSTEMS in the Territory." (PX 1 ¶ 5(3); emphasis added.)  Consist has done so by making marketing efforts commensurate with the likely return. Accordingly, Consist did not breach its obligation to use all <u>reasonable</u> efforts to successfully market the Systems (as defined in the Agreement) in the Territory.

(2)     <u>The August 16 Letter</u>

52.     Following Consist's receipt of the July 4 E-mail, Consist's attorneys sent two letters to SAG and SAGA in which they stated that the July 4 E-mail was improper and insufficient. (PX 6; <u>see also</u> PX 7.)  In response, Baker & McKenzie, on behalf of SAG and SAGA, sent Consist's outside counsel a letter on August 16, 2006 (the "August 16 Letter") which retroactively characterized Streibich's July 4 E-mail as a notice of material breach under Paragraph 7 of the Agreement, which had to be cured by September 3, 2006. (PX 8.)

53.     Like the July 4 E-mail, the August 16 Letter was procedurally improper and substantively baseless. It was not sent to Consist at the address specified in Paragraph 8 of the

---

[3]     An earlier distribution agreement with SAGA imposed certain revenue thresholds for Chile. (PX 2 at ¶ 1.) The Agreement establishes no such thresholds.

Agreement; did not state "in detail what material conditions the other party has failed to perform," as required by Paragraph 7 of the Agreement; and made allegations which are baseless.

54.    In the August 16 Letter, Defendants' counsel made an after-the-fact attempt to turn the July 4 E-mail into a Notice of Termination under Paragraph 7 of the Agreement. To this end, the August 16 Letter states that Streibich's "letter effectively put your client on notice under Paragraph 7 of the Agreement that it was in material breach of the Agreement and that it had sixty days to cure the defaults therein detailed." (PX 8; emphasis added.) In addition to retroactively pronouncing the July 4 E-mail a Notice of Termination, the August 16 Letter asserts that Consist had breached other obligations which "include[d] the following": (a) the sale of a competing product – Attunity.Connect – in violation of ¶ 5(11) of the Agreement; (b) the refusal to bid on Software products for a Chilean company – Cementos Bio Bio – in violation of ¶ 5(3) of the Agreement; (c) the failure to provide satisfactory technical support to two customers (HSBC and Pao De Acucar Group) in violation of ¶ 5(4) of the Agreement; and (d) the representation to ABN that the Agreement had been renewed which supposedly violated ¶ 5(3) of the Agreement and the implied covenant of good faith and fair dealing under New York law. (PX 8.)

55.    The four new alleged breaches in the August 16 Letter are all specious. Even if the claims had some basis in fact – which they do not – none would constitute a breach of a material condition of the Agreement.

56.    The first alleged breach – that Consist sold a Software product (Attunity.Connect) which competed with SAGA's products without SAGA's approval – is contradicted by

documentary evidence. On January 10, 2002, an officer of SAGA notified Consist in writing that "the Attunity Connect product may be sold by Consist." (PX 11.)

57.    Defendants' counsel's next allegation – that Consist breached Paragraph 5(3) of the Agreement by refusing to bid on Software products for Cementos Bio Bio – is also baseless. Consist did not receive a request to bid from Cementos Bio Bio. The request to bid came from a branch of SAG Spain which was operating in Chile and wanted information for SAG to make a bid to this customer. Defendants' complaint appears to be that Consist did not submit a price that would have allowed the SAG branch in Chile to sell Defendants' product there in violation of the terms of the Agreement. Nothing in the Agreement required Consist to respond to such a request from a SAG branch to facilitate a bid to its own prospects or clients in violation of Consist's exclusive rights.

58.    The third allegation in the August 16 Letter was that Consist failed to provide satisfactory technical assistance and support to customers in the Territory, including HSBC and the Pao De Acucar Group. Consist has no record of any complaints from either of these customers, and Defendants have never provided us with any evidence supporting this allegation. Pao De Acucar has been a Consist customer for nearly 20 years and it continues to be a Consist customer. HSBC is the successor to a Consist customer, Bamerindus Bank. Following HSBC's acquisition of Bamerindus Bank, HSBC started to adapt the software HSBC uses elsewhere, which is not based on Defendants' technologies, for use in Brazil and thus did not renew the maintenance contract for SAG software for 2007. There is no evidence that either HSBC or Pao De Acucar Group ever complained about the level of technical assistance and support Consist provided or, even if they had, that they continued to complain after the August 16 Letter.

Moreover, these two supposed complaints would, by themselves, be insufficient to constitute material breaches of the Agreement.

59.    Finally, Defendants assert in the August 16 Letter that Consist made a misrepresentation to ABN that the Agreement had been renewed for another five years. According to Defendants, this alleged representation violated Paragraphs 1 and 5(4) of the Agreement and the covenant of good faith and fair dealing implied under New York law. Nothing in the Agreement or in the covenant of good faith and fair dealing bars Consist from sharing with its customers its views about the term of the Agreement.  For their part, Defendants have made repeated public statements that the Agreement will terminate on December 31, 2007, and in fact, opened a Brazilian office. (PX 10.)  There is no reason why such statements by Defendants are permitted, but comparable statements by Consist are not.  Even if Consist had made a representation to ABN – and Consist is not aware that such a statement was made – it would not constitute a failure to perform any material condition of the Agreement.

60.    On September 11, 2006, Consist's counsel advised Defendants' counsel that Consist did not believe the August 16 Letter was "adequate or timely for any purpose under the Agreement, that the breaches are either factually or legally correct, are material to the Agreement or are breaches of any sort thereunder."  (PX 9.)

(3)    The October 9 and 10 Letters

61.    Defendants made no further complaints about Consist's performance under the Agreement for more than a year. Then, on October 9, 2007,[4] Defendants' counsel sent Consist's outside counsel a new letter which purported to be a termination notice under the Agreement (the "October 9 Letter"). (PX 124.) By the time the October 9 Letter was sent, Consist had already filed this action seeking, among other things, a declaration that Defendants could not terminate the Agreement.

62.    One day after Defendants' counsel sent their October 9 Letter, they sent another "notice" (the "October 10 Letter") which purported to provide "further" detail concerning two of the defaults alleged in the October 9 Letter.[5] (PX 125.)

63.    The October 9 and 10 Letters suffered from the same procedural and substantive defects as the August 16 Letter: they were not sent to Consist as required by Paragraph 8 of the Agreement, did not describe in detail the material conditions that Consist supposedly failed to perform, and were factually baseless.

64.    The October 9 Letter listed seven supposed breaches, four of which had never been the subject of any notice in the nearly ten years between January 1, 1998 (when the Agreement commenced) and October 2007 (when the notice was mailed to Consist's counsel at an old address), and the three of which represented modifications of claims previously asserted in the July 4 E-mail and August 16 Letter.

65.    The first claim in the October 9 Letter is that Consist breached Paragraph 5(1) of the Agreement by failing to show SAG's authorship, copyright, and trademark in written

---

[4]    The letter that Defendants' counsel sent on October 9, 2007 is actually dated October 9, 2008.

[5]    The October 10 Letter is also dated 2008.

materials for marketing or support of the Systems. On November 2, 2007, Consist responded to this allegation, stating:

> a disclosure concerning copyrights and trademarks appears on the "legal" page of Consist's websites in the Territory. Please inform us immediately if you do not believe that the website disclosure is sufficient, and, if so, in which specific ways. As to user and technical manuals, Consist reproduces them precisely as Software AG provides them.

(PX 19.)

66.     If Defendants were not satisfied with Consist's response to their claim, they said nothing, as evidenced by the November 6, 2007 letter from Defendants' counsel to Consist's counsel which failed to substantively respond to the November 2, 2007 letter, claiming that these issues "are not suitable for debate by letter." (See PX 129.) Defendants thus prevented Consist from taking further steps to cure and cannot complain.

67.     The next claim made in the October 9 Letter appears to be a variation of the claim made in the July 4 E-mail. Defendants now contend that Consist breached Paragraph 5(3) of the Agreement by "fail[ing] to reasonably market the SYSTEMS in Chile, Bolivia, Paraguay, Uruguay and Peru. There are few if any Consist customers of Software AG technology in Chile, Bolivia, Paraguay, Uruguay or Peru." (PX 124.) In their reformulation of the allegation made in the July 4 E-mail, Defendants eliminated the reference to Argentina, apparently because they recognize that Consist had success in marketing SAG products there. For the same reasons that Defendants' July 4 E-mail was factually baseless, their October 9 Letter is also baseless: Consist's marketing efforts throughout the Territory have been reasonable. Defendants were also asked to provide Consist with evidence to the contrary so that Consist could investigate their breach claim (PX 19), and they failed to do so.

68.    Paragraph 3 of the October 9 Letter alleges that Consist breached Paragraph 5(3)

of the Agreement "by failing to make all reasonable efforts to market Special Products."

(PX 124.)  After learning of this allegation which was first made in the October 9 Letter,

Fridman asked Defendants to provide Consist with, among other things, an updated list of all

Special Products included under the Agreement, the international pricelist for these products, the

marketing materials for these products, the user, training, and technical manuals for these

products, and the latest version of the software.  (PX 130.)  Consist requested an updated list

because of SAG's recent acquisition of webMethods, Inc.  The integration of webMethods into

SAG would, in Consist's estimation, clearly result in a reformulation of the Special Products list,

particularly because many of the former Special Products would now become SAG's own

products, and thus included under Annex A of the Agreement and not Annex B governing

Special Products.  Without the information Consist requested, it cannot sell Special Products; it

does not even have Special Products software to sell.  In response to Fridman's request for

information on Special Products, SAGA stated on October 31, 2007 that they had forwarded it to

their attorneys at Baker & McKenzie and stated that "it would be best for our counsel and yours

at Duane Morris discuss the request and determine whether and how it can be fulfilled."  (Ibid.)

Consist's counsel also made multiple requests that Defendants' counsel provide them with the

same material.  (PX 19 at p. 2, PX 132).  In fact, however, Baker & McKenzie responded to

Consist's and its counsel's requests by stating that "your requests for documents and other

evidence are also improper; they should be embedded in document requests or other discovery

mechanisms in order that they are subject to established rules and future objections and rulings."

(PX 129).  Thus, Consist has been told by SAGA to address requests for business information to

Baker & McKenzie through its counsel.  Baker & McKenzie itself, on three occasions (August

16, 2006 and October 9 and 10, 2007) purported to send "default" letters as a business matter pursuant to the Agreement (i.e., not in this lawsuit), announcing that Consist has 60 days to cure; yet, when Consist and its counsel follow SAGA's direction, and request appropriate and necessary business information under the Agreement, Baker & McKenzie refuses to provide it other than within this lawsuit. Baker & McKenzie cannot both send default notices under an Agreement as a business matter and then refuse to respond in a business manner. To date, no updated Special Products list, with appropriate supporting material, has been provided to Consist. The last such list, dated March 2007, predated the webMethods acquisition. In any event, none of Consist's customers has, to date, purchased any Special Products.

69.     In Paragraph 4 of the October 9 Letter, Defendants complained that Consist breached Paragraph 5(3) of the Agreement "by failing to provide written quarterly reports of all installations and de-installations of Special Products." (PX 124.) This claim is baseless. As a factual matter, there have been no contracts for Special Products, and thus, nothing to report. The form that SAGA itself created for such reports requires reporting of contracts (PX 20) and there are none.

70.     Defendants do not seem to have any basis for their allegation that Consist should have provided quarterly reports. Consist's counsel asked Defendants' counsel to let them know if Defendants were aware of any sales of Special Product by Consist. (PX 19 at p. 3.) To date, neither Defendants nor their counsel have identified any. Since Consist had nothing to report, it was not required to submit quarterly reports, and its failure to do so therefore cannot constitute a material breach of the Agreement.

71.     Paragraph 5 of the October 9 Letter is a new version of the claim in the August 16 Letter that Consist failed to provide satisfactory technical assistance and support to customers of

SAGA products in the Territory, this time substituting HP in place of the two customers

identified in the August 16 Letter. On November 2, 2007, Consist's counsel notified

Defendants' counsel that HP was not a Consist customer in the Territory. (PX 19.) Consist's

counsel further stated: "Please provide us with any further details concerning this claim and any

other purported failure to provide the technical support that your clients are relying on in support

of this assertion." (PX 19.) Without this information, if there had actually been any complaints

about the technical support Consist provided, Consist would have been unable to address such

complaints and could not cure. No information has been provided by Defendants and the claim

is thus baseless.

72.     Paragraph 6 of the October 9 Letter repeats the claim made in the August 16

Letter that Consist breached Paragraph 5(11) of the Agreement by marketing Attunity – a

product that Defendants claim competes with one of SAGA's products. Since Consist had

previously pointed out to Defendants that it obtained SAGA's permission to sell Attunity,

Defendants abandoned their claim that Consist was selling Attunity without their permission and

replaced it with a new claim that SAG's approval was "hereby revoked." (PX 124.) Even

though Consist was aware of nothing in the Agreement that authorized Defendants to revoke

their prior authorization, our counsel informed Defendants' counsel that Consist would stop

selling Attunity in the Territory. (PX 19.) Thus, if there had been a breach – and there was none

– it was cured.

73.     Finally, in Paragraph 7 of the October 9 Letter, Defendants make another claim

relating to SAG's copyrights and trademarks. They expanded on this claim in their October 10

Letter, where they allege that, in 1986, Consist applied for and was granted trademarks for

ADABAS and Natural in Brazil. (PX 125.) Fridman testified that Consist did so with

Defendants' knowledge and his testimony is unrebutted.  Moreover, the trademarks have been a matter of public record for more than 20 years, and it was not until after Consist commenced this action that Defendants took any steps of their own to protect their intellectual property in the Territory.  Put differently, SAG and SAGA themselves have done absolutely nothing to protect their own trademarks in the Territory for over 25 years.  Their assertions concerning steps that Consist took or did not take to protect them are disingenuous in the extreme.

74.    Consist has not breached any material condition of the Agreement and, if it had, Defendants did not give Consist an opportunity to cure.  Accordingly, Defendants cannot terminate the Agreement under any theory.

## II. CONCLUSIONS OF LAW

1.    This Court has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(3).

2.    Venue is proper in this Court under 28 U.S.C. § 1441(a) because this action was removed from the Supreme Court of the State of New York for New York County.

3.    The Agreement provides that it is governed by New York law.  (PX 1 at ¶ 10.) Under New York law, the question of whether a contract is ambiguous is a question for the Court to decide.  W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990); Krumme v. Westpoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("It is well settled that 'the threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous.'") (citation omitted); Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) ("Under New York law, which governs here pursuant to § 21(c) of the Settlement Agreement, whether a contract is ambiguous is a matter of law for the court to decide"); Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263-264 (2d Cir.

1987) ("The determination of whether a contract term is ambiguous is a threshold question of law for the court").

4.      A contract is ambiguous if it is reasonably susceptible of more than one meaning. Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1095 (2d Cir. 1993) ("Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'") (citation omitted); Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 430 (2d Cir. 1992) ("because the interrelationship of the two provisions in the letter agreement is susceptible to several reasonable interpretations, the contact is ambiguous. It cannot definitely and precisely be gleaned which reading was intended by the parties."); Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990) (a contract "is ambiguous if it is reasonably susceptible of more than one interpretation").

5.      The Agreement is ambiguous. It is not clear from the face of the Agreement whether Paragraph 1 and Paragraph 7 were intended to be read together, as Consist contends, or are separate and independent provisions, as Defendants assert. A termination of the Agreement pursuant to Paragraph 1 falls within "any termination" of the Agreement under Paragraph 7, which provides that, "[b]efore any termination of this Agreement shall become effective, the terminating party shall give written notice to the other party describing in detail what material conditions the other party has failed to perform, and the other party shall have sixty (60) days in which to perform such conditions." (PX 1.) The Court therefore cannot ascertain from the language of the Agreement whether the parties intended the Agreement to be terminable based

on a written notice given 18 months prior to the end of a term where there was no uncured failure to perform a material condition of the Agreement.

      6.     Where, as in this case, an ambiguity exists, "extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." Sayers, supra, 7 F.3d at 1095. Accord Scott-Macon Sec., Inc. v. Zoltek Co., 2007 U.S.App. LEXIS 23356, at *11 (2d Cir. Oct. 4, 2007) ("district court erred in resolving an obvious ambiguity in the contract without examining available extrinsic evidence of the parties' intent in this regard or authorship of the ambiguous term."); Burger King Corp., supra, 893 F.2d at 528 ("The parties' intended meaning simply is not apparent from the face of the agreement, and examination of extrinsic evidence of intent is therefore appropriate."); Omni Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F.Supp. 2d 534, 540 (S.D.N.Y. 2004) ("If the language of a contract is ambiguous, the court may look to extrinsic evidence of the parties' intent."); RJE Corp. v. Northville Indus. Corp., 198 F. Supp. 2d 249, 263 (E.D.N.Y. 2002) (internal citations omitted), aff'd, 329 F.3d 310 (2d Cir. 2003) ("When contract language is ambiguous, extrinsic evidence is relevant to the extent it bears on the parties' objective manifestations of intent."); Korff v. Corbett, 18 A.D.3d 248, 251, 794 N.Y.S.2d 374, 377 (1st Dep't 2005) ("Parol evidence, where necessary, may be used to . . . explain the meaning of particular terms used."); Weiner v. Anesthesia Assocs., P.C., 203 A.D.2d 454, 454- 455, 610 N.Y.S.2d 606, 608 (2d Dep't 1994) (where "court determines that the terms of the agreement are ambiguous and the intent of the parties becomes a matter of inquiry, parol evidence is permitted to determine that intent.").

      7.     In construing ambiguous language, the Court may consider what the parties discussed in their negotiations. Roberts v. Consolidated R. Corp., 893 F.2d 21, 24 (2d Cir. 1989) (in cases of ambiguity, "courts look to the acts and circumstances surrounding execution of the

ambiguous term to ascertain the parties' intent."); <u>Adasar Group</u> v. <u>NetCom Solutions Int'l, Inc.</u>, 2003 U.S. Dist. LEXIS 3648, at *19-20 (S.D.N.Y. March 13, 2003) ("Extrinsic evidence includes evidence surrounding the negotiation and execution of the ambiguous terms"); <u>Fein</u> v. <u>Chi. Ins. Co.</u>, 2003 U.S. Dist. LEXIS 12374, at * 17 (S.D.N.Y. July 18, 2003) ("If the language of a contract is ambiguous, however, extrinsic evidence of the parties' intent is admissible.").

8.    It is undisputed that Fridman demanded an Agreement that was perpetual or evergreen that, in negotiations with SAGA he made that position known to SAGA's negotiator, Daly, and that he never stated in words or substance that he was withdrawing from or changing that position. The evidence further establishes that Daly affirmatively made changes which are inexplicable except as an attempt to meet Consist's demand for a perpetual contract.

9.    An ambiguous contract should be construed against the drafting party. <u>Kerin</u> v. <u>United States Postal Serv.</u>, 116 F.3d 988, 992 (2d Cir. 1997) ("It is generally accepted that ambiguities in contract terms are construed against the drafter"); <u>Command Cinema Corp.</u> v. <u>VCA Labs, Inc.</u>, 464 F.Supp. 2d 191, 199 (S.D.N.Y. 2006) ("Ambiguous language . . . should be 'construed against the interest of the drafting party'") (citation omitted); <u>GuideOne Specialty Mut. Ins. Co.</u> v. <u>Congregation Bais Yisroel</u>, 381 F. Supp. 2d 267, 274 (S.D.N.Y. 2005) ("the settled rule [is] that ambiguities in a contract are construed against the drafter of the contract"); <u>Subaru Distribs. Corp.</u> v. <u>Subaru of Am., Inc.</u>, 47 F. Supp. 2d 451, 470, 471 n.15 (S.D.N.Y. 1999) (ambiguous distributorship agreement "must be construed against the drafter").

10.    In this case, the drafting party was SAGA, and the ambiguity is construed against it. Moreover, Daly, an attorney who had drafted hundreds of contracts, was negotiating with Fridman, who was a layman. <u>See</u> <u>Isler v. Margolin</u> 259 A.D.2d 396, 397 (1st Dep't 1999) ("To the extent the provision is ambiguous, it must be construed against the attorney").

11.    "A contractual provision should be read so as to avoid rendering any part of the contract superfluous or without effect." <u>Omni Berkshire Corp</u>, <u>supra</u>, 307 F.Supp. at 540.  Since Defendants' interpretation of the Agreement renders the word "any" in Paragraph 7 meaningless, it cannot be credited.

12.    Giving effect to the intent of the parties and accepted rules of contract construction, the Agreement should be construed to provide that it can only be terminated on December 31, 2007 if, at least 18 months prior to that date, SAGA sent a notice to Consist identifying in detail the material conditions that Consist failed to perform and those conditions were not cured within 60 days.  Since no such notice was sent to Consist, the Agreement has been renewed for another five years.

13.    While the general rule is that, where one party to a contract commits a material breach, the other party may terminate the contract, the parties may change this rule, as they did in the Agreement, and condition the right to terminate for a material breach on giving the breaching party notice and an opportunity to cure.  <u>Bausch & Lomb</u> v. <u>Bressler</u>, 977 F.2d 720, 727 (2d Cir. 1992) ("if there was no contractual provision to the contrary, [defendant] would not have had to provide [Bausch & Lomb] with any notice prior to cancelling the Agreement," but § 8.02 "limited the ability of an aggrieved party to terminate the Agreement by providing that, upon the occurrence of a material breach, the aggrieved party could cancel the Agreement only upon 30 days notice during which time the breaching party could attempt to effect a cure"); <u>Filmline (Cross-Country) Productions, Inc.</u> v. <u>United Artists Corp.</u>, 865 F.2d 513, 518 (2d Cir. 1989) ("'Under New York law, . . . where the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with'") (citation omitted and ellipses in original); <u>SVS, Inc.</u> v. <u>Rabbit Ears Productions, Inc.</u>, 1991 U.S. Dist. LEXIS 18199, at *27 (S.D.N.Y. Dec.

16, 1991) ("Where the party asserting nonperformance does not give the defaulting party a chance to cure, the party asserting nonperformance cannot terminate the agreement").

14.    Under New York law, the party invoking a termination provision has the burden of establishing that the notice of termination was properly served and that the other party is in breach. Kolvek v. Ferrucci, 245 A.D.2d 1078, 1079 (4th Dep't 1997) ("plaintiffs failed to prove that they had served notices of default and termination upon defendant, as required by the contract... In the absence of proof that the required notices were sent and that defendant failed to cure his alleged default, plaintiffs failed to establish as a matter of law that defendant was in default under the contract").

15.    The notices that SAG and Defendants' counsel sent to Consist or Consist's counsel were so vague as to be ineffective as notices of material breach. Specifically, the July 4 E-mail was sent by Streibich, SAG's CEO, not by SAGA, and was sent in a manner which is not an authorized method under the Agreement. It did not state "in detail" what condition of the Agreement Consist supposedly was not performing, or in what way, nor did it give any indication that it purported to be a "notice" under the Agreement, let alone a notice of termination. The July 4 E-mail was ineffective as a termination notice under the Agreement. It was not even given at least 18 months before the December 31, 2007 putative termination date and was factually baseless. Like the July 4 E-mail, the August 16 Letter was procedurally improper and substantively baseless. It was not sent to Consist at the address specified in Paragraph 8 of the Agreement; did not state "in detail what material conditions the other party has failed to perform," as required by Paragraph 7 of the Agreement; and made allegations which are baseless. The October 9 and 10 Letters suffered from the same procedural and substantive defects as the August 16 Letter:  they were not sent to Consist as required by Paragraph 8 of the

Agreement, did not describe in detail the material conditions that Consist supposedly failed to perform, and were factually baseless. As the court explained in Ulla-Maija, Inc. v. Kivimaki, 2005 U.S. Dist. LEXIS 22249, at 11 (S.D.N.Y., Sept. 30, 2005), where it held that the parties' licensing agreement had not been terminated because defendants failed to provide an adequately detailed notice of termination, "the notice must be specific enough so as to give the other party a reasonable opportunity to cure the breach if this can be done." The court added:

> This purported notice was the letter of April 12, 2002. However, it was stated in terms so general as to be meaningless insofar as providing an opportunity to cure any alleged breaches. The letter claimed the failure "to perform material obligations" under the License Agreement. These were said to include (but were not limited to) the obligation to manufacture and sell dresses "of certain design and quality standard." This gave no hint of what specific defects needed to be cured. Were they in the design? And, if so, in what way? Were there defects in the manufacture? If so, what? Nothing was specified. As to the promotional material, again there was the most general objection without any guidance as to what needed to be cured.
>
> In connection with the obligation to obtain approval, all that is mentioned is advertising and promotional materials. Nothing was said about any failure to submit dress designs.
>
> Also, the April 12, 2002 letter was wholly lacking in the essential feature required by the License Agreement - i.e., providing a 30-day period to cure defects.

(Emphasis added.)

16.    A breach of contract is material only if it "'go[es] to the root, or essence of the agreement between the parties, or [is] one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" Jordan v. Can You Imagine, Inc., 485 F. Supp. 2d 493, 498 (S.D.N.Y. 2007). None of the breaches that SAG or Defendants' counsel mentioned in their correspondence was material.

17.    Where a contract gives a party the right to cure a breach, a notice of termination is not effective until the cure period has passed without cure. As the court held in Gibbs & Soell, Inc. v. Armstrong World Indus., 2005 U.S. Dist. LEXIS 4004, at *8 (S.D.N.Y. Mar. 17, 2005), "'under New York law, an attempt to terminate a contract containing a notice provision does not take effect until the notice period has passed.'"

18.    Under New York law, a timely cure both cuts off any claim for damages and precludes termination. RBFC One, LLC v. Zeeks, Inc., 367 F. Supp. 2d 604, 618, 625 (S.D.N.Y. 2005), aff'd, 171 Fed. Appx. 902 (2d Cir. 2006) ("To the extent that Defendants timely cured a problem described in a notice of breach, Plaintiff cannot sue for breach of contract"); SVS, Inc. v. Rabbit Ears Productions, Inc., supra, 1991 U.S. Dist. LEXIS 18199, at *27 ("A nondefaulting party cannot terminate a contract with a party that cures all defaults within the cure period"); Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 906-07 (2d Cir. 1985) ("Because [defendant] had cured any potential default by completing all requested deliveries before the period for cure expired, the contract does not permit [plaintiff] to terminate").

19.    Where a contract requires that a party make "reasonable efforts," the test of whether the party has fulfilled its obligation is whether it has acted in good faith. In re Chateaugay Corp., 186 B.R. 561, 594-95 (S.D.N.Y. 1995), where the court had to construe the term "reasonable efforts," it held:

> By using the term "reasonable efforts" in Section 7.01 of the Asset Purchase Agreement the parties necessarily intended to impose a lesser obligation than would have been required had they chosen to use the term "best efforts" – as they did elsewhere in the Agreement . . . .  However, even a best efforts clause permits parties a degree of discretion in the selection of a plan of action and allows them to rely on their good faith business judgment as to the "best way" to achieve the desired result.  A best efforts clause "does not strip the promising party of its right to give reasonable consideration to its own interests."  Accordingly, to prevail upon its contention that a party has failed to use its best efforts, the movant must show that the nature and extent of the opposing party's efforts did not reflect good faith business judgments.

(Emphasis added and citation omitted.)

20.    There is no evidence that Consist did not exercise its good faith business judgment in the marketing efforts it made in the Territory or otherwise failed to perform material conditions of the Agreement.

Dated: New York, NY
      December 3, 2007                       DUANE MORRIS LLP

                                        By:    /s Hyman L. Schaffer

                                             Hyman L. Schaffer
                                             Fran M. Jacobs
                                             Brian Damiano
                                    1540 Broadway
                                    New York, New York 10036
                                    Telephone: (212) 692-1000
                                    Facsimile: (212) 692-1020
                                    *Attorneys for Plaintiff*
                                    *Consist Software Solutions, Inc.*