UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC.,

    Plaintiff,

-against-

SOFTWARE AG, INC. and SOFTWARE AG,

    Defendants.

Case No. 07-cv-7047 (CM)(FM)

DEFENDANTS' SOFTWARE AG, INC. AND SOFTWARE AG'S EXPERT REPORT OF DAVID A. MacSWAIN

## 1. **Engagement**

I have been retained by Baker & McKenzie LLP in connection with the lawsuit "Consist Software Solutions, Inc. f/k/a Consist International, Inc. against Software AG, Inc. and Software AG", Case No. 07-7047 (CM) (FM) to review certain documents and materials in anticipation of offering testimony and opinions in this case.

I anticipate being called as an expert witness to opine on five issues: (1) standard industry practices in software distribution agreements; (2) the market for Special Products throughout the Territory from 1998 until present; (3) whether Attunity Connect is competitive to SAGA's products; (4) brand confusion in the Territory; and (5) life after the Distribution Agreement for SAGA and Consist.

I am intimately familiar with Software AG's systems (*i.e.,* ADABAS and NATURAL) and the third party Special Products at issue in this case. Adabas is Software AG's database management system and Natural is its proprietary programming language. Special Products are third party products that when sold require Software AG to pay royalties to those third parties.

## 2. **Qualifications**

My professional career since 1972 has been in the computer industry focusing on database technology and associated software applications. I have experience in providing sales, marketing, and software development services to customers in industries such as financial services, government, higher education, and manufacturing. Since 1985 I have worked on worldwide product and market requirements in the area of legacy database technology. My job duties included designing, developing, and bringing to market many successful software industry products. In this capacity I have conducted and sponsored more than 100 studies and analyses of the legacy database market.



1

I have worked with all the major legacy database vendors at the technical, sales and marketing levels. Since 1985, I have initiated, supervised and been a party to many worldwide software partnership and distribution agreements involving my companies' products as well as products sold either with a partner's brand name or under a "private label". My experience includes both exclusive and non-exclusive software distribution agreements. I am familiar with the revenue streams included in these agreements including royalty structures, pre-payments and other forms of revenue sharing and revenue distribution.

In 2003, I founded and operated Zulu Software Inc. ("Zulu") where I focused on assisting clients with the automatic conversion of Software AG's Natural/Adabas systems to the Java/Oracle platform. Our target market was North America, Brazil and Venezuela. We conducted intensive market research in the South American territory in order to identify the customer base and visited many database customers in Brazil and Venezuela. In this capacity we ran numerous customer seminars in this territory and partnered with Oracle's South American operations.

My qualifications, background and experience are further outlined on my *curriculum vitae* attached hereto as Exhibit A.

3. **Publications Authored Within Preceding Ten Years**

I recall authoring and co-authoring some case studies in trade and industry publications in the late 1990s. I have attempted to locate copies of these publications, but have been unsuccessful.

4. **Other Cases In Which I Have Testified At Trial Or By Deposition Within The Preceding Four Years**

None.

5. **Documents Reviewed In Forming My Opinions**

   a) Distribution Agreement between Software AG Americas, Inc. and Consist International, Inc. effective January 1, 1998 (Exh. B hereto).
   b) Updated Annex B to the Distribution Agreement (Exh. C hereto).
   c) Transcript of Natalio S. Fridman deposition on November 5, 2007 (not attached because confidential).
   d) Exhibit 6 from Mr. Fridman deposition (Exh. D hereto).
   e) Consist websites (www.consist.com, www.consist.com.br, www.e-consist.com, www.printhos.com, www.makdata.com).
   f) Internet publication entitled "Consist Solutions and Services" (Exh. E hereto).
   g) Attunity website (www.attunity.com) and Attunity Connect product datasheet (Exh. F hereto).
   h) Software AG websites (www.softwareag.com and www.softwareagusa.com).

2



    i)   Adabas SQL Gateway product datasheet (http://www.softwareag.com/Corporate/products/adabas/sql/default.asp) (Exh. G hereto).

    j)   CONNX product datasheet (http://www.connx.com/products/adabas.html) (Exh. H hereto).

**6.**   **Opinion**

*Overview of Database Industry*

The software industry is best represented as a multi-layered stack or cake:

| | | | |
|---|---|---|---|
| *LAYER 5* | packaged applications | customized applications | integration software (middleware) |
| *LAYER 4* | programming language | | |
| *LAYER 3* | database technology | | |
| *LAYER 2* | operating system | | |
| *LAYER 1* | hardware | | |

Layer 1 is hardware which is essentially a "box" of physical computer components. For example, hardware includes integrated circuits and memory.

Layer 2 is the operating system layer which is the overall software management facility for the hardware. The operating system layer is an interface to the hardware which governs how the hardware is used. Microsoft Windows® is an example of an operating system.

Layer 3 is a database technology layer which is a datastore that enables data storage and management. For example, database technology operates as a repository for storing legal documents and providing a user access and retrieval capabilities to those documents.

Layer 4 is the programming language which is expressed as a collection of formulas and algorithms that allow the user to store and manipulate data in a database. There are many programming languages being used in the world today such as Basic, Fortran, C++, JAVA, Cobol and Natural.

Layer 5 is the application layer which is comprised of three sub layers –
(i) packaged applications, (ii) customized applications, and (iii) integration software:

    (i) <u>Packaged applications</u> are standard products that are widely available and typically referred to by the industry as COTS ("Commercial Off The Shelf"). The Google® search engine or Quicken® is considered a packaged application.

    (ii) <u>Customized applications</u> are typically "one off" applications. For example, a software engineer could write a custom application for searching

3 

and sorting legal documents stored in a database that fits the needs of an individual entity. This Court's electronic filing system is such a custom application.

(iii) <u>Integration software</u> is the "glue" that sticks applications together. Integration software is designed to couple multiple applications, either packaged applications or customized applications, together in a way that they can communicate such as by sharing data and transactions. For example, integration software could enable communication between a billing application and a database storage application to monitor the use of stored legal documents and based on that usage generate and distribute an invoice to the user as is done by the Lexis® legal service.

The software industry also refers to certain types of software as a "tools application". A tool is software technology with which a software engineer designs and constructs packaged or customized applications. For example, a compiler that translates source into object code is a tool.

Software AG is a database vendor who provides database management systems (known as Adabas) and programming tools, including a compiler for its proprietary programming language known as Natural, and integration software. Examples of Software AG's integration software are EntireX and CrossVision. Each of Software AG's products are intended for customers and partners that design and construct packaged applications and customized applications. Software AG thus operates in Layers 3 and 4 of the multi-layered stack.

Database technology can be broken down into relational databases and non-relational databases. Non-relational databases are often referred to in the software industry as legacy technology. Adabas is non-relational legacy technology. Example of vendors that sell relational databases include Oracle, Microsoft and IBM. Depending on the hardware used by the customer, legacy databases may be superior to relational databases because they offer greater speed and efficiencies. Mission critical applications tend to run on Adabas and other legacy databases as opposed to relational databases. For certain large volume customers, legacy databases may be the only viable business option.

The main players in the database industry, *e.g.*, Software AG, Oracle, IBM and Microsoft, develop, sell and service products in one or more of the five layers to varying degrees. Many well-established companies have business restricted to the development and distribution of packaged applications or alternatively database technology. There is a major exception to the rule and that exception is Oracle. Oracle's business is quite diverse and comprises an amalgam of the third, fourth and fifth layers of the multi-layered stack.

SAP, which is an ISV ("Independent Software Vendor"), develops and sells packaged applications, but does not develop and sell databases and a programming language. That means SAP is not a database or programming language vendor. Software AG's business, on the other hand, is essentially an inverse of SAP's business —developing and selling its

4 

legacy database (Adabas) and proprietary programming language (Natural). Software AG does not develop or sell packaged software applications for the most part.

SAP's packaged application products work with third party database management systems and the Oracle database is the most popular selection based on market share. Oracle also sells packaged application products that compete directly with SAP packaged application products. Oracle and SAP thus coexist in the marketplace, although at times they compete. This is sometimes referred to in the industry as "coopetition".

This five-layer database industry breakdown is equally applicable throughout the world, including Brazil and the United States. The database industry almost uniformly recognizes, and has for the last 30 years, that separating the database platform business from the application business is mutually beneficial to the respective companies. By separating these two parts, database vendors do not compete with the ISVs that develop and sell packaged and customized applications that use the database vendors' software, and thus encourage the ISV to develop applications for the vendors' databases.

### *The Software AG/Consist Distribution Agreement*

I have reviewed the Distribution Agreement between Software AG Americas, Inc. ("SAGA") and Consist International, Inc. ("Consist") effective January 1, 1998 and attached as Exhibit B ("Agreement"). The Agreement includes Annex A and Annex B. Annex A references certain software products of SAGA, including Bolero and Odyssey, ("SAGA Products") and Annex B sets forth certain products for which SAGA pays royalties to third parties ("Special Products"). My understanding is that Consist has exclusive distribution rights to the SAGA Products and Special Products in Argentina, Brazil, Chile, Bolivia, Paraguay, Uruguay and Peru ("Territory"). Annex B of the Agreement lists two Special Products –Esperant and Passport. My understanding, however, is that Annex B was updated during the term of the Agreement. I have reviewed the updated Annex B which is attached as Exhibit C.

### *Standard Industry Terms*

The Agreement is an exclusive distribution agreement in the Territory. I understand that Consist's interpretation of this Agreement effectively causes the term to be perpetual. A distribution agreement that is perpetual as Consist is proposing is unknown in the software industry. The industry practice in any distribution relationship is to have both (1) an expiration of the Term with the ability to provide notice to the other party by a date certain of the intent not to renew, and (2) the right to terminate the relationship for cause at any time during the Term.

It is standard software industry practice to treat (1) and (2) as separate and distinct reasons to exit a relationship. My understanding is that Consist's position is that the above reasons for termination do not exist separately in the Agreement, but rather must be read together – SAGA can only terminate the relationship if on the 18 month date there is also a breach by Consist. This is contrary to standard industry practice. In my 35 years in the software

5 

business, I have never seen an agreement that does not treat (1) and (2) above as separate and distinct reasons to exit a relationship.

I believe the Agreement would not be considered perpetual pursuant to standard industry practices for the following additional reasons.

In my experience it is very unlikely that SAGA, a sophisticated database vendor, would choose to enter into a perpetual agreement and not leave itself a way out of the relationship after a discrete term. Exclusive distributorship agreements typically set forth that the manufacturer is paid the greater of an annual flat fee or the actual annual total license revenue which is a performance-based metric giving the manufacturer an upside if the distributor performs better than expected. In the Agreement SAGA has no such upside. It is highly unusual to grant a distributor exclusive rights in a territory with the financial arrangement set forth in the Agreement, that is, payment of an annual flat fee for licensing, maintenance and other rights. Generally, the industry favors non-exclusive relationships because a manufacturer wants to have as many companies as possible distributing its products.

Critically, at the time that this Agreement was being negotiated, SAGA was in the process of executing an initial public offering on the New York Stock Exchange. In my experience, when an IPO is in the works, a company is highly motivated to obtain a long term distribution contract with a predictable, sizable annual revenue stream. The fixed revenue stream would drop right to SAGA's bottom line and therefore have a very favorable impact on the IPO process. However, for the long term financial growth of the business, SAGA would want to more fully recognize the revenue its software generated in the Territory and thus revert to a standard performance based metric. Accordingly, SAGA would for this reason insist on a fixed term license agreement.

I am also experienced with the level of involvement in an IPO by sophisticated business people including investment bankers. With IPO's the investment bankers typically closely review every contract prior to the initial public offering. It would be highly unusual for these sophisticated bankers to sign off on a "perpetual" distribution agreement because of the financial penalty over the long term to SAGA, the company seeking the IPO.

Finally, the Agreement includes an 18 month notice period to exit the relationship. Based on my experience, a 12 month notice period is more typical for an enterprise software distributorship; an 18 month period is a very generous time period. This long exit period leads me to conclude that the parties contemplated ceasing the relationship at some point. It is standard industry practice to allow an "exit period" so that the distributor (here, Consist) has sufficient time to develop alternate business strategies and resolve any pending deals.

### *"All Reasonable Efforts" in the Territory*

It is typical for a distributor to get rights in multiple countries if those countries have similarities in language, culture, market size and proximity. I am therefore not surprised to

6 

see the seven countries comprising the Territory to have been grouped together under the Agreement.

It is customary in the industry that an exclusive distributor must use its best efforts to distribute that database technology throughout the entire territory. When "best efforts" are required, it is standard for the exclusive distributor to have a country-specific plan for each country within the defined territory that it has exclusive rights. The manufacturer would expect nothing less, as the exclusive distributor was entrusted with developing, expanding and otherwise exploiting the technology in those countries.

It would be contrary to industry practice for Consist to be allowed to "cherry pick" which countries to focus on and which countries to neglect. Based upon the deposition testimony of Consist's President Mr. Fridman, Consist has effectively blocked SAGA from the Paraguay, Uruguay and Peru markets, as only Consist has the right to do business in those markets both as a database reseller and an application vendor.

### *Market Demand for Special Products Inside the Territory*

The list of Special Products includes a number of products and product families. The majority of these Special Products are integration software and programming tools. For example, one such integration software product listed in Annex B is EntireX XML Adapter which has a product family of thirty three different interface options. Indeed, I am quite familiar with many of these products and product families based on my expertise.

I refer to Mr. Fridman's testimony at page 45, lines 13-15 and page 31, lines 9-22 of his deposition. Special Products are clearly relevant to his customers because they are value added enhancements to the core Software AG database platform (Natural/Adabas).

I am not only familiar with the functionality of many of the Special Products, but I have expertise with the sales and marketing of some of the Special Products and similar products and the effort and expense that needs to be undertaken to successfully penetrate the marketplace. My sales and marketing expertise extends inside and outside the Territory. As the former VP of worldwide product marketing at Software AG I was aware and responsive to global market requirements and routinely rolled out products, including Special Products, throughout the world, including the very same countries in Consist's Territory. I was never made aware of any territory-specific requirements from the Consist Territory that would prevent them from being viable products within that Territory. At the very least, Consist should have been pushing the Special Products to its current customer base in the Territory given the brand loyalty and the complimentary nature of these add-on products. In addition to working the existing customer base, a second strategy would be to use this product set to gain new customers throughout the Territory. I have no reason to believe that Consist would not have been successful with these endeavors.

The Special Products are considered "horizontal products" by the software industry and used by large enterprises that have in excess of $100M in annual revenue, *i.e.*, they are not vertical products or industry specific products. The fact that these Products are not industry



specific products provides an unlimited customer base that extends throughout all industries ranging from government to financial services institutions. These are additional reasons why Consist could have successfully marketed at least some of these Special Products in each and every one of the seven countries comprising the Territory.

Consist apparently maximized its income from its packaged and customized application business at the expense of marketing Software AG products. Consist may not have invested in rolling out Special Products in certain countries in order to save Consist the cost of doing that work. I refer to Mr. Fridman's testimony at pages 209, line 22 – 210, line 17. As explained above, what is good for Consist is not necessarily good for SAGA.

In sum, although the market demand for Special Products may vary from one country to another within Consist's Territory, there would be with appropriate marketing and promotion, a reasonable demand for at least some of these Special Products throughout the Territory since 1998.

### *Competitive Products*

Not surprisingly, there are various third party products that compete with SAGA Products and Special Products. One such product is Attunity Connect which is offered by Attunity Ltd. I understand the Agreement forbids Consist from selling competitive products.

Attunity Connect is integration software which adds a relational layer on top of a non-relational database (such as Adabas) to give a customer relational database functionality. Attunity Connect enables relational tools such as an SQL application to access the non-relational database. A general description of Attunity Connect is attached as Exhibit F.

Software AG has had a product for the last four years that competes with Attunity Connect. The products are known as the Adabas SQL Gateway and CONNX. A brief description of these products is attached as Exhibits G and H.

### *Confusion In The Territory*

The Natural/Adabas brands are internationally known. In my experience however, the source of these brands is a matter of confusion in the Territory. For example, throughout the world, with the exception of Consist's Territory, the Natural/Adabas brands are typically associated with Software AG. Yet in the Territory in my experience these brands are solely associated with Consist. I have been privy to numerous reports from Consist customers in Brazil that they were unaware that Natural/Adabas is a Software AG brand. I have also conducted an Internet search and reviewed a number of public Consist documents which do not contain any reference to Software AG being the brand owner of Natural/Adabas. I attach as Exhibit E one such public document which is replete with Natural/Adabas references but no indication that these brands are owned by Software AG. In my opinion, therefore, most if not all of the customers in the Territory have no basis to conclude that these brands are owned by Software AG.



### *Life After the Distribution Agreement*

Like Oracle, Consist is a company that currently operates within the top three layers of the stack, *i.e.*, operating as both a database platform reseller and an application vendor. If the Consist relationship ends with Software AG, Consist can continue developing, selling/licensing and servicing all of its software applications, including all packaged applications and customized applications, much like SAP. Consist can even continue developing and selling such applications using Software AG's programming language Natural. For Consist, the top layer of the stack is virtually unchanged.

Restricting its business to applications is an extremely viable business for Consist. It should be able to retain its present application customers, even if its existing customers switch from Adabas to third party databases. Consist is free to seek new customers with no existing database technology. Thus, in the event the Consist distributorship of Software AG ends, Consist's business begins to conform to the industry standard model of ISVs and database platform vendors.

Based on my understanding of Consist's business and without the benefit of having reviewed any financial data of Consist, the termination of the distributorship of Software AG's products would have minimal business effect on Consist and may even be beneficial to Consist's future business. Without having to support Software AG's products, Consist would then be able to focus solely on packaged and customized applications without the burden and overhead of providing direct database and programming language support.

It is very important for Software AG, a database platform vendor, to have direct contact with Consist's database customers. Software AG could thus learn its customers' needs and develop new products that solve those needs. Furthermore, Software AG could provide meaningful support and maintenance of the database technology to those customers. Further, upon the termination of the relationship with Consist, Software AG can enter the Territory and sell the Special Products which based on my understanding have been historically neglected by Consist.



*7.* **<u>Conclusion</u>**

For the reasons set forth above, it is my opinion that:

(1) (a) The Agreement was not perpetual. It is not industry practice to have perpetual distribution agreements. SAGA, as a sophisticated database vendor, would not have entered into a perpetual agreement and not leave itself a way out of the relationship, *i.e.*, in the event Consist was underperforming or even over-performing. SAGA would want to maintain the ability to once again have direct contact with Consist's database customers and provide meaningful support and maintenance of the database technology (the bread and butter of SAGA's business) to those customers. Finally, an 18 month notice and exit period cuts against the Agreement being perpetual as it evidences an intent of the parties to provide sufficient time for the distributor to develop alternate business strategies and resolve any pending deals;

(b) Consist's interpretation of the Agreement regarding termination is totally contrary to industry practice. It does not make business sense to allow a party to only have the right to terminate a distribution relationship if on the date certain there must also be a breach of the agreement. In my 35 years in the software business, I have never seen an agreement that would not treat non-renewal and material breaches as separate and distinct reasons to exit a relationship;

(c) It is customary in the industry that an exclusive distributor must use its best efforts to distribute that database technology throughout the entire territory. When "best efforts" are required, it is standard for the exclusive distributor to have a country-specific plan for each country within the defined territory that it has exclusive rights. The manufacturer would expect nothing less, as the exclusive distributor was entrusted with developing, expanding and otherwise exploiting the technology in those countries. It would be contrary to industry practice for Consist to be allowed to "cherry pick" which countries to focus on and which countries to neglect.

(2) Although the market demand for Special Products may vary from one country to another within Consist's Territory, with appropriate marketing and promotion, there would be a reasonable demand for at least some of the Special Products throughout the Territory since 1998;

(3) Attunity Connect competes with Software AG products; and

(4) Customers in the Territory do not recognize that Natural/Adabas is owned by Software AG.

(5) If the Consist relationship ends with Software AG, Consist can continue developing, selling/licensing and servicing all of its software applications, including all packaged applications and customized applications, much like SAP. Consist can even continue



10

developing and selling such applications using Software AG's programming language Natural. For Consist, the top layer of the stack is virtually unchanged.

I am being compensated for this case at my normal hourly billing rate of $300 per hour and have no interest in the outcome of this matter. Prior to this request from Baker & McKenzie LLP for consulting services, I have not worked for or had a prior working or personal relationship with Baker & McKenzie LLP.

I declare that the opinions and information set forth above are true to the best of my knowledge and information. Dated November 9, 2007.

*[signature]*