James David Jacobs
Frank M. Gasparo
Marcella Ballard
John A. Basinger*
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, NY 10036
*admitted pro hac vice

Attorneys for Defendants
Software AG, Inc. and Software AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> -against- <br><br> SOFTWARE AG, INC. and SOFTWARE AG, <br><br> Defendants. | Case No. 07-cv-7047 (CM)(FM) <br><br><br> **DEFENDANTS SOFTWARE AG, INC. AND SOFTWARE AG'S MEMORANDUM OF LAW REGARDING CONSTRUCTION OF CONTRACTS AGAINST THE DRAFTER ("*CONTRA PROFERENTEM*")** |

Consist contends in its Proposed Findings of Fact and Conclusions of Law ("Consist Findings") that "In this case, the drafting party was SAGA, and the ambiguity [in the parties' Agreement] is construed against it." *See* Consist Findings at p. 30, ¶ 10. The rule of construction of a contract against the drafting party ("*contra proferentem*") is inapplicable both factually and legally. Consist's President Natalio Fridman testified that he may have dictated the terms in question. No doubt exists that he actively negotiated the Agreement's final terms. Furthermore, New York law requires that the *contra*

*proferentem* rule be applied only as a last resort after all other means to interpret an ambiguous contract have failed.  Consist wrongly applies the rule as its primary method of interpretation, rather than as a last resort.

## **ARGUMENT**

Consist rests its contention that SAGA drafted the Agreement on the Statement of Direct Testimony of its President, Natalio Fridman ("Fridman Statement").  *See* Fridman Statement at ¶ 15.  However, in his deposition Mr. Fridman stated otherwise:

```
 6      Did you ask Software AG to make
 7   paragraph 7 mutual so both parties would
 8   have the same cancellation rates?              (sic)
 9      A.  Yes, yes, maybe yes.  I don't
10   recall it, but maybe yes, because I had a
11   good reason for that.
12      Q.  Do you recall who suggested the
13   particular wording of paragraph 7?
14      A.  Maybe I was, I don't know.
15      Q.  You don't know?
16      A.  I don't know.  Maybe I was the
17   one.
```

Nov. 5, 2007 Deposition of Natalio Fridman at 167:6-17.

Consist was an active participant in the negotiations through Mr. Fridman.  Mr. Fridman is a sophisticated businessman who oversees a multi-national company with over 800 employees, which he founded 35 years ago.  Fridman Statement ¶¶ 2-3.  Mr. Fridman has over 30 years of experience negotiating the very types of agreements at issue in this case.  *See* Fridman Statement ¶ 4.  Consist was represented by counsel during the course of the negotiations.  *See* November 5, 2007 Deposition of Natalio Fridman ("Fridman Dep.") at pp. 214-216 (relevant excerpts are quoted in the Appendix accompanying this memorandum, and pages of the transcript are attached as Exhibit B).

2

Software AG sent Consist's counsel, Jay Schafrann, a copy of a late draft of the Agreement. *See* PX 41 (attached as Exhibit A).

*Contra proferentem* has no applicability under these circumstances where the agreement was freely negotiated. Rather it applies only where the party asserting the doctrine had **no voice** in the negotiations. *See Coliseum Towers Assocs. v. County of Nassau*, 2 A.D.2d 562, 565, 769 N.Y.S.2d 293, 297 (2d Dept. 2003). *See also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983)("in cases involving bargained-for contracts, negotiated by sophisticated parties, the underlying adhesion contract rationale for the doctrine is inapposite.") Indeed Consist contends that it had an active voice in negotiating the terms at issue. Fridman Dep. at pp. 166-67, 214-16; Fridman Statement at ¶¶ 7, 10, 14.

Policy reasons also render Consist's application unwarranted: . This is hardly an instance of one party imposing language on another unsophisticated party with no voice.

Furthermore, under New York law the doctrine is not to be applied as an initial matter, but only where the intent of the parties cannot be deciphered from extrinsic evidence. The Second Circuit has stated, "we have made clear that under New York law, courts should not resort to *contra proferentem* until after consideration of extrinsic evidence." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002)(citation omitted). Construing a contract against the drafter is reluctantly applied "as a matter of last resort after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *Id.* ("commenting that [the] rule is . . . generally inappropriate if both parties are sophisticated."), *citing United States Fire Ins. Co. v. General Reins. Corp.*, 949 F.2d 569, 573 (2d Cir. 1991).

3

*Balanoff v. 83 Maiden LLC*, 2000 U.S. Dist. LEXIS 109 *27-28 (S.D.N.Y. Jan. 10, 2000) is instructive. In that case, Judge Patterson declined to construe the agreement against the drafter where extrinsic evidence of the parties' intent dictated a different result:

> The one rule of construction that supports Maiden's reading of the clause and the schedule is *contra proferentem*, because West World drafted the agreement. However, the authority in the Second Circuit instructs that this rule is to be used only as a "last resort." In this case, the parties' intent and knowledge of each other's intent regarding the ambiguous terms may be ascertained through extrinsic evidence. This extrinsic evidence and other rules of contract interpretation support West World's interpretation of the contract terms. Therefore, the Court declines to apply the rule of *contra proferentem*.

*See also id.* at *21-22 (examining authorities regarding doctrine). *See also Trinidad v. King*, 1998 U.S. Dist. LEXIS 18516 *28-31 (S.D.N.Y. Nov. 24, 1998)(stated intent in negotiations was most relevant to interpretation, trumping construction against drafter).

Given the above well-settled law in New York Consist unsurprisingly cites two cases that apply the law of states other than New York. *See* Consist Findings at p. 30, ¶10, *citing Kerin v. U.S. Postal Serv.*, 116 F.3d 988 (2d Cir. 1997)("We do this under both federal common law and Connecticut law, which, the parties agree, would be the applicable state law." *Id.* at 991.) and *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 47 F.Supp.2d 451 (S.D.N.Y. 1999)("Pursuant to the choice of law clause in Article 15(12), the DA is governed by the law of Pennsylvania." *Id.* at 456). The other two cases that Consist cites refer to the *contra proferentem* rule in dicta, without analysis.

Consist also cites *Isler v. Margolin*, 259 A.D.2d 396, 397 (1st Dept. 1999) for the proposition that provisions are to be construed against attorneys. *Isler* is wholly inapplicable as the case addresses fee agreements between attorneys and their clients. *Id.*,

4

*citing Jacobson v. Sassower,* 66 N.Y.2d 991, 489 N.E.2d 1283 (1985)(also addressing attorney-client fee agreements).  Consist, too, was represented by counsel in the negotiations.  Fridman Dep. at pp. 214-216; PX 41.

## CONCLUSION

Construing the Agreement in this case against SAGA is entirely inappropriate where the testimony and documentary evidence demonstrate that Consist, through Mr. Fridman, actively negotiated for the terms in the Agreement and where Consist was represented by counsel.  Indeed, Consist's very argument that it prevailed in negotiating an agreement that fulfilled its goals makes application of the rule wholly improper.  Consist is not entitled to rely on *contra proferentem* construction against SAGA.

Dated: New York, New York
      December 11, 2007      BAKER & McKENZIE LLP

    By:   */s James David Jacobs*
        James David Jacobs
        Frank M. Gasparo
        Marcella Ballard
        John A. Basinger*
        1114 Avenue of the Americas
        New York, New York 10036
        (212) 626-4100
     *Admitted pro hac vice*

        Attorneys for Defendants
        Software AG, Inc. and Software AG

# APPENDIX
## CONSIST'S PARTICIPATION IN NEGOTIATIONS AND REPRESENTATION BY COUNSEL

**FRIDMAN DEPOSITION**

**November 5, 2007 Deposition of Natalio Fridman at 166:7-10**

```
 7     Q.  Did you ask Software AG to drop
 8   the first sentence of paragraph 7?
 9     A.  I think, I don't remember.  But
10   it was after.
```

**November 5, 2007 Deposition of Natalio Fridman at 167:3-20**

```
 3     Q.  Let me ask the question, because
 4   I haven't -- let me finish the question if
 5   I may.
 6         Did you ask Software AG to make
 7   paragraph 7 mutual so both parties would
 8   have the same cancellation rates?
 9     A.  Yes, yes, maybe yes.  I don't
10   recall it, but maybe yes, because I had a
11   good reason for that.
12     Q.  Do you recall who suggested the
13   particular wording of paragraph 7?
14     A.  Maybe I was, I don't know.
15     Q.  You don't know?
16     A.  I don't know.  Maybe I was the
17   one.
18     Q.  Maybe you were, maybe Mr. Daly
19   was?
20     A.  Could be, I don't know.
```

**November 5, 2007 Deposition of Natalio Fridman at 214:2-6**

```
 2     Q.  Who participated in the
 3   negotiations that culminated in the 98
 4   agreement?
 5     A.  98 agreement, Jim Daly, myself,
 6   and Mr. Schafrann also.
```

**November 5, 2007 Deposition of Natalio Fridman at 215:14-24**

    14    Q.  So the negotiation session which
    15  you just referred to occurred after August
    16  26 and before September 9, correct?
    17    A.  Yes.
    18    Q.  And that occurred in New York?
    19    A.  In New York.
    20    Q.  And you attended that session?
    21    A.  Of course.
    22    Q.  And Mr. Daly attended that
    23  session?
    24    A.  Yes, and Mr. Schafrann also.

**November 5, 2007 Deposition of Natalio Fridman at 216:10-12**

    10    Q.  Mr. Schafrann was an attorney of
    11  yours for a long time?
    12    A.  Since 69. No, 68 or 67.

**FRIDMAN WITNESS STATEMENT**:

¶ 7: "I told Daly that . . . I was no longer happy with some of the terms that had been in our prior distributorships agreements. Specifically, I did not want to have to negotiate new distributorship agreements every few years."

¶ 10: "In response to my other demand – that the new agreement be perpetual – SAGA's proposal included a 25-year term. But the proposal also stated that, '[a]t the end of the first 5 years of this Agreement either party can Terminate this Agreement with 18 months notice.' I told Daly that this aspect of SAGA's proposal was completely unacceptable ...."

¶ 14: "After reviewing the draft, I told Daly that Consist would not sign it because its term was unacceptable, it could be terminated in two ways and because it continued to impose reporting obligations on Consist."

¶ 15: "Following our conversation, Daly made further revisions. Since Daly is a lawyer – he was also SAGA's General Counsel throughout – and I am not, Daly did all fo the drafting and supplied all of the language of the Agreement; I only reviewed the proposals and drafts Daly prepared, and told him whether they were acceptable."

2