# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

CONSIST SOFTWARE SOLUTIONS, INC.,

                              Plaintiff,

         vs.

SOFTWARE AG, INC. and SOFTWARE AG

                              Defendant.

-------------------------------------x

                    November 5, 2007
                    10:14 a.m.

     H I G H L Y   C O N F I D E N T I A L
              ATTORNEYS' EYES ONLY

   Deposition of NATALIO S. FRIDMAN, held
at the offices of Baker & McKenzie, 1114
Avenue of the Americas, New York, New York
10036, before David Henry, a Certified
Shorthand Reporter and Notary Public of the
State of New York.

             HIGHLY CONFIDENTIAL

Page 166

1 Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 we want an evergreen contract, no
3 termination. To do any termination, have
4 to be a reason for terminate, and we always
5 be careful not to have any reason to
6 terminate a contract, very careful.
7 **Q. Did you ask Software AG to drop**
8 **the first sentence of paragraph 7?**
9 A. I think, I don't remember. But
10 it was after.
11 **Q. Did you ask Software AG that --**
12 A. Yes, because that doesn't make
13 sense in the text. It doesn't make sense
14 in the text, you know. I mean, these are
15 before any termination, but any
16 termination, we got there, there are other
17 reasons for termination here, no, no
18 terminations, reason for material breaches,
19 okay, there are material breach, a reason,
20 okay, so we want to be sure that
21 everything, we continue working. I
22 remember this was after the shock of the
23 cancellation of the contract, that from the
24 beginning maybe, we were since 1995
25 exclusive distributors and never was a

Page 167

1 Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 contract even for 10 years before.
3 **Q. Let me ask the question, because**
4 **I haven't -- let me finish the question if**
5 **I may.**
6 **Did you ask Software AG to make**
7 **paragraph 7 mutual so both parties would**
8 **have the same cancellation rates?**
9 A. Yes, yes, maybe yes. I don't
10 recall it, but maybe yes, because I had a
11 good reason for that.
12 **Q. Do you recall who suggested the**
13 **particular wording of paragraph 7?**
14 A. Maybe I was, I don't know.
15 **Q. You don't know?**
16 A. I don't know. Maybe I was the
17 one.
18 **Q. Maybe you were, maybe Mr. Daly**
19 **was?**
20 A. Could be, I don't know.
21 **Q. Do you recall what you said to**
22 **Mr. Daly about paragraph 7?**
23 A. I cannot recall the words. I
24 want to say that any -- and any
25 termination, I wanted notice, okay?

Page 168

1 Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 (Recess taken.)
3 FURTHER EXAMINATION BY MR. JACOBS:
4 **Q. Mr. Fridman, Consist wants the 98**
5 **agreement to automatically renew for**
6 **another five years, correct?**
7 A. Yes.
8 **Q. Consist is generally satisfied**
9 **with the terms of the 98 agreement,**
10 **correct?**
11 A. Pardon?
12 **Q. Consist is generally satisfied**
13 **with the terms of the 98 agreement?**
14 A. Yes, sir.
15 **Q. Are there any terms in the 98**
16 **agreement that you would like changed?**
17 MR. SCHAFFER: Objection. This
18 is utterly irrelevant, utterly
19 speculative, has no bearing whatsoever
20 on any issue in this case. And unless
21 you can articulate a reason for it,
22 I'm going to instruct him not to
23 answer.
24 MR. JACOBS: I think it's very
25 relevant.

Page 169

1 Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2 MR. SCHAFFER: To what issue?
3 MR. JACOBS: It has to do with
4 the relevance of his position and the
5 credibility of the position itself.
6 MR. SCHAFFER: I believe that
7 is utterly fallacious. He wants to
8 renew the agreement on its terms,
9 period. He doesn't have to tell you
10 whether there are terms that in theory
11 he might change. He wants the
12 agreement renewed. He believes it is
13 renewed. What conceivable relevance
14 does this have to anything?
15 MR. JACOBS: Well, I believe it
16 does.
17 MR. SCHAFFER: You don't have
18 to answer that question. You can tell
19 him if you want to. You don't have
20 to, it has nothing to do with this
21 lawsuit. It has to do with some
22 business negotiation.
23 MR. JACOBS: Did you instruct
24 him not to answer? Did I understand
25 that?

43 (Pages 166 to 169)

Page 214

Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2      Q.  Who participated in the
3   negotiations that culminated in the 98
4   agreement?
5      A.  98 agreement, Jim Daly, myself,
6   and Mr. Schafrann also.
7      Q.  Did Neil Rothberg participate?
8      A.  No, only -- I don't recall, he
9   came to our office.  No, Rothstein --
10  nothing to do with that, I don't think so.
11  He send information, but I don't know if it
12  was an invoice.  Not directly in discussion
13  with us.  Jim Daly was in discussion with
14  us.
15     Q.  Is Mr. Schafrann still your
16  Consist attorney?
17     A.  Mr. Schafrann is 89 years old,
18  okay?  He had an office until recently at
19  277 Park Avenue.  He had to sign a ten year
20  lease, and he doesn't feel to sign.  Now
21  his office is in my office, okay?  89 years
22  old.  He still has a good memory.
23     Q.  Did Mr. Schafrann attend all the
24  negotiation sessions?
25     A.  I don't recall, but when he was

Page 215

Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2   in New York, Jim Daly, I try to involve
3   him.
4      Q.  On the telephone calls, were the
5   telephone calls --
6      A.  I don't know.  I would say the
7   following.  We're very intense in
8   negotiations, very short one, because I
9   remember on August 26, I saw, I remember
10  now because I saw, he send the proposal to
11  contract, ready to sign, he came and we
12  changed everything.  And the contract was
13  signed, dated September 9.
14     Q.  So the negotiation session which
15  you just referred to occurred after August
16  26 and before September 9, correct?
17     A.  Yes.
18     Q.  And that occurred in New York?
19     A.  In New York.
20     Q.  And you attended that session?
21     A.  Of course.
22     Q.  And Mr. Daly attended that
23  session?
24     A.  Yes, and Mr. Schafrann also.
25     Q.  And Mr. Rothberg also?

Page 216

Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2      A.  I don't recall that.  I recall
3   daily, I don't recall that.
4      Q.  Did anyone take notes at that
5   meeting?
6      A.  No.
7      Q.  Mr. Schafrann didn't have a habit
8   of taking notes?
9      A.  I don't remember.
10     Q.  Mr. Schafrann was an attorney of
11  yours for a long time?
12     A.  Since 69.  No, 68 or 67.
13     Q.  And based upon your recollection,
14  did Mr. Schafrann often take notes?
15     A.  I don't recall it.  Maybe two
16  notes, I don't recall it.
17     Q.  Did you take notes during the
18  meeting?
19     A.  If I take notes, if I made it,
20  afterwards I cannot read it.
21     Q.  So the answer is --
22     A.  I never take notes.  I cannot
23  read my handwriting.
24        (Recess taken.)
25  FURTHER EXAMINATION BY MR. JACOBS:

Page 217

Fridman - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2      Q.  Mr. Fridman, I want to tell you
3   much I appreciate your patience today.
4   Just two questions.
5         Other than the agreement, are
6   there any other documents that support your
7   view that the 98 agreement is an evergreen
8   contract?
9      A.  The evolution of the contract.
10     Q.  And what do you mean by that, by
11  the evolution of the contract?
12     A.  That this was done, we did it, in
13  a rush, according to them, okay, with Jim
14  Daly, and we make all the changes to be an
15  evergreen contract because we wouldn't
16  accept that contract the way they wrote it,
17  okay?
18     Q.  But can you point to any other
19  document other than the agreement which
20  supports your contention that the 98
21  agreement is an evergreen contract?
22        MR. SCHAFFER:   I think what
23     he's just said is that if you are
24     including within that the drafts of it
25     and of predecessor agreements and the

Elisa Dreier Reporting Corp.  (212) 557-5558
780 Third Avenue, New York, NY 10017