James David Jacobs
Frank M. Gasparo
Marcella Ballard
John A. Basinger*
Baker & McKenzie LLP
1114 Avenue of the Americas
New York, NY 10036
*admitted pro hac vice

Attorneys for Defendants
Software AG, Inc. and Software AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>SOFTWARE AG, INC. and SOFTWARE AG,<br><br>Defendants. | Case No. 07-cv-7047 (CM)(FM)<br><br>**APPENDIX OF UNREPORTED CASES CITED IN DEFENDANTS SOFTWARE AG, INC. AND SOFTWARE AG'S MEMORANDUM OF LAW REGARDING CONSTRUCTION OF CONTRACTS AGAINST THE DRAFTER ("_CONTRA PROFERENTEM_")** |

1.    *Balanoff v. 83 Maiden LLC*, 2000 U.S. Dist. LEXIS 109 (S.D.N.Y. Jan. 10, 2000)

2.    *Trinidad v. King*, 1998 U.S. Dist. LEXIS 18516 (S.D.N.Y. Nov. 24, 1998)

LEXSEE 2000 U.S. DIST. LEXIS 109



Analysis
As of: Dec 05, 2007

**THOMAS BALANOFF, as Trustee of LOCAL 32B-32J, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, Plaintiff, - against - 83 MAIDEN LLC, Defendant.**

**98 Civ. 6442 (RPP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 109; 163 L.R.R.M. 2337*

**January 7, 2000, Decided
January 10, 2000, Filed**

**DISPOSITION:** [*1] Arbitrator's award granted to Local 32B-32J in Maiden's absence confirmed. Maiden's counterclaim to vacate the arbitrator's award denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff union petitioned the court to confirm an arbitration award granted in its favor, holding defendant assumed, then violated, collective bargaining agreement entered into by seller of building and plaintiff, by firing cleaning employees after acquiring building from seller. Defendant counterclaimed to vacate the award.

**OVERVIEW:** Defendant acquired a building from seller who had a collective bargaining agreement with plaintiff union (union). Defendant did not retain the seller's cleaning employees after the closing. Plaintiff filed a grievance against the seller, who through amendment named defendant a party to the case. The arbitrator dismissed seller and awarded plaintiff relief in the form of hiring the employees and reimbursement of lost funds because he deemed defendant to have assumed the agreement and violated it by not retaining the employees. On appeal, the court affirmed because: (1) defendant assured seller that the employees would be hired, and despite the ambiguity of the agreement, seller had no reason to know of defendant's differing interpretation of the ambiguous terms; (2) defendant by implication assumed the union agreement, and had a duty to arbitrate, because there was a substan-

tial continuity of identity of the work force across the change in ownership.

**OUTCOME:** Arbitration award affirmed because defendant assured seller of building that employees would be hired, and defendant by implication assumed collective bargaining agreement and had duty to arbitrate because of substantial continuity of identity of the work force after the change in ownership.

**CORE TERMS:** union contract, predecessor's, contract of sale, hire, purchaser, seller, bargaining agreement, arbitrate, ambiguous, arbitrator's, contractor, successor, cleaning, hired, assent, proferentem, continuity, contra, contract terms, reason to know, dyeing, proration, unfair, entity, midnight, night, arbitrator's award, labor practices, compel arbitration, binding

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Mergers & Acquisitions > General Business Considerations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN1] In determining whether a successor is bound to the collective bargaining agreement of its predecessor,

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 3 of 24

Page 2
2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

the court must look at whether there has been express or implied assumption of the agreement.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN2] Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning, each as reasonable as the other, and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN3] If there is a lack of mutual assent between the parties in construction of a contract term and neither party knows or has reason to know of the other party's differing interpretation, the disputed term is not included in the contract. The result is the same if both parties knew or had reason to know of the other party's interpretation.

*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN4] The proper construction of an agreement is that given by one of the parties when that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN5] Under New York law, an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*

*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN6] The doctrine of contra proferentem is expressed as follows: in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds. The rule of contra proferentem is to be applied as a last resort, only if the terms cannot be construed by application of the other rules of construction.

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > General Overview*
[HN7] A substantial continuity of identity in the business enterprise before and after a change of ownership is required for there to be a duty to arbitrate, and that the substantial continuity necessarily includes, a substantial continuity in the identity of the work force across the change in ownership.

*Business & Corporate Law > Mergers & Acquisitions > General Business Considerations > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Liabilities & Rights of Successors > Mere Continuation*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Duty to Bargain*
[HN8] Several factors to be considered in determining whether there is substantial continuity between the enterprises such that the successor has the duty to bargain with the union of the predecessor's employees are: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers; and whether those employees who have been retained will understandably view their job situations as essentially unaltered.

COUNSEL: For Plaintiff: Ira A. Sturm, Raab & Sturm, LLP, New York, New York.

For Defendant: Robert A. Sparer, Clifton Budd & Demaria, LLP, New York, New York.

JUDGES: ROBERT P. PATTERSON, JR., U.S.D.J.

OPINION BY: ROBERT P. PATTERSON, JR.

Case 1:07-cv-07047-CM     Document 56-4     Filed 12/11/2007     Page 4 of 24

Page 3

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

OPINION

OPINION AND ORDER

ROBERT P. PATTERSON, JR., U.S.D.J.

Plaintiff filed a petition in the Supreme Court, New York County, to confirm the award issued in its favor by the Office of the Contract Arbitrator ("OCA"). (Def.'s Notice of Removal, Ex. A.) Defendant 83 Maiden LLC ("Maiden") filed a notice of removal pursuant to *28 U.S.C. § 1441(b)* to have the action removed to the Southern District of New York. (Notice of Removal.) Maiden then filed a counterclaim in this Court to vacate the arbitrator's award. (Am. Answer P 23.) For the reasons that follow, plaintiff's petition is granted and defendant's counterclaim is denied.

Background

I. Statement of Facts

West World Holding, Inc. ("West World") owned the building at 83 Maiden Lane, New York, New York (the "property"), [*2] and employed cleaning personnel represented by Local 32B-32J at the property. The terms and conditions of the employment of those employees were governed by a contract entitled the 1996 Commercial Building Agreement (the "union contract"). (Joint Stipulated Facts, PP 17-18.) West World was a member of the Realty Advisory Board of Labor Relations, Inc. ("RAB") in connection with the property. The RAB is a multi-employer bargaining representative that was party to the union contract. (Joint Stipulated Facts, PP 4-5.)

West World sold the property to non-party 83 Maiden LLC, a New Jersey limited liability company, pursuant to an August 27, 1997 contract of sale (the "contract of sale"). Non-party 83 Maiden LLC then assigned the contract of sale to defendant Maiden, a New York limited liability company. Maiden is bound to all the obligations of the Purchaser, non-party 83 Maiden LLC, in the contract of sale. (Joint Stipulated Facts, PP 16, 19-20.) Neither defendant Maiden nor non-party 83 Maiden LLC is a member of the RAB. (Joint Stipulated Facts, P 3.)

Section 4.01(i) of the contract of sale provides:

Seller shall make available to Purchaser in accordance with Section 1.03 (d) [*3] true, complete and correct list of all building employees of Seller at the Property as of March 1, 1997 showing the following: (a) the name and age of the employee, (b) the date of initial employment, (c) the job position, (d) whether such employee is union or non-union, (e) the employee's

base salary, (f) the employee's benefits and (g) the status of the employee's rights relating to vacation and leave time. There are no union or employment contracts or agreements (written or oral) involving employees of Seller or its affiliates affecting the Property which will be binding on Purchaser after the Closing except as set forth on Schedule 1 of Exhibit H.

(Trial Ex. 8, Bates # 0288.)

Exhibit H of the contract of sale is entitled "Building Employees," and Schedule 1 of Exhibit H is a chart entitled "83 Maiden Lane Percentage Increase for Rates & Benefits 1994 - To - 1997." Schedule 1 lists eight employees, their unions, and their hourly rate and benefits increases from 1994 to 1997. Schedule 1 also lists the 1997 benefits for Local 32B-32J. (Trial Ex. 9, Bates # 0289.) It does not otherwise identify or refer to any "union or employment contracts or agreements."

The closing occurred [*4] on or about November 6-7, 1997. The closing statement includes a remittance form from the Building Service 32B-J Funds setting forth the health deposit paid by West World for the fourth quarter of 1997 and pension and annuity funds contributions for the third quarter of 1997, paid by West World. (Joint Stipulated Facts, PP 26, 32.)

At the closing, the parties made adjustments for several costs incurred by West World, including:

. accrued unused vacation;

. pre-paid deposits for "32B-J Fourth Quarter," which refers to the deposit paid to the Building Service 32B-J Health Fund at the beginning of the fourth quarter of the year. Maiden was not required to make any direct payment to the Health Fund for West World; and

. an advance payment made to Jose DeJesus, a Local 32B-32J employee who was out on workers' compensation, in the amount of $ 1,220.50. The closing statement indicated that the $ 1,220.50 should be deducted from DeJesus' pay when he returned to work. Maiden agreed to forward that amount to West World at that time.

(Trial Ex. 11, Schedules 3-4, Bates # 0296-0297.) West World agreed to pay directly all union benefits accruing through November 5, 1997 and [*5] all union dues for November 1997. (Joint Stipulated Facts, P 33; Trial Ex. 11, Schedule 5, Bates # 0308.)

Maiden did not retain the services of West World's cleaning employees after the closing. Neither Maiden nor its managing agent ever paid West World's cleaning em-

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

ployees or included them on the building payroll. (Joint Stipulated Facts, PP 34-35.)

By a letter to the OCA dated December 2, 1997, Local 32B-32J filed a grievance against West World and the RAB under the union contract. In the grievance, Local 32B-32J sought "liquidated damages" from West World for the cleaning services employees because Maiden did not offer those employees employment at the property at their current wages, hours, and working conditions. (Joint Stipulated Facts, P 36.) After two adjournments and an amendment naming Maiden as a party to the case, the matter was heard by John Anner, one of the contract arbitrators, on June 29, 1998. (Joint Stipulated Facts, PP 38-42; Trial Ex. 14, Bates # 0337-0338.) Although it received notice that it was named as a party to the arbitration care of Craven Management, the managing agent of the premises at 83 Maiden Lane, Maiden did not appear or participate in any way [*6] in the arbitral proceeding. (Joint Stipulated Facts, PP 41-42.) Anner's ruling stated, in pertinent part:

Based on the facts and testimony submitted at the hearing, I find that the 83 Maiden LLC c/o Craven Management Corp. has assumed the existing Collective Bargaining Agreement between the seller, West World Holding Corp., and Local 32B-J, SEIU, AFL/CIO. Further, I find that it has violated the terms and conditions of that Agreement by refusing to hire the current employees and failing to recognize its obligations under the Collective Bargaining Agreement with Local 32B-J.

**Award**

1. The case against West World Holding Corp. is dismissed.

2. 83 Maiden LLC. c/o Craven Management Corp. shall hire all the former employees with all the terms and conditions of the Collective Bargaining Agreement, forthwith.

3. 83 Maiden LLC. shall reimburse the employees and the funds for any and all losses sustained.

(Joint Stipulated Facts, P 44; Trial Ex. 13, Bates # 0315-0316.)

Plaintiff and defendant filed cross-motions for summary judgment, both of which were denied. Balanoff v. 83 Maiden LLC, 1999 U.S. Dist. LEXIS 13623, 1999

WL 688278 (S.D.N.Y. Sept. 3, 1999). Accordingly, a trial [*7] was held on October 6, 1999. At trial, Thomas Kelly ("Kelly"), corporate counsel for West World, and Joseph Hershkowitz ("Hershkowitz"), attorney for Maiden at the closing, were called by the plaintiff. Robert Danial ("Danial"), a managing member of Maiden, testified for the defendant.

II. Parties' Interpretation of Section 4.01(i) and Schedule 1 of Exhibit H

A. *West World's Interpretation of the Contract Terms*

At trial, Kelly testified as to his impression about Maiden's responsibilities to the building employees. Kelly communicated to Shearman & Sterling, West World's outside counsel for the closing and the drafter of the contract, that:

we want them to take the employees with the building--if they take the building, we want them to take the employees--and we would prepare an exhibit to disclose to them who the employees were and what the terms of their employment were. We expected that they would take the necessary actions, after closing, in order to fulfill that obligation.

(Trial Tr. at 14.) Kelly explained that no document was prepared to assign the union contract to Maiden because "with respect to the employees, we had arranged and understood with [*8] Shearman and Sterling that the buyers would, after closing, either join the RAB if they were not members already or would assent to the existing contract between the Realty Advisory Board and Local 32B[-32J]." (Trial Tr. at 14.)

Kelly testified that the final dispute at the closing concerned the proration of the employees' wages and benefits. West World wanted the wages and benefits to be prorated so that they would become Maiden's responsibility as of midnight the night before the closing. He explained that "the theory is that if you close today, you take the building and the employees today as buyer. Our obligation, the seller, for the employees stops as of midnight last night, the night before." (Trial Tr. at 15.) For West World, "paying the employees wages and benefits for the date of closing would symbolize their taking the employees for that day." (Trial Tr. at 43.)

The issue of the proration was contentious at the closing. During a break in the negotiations over this point, Hershkowitz expressed to Kelly that, "I believe that we don't want the employees for today, for the closing," and Kelly responded, "I don't see how you can do

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 6 of 24

Page 5

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

that." (Trial Tr. at 16-17.) The issue was [*9] resolved when Danial indicated that Maiden was ready to accept West World's position, saying "we will deal with it, we will take care of it, or let's go forward." (Trial Tr. at 17.)

Kelly testified at trial that his understanding as to the intent of Section 4.01(i) of the contract of sale was that "we were telling them, here are all the employees, here are the terms, their wages, their benefits, and these are the only employees and the benefits that you have to take after closing. There were no others." (Trial Tr. at 19.)

Kelly explained that the procedure by which Maiden would have become bound to the union contract was "that an assent form is filed with the Realty Advisory Board after closing. You assent to the existing contract between the Realty Advisory Board and Local 32B-J or Local 94, as applicable." (Trial Tr. at 22.) Kelly disavowed any responsibility of West World to assure that Maiden filed such an assent form, describing the filing of the assent form as "a post-closing matter for the buyer to attend to. We disclose to them who all the employees are, what their terms are, and it is up to them, after the closing, to go forward and get the assent forms and file them." (Trial [*10] Tr. at 23.) West World's interest was that Maiden honor the employees' terms as spelled out by West World in Schedule 1 of Exhibit H:

> Whether they did it by assent, whether they didn't sign the assent but honored the same conditions, was really up to them. But we told them, these are the people and the terms by which you are going to be bound if you take this property in closing. However you accomplish it is really up to you.

(Trial Tr. at 35.) He stated that Maiden had the freedom to give the employees better terms than those spelled out on Schedule 1 of Exhibit H, but that the terms on the schedule were "the minimums." (Trial Tr. at 36.)

Kelly's impression of Maiden's responsibility for the building employees is also illustrated by his correspondences regarding the closing. Kelly drafted a memorandum to be distributed to the building employees entitled "Sale of Building and Change of Employer." The memorandum, as drafted by Kelly, stated in relevant part:

> You may be concerned about the effect of the sale on your employment situation. On the date of the closing, your employment with Harbor Property Management, Inc. [1] will end. We are advised by the purchaser's [*11] attorney that 83 Maiden

LLC will be your new employer from and after November 7, 1997.

(Trial Ex. 10, Bates # 0291.) Kelly sent the memorandum to Hershkowitz for approval, and Hershkowitz changed the last sentence to read, "We are advised by the purchaser's attorney that 83 Maiden LLC *or a management company designated by it* will be *the* new employer from and after *the closing.*" (Id. (emphasis added).) [2]

> 1    West World Holding, Inc. owned the building at 83 Maiden Lane prior to the sale, and Harbor Property Management, Inc. provided the management service. (Kelly Dep. at 35.)

> 2    Neither memorandum was ever sent to the employees, but both are evidence of Kelly's perceptions of West World's and of Maiden's obligations to the building employees prior to the closing and the sale of 83 Maiden Lane. (Joint Stipulated Facts, P 25.)

Kelly sent a letter to Local 32B-32J on October 28, 1997, regarding the sale of the buildings at 20 Exchange Place and 83 Maiden Lane. The letter states:

> The [*12] terms and conditions of the present agreement with your Union will be continued until the respective sales dates which are presently scheduled for December 4, 1997 (20 Exchange Place) and November 7, 1997 (83 Maiden Lane). Accordingly, the employment by Harbor Property Management, Inc. of all employees at those buildings represented by your Union will end on those sales dates (or any adjournments thereof) and there will also be a change of employers in both buildings on those dates.

(Trial Ex. 13, Bates # 0317.)

On June 9, 1998, Kelly sent a letter to Kevin O. McCulloch, Assistant to the President of Local 32B-32J, regarding the grievance filed by Local 32B-32J with the OCA. Kelly explained in the letter that "we have required in writing that the new owner hire the employees and maintain the contractual wages and benefits in effect at the time of the sale." (Trial Ex. A, Bates # 0340.) Kelly testified at his deposition that the "writing" to which he referred in that letter was Section 4.01(i) of the contract of sale. (Kelly Dep. at 43.) Kelly also asserted in the letter that "we did not terminate these employees -- the purchaser did so after agreeing with us that they

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 7 of 24

Page 6

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

would [*13] take the property with those employees." (Trial Ex. A, Bates # 0340.)

West World's position, as evidenced by Kelly's testimony and his correspondence with Local 32B-32J, was that Maiden was required to employ the building employees with the rates and benefits set forth in Schedule 1 of Exhibit H, consistent with the terms of Section 401(i) of the contract of sale.

## B. *Maiden's Interpretation of the Ambiguous Contract Terms*

Hershkowitz described Section 4.01(i) as "a representation made by the seller to the purchaser." (Trial Tr. at 53.) He explained that the clause indicated that "there is nothing anyplace that I have to assume and that there are no contracts except as set forth in Schedule 1 of Exhibit H." (Trial Tr. at 55.) He agreed with the Court that "the seller represented that [Schedule 1 of Exhibit H] will be binding after the closing," but took the position that "it doesn't mean that we assume those obligations. It means that we are at liberty to assume it or not to assume it if we so desire. And the seller is telling us that there is nothing that we have to assume." (Trial Tr. at 56.) Hershkowitz's testimony regarding the contract clause and the schedule continued [*14] as follows:

> Q. So what does this clause serve, then? Does it serve a purpose, then?
>
> A. Sure. It protects us.
>
> Q. How does it protect you?
>
> A. We know that there are no union contracts or other agreements that we have to take subject to.
>
> Q. Other than those set forth in Schedule 1?
>
> A. The ones that are set forth in Schedule 1 are in existence, fine, we acknowledge these are in existence. Now, the next question is, do we have to assume it? That would be another part of the contract. What you are saying is that this provision is somewhat ambiguous. Yes. So what? If it is ambiguous and if we so read it as being ambiguous, we would have construed it as the way I am reading it, protecting the purchaser against the seller who drafted it.
>
> Q. Wouldn't you be just as protected if the contract said nothing about the union contracts?
>
> A. Yes.

> Q. So it is superfluous, you don't need it?
>
> A. I didn't draft it.

(Trial Tr. at 56-57.)

Hershkowitz asserted that the clause and the schedule serve an informational purpose because "I would need some place to know what employees there are and to know that I don't have to take anything, even at the seller's reading of it, that I don't [*15] have to take anything." (Trial Tr. at 57-58.) He explained that "the purchaser wants to know what the expense of the building are, the purchaser wants to know what the employees are getting, how many employees there are, what he has to deal with in terms of further negotiations." (Trial Tr. at 59.)

Hershkowitz contrasted the contract clause and the schedule with contracts of sale in which the purchaser agrees to employ the seller's employees and contain a clause stating that "[the purchasers] expressly agree to assume the 32B-J, or whatever." (Trial Tr. at 60-61.)

Danial testified about his conversations with Kelly before the closing regarding the building employees. He stated that "at some point I believe he asked what our intentions were with the employees. At that point I believe I told him we hadn't determined our intentions yet." (Trial Tr. at 70.) In another conversation, Danial told Kelly "that there probably would be a cleaning contractor that would be taking over the employees." (Trial Tr. at 71.) Danial also testified that "when we made a determination we told him that we were going to have a cleaning contractor who was going to handle the cleaning in the building and [*16] [the cleaning contractor] would offer the employees jobs." (Trial Tr. at 73.)

According to Danial, the union contract was not discussed at the closing, nor were there discussions regarding "the employees themselves." (Trial Tr. at 73.) The only discussions at the closing relating to the employees regarded "subjects. . .that would have affected the employees' pay and adjustment of those items as per contract," i.e. the proration of the employees' wages and benefits. (Trial Tr. at 73.) Maiden agreed to West World's position on the proration "because that is what the contract called for, sir. We followed the provisions of the contract verbatim. Those adjustments are contractual obligations, just like paying the purchase prices. It was a monetary adjustment." (Trial Tr. at 85.)

Danial's explanation of the meaning of the clause and schedule also emphasized its informational significance. Danial testified that the "representations by the seller [in Schedule 1 of Exhibit H] were very, very mean-

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 8 of 24

Page 7

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

ingful. . . It helped us to analyze the economic value of the property based on those costs and expenses." (Trial Tr. at 92.) Regarding Section 4.01(i)'s meaning, Danial's testimony was:

> A. [*17] "Exactly what it means, there is no other binding agreements that we would either voluntarily want to take, that might bind the building, that we would be getting into.
>
> Q. Other than these.
>
> A. If we choose to assume them, that is correct.
>
> Q. Where does it say you have that option?
>
> A. Where does it say that I have to assume it? There was a $ 35 beeper contract that they required me to assume in this agreement. Are you telling me a multi-hundred-thousand dollar contract they forget to tell me, I had to assume it?
>
> Q. Did you ever ask them?
>
> A. No. It didn't say I had to assume it.

(Trial Tr. at 95.)

Danial also testified that, "in a contract I have usually been involved in, when there is assignment of a collective bargaining agreement there is a specific clause that assigns that contract." (Id. at 93.) Such a clause was not present in the contract of sale between West World and Maiden.

The statements of Hershkowitz and Danial indicate that Maiden did not construe Section 4.01(i) of the contract of sale and Schedule 1 of Exhibit H as anything more than useful data.

## Discussion

The arbitrator held that Maiden had assumed the union contract entered into by West [*18] World and Local 32B-32J, and that Maiden violated the terms and conditions of that contract. The central inquiry in determining whether the arbitrator's award should be enforced is whether Maiden in fact assumed the union contract. If Maiden did not assume the union contract, it does not have a duty to arbitrate with Local 32B-32J, in that the duty to arbitrate arose out of the union contract. (Trial Ex. 1, Article VIII, Bates # 0015-0017.) [HN1] In determining whether a successor is bound to the collective bargaining agreement of its predecessor, the Court must look at whether there has been "express or implied as-

sumption of the agreement." *Howard Johnson Co. v. Local Joint Exec. Bd., Hotel and Restaurant Employees and Bartenders Int'l Union, AFL-CIO, 417 U.S. 249, 249, 41 L. Ed. 2d 46, 94 S. Ct. 2236 (1974).*

## I. Express Assumption of the Union Contract

Whether there was express assumption of the union contract turns on the construction of Section 4.01(i) of the contract of sale and the schedule to which it refers, Schedule 1 of Exhibit H.

### A. *Construing Ambiguous Contract Terms*

This Court has already determined that Section 4.01(i) of the contract and Schedule [*19] 1 of Exhibit H are ambiguous contract terms. See Balanoff v. 83 Maiden LLC, 1999 U.S. Dist. LEXIS 13623, 1999 WL 688273 (S.D.N.Y. Sept. 3, 1999). "Where [HN2] reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning--each as reasonable as the other--and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact." *Consarc Corporation v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993).* As the trier of fact in this case, the Court will examine the evidence, using the applicable rules of contract interpretation, to determine the parties' intent regarding the ambiguous terms in the contract of sale.

West World and Maiden have differing interpretations of the contract terms at issue. It is well-settled that, [HN3] if there is a lack of mutual assent between the parties in construction of a contract term and neither party knows or has reason to know of the other party's differing interpretation, the disputed term is not included in the contract. See *United States Naval Institute v. Charter Communications, Inc., 875 F.2d 1044, 1050 (2d Cir. 1989);* [*20] *RESTATEMENT (SECOND) OF CONTRACTS § 201(3);* CORBIN ON CONTRACTS § 24.5 (Revised Ed. 1998). The result is the same if both parties knew or had reason to know of the other party's interpretation. See CORBIN ON CONTRACTS § 24.5 (Revised Ed. 1998). [HN4] However, as the Supreme Court stated in *United States v. Stuart,* "the proper construction of an agreement is that given by one of the parties when 'that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.'" *489 U.S. 353, 367 n.7, 103 L. Ed. 2d 388, 109 S. Ct. 1183 (1989)* (quoting *RESTATEMENT (SECOND) OF CONTRACTS § 201(b) (1981)).*

In *Galli v. Metz,* the Second Circuit described another applicable rule of contract interpretation:

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 9 of 24

Page 8

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

[HN5] Under New York law an interpretation of a contract that has "the effect of rendering at least one clause superfluous or meaningless. . .is not preferred and will be avoided if possible." Rather, an interpretation that "gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."

*973 F.2d 145, 149 (2d Cir. 1992)* [*21] (internal citations omitted); *see also Rentways v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271, 273 (N.Y. 1955); Fleischman v. Furgueson, 223 N.Y. 235, 119 N.E. 400, 401 (N.Y. 1918).*

Finally, courts apply the doctrine of *contra proferentem* [3] when interpreting ambiguous contract terms. [HN6] This maxim is expressed in the Restatement as follows: "in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." *RESTATEMENT (SECOND) OF CONTRACTS § 206.* The Supreme Court has explained that "the reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." *Mastrobuono v. Shearson Lehman Hutton, 514 U.S. 52, 63, 131 L. Ed. 2d 76, 115 S. Ct. 1212 (1995).* The rule of *contra proferentem* is to be applied as a "last resort," only if the terms cannot be construed by application of the other rules. [4] *Herzog v. Williams, 139 Misc. 2d 18, 526 N.Y.S.2d 329, 330 (Just. Ct. 1988).*

3    The entire Latin expression of this rule is: "Verba chartarum fortius accipiunter contra proferentem." This expression translates into English as: "Contract terms will be most strongly interpreted against the drafter."

[*22]

4    Some New York courts have expressed the significance of the rule of *contra proferentem*, describing it as "established," *BT Commercial Corp. v. Blum, 175 A.D.2d 43, 44, 572 N.Y.S.2d 10 (1st Dept. 1991),* "axiomatic," *Johnson v. Werner, 63 A.D.2d 422, 424, 407 N.Y.S.2d 28 (1st Dept. 1978),* a "hornbook principle," *Chase Manhattan Bank, N.A. v. Mehlman, 59 A.D.2d 694, 694, 398 N.Y.S.2d 686 (1st Dept. 1977),* a "canon of construction," *Surrey Strathmore Corp. v. Dollar Savings Bank of New York, 36 N.Y.2d 173, 325 N.E.2d 527, 530, 366 N.Y.S.2d 107 (N.Y. 1975),* and a "well-settled maxim," *Rent-*

*ways v. O'Neill Milk & Cream Co., 308 N.Y. 342, 126 N.E.2d 271, 273 (N.Y. 1955).*

Other courts have pointed out, however, that this rule has low priority in New York contract law. The Second Circuit has asserted that "New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without a satisfactory result.'" *Albany Savings Bank, FSB v. Halpin, 117 F.3d 669, 674 (2d Cir. 1997)* (quoting *Herzog v. Williams, 139 Misc. 2d 18, 526 N.Y.S.2d 329, 330 (Just. Ct. 1988); see also Prudential Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Association, Inc., 158 F.3d 65, 77 n.6 (2d Cir. 1998); O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc., 37 F.3d 55, 61 (2d Cir. 1994); Record Club of America, Inc. v. United Artists Records, Inc., 890 F.2d 1264, 1271 (2d Cir. 1989); United States Naval Institute v. Charter Communications, Inc., 875 F.2d 1044, 1050 (2d Cir. 1989); Schering Corp. v. Home Insurance Co., 712 F.2d 4, 10 (2d Cir. 1983).* In *National Equipment Rental, Ltd. v. Reagin,* the court resisted application of the doctrine of *contra proferentem* in a case where the nondrafting party's interpretation of the contract term rendered the term "almost meaningless." *338 F.2d 759, 763 (2d Cir. 1964).* In addition, the Second Circuit has acknowledged that "a number of courts have recognized that in cases involving bargained-for contracts, negotiated by sophisticated parties, the underlying adhesion contract rationale for the [*contra proferentem*] doctrine is inapposite." *Schering Corp. v. Home Insurance Co., 712 F.2d at 10* (citing *Eagle Leasing Corp. v. Hartford Fire Insurance Co., 540 F.2d 1257, 1261 (5th Cir. 1976)).*

[*23] B. *Application of Contract Interpretation Rules to This Case*

It is clear that West World and Maiden had differing interpretations of Section 4.01(i) of the contract of sale and Schedule 1 of Exhibit H. West World interprets the terms to be an embodiment of Maiden's commitment to its obligation to hire the building employees. Maiden interprets the terms as purely informative, detailing the terms of the building employees' employment if Maiden should choose to hire them. To determine whose interpretation of the ambiguous terms should prevail, the above related rules of contract interpretation will be applied.

1. Mutual Mistake and Knowledge of Differing Interpretations

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 10 of 24

Page 9

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

Prior to the closing, West World believed that Maiden was planning to hire the building employees based on Danial's statement to Kelly that Maiden's cleaning contractor would offer jobs to the building employees. There was no discussion of Section 4.01(i) or Schedule 1 of Exhibit H at the closing, but Hershkowitz made a comment to Kelly that "we don't want the employees for today, for the closing." (Trial Tr. at 16.) This comment indicated to Kelly that Maiden was not committed to hiring the building employees. [*24] The comment was made, however, while West World and Maiden were in negotiation about the date of proration of employee benefits. The negotiation on this matter ended with Maiden accepting West World's position. Though Danial's statement that Maiden would "deal with it" is not a particularly convincing statement of Maiden's commitment to hire the building employees, (Trial Tr. at 17,) Maiden's agreement to be responsible for the employees as of midnight before the closing, coupled with Danial's pre-closing statement to Kelly that Maiden's cleaning contractor would hire the employees, is sufficient evidence that West World neither knew or had reason to know of Maiden's differing interpretation of the ambiguous contract terms.

Maiden, on the other hand, had reason to know that West World intended for Maiden to hire the building employees. Danial testified that Kelly asked him prior to the closing "what our intentions were with the employees." (Trial Tr. at 70.) At first, Danial told Kelly that "we hadn't determined our intentions yet," but stated in a later conversation with Kelly that Maiden's cleaning contractor would offer the building employees employment. (*Id. at 71, 73.*) Therefore, [*25] Danial knew that West World expected that the building employees would be hired, based on Danial's own representation to that effect.

In addition, Maiden did agree at the closing to take responsibility for the employees' wages and benefits starting at midnight before the closing. It is likely that Maiden knew that the symbolic effect of this proration for West World was to pass the employees on to Maiden. Even though Danial testified that Maiden agreed to this term simply "because that is what the contract called for," he had reason to know that West World attached more meaning to the proration. (Trial Tr. at 85.) West World inquired about Maiden's intentions regarding the building employees prior to the closing, Maiden assured West World that the employees would be hired, and the parties made adjustments at the closing such that the employees' wages and benefits as listed were Maiden's responsibility as of midnight the night before the closing.

The evidence suggests that West World did not know or have reason to know about Maiden's different interpretation of the contract terms when the actual closing occurred. It appears that Maiden did know that West

World construed the ambiguous [*26] contract terms to require Maiden to hire the building employees at the wages and benefits listed. Therefore, West World's interpretation of the ambiguous terms should prevail.

### 2. Giving Meaning to All Clauses

West World's interpretation gives meaning to the ambiguous terms of the contract, while Maiden's interpretation renders those terms meaningless. According to West World, Section 4.01(i) and Schedule 1 of Exhibit H obligate Maiden to hire the employees listed on the schedule. By Maiden's interpretation, the clause and schedule do not bind Maiden to hire the employees, but inform Maiden of the terms by which Maiden should abide if it does hire the employees. Hershkowitz claimed that the clause "protected" Maiden, but admitted that Maiden "would be just as protected if the contract said nothing about the union contracts." (Trial Tr. at 57.) In addition, he characterized the clause as possibly "superfluous," stating, "you are saying that it doesn't add anything. Possibly. I didn't ask for the clause, I didn't insert it, I didn't draft it." (Trial Tr. at 58.) By Hershkowitz's testimony, Maiden's construction of the clause and the schedule render the provision, "there are no union [*27] or employment contracts or agreements (written or oral) involving employees of Seller and its affiliates affecting the Property which will be binding on Purchaser after the closing except as set forth on Schedule 1 of Exhibit H" meaningless. To the extent that the schedule is informative to Maiden, the data could have been rendered in a document separate from the contract of sale. In addition, the use of the word "binding" to refer to Schedule 1 of Exhibit H argues against construing the schedule as only providing background information on the employees and their wages and benefits.

### 3. *Contra Proferentem*

The one rule of construction that supports Maiden's reading of the clause and the schedule is *contra proferentem*, because West World drafted the agreement. However, the authority in the Second Circuit instructs that this rule is to be used only as a "last resort." In this case, the parties' intent and knowledge of each other's intent regarding the ambiguous terms may be ascertained through extrinsic evidence. This extrinsic evidence and other rules of contract interpretation support West World's interpretation of the contract terms. Therefore, the Court declines to apply [*28] the rule of *contra proferentem*.

### C. *West World's Interpretation of the Terms and Assumption of the Union Contract*

Although West World expected Maiden to hire the building employees at 83 Maiden Lane at their listed

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 11 of 24

Page 10

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

wages and benefits, the evidence did not show that West World interpreted the contract to require Maiden to assume the union contract per se. Kelly stated at trial that West World "had arranged and understood with Shearman and Sterling that the buyers would, after closing, either join the RAB if they were not members already or would assent to the existing contract between the Realty Advisory Board and Local 32B." (Trial Tr. at 14.) However, the statements of West World's representatives at the closing indicate that West World's priority in closing the contract of sale was that its own obligations to the employees and their unions would end with the sale of the building. Kelly testified as to the importance of calculating the proration of employees' salaries and benefits as of midnight the night before the closing, explaining that "our obligation, the seller, for the employees stops as of midnight last night, the night before." (Trial Tr. at 15.) He described the [*29] assumption of the union contract as a "post-closing matter for the buyer to attend to." (Trial Tr. at 23.)

Section 4.01(i) of the contract of sale and Schedule 1 of Exhibit H obligated Maiden to take responsibility for the building employees and employ them at the terms and conditions specified in Schedule 1, thereby relieving West World of that obligation. The terms did not expressly require Maiden to assume all the terms of the union contract or to submit to the authority of the OCA. Maiden may well have violated its obligation to West World under the contract of sale by terminating the union employees, but there is no showing that West World ever understood that Maiden would assume the union contract and agree to arbitrate disputes with Local 32B-32J. Therefore, Local 32B- 32J cannot rely on the contract of sale as evidence that Maiden expressly assumed the union contract.

II. Implied Assumption of the Union Contract

Although Maiden did not expressly assume the union contract, it may have assumed the contract by implication. The Supreme Court has heard cases on this issue in the context of suits to compel arbitration under *29 U.S.C. § 301* and suits [*30] brought by the National Labor Relations Board ("NLRB") to confirm its findings of unfair labor practices under the National Labor Relations Act ("NLRA"). Because this case centers on Maiden's duty to arbitrate with Local 32B-32J, the suits to compel arbitration, namely *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)*, and *Howard Johnson Company v. Detroit Local Joint Executive Board, 417 U.S. 249, 41 L. Ed. 2d 46, 94 S. Ct. 2236 (1974)*, are more pertinent. The cases concerning the NLRB's findings of unfair labor practices are *NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 32 L. Ed. 2d 61, 92 S. Ct. 1571 (1972)*, and

*Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 96 L. Ed. 2d 22, 107 S. Ct. 2225 (1987)*. Though these cases are procedurally different from this case, the Supreme Court in *Howard Johnson* asserted that "the reasoning of *Burns* must be taken into account" in suits to compel arbitration. [5] *417 U.S. at 256*. Therefore, the Court will consider *Burns* and *Fall River Dyeing* in determining Maiden's obligations under [*31] the union contract.

5 In *Howard Johnson*, the Court quoted Justice Douglas' statement in *Textile Workers Union v. Lincoln Mills* that "§ 301 of the Labor Management Relations Act authorized the federal courts to develop a federal common law regarding enforcement of collective-bargaining agreements . . . [which] must be 'fashioned from the policy of our national labor laws.'" *417 U.S. 249, 255, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974)* (quoting *Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957))*. The Court interpreted this statement as instructing that *Burns* be applied in *§ 301* cases, explaining that "it would be plainly inconsistent with this view to say that the basic policies found controlling in an unfair labor practice context may be disregarded by the courts in a suit under *§ 301*, and thus to permit the rights enjoyed by the new employer in a successorship context to depend upon the forum in which the union presses its claims." *417 U.S. at 256*.

[*32] A. *Section 301 Suits to Compel Arbitration*

In *John Wiley*, a case in which the union sought to compel arbitration under a collective bargaining agreement under *§ 301*, the Supreme Court held that the defendant was required to arbitrate with the union under the collective bargaining agreement between the union and the defendant's predecessor, Interscience. Interscience had merged with and disappeared into the defendant corporation, and the surviving business entity continued to conduct the same business. The Court stated that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and . . . in appropriate circumstances . . . the successor employer may be required to arbitrate with the union under the agreement." *376 U.S. 543, 548, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964)*. The "appropriate circumstances" in *John Wiley* were "the wholesale transfer of Interscience employees to the Wiley plant" and the fact that the union notified the surviving corporation of its collective bargaining agreement with Interscience. 376 U.S. at 551. [*33]

Case 1:07-cv-07047-CM    Document 56-4    Filed 12/11/2007    Page 12 of 24

Page 11

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

*John Wiley* can be distinguished from this case in that it dealt with a merger of the defendant and its predecessor in which the predecessor corporation was consumed by the defendant, a situation in which there is a great risk of bad faith manipulation to avoid a union contract. Maiden and West World, on the other hand, appear to have no connection beyond the transaction to sell the building at 83 Maiden Lane.

In *Howard Johnson*, the Court held that the defendant was not required to arbitrate with the union when it had purchased all the assets of a restaurant and motor lodge and leased the property from the prior owners who had entered into a collective bargaining agreement with the union. The Court noted that *Howard Johnson* "involves only a sale of some assets, and the initial employers remain in existence as viable corporate entities, with substantial revenues from the lease of the motor lodge and restaurant to Howard Johnson," compared with *John Wiley*, where the initial employer disappeared into the defendant corporation in a merger, allowing the employees no realistic remedy against it. *417 U.S. at 257.* The Court cited as "even more important" the fact [*34] that the surviving corporation in *John Wiley* hired all of the employees of the disappearing corporation. *417 U.S. at 258.* In *Howard Johnson*, the defendant hired only nine of the 53 employees of its predecessor. *417 U.S. at 259-60.* The Court held that [HN7] that a "'substantial continuity of identity in the business enterprise' before and after a change of ownership" was required for there to be a duty to arbitrate, and that the substantial continuity "necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership." *417 U.S. at 263* (quoting *John Wiley, 376 U.S. 543, 551, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964)).*

The Court in *Howard Johnson* based its decision on (1) the fact that the union still had a "realistic remedy" from Howard Johnson's predecessor, *417 U.S. 249, 257, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974),* and (2) the small number of the predecessor's employees hired by Howard Johnson. The facts of this case are similar to *Howard Johnson* as to the first factor but differ as to the second factor.

As in *Howard Johnson*, the union in this case has a "realistic remedy" against the predecessor employer, because West [*35] World still exists as a corporate entity. However, whereas the predecessor employers in *Howard Johnson* retained ownership of the building and leased it to Howard Johnson, West World has no continued connection to the building at 83 Maiden Lane. The Court in *Howard Johnson* noted, in contrasting the case with *John Wiley*, that "this case involves only a sale of some assets, and the initial employers remain in existence as viable corporate entities, with substantial revenues from the lease of the motor lodge and restaurant to

Howard Johnson." *417 U.S. 249, 257, 41 L. Ed. 2d 46, 94 S. Ct. 2236 (1974).* The Court did not specify whether it deemed more important that the predecessors had "substantial revenues" or that those revenues derived from the property operated by Howard Johnson, but went on to state that, "because the [predecessors] continue as viable entities with substantial retained assets, the Union does have a realistic remedy to enforce their contractual obligations." *417 U.S. at 257.* The omission in this statement of the fact that the predecessors' "substantial retained assets" derived from the lease of the premises to Howard Johnson indicates [*36] that the Court was more concerned with the predecessors' financial situation than with their continued connection to the property leased by Howard Johnson. Though West World does not retain an interest in the property at 83 Maiden Lane, its financial situation is such that Local 32B-32J has a "realistic remedy" against it. Therefore, the facts of this case are sufficiently similar to *Howard Johnson* regarding the first factor.

However, Maiden does not satisfy the second, "more important" factor in *Howard Johnson. 417 U.S. at 258.* The Court found it significant that Howard Johnson had hired only nine of the 53 employees of its predecessors. Upon first glance, it appears that Maiden's case is even stronger than Howard Johnson's in this respect, in that Maiden hired none of West World's Local 32B-32J employees. (Joint Stipulated Facts, P 34.) However, by the terms of the contract of sale, Maiden committed to hire all of West World's employees at the wage and benefit rates listed in Schedule 1 of Exhibit H which were set by the union contract. Instead of rewarding Maiden for violating that commitment, the Court deems that, for purposes of analyzing Maiden's responsibility [*37] as West World's successor, Maiden must be considered to have hired all of West World's union employees. Therefore, Maiden does not satisfy the second factor in *Howard Johnson.*

In addition, Howard Johnson's disavowal of its predecessors' collective bargaining agreement contrasts with Maiden's post-closing rejection of the union contract in this case. Howard Johnson sent a letter to its predecessors approximately one month before the transfer of operation of the restaurant and motor lodge was complete "clarifying that 'it was understood and agreed that the Purchaser . . . would not recognize and assume any labor agreements between the Sellers . . . and any labor organizations,' and that it was further agreed that 'the Purchaser does not assume any obligations or liabilities of the Sellers resulting from any labor agreements. . .'" *417 U.S. 249, 251-52, 94 S. Ct. 2236, 41 L. Ed. 2d 46 (1974).* The predecessor employers "acknowledged and confirmed" receipt of this letter. *417 U.S. at 251.* Two weeks before the transfer, the predecessors notified their

Case 1:07-cv-07047-CM     Document 56-4     Filed 12/11/2007     Page 13 of 24

Page 12

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

employees and the union that the employees' employment with them would terminate on the date of the transfer. At around the same time, Howard [*38] Johnson notified the union "that it would not recognize the Union or assume any obligations under the existing collective-bargaining agreements." *417 U.S. at 252.* By contrast, Maiden, which owns and manages other real estate in the city with both union and non-union employees, did not make any express disavowal of the union contract, either to West World or to Local 32B-32J. Maiden relies on Section 4.01(i) and Schedule 1 of Exhibit H in the contract of sale, terms which this Court has interpreted as requiring Maiden to hire West World's union employees at their existing wages and benefits.

Though West World is a "viable corporate entity" from which Local 32B-32J may seek relief, as it did in arbitration, [6] *417 U.S. at 257,* the Court finds that Maiden did hire all of West World's employees, differentiating the case from *Howard Johnson.* The importance of this continuity of workforce in binding successor employers to the collective bargaining agreements of their predecessors is evidenced by the Court's consideration of that factor in *John Wiley.* In that case, where the defendant literally embodied the predecessor after the merger, which alone would [*39] seem to be enough to hold that the defendant had a duty to arbitrate, the Court's decision was based in part on the fact that the defendant had hired all of its predecessor's union employees. See *376 U.S. 543, 551, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964).* This demonstrates the Supreme Court's emphasis on the importance of the successor retaining the employees of its predecessor in determining a successor's duty to arbitrate.

> 6   The Contract Arbitrator dismissed Local 32B-32J's case against West World. (Trial Ex. 2, Bates # 0059.)

B. *Unfair Labor Practice Cases*

The issue in *Burns* was whether the NLRB could compel a purchaser of a business to bargain with a union with whom its predecessor had a collective bargaining agreement. The Supreme Court held that Burns did have a duty to bargain with the union because "a majority of the employees" hired by it, 27 of 42 guards, were represented by the union. *406 U.S. 272, 281, 92 S. Ct. 1571, 32 L. Ed. 2d 61 (1972).* The Court opined that, "although a successor employer is ordinarily free to set initial [*40] terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms." [7] *406 U.S. at 294-95.*

> 7   Though the Court held that Burns was not "bound to observe the substantive terms of the collective-bargaining contract the union had negotiated with [Burns' predecessor] and to which Burns had in no way agreed," *406 U.S. at 281-82,* difference between *Burns* and this case dictate that such a limitation is not required here. In declining to extend *John Wiley,* the Court in *Burns* noted that *John Wiley* "arose in the context of a § 301 suit to compel arbitration, not in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8(d)." *406 U.S. at 285.* In addition, *Burns* differs from this case in that the successor employer acquired the business by outbidding its predecessor, whereas Maiden acquired the building directly from West World and the acquisition was accompanied by extensive negotiations. The Court in *Burns* also noted that its decision in that case "turns to a great extent on the precise facts involved here." *406 U.S. at 274.* For those reasons, the holding in *Burns* is not directly applicable to this case.

[*41]   In *Fall River Dyeing,* the Supreme Court upheld the NLRB's order that a successor corporation had committed an unfair labor practice by not bargaining with the union of the employees of its predecessor, Sterlingwale, a textile dyeing and finishing plant in Fall River, Massachusetts. The employees of Sterlingwale had been represented by the United Textile Workers of America, AFL-CIO, Local 292 for several years. Sterlingwale went out of business in late summer 1982. A former officer of Sterlingwale and the president of one of its major customers formed the defendant corporation, Fall River Dyeing & Finishing Corporation, which began operating out of Sterlingwale's former facilities in September 1982. The defendant initially hired 55 workers, enough for one shift, 36 of whom were former Sterlingwale employees. *482 U.S. 27, 30-34, 107 S. Ct. 2225, 96 L. Ed. 2d 22 (1987).*

In holding that defendant was a successor to Sterlingwale with a duty to bargain with the United Textile Workers of America, the Court listed [HN8] several factors to be considered by the NLRB in determining whether there is "'substantial continuity' between the enterprises" such that the successor has the duty to bargain with the union of [*42] the predecessor's employees:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions

Case 1:07-cv-07047-CM     Document 56-4     Filed 12/11/2007     Page 14 of 24

Page 13

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

*482 U.S. at 43.* An additional consideration was "whether 'those employees who have been retained will understandably view their job situations as essentially unaltered.'" *482 U.S. at 43* (quoting *Golden State Bottling Co. v. NLRB, 414 U.S. 168, 184, 38 L. Ed. 2d 388, 94 S. Ct. 414 (1973)).* Applying these factors to *Fall River Dyeing,* the Court found it to be "of particular significance . . . that, from the perspective of the employees, their jobs did not change." *482 U.S. at 44.*

The Court's consideration of the employees' perspective in *Fall River Dyeing* is instructive. Had Maiden employed the union workers, as it was obligated to do, the employees' employment at 83 Maiden Lane would have continued at the same wage and benefit rates as before, and their responsibilities [*43] and working conditions would have remained unchanged. Those employees would undoubtedly have viewed their "job situations as essentially unaltered." Though this similarity to *Fall River Dyeing* is not dispositive, it supports a finding that Maiden assumed the union contract by implication when it agreed to hire the union employees at the existing wages and benefits.

Analysis of these four Supreme Court cases leads to the conclusion that Maiden had a duty to arbitrate with Local 32B-32J. For purposes of evaluating Maiden's obligations under the union contract, Maiden is considered to have honored its obligation to West World to hire those employees at their union wages and benefits. Continuity of workforce was a factor in holding that the successor employer in *John Wiley* had a duty to arbitrate and the lack of this continuity of workforce was the more important of the two main factors leading the Court in *Howard Johnson* to hold that the defendant did not have a duty to arbitrate. A finding that Maiden assumed the union contract is further supported by *Burns* and *Fall River Dyeing,* in which continuity of workforce played a factor, as did the perception of the union [*44] employees about the extent to which their positions changed after transfer of ownership. This Court holds that Maiden assumed the union contract by implication and, therefore, had a duty to arbitrate with the union.

## III. Maiden's Other Claims

Maiden argues that the arbitrator's award should be vacated because 1) the union contract is illegal and 2) the arbitrator exceeded his authority and/or is guilty of misconduct. (Def.'s Statement of Elements of Claims and Defenses, PP 30-47.)

### A. *Legality of the Union Contract*

Maiden contends that the union contract is illegal because it contains a "cease doing business" clause in violation of § 8(e) of the NLRA. Maiden cites Article II(3) of the union contract, which Maiden interprets as permitting subcontracting "only to union contractors, or those willing to sign a union contract." (Def.'s Statement of Elements of Claims and Defenses, P 31.) In fact, the clause does not require that contractors sign a union contract, only that their employment of union workers, as arranged by the employer, be governed by the union contract. In addition, the clause does not require that the contractor maintain a contract with Local 32B-32J or [*45] another SEIU local, as Maiden claims. Instead, it states that the union will consider if the contractor has a history of failing to comply with labor agreements with these unions in assessing whether the contractor is likely to honor the terms of this contract when employing Local 32B-32J members. Maiden's concern that contractors will be rejected by the union for mistakes to remittances to union benefit funds caused by "a totally innocent error committed by a junior clerk," (Def.'s Statement of Elements of Claims and Defenses, P 34), is allayed by the clause's statement that "[a] rejection of a contractor shall not be arbitrary." (Trial Ex. 1, Bates # 0009.)

Maiden is also incorrect in asserting that the clause "purports to make the contracting employer financially responsible for any labor contract defaults of the subcontractor" in violation of § 8(e) of the NLRA. (Def.'s Statement of Elements of Claims and Defenses, P 36.) The clause instructs the employer regarding its own employees who are working for the subcontractor as arranged by the employer and the subcontractor. Quoting from the case Maiden cites in support of its argument, "the object of the agreement is to benefit [*46] the employees of the bargaining unit represented by the union[, so] it is 'primary' and . . . does not fall within the proscription of § 8(e)." *Bermuda Container Line Ltd. v. International Longshoremen's Association, 192 F.3d 250, 256 (2d Cir. 1999)* (quoting *A. Duie Pyle, Inc. v. NLRB, 383 F.2d 772, 776 (3d Cir. 1967)).*

### A. *The Arbitrator Did Not Exceed His Authority and is Not Guilty of Misconduct*

Maiden asserts that the arbitrator exceeded his authority by granting more than the union requested. The union requested that Maiden reinstate the former employees to their positions with full back pay, and the arbitrator found that Maiden had assumed the union contract and was required to "hire all the former employees with all the terms and conditions of the Collective Bargaining Agreement," (Trial Ex. 2, Bates # 0060), when (Def.'s Statement of Elements of Claims and Defenses,

Case 1:07-cv-07047-CM     Document 56-4     Filed 12/11/2007     Page 15 of 24

Page 14

2000 U.S. Dist. LEXIS 109, *; 163 L.R.R.M. 2337

PP 39-40.) The Court finds that the arbitrator did not exceed his authority in making his award. Though the union did not specifically request that Maiden hire the employees "with all the terms and conditions of the Collective Bargaining Agreement," that was undoubtedly [*47] its intention.

Maiden also argues that the arbitrator was guilty of misconduct in not granting Maiden an adjournment. However, Maiden failed to respond to the notice of arbitration in any way and there is no evidence that it requested an adjournment. More importantly, Maiden misinterprets the relevant clause of the union contract. Article VIII(2) of the union contract states, in relevant part: "No more than one adjournment per party shall be granted by the Arbitrator without consent of the opposing party." (Trial Ex. 1, Bates # 0016.) In no way does that clause require the arbitrator to grant an adjournment.

All of these arguments against enforcement of the arbitrator's award are without merit. In addition, Maiden's arguments about the illegality of the subcontracting clause of the union contract concern an issue unrelated to the issue before the Court. The union contract contains a "saving clause" which provides that, "if any provision of this agreement shall be held illegal or of no legal effect, it shall be deemed null and void without affecting the obligations of the balance of this agreement." (Trial Ex. 1, Bates # 0051.) Therefore, all of

Maiden's claims about the illegality [*48] of the subcontracting clause and about the arbitrator exceeding his authority and committing misconduct are denied.

**Conclusion**

Section 4.01(i) of the contract of sale and Schedule 1 of Exhibit H required Maiden to hire West World's employees at the wage and benefit rates set up by the union contract. Had Maiden honored this obligation, there would have been complete continuity in the workforce at 83 Maiden Lane before and after the transfer. Therefore, Maiden assumed the union contract by implication, because of which it had a duty to arbitrate with Local 32B-32J. Maiden was given sufficient notice of the arbitration before the OCA and chose not to attend. Therefore, the arbitrator's award granted to Local 32B-32J in Maiden's absence is confirmed. Accordingly, Maiden's counterclaim to vacate the arbitrator's award is denied.

IT IS SO ORDERED.

Dated: New York, New York

January 7, 2000

Robert P. Patterson, Jr.

U.S.D.J.

1998 U.S. Dist. LEXIS 18516, *

LEXSEE 1998 USDIST LEXIS 18516



Cited
As of: Dec 05, 2007

**FELIX TRINIDAD, JR., Plaintiff, v. DON KING, DKP CORPORATION, (a Delaware corporation), successor through merger to DON KING PRODUCTIONS, INC. (a New York corporation), DON KING PRODUCTIONS, INC., (a Delaware corporation), Defendants.**

**98 Civ. 4518 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 18516*

**November 23, 1998, Decided**
**November 24, 1998, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a declaratory action seeking a declaration that a prior, exclusive promotional agreement with defendants had been altered by a subsequent agreement and no longer valid. Subsequently, plaintiff filed a motion for a preliminary injunction.

**OVERVIEW:** Plaintiff boxer entered into a promotional agreement with a sports production company for promotion of his bouts. The production company contracted with a cable television company to televise plaintiff's bouts. Subsequently, defendants advised the companies of its claimed exclusive right to promote plaintiff's bouts and that their agreement with plaintiff constituted tortious interference with defendant's contractual rights. The cable company was not willing to proceed with televising plaintiff's bouts without at least a preliminary ruling concerning the validity of defendants' contractual rights. Thus, plaintiff filed the instant declaratory action and sought a preliminary injunction against defendants. The court denied the injunction. Plaintiff and defendant had entered into a promotional agreement. There was no evidence that a subsequent agreement sought or expected any change in the terms of the first agreement and there was no evidence that defendant would have agreed to such a change, had it been asked for. The parties' conduct and statements after their entry into the promotional agreement were not conclusive on the present record.

**OUTCOME:** Plaintiff's motion for a preliminary injunction was denied.

**CORE TERMS:** bout, promotional, welterweight, championship, negotiation, champion, won, preliminary injunction, sentence, ambiguity, bonus, evidentiary hearing, expedited, contractual, purse, discovery, present record, world champion, ambiguous, cease, fight, agreement contained, year term, new contract, integration, acquisition, co-manager, translated, integrated, drafted

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
[HN1] Proof of many of the circumstances of a transaction that would tend to show how the contract came to be made, the motivation or purposes of the parties in making it, the particular characteristics of the subject matter, and the like, are admissible to show its meaning. Even courts which profess to follow the plain meaning rule generally recognize an exception for relevant circumstances.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*

*Contracts Law > Formation > Ambiguity & Mistake > General Overview*

[HN2] The scope of the circumstances that may be resorted to in interpreting an ambiguity in an integrated contract is as broad as the scope of evidence with respect to the interpretation of a nonintegrated contract.

*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview*
*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Contract Interpretation > Parol Evidence > General Overview*

[HN3] New York applies the common law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it only as a matter of last resort after all aids to construction have been employed without a satisfactory result. The court has held specifically that the rule does not preclude the admission of parole evidence. The rule does not supersede the commercial setting of the transaction.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN4] A party seeking a preliminary injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. The movant, by a clear showing, must carry the burden of persuasion.

**COUNSEL:** [*1] For FELIX TRINIDAD, JR., plaintiff: Herbert F. Kozlov, Parker Duryee Rosoff & Haft, New York, NY.

For DON KING, DKP CORPORATION, DON KING PRODUCTIONS, INC., defendants: Peter E. Fleming, Jr., Curtis Mallet-Prevost Colt & Mosle, NY, NY.

For DON KING, DKP CORPORATION, DON KING PRODUCTIONS, INC., counter-claimants: Peter E. Fleming, Jr., Curtis Mallet-Prevost Colt & Mosle, NY, NY.

For FELIX TRINIDAD, JR., counter-defendant: Herbert F. Kozlov, Parker Duryee Rosoff & Haft, New York, NY.

**JUDGES:** LAWRENCE M. McKENNA, U.S.D.J.

**OPINION BY:** LAWRENCE M. McKENNA

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

1.

By written order dated August 20, 1998, the Court denied plaintiff's motion for a preliminary injunction on the then "present record" (Mem. & Order, Aug. 20, 1998, at 1), and on August 24, 1998, the Court put on the record its reasons for that determination. (Transcript, Aug. 24, 1998, at 1-10.)

On June 11, 1994, a predecessor of defendant Don King Productions, Inc. (hereinafter collectively "DKP") had entered into a written promotional agreement with plaintiff, the term of which is provided for in paragraph 2 thereof as follows:

> This Agreement shall be for a term of *FOUR* (4) years, commencing on the date hereof. In the event you are recognized as world champion by either the WBC, the WBA, the WBO, or the IBF at any time during the term hereof, this Agreement shall be automatically extended to cover the entire period you are world champion and a period of *two* (2) years following the date on which you thereafter cease, for any reason to be so recognized as world champion.

(Pl. Ex. 15 at 1. [1]) On August 24, 1998, the Court described its reasons for [*2] finding paragraph 2 of the June 11, 1994 agreement ambiguous. (Transcript, Aug. 24, 1998, at 4-6.)

> 1 All references to exhibits are to the exhibits as identified during the evidentiary preliminary injunction hearing held on September 23, 24, 25, 29 and 30, and October 1 and 5, 1998 (*see* below), and not as identified in the affidavits previously submitted by the parties.

In the Court's written order of August 20, 1998, the Court had offered to consider "the possibility of an expedited trial or an evidentiary hearing on a renewed motion for a preliminary injunction (in either case to be preceded by expedited discovery)." (Mem. & Order, Aug. 20, 1998, at 1.) On August 24, 1998, the Court explained that the "expedited evidentiary hearing on the motion . . . in [the Court's] contemplation would deal with the single issue of the ambiguity of paragraph 2 of the June 11, 1994 agreement" (Transcript, Aug. 24, 1998, at 10), and

plaintiff opted for "an evidentiary hearing on the limited issue" rather than an expedited [*3] trial. (*Id.*)

Expedited discovery, the evidentiary hearing and the submission of post-hearing memoranda followed.

**2.**

The ambiguity of paragraph 2 of the June 11, 1994 agreement arises from the fact that, on that date, plaintiff "was already the IBF world welterweight champion." (*Id.* at 4.)

> Plaintiff, pointing out that, at the time the agreement was entered into, he was already the IBF world welterweight champion, argues that the automatic extension clause was to take effect only if he were to win some other championship, while defendants argue that, since at the time the agreement was entered into plaintiff was the IBF world welterweight champion, the automatic extension became effective the moment the agreement was entered into.

(*Id.*)

> The agreement's actual language is not conclusive. In part, the language of the automatic extension provision, i.e., the second sentence of paragraph 2, looks to the present: "you are recognized." At the moment the agreement was entered into, plaintiff was, at that moment, recognized as the IBF world welterweight champion. Yet in part the language looks to the future: "in the event."

(*Id.* at 5.)

The [*4] significance of the parties' different readings of paragraph 2 is that, if the DKP reading is correct, then DKP has the "sole and exclusive" right to promote plaintiff's bouts (Pl. Ex. 15, P 1), while, if plaintiff's reading is correct, then plaintiff is free to engage in bouts arranged by another promoter, as he wishes to do.

Plaintiff's application for a preliminary injunction arises out of the following facts. Plaintiff has entered into a promotional agreement with New Jersey Sports Productions, Inc., d/b/a Main Events ("Main Events"), pursuant to which Main Events will promote his bouts. Main Events has entered into an agreement with Home Box Office ("HBO"), a Division of Time Warner Entertainment Company, L.P. ("TWE"), and TVKO, a Subdivision of TWE, pursuant to which HBO will televise bouts

of plaintiff promoted by Main Events. [2] On June 8, 1998, DKP advised Main Events and HBO of its claimed exclusive right to promote plaintiff's bouts and that "your or your affiliates' promotion, broadcast, distribution and/or exploitation of Mr. Trinidad's bouts would constitute tortious interference with DKP's contractual rights" and demanded that "you and your affiliates . . . immediately [*5] cease and desist from any such tortious interference with DKP's contractual rights." (Pl. Ex. 47.) HBO is not willing to proceed with the televising of plaintiff's bouts without at least a preliminary ruling that DKP does not have any valid contractual rights as regards plaintiff.

> 2  The agreements between plaintiff and Main Events and Main Events and HBO/TVKO have been filed under seal and not been produced to defendants, as containing sensitive competitive information.

**2.**

On August 24, 1998, the Court noted that "it does not appear from the affidavits submitted by both sides that the question of the effect of plaintiff's possession on June 11, 1994 of the IBF world welterweight championship on the term of the agreement was specifically discussed as part of the negotiation of the agreement." (Transcript, Aug. 24, 1998, at 4-5.) The evidentiary hearing produced no evidence of negotiation of the point.

The parties have adduced some evidence, however, as to the context of the June 11, 1994 agreement, of [*6] what happened during the meeting, and of subsequent conduct claimed to bear on the meaning of the agreement.

**3.**

On May 13, 1993, plaintiff had entered into an earlier exclusive promotional agreement with DKP. (Pl. Ex. 2.) Paragraph 2 of that agreement is substantially identical to paragraph 2 of the June 11, 1994 agreement. (*Id.*; Pl. Ex. 15, P 2.) The May 13, 1993 agreement was negotiated on plaintiff's behalf by Yamil Chade, his co-manager, who (together with plaintiff) signed the agreement. Plaintiff was not represented by counsel during the negotiation of the May 13, 1993 agreement, plaintiff's father and co-manager (because of other business commitments) was not present during that negotiation, and the agreement was not translated for plaintiff into Spanish, his only language.

On May 13, 1993, plaintiff was 19 years old, and had won 19 professional bouts without defeat over a period of a little over three years; all but five of those bouts had taken place in Puerto Rico, where plaintiff resides. (Pl. Ex. 1 [*The Boxing Record Book* (1998), entry for

Felix Juan Trinidad.) The largest purses plaintiff had obtained in those 19 bouts were in the $ 8,000-$ 10,000 range. [*7] (Transcript, Sept. 25, 1998, at 370 [Plaintiff]; id., Sept. 30, 1998, at 556 [Trinidad, Sr.].) On June 19, 1993, plaintiff, in his first bout under the May 13, 1993 promotional agreement with DKP, defeated Maurice Blocker for the IBF world welterweight championship, which he has never lost, and still holds; he has never won a different championship.

On or about February 7, 1994, plaintiff's father sent DKP a letter, in the name of plaintiff, requesting, among other things, payment of a $ 300,000 bonus to plaintiff (which plaintiff's father understood Mr. Chade was to have obtained in connection with plaintiff's entry into the May 13, 1993 promotional agreement with DKP, but was not provided for in that agreement) (Pl. Ex.5.) Thereafter, in February or March of 1994, plaintiff and his father retained counsel, Jose Nicolas Medina Fuentes ("Medina"), who drafted a letter which plaintiff's father signed and sent to DKP and Mr. Chade. (Pl. Ex. 7.) The letter detailed claimed "express and implicit contractual breaches" (id. at 1) on the part of Don King, the principal of DKP, and Mr. Chade, and stated that "since our interest is to improve the process, a set of alternatives [*8] and priorities is exposed, in the hope that speedy corrective measures be taken by the whole group as soon as possible." (Id.) The letter requested a meeting. (Id. at 4.) On May 20, 1994, Mr. Medina sent a letter to DKP's outside counsel, Robert Hirth, protesting the announcement by Mr. Chade, pursuant to a contract signed by Mr. King and Mr. Chade (but not plaintiff) of a bout between plaintiff and Oba Carr which had not been discussed with plaintiff, his father or Mr. Medina. (Pl. Ex. 14.)

On June 11, 1994, a meeting was held, attended by (among others) plaintiff, plaintiff's father, Mr. Medina, Roberto Munoz-Zayas (plaintiff's training physician), Mr. Chade and Mr. King. Those persons were aware that plaintiff had, on June 19, 1993, won, and still held, the IBF world welterweight championship. At the meeting, Mr. Medina (in addition to various points mentioned in the letters [Pl. Exs. 5, 7 & 14] referred to above), argued that the May 13, 1993 contract was not valid because plaintiff was under 21 when he signed it. (Transcript, Sept. 23, 1998, at 37-38 [Medina].)

At the meeting, Mr. Medina made a number of demands of DKP on behalf of plaintiff. In plaintiff's summary: [*9]

> [A] new contract would have to be negotiated because the old contract was, in the view of the Trinidads, void [because Trinidad, Jr. was a minor under Puerto Rican law at the time it was executed]. The minimum purses would have to be three hundred thousand dollars ($ 300,000.00) per bout, with more for the Campas bout. Felix Trinidad, Sr. had to be a direct participant in negotiations because the Trinidads did not trust Chade. Finally, the [$ 300,000] bonus which the Trinidads claimed was due had to be paid, although they would accept the bonus in installments.

(Pl. Post Hearing Mem. at 10 (citations to record omitted).)

At the end of the negotiation, the new promotional agreement (Pl. Ex. 15) and five bout agreements (Pl. Ex. 16) were signed. All were signed by plaintiff's father, as well as by plaintiff, Mr. Chade and Mr. King. The promotional agreement had been translated for plaintiff, and the bout agreements were explained to him by Mr. Medina. The new promotional agreement's provision as to its term was substantially identical to that of the May 13, 1993 promotional agreement ( Pl. Ex. 2 P 2; Pl. Ex. 5 Utah 274, 15 P 2), and the new agreement contained, [*10] as had the May 13, 1993 agreement, New York choice of law and integration provisions. (Pl. Ex. 2 PP 13 & 14; Pl. Ex. 15, PP 13 & 14.)

The parties raise several points about what occurred on June 11, 1994.

At the beginning of the meeting, Mr. King said to plaintiff and his advisors "the kid is a champion now, you know what I mean, and I have him for the duration that he is champion and two years after, and we are going to make big things with him. . . ." (Transcript, Oct. 1, 1998, at 854 [King].) After hearing plaintiff's demands, Mr. King agreed to "work out a plan" to give plaintiff the $ 300,000 bonus, to make plaintiff's father "a co-signer on the contract so that he would be in the decision making process" and to "raise the minimum limit to $ 300,000" (Transcript, Oct. 5, 1998, at 866 [King]), and agreed to a new agreement so that plaintiff's father could be a signatory, but said "we can write another agreement, but all the terms and conditions of my agreement that I have is in full force and effect and all we do is to change the minimum guarantee . . . and make [plaintiff's father] a signatory so that no decision could be made by some date without his approval. . . ." [*11] (Id. at 867.)

Mr. Medina, plaintiff, plaintiff's father and Dr. Munoz-Zayas all testified that, during the meeting, Mr. King agreed to a four year contract. (Transcript, Sept. 23, 1998, at 42-43 [Medina]; id., Sept. 25, 1998, at 339-40 [Plaintiff]; id., Sept. 29, 1998, at 471 [Trinidad, Sr.]; and id., Sept. 24, 1998, at 299-300 [Munoz-Zayas].)

After an agreement was produced by DKP, Mr. Medina reviewed it, privately, with plaintiff, plaintiff's father and Dr. Munoz-Zayas. (Transcript, Sept. 23, 1998, at 45 [Medina].) The agreement contained paragraph 2 as it now appears in Plaintiff's Exhibit 15. Mr. Medina noticed the extension provision (Pl. Ex. 15, P 2, second sentence) and told plaintiff, plaintiff's father and Dr. Munoz-Zayas that he had not asked for that provision. (Transcript, Sept. 24, 1998, at 300 [Munoz-Zayas].) He did not ask Mr. King why it was included, or otherwise raise the issue of its inclusion or effect. Mr. Medina explained paragraph 2 of the agreement to plaintiff, his father and Dr. Munoz-Zayas. He told them

> that this was a contract for four years as we have agreed and that if Tito Trinidad won a new title, because this says [*12] in the event, then this contract would be extended to cover the entire period he will be champion plus two years after he cease to be so champion, and they understood that.

(Transcript, Sept. 23, 1998, at 46.)

Plaintiff's father testified as follows:

> Q. By reason of winning the championship when he fought Blocker, Don King Productions' rights had been extended beyond four years?
>
> A. The clause had already been activated.
>
> Q. Was it your belief on June 11, 1994 that Mr. King, on behalf of Don King Productions, was prepared to give up all of those rights?
>
> A. That's not what we proposed to him.

(Transcript, Sept. 30, 1998, at 556.)

There was no discussion at the June 11, 1994 meeting between plaintiff and his representatives, on the one hand, and any representative of DKP, on the other, as to the effect, under paragraph 2 of the June 11, 1994 promotional agreement, of the fact that plaintiff, on that date, was the IBF world welterweight champion. There was no discussion of the effect of the integration clause on that question.

After the agreements were signed, plaintiff "told the press that [he] had signed a new contract for four years

and I believe [*13] I also told them that it was a good contract for my career." (Transcript, Sept. 25, 1998, at 345-46 [Plaintiff].)

The June 11, 1994 promotional agreement contains an integration clause. (Pl. Ex. 15, P 14.) The extension of the term of DKP's exclusive promotional rights effected under the earlier, May 13, 1993, promotional agreement by plaintiff's defeat of Maurice Blocker, therefore, did not automatically, under the language of the new promotional agreement, carry over after June 11, 1994. Nevertheless, as the Court noted on August 24, 1998, "the June 11, 1994 agreement, which is fully integrated, still has to be applied to the facts existing on the date on which it was entered into. And that brings us back to the ambiguous language." (Transcript, Aug. 24, 1998, at 5.)

In interpreting paragraph 2 of the June 11, 1994 agreement,

> [HN1] proof of many of the circumstances of the transaction that would tend to show how the contract came to be made, the motivation or purposes of the parties in making it, the particular characteristics of the subject matter, and the like, are admissible to show its meaning. Even courts which profess to follow the "plain meaning" rule generally recognize [*14] an exception for "relevant circumstances."

Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833, 843 (1964). "[HN2] The scope of the circumstances that may be resorted to in interpreting an ambiguity in an integrated contract is as broad as the scope of evidence with respect to the interpretation of a nonintegrated contract." *Id.* at 846. Such evidence of relevant circumstances, here, does not support plaintiff's contentions as to how paragraph 2 of the June 11, 1994 agreement should be interpreted.

In the first place, Mr. Medina's explanation of the second sentence of paragraph 2 of the agreement to plaintiff, his father and Dr. Munoz-Zayas, which was not communicated to DKP, is not relevant to the interpretation of that provision. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 36 (2d Cir. 1995)* ("Whatever thoughts Josey may have had . . . is irrelevant because those thoughts were not communicated to TOR's negotiators."); *see also* Patterson, *op. cit.*, at 847 ("The unexpressed thoughts of one party, prior to or contemporaneous with the making of the contract, as to what its terms meant, are inadmissible [*15] for the purpose of proving its meaning, whether it be integrated or not.").

Nor does the fact that plaintiff, his father, Mr. Medina and Dr. Munoz-Zayas said that plaintiff had entered into a four year contract mean that their present reading of the agreement should be accepted. Paragraph 2 of the agreement, in its first sentence, *did* provide for a four year term. To recognize that, however, leaves open the question of the second sentence of paragraph 2. Mr. Medina's private advice to plaintiff, his father and Dr. Munoz-Zayas, that paragraph 2 meant that the four-year term provided for in the first sentence would only be extended if plaintiff won a *new* title necessarily affected their understanding as to what was agreed to, as well as plaintiff's statement to the press, which were correct *if* Mr. Medina's advice, privately given, was correct. But that begs the question.

Most importantly, plaintiff had come to the meeting with specific demands for substantive changes in the contractual arrangements between himself and DKP in mind, and articulated those demands: minimum purses of $ 300,000; that plaintiff's father be a direct participant in negotiations; and payment of a [*16]  $ 300,000 bonus. Plaintiff had not asked for any change in the term of the promotional agreement which had already been extended by plaintiff's winning of the IBF world welterweight championship, and plaintiff's father (and co-manager), at least, did not expect DKP to give up that extension. Mr. King had made known his view that, upon satisfying plaintiff's stated demands, DKP would "have [plaintiff] for the duration that he is champion and two years after, and we are going to make big things with him. . . ." (Transcript, Oct. 1, 1998, at 854.) Given the very high opinions of plaintiff's talent and great expectations for his future expressed at the hearing by a number of witnesses, it is readily understandable that DKP would not give up the extension when it had not even been proposed by plaintiff that DKP should do so. In this context, Mr. Medina's silence when he noticed that the proposed new promotional agreement contained, although he had not asked for it, the same provision which had extended the four year term of the May 13, 1993 agreement, suggests that DKP's reading of paragraph 2 of the June 11, 1994 agreement, rather than plaintiff's, should control. Mr. Medina was aware [*17]  of DKP's expectation that the extension would not be affected by entry into the new promotional agreement, and did not state, to DKP, a contrary view. If the "parties had conflicting understandings as to the meaning of a material term, there is contract based on the meaning of the party who is unaware of the ambiguity if the other party knows or has reason to know of the ambiguity." John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 3-11, at 169 (3d ed., 1987); *see also Restatement (Second) of Contracts § 201(2)* (1981).

4.

On or about September 5, 1995, a complaint was filed on behalf of plaintiff, against DKP, in the United States District Court for the Southern District of Florida. (Def. Ex. N.) The complaint sought a determination that the June 11, 1994 promotional agreement (a copy of which was annexed to the complaint) was void. It alleged that plaintiff "is the present [IBF] world welterweight champion" (*id. P 8*) and that "the subject contract is not limited in time or area, as the contract continues in perpetuity for so long as Plaintiff remains a champion, and for two years thereafter, and restrains Plaintiff's ability to compete as a professional [*18]  boxer throughout the entire world unless promoted by the Defendant." (*Id. P 10*.) That allegation sets forth DKP's reading of paragraph 2 of the June 11, 1994 promotional agreement, and is completely inconsistent with plaintiff's contention as to its meaning, *i.e.*, that the agreement was to expire on June 11, 1998 (absent plaintiff's acquisition of a new title). Paragraph 10 of the complaint was quoted, in part, in DKP's letter to Main Events and HBO (Pl. Ex. 47) described above.

Prior to the Court's decision of August 24, 1998, Fredric G. Levin, a Florida lawyer, submitted an affidavit, sworn to July 31, 1998, in support of plaintiff's motion for a preliminary injunction. In that affidavit, he stated that he was responsible for filing the Complaint (Fredric Levin Aff., July 31, 1998, P 2), that "when I filed the Complaint . . . I made the assumption that Felix Trinidad, Jr. won his IBF Welterweight title during the term of the contract. I was factually incorrect." (*Id. P 3*), that

it is my belief that contracts with an indefinite term and which continue during the term of a championship, and thereafter, no matter how long that championship period, are or should be found [*19]  to be void as against public policy. I proceeded on that basis again, based upon the factual misimpression that Mr. Trinidad had won his title during the term of the contract.

(*id. P 4*), and that "I never had the Complaint translated and sent to Mr. Trinidad." (*Id. P 6*.) [3]

> 3    The Florida action was subsequently transferred to the Southern District of New York and then voluntarily dismissed. A copy of the complaint was not sent to plaintiff or his representatives in Puerto Rico until January of 1996.

Fredric Levin and his son, Martin Levin, who worked with his father on the complaint, were deposed during the expedited discovery preceding the evidentiary

hearing, and the transcripts submitted as part of the record. Their testimony is consistent with Fredric Levin's affidavit. On August 24, 1998, the Court had said that Fredric Levin's "mistaken assumption that plaintiff did not win the IBF world welterweight championship until after June 11, 1994 . . . seems to eliminate the Florida complaint as [*20] an aid to interpretation," as well as that "Mr. Levin's affidavit . . . need not be conclusively accepted without cross-examination." (Transcript, Aug. 24, 1998, at 6.)

After cross-examination, even though neither of the Levins contradicted the senior Mr. Levin's affidavit, the Court remains troubled. Fredric Levin is not only a successful personal injury lawyer but a principal in a boxing promotion company called Square Ring. (Fredric Levin Transcript, Sept. 2, 1998, at 4-9.) [4] Plaintiff, with his father and an interpreter, came to Florida in order that Fredric Levin might represent him (*id. at 10*), and plaintiff met with Fredric Levin two or three times before the complaint was filed. (*Id. at 12-13*.) Fredric Levin understood that plaintiff wanted advice as to his rights with respect to DKP. (*Id. at 14*.) Since a copy of the June 11, 1994 promotional agreement (Pl. Ex. 15) was annexed to the complaint, he had plainly been given a copy. Plaintiff himself argues that "paragraph 4 of the June 11, 1994 contract clearly recognized the fact that Mr. Trinidad's IBF Welterweight title was pre-existing, at paragraph 4(b)." (Pl. Post Hearing Mem. at 25.) [5] A copy of the current [*21] *Boxing Record Book* (*cf.* Pl. Ex. 1) was kept at the Levins' firm in 1995. (Martin Levin Transcript, Sept. 2, 1998, at 23.)

> 4    It does not appear that the operations of Square Ring are on the scale of those of DKP or Main Events; they seem to be pretty much limited to one boxer. (*Id.*)

> 5    Paragraph 4(b) of the June 11, 1994 promotional agreement provides that, after plaintiff's first bout thereunder,

> > provided that you have won the first Bout, and remain the IBF Welterweight Champion all succeeding Bouts covered by this Agreement, your purse for each Bout shall be negotiated and mutually agreed upon between us, but shall not be less than *THREE HUNDRED THOUSAND* U.S. Dollars ($ *300,000.00*) unless otherwise agreed upon by the parties herein.

(Pl. Ex. 15, P 4(b).)

The Court, given the obligations of counsel under *Fed. R. Civ. P. 11*, cannot avoid the speculation that the Levins' recollections may be inaccurate (unless they were specifically misinformed by the Trinidads). Nevertheless, [*22] on the present record, that is only speculation, and the Court will not, on the present motion, treat the allegations of the Florida complaint as an admission by plaintiff that paragraph 2 of the June 11, 1994 promotional agreement is to be read, consistently with such allegations, as DKP reads it. This does not mean, however, that it cannot be considered at trial. *See Kunglig Jarnvagssty-relsen v. Dexter & Carpenter, Inc., 32 F.2d 195, 198 (2d Cir. 1929)* ("If the agent made the admission without adequate information, that goes to its weight, not to its admissibility.")

### 5.

The parties adduced a considerable amount of evidence at the preliminary injunction hearing concerning their conduct after June 11, 1994.

"Very instructive as to how the parties interpreted the June 11, 1994 contract," according to plaintiff (Pl. Post Hearing Mem. at 18), were negotiations leading to the execution of a bout agreement pursuant to which plaintiff would fight Laurent Boudouani for the WBA world junior middleweight world championship, a new title, plaintiff's acquisition of which would, under plaintiff's reading of paragraph 2 of the June 11, 1994 promotional agreement, have extended that [*23] agreement under the second sentence of that paragraph.

Plaintiff, his father, Mr. Medina and a translator met with Mr. King and John Wirt, inside counsel to DKP, on or about July 7, 1997. At the meeting, Mr. Medina expressed his view that the June 11, 1994 promotional agreement was to expire on June 11, 1998 (Transcript, Sept. 23, 1998, at 84 [Medina]), and Mr. Wirt disagreed, stating "that's not the case. We have you for the entire time that you are champion." (*Id.*, Sept. 30, 1998, at 699 [Wirt].) The parties then agreed that paragraph 2 of the June 11, 1994 promotional agreement would not apply "for this fight." (*Id.*, Sept. 23, 1998, at 87 [Medina]; *id.*, Sept. 30, 1998, at 699 [Wirt].) The Trinidad-Boudouani bout agreement (Pl. Ex. 33) as signed by the parties, as a result of the negotiation, included a paragraph which states as follows: "*Suspension of Promotional Agreement for this Bout*. Notwithstanding clause 16, the parties understand and agree that clause [*i.e.*, paragraph] 2 of the Promotional Agreement dated June 11, 1994 is suspended and shall have no effect for the [Trinidad-Boudouani] Bout only and shall become fully operative for all future [*24] bouts of Fighter." (*Id. P 24*.) [6] The parties also eliminated from a draft of the Trinidad-Boudouani bout agreement (Pl. Ex. 32) a provision that,

among other things, would have, in the event plaintiff won the bout, made DKP plaintiff's "exclusive promoter during the entire time that Fighter is world champion plus a period of 2 years following the date on which Fighter thereafter ceases to be such champion (but for no less than 3 years from the date of the Bout)." (*Id. P 11*(a), omitted in Pl. Ex. 33.)

> 6   In paragraph 16 of the Trinidad-Boudouani bout agreement, plaintiff acknowledged and reaffirmed the "valid and subsisting Promotional Agreement . . . dated June 11, 1994 . . . the terms and conditions of which shall remain in full force and effect." (*Id. P 16*.)

The negotiation leading to the Trinidad-Boudouani bout agreement, and the agreement itself, prove nothing except the parties' positions in July of 1997, their recognition of their differences, and the avoidance or postponement of a resolution [*25] of such differences. [7]

> 7   The Trinidad-Boudouani bout did not take place. The reasons for that, however, do not affect the conclusion drawn from the negotiation and the contract for the bout.

What has been said about the Trinidad-Boudouani bout agreement, and the negotiation preceding its finalization, applies equally to plaintiff's arguments based on subsequent bout agreements pursuant to which plaintiff was to fight David Ciarlante (for the WBC super welterweight championship) (Pl. Ex. 39), Vincent Petway (for the IBF welterweight championship) (Pl. Ex. 43), and Mehenge Zulu (for the IBF welterweight championship). (Pl. Ex. 45.) [8] (*See* Pl. Post Hearing Mem. at 20-21.) Plaintiff and his advisors, on the one hand, and DKP, on the other, were aware of the other party's positions, and avoided a resolution of their different positions. Similarly, plaintiff's unilateral declination of the WBC world 154 pound championship in November of 1997 (Pl. Ex. 40) represents no more than plaintiff's avoidance of a title [*26] acquisition of which would have caused an extension even under plaintiff's interpretation of the June 11, 1994 promotional agreement.

> 8   The Trinidad-Ciarlante and Trinidad-Petway bouts did not take place; the Trinidad-Zulu bout did. Again, these facts do not affect the Court's conclusion. *See* n.7 *supra*.

As far as the record made at the preliminary injunction hearing is concerned, the earliest occasion on which plaintiff or his advisors made known to DKP their present position regarding paragraph 2 of the June 11, 1994 promotional agreement, that the extension of the four year term did not apply unless, during that term, plaintiff were to win a championship other than the IBF world

welterweight championship, so that, otherwise, the June 11, 1994 promotional agreement would expire on June 11, 1998, appears to have been on or about May 10, 1997, on which date plaintiff and his father met with Mr. King to discuss the postponement of a bout between plaintiff and Terry Norris, and Mr. King discussed plaintiff's [*27] position with Mr. Wirt. (Transcript, Sept. 30, 1998, at 689 [Wirt].) [9] As described above, plaintiff's position was again discussed between the parties in some detail, during the negotiations for the Trinidad-Boudonani bout.

> 9   Mr. Medina testified that, during negotiations regarding the Trinidad-Norris bout, for which a bout agreement (Pl. Ex. 24) was signed in October of 1996, plaintiff's position was not brought up "because we wanted that fight." (*Id.*, Sept. 23, 1998, at 83.) The Trinidad-Norris bout did not take place.

Plaintiff, citing a term provision contained in a promotional agreement between DKP and Keith Holmes (Pl. Ex. 49), argues that "when defendants wanted to draft a contract without ambiguity as to the term with respect to an existing champion, they could do it." (Pl. Post Hearing Mem. at 26.) That is no doubt true, just as it is true that plaintiff could have proposed a clarification at the June 11, 1994 meeting. The clause in the DKP-Holmes agreement, however, cannot reasonably be taken [*28] to mean that paragraph 2 of the June 11, 1994 agreement should (because it does not contain the clarifying language contained in the term provision of the Holmes agreement) be interpreted as plaintiff urges, because the clause in the Holmes agreement was drafted by Mr. Wirt after he became aware of plaintiff's position as to the meaning of paragraph 2 of the June 11, 1994 agreement, to "protect DKP from needless litigation in the future in these situations, [to] draft a provision preventing, trying to preclude this type of litigation in the future." (Transcript, Sept. 30, 1998, 690-91 [Wirt].)

**6.**

Plaintiff relies also on "the common law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S. Ct. 1212, 1219, 131 L. Ed. 2d 76 (1995) (citing *Graff v. Billet*, 64 N.Y.2d 899, 902, 487 N.Y.S.2d 733, 477 N.E.2d 212 (1984); other citations omitted). DKP did draft the language of paragraph 2 of the May 13, 1993 promotional agreement, which was carried over, substantially unchanged, into the June 11, 1994 promotional agreement when plaintiff [*29] insisted on a new contract. The rule has its limits, however. "[HN3] New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without

1998 U.S. Dist. LEXIS 18516, *

a satisfactory result,' and we have held specifically that the rule does not preclude the admission of parole evidence." *Albany Savings Bank v. Halpin, FSB, 117 F.3d 669, 674 (2d Cir. 1997)* (quoting *Herzog v. Williams, 139 Misc. 2d 18, 526 N.Y.S.2d 329, 330 (Just. Ct. 1988)*; other citations omitted). The rule does not supersede the "commercial setting of the transaction." *Golden Eagle Liberia, Ltd. v. St. Paul Fire and Marine Ins. Co., 685 F. Supp. 393, 399 (S.D.N.Y. 1988), vacated, 718 F. Supp. 1097 (S.D.N.Y. 1988).* [10]

> 10   The Court does not understand the vacating of Judge Mukasey's opinion reported at *685 F. Supp. 393* pursuant to a stipulation of settlement between the parties reported at *718 F. Supp. 1097* to affect the precedential value or the correctness of the reasoning of the opinion.

7.

[HN4] [A] [*30] party seeking [a preliminary] injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.

*Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991).* "'The movant, *by a clear showing*, [must carry] the burden of persuasion.'" *Mazurek v. Armstrong, 520 U.S. 968, 117 S. Ct. 1865, 1867, 138 L. Ed. 2d 162 (1997) (per curiam)* (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995)) (emphasis by Supreme Court). Plaintiff has not met his burden.

The most relevant evidence on the question of how paragraph 2 of the June 11, 1994 promotional agreement is to be interpreted is that of the business context of the negotiations leading to the parties' entry into that agreement, and what was expressed by the parties to each other during the negotiations. What plaintiff asked of DKP -- a $ 300,000 minimum for purses, that his father be made a party to the promotional agreement, and [*31] the $ 300,000 bonus -- was agreed to. A new agreement was entered into so that plaintiff's father could become a party to the promotional agreement. There is no evidence that plaintiff sought or expected any change in the term of the agreement, already extended under paragraph 2 as

a result of the Blocker bout, and there is no evidence that DKP would have agreed to such a change, had it been asked for. Further, plaintiff was made aware that DKP understood that its agreement to what plaintiff did ask for would not affect the extension already in place and did not take issue with DKP's understanding.

The parties' conduct and statements after their entry into the June 11, 1994 promotional agreement are not conclusive on the present record, nor is the *contra preferentem* doctrine an adequate basis to overcome the evidence of the business context of the agreement and what was expressed at the meeting. [11]

> 11   The Court notes that it has not discussed herein, although it has considered, all of the arguments advanced and evidence cited by the parties in the approximately 150 pages of their post hearing memoranda and reply memoranda.
>
> The Court has not relied on those exhibits offered by defendants to which plaintiff has interposed post-hearing objections. (*See* Pl. Post Hearing Mem. at 45, corrected in Pl. Post Hearing Reply Mem. at 39.)
>
> The Court notes that it is not persuaded, on the present record, by defendants' contention that paragraph 2 of the June 11, 1994 promotional agreement is not ambiguous. (*See* Def. Post Hearing Mem. at 48-49.)

[*32]   For the reasons described above, the Court finds that plaintiff has not shown a likelihood of success on the merits. While it may be that plaintiff has shown questions going to the merits sufficiently serious to make them a fair ground for litigation, he has not, for the reasons set forth on August 24, 1998 (Transcript, Aug. 24, 1998, at 9), shown a balance of hardships tipping decidedly toward himself.

Preliminary injunction denied.

8.

Counsel are to confer concerning the need for further discovery and advise the Court (jointly, if possible) in writing within 14 days of the date hereof as to when they will be able to complete discovery.

SO ORDERED.

Dated: New York, New York

November 23, 1998

LAWRENCE M. McKENNA

U.S.D.J.