JAN 1 6 2008

S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CONSIST SOFTWARE SOLUTIONS, INC.,
f/k/a CONSIST INTERNATIONAL, INC.,

                                    Plaintiff,

          -against-

SOFTWARE AG, INC. and SOFTWARE AG,

                                 Defendants.

------------------------------------------------------------x

07 CV 7047 (CM) (FM)

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that plaintiff Consist Software Solutions, Inc. f/k/a Consist

International, Inc. ("Consist") hereby appeals to the United States Court of Appeals for the

Second Circuit from (1) the Stipulation and Final Judgment (the "Judgment") of the District

Court for the Southern District of New York (McMahon, J.), dated December 21, 2007 and

entered on December 26, 2007, in favor of defendants Software AG, Inc. ("SAGA") and

Software AG ("SAG"), and (2) the District Court's December 17, 2007 Findings of Fact,

Conclusions of Law and Verdict, to the extent that the District Court ruled that the

Distributorship Agreement between SAGA and Consist effective January 1, 1998 (the

"Agreement") was terminated in accordance with the terms thereof as of December 31, 2007.

Copies of the Judgment and the December 17, 2007 ruling are respectively annexed hereto as

Exhibits 1 and 2.

Dated: New York, New York
       January 16, 2008

SULLIVAN & CROMWELL LLP

By: _John L. Warden_

John L. Warden, Esq.
125 Broad Street
New York, New York 10004
Telephone: (212) 558-3610
Facsimile: (212) 558-3588

-and-

DUANE MORRIS LLP
Hyman L. Schaffer, Esq.
Fran M. Jacobs, Esq.
Brian Damiano, Esq.
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
Facsimile: (212) 692-1020

*Attorneys for Plaintiff*
*Consist Software Solutions, Inc.*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONSIST SOFTWARE SOLUTIONS, INC. f/k/a CONSIST INTERNATIONAL, INC., | Case No. 07-7047 (CM)(FM) |
| Plaintiff, | STIPULATION AND FINAL JUDGMENT |
| -against- | |
| SOFTWARE AG, INC. and SOFTWARE AG, | |
| Defendants; | |
| AND RELATED COUNTERCLAIMS | |

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12 31 07

Plaintiff Consist Software Solutions, Inc. f/k/a Consist International, Inc. ("Consist") and defendants Software AG, Inc. ("SAGA") and Software AG ("SAG")(collectively "Software AG") (all together "the Parties") stipulate as follows:

1.    Counts II and VII of Consist's Complaint and Counts II and III of Software AG's Answer and Counterclaims seeking declaratory judgment (collectively the "Declaratory Judgment Claims") concerning the Distributorship Agreement between SAGA and Consist effective January 1, 1998 (the "Agreement"), were resolved in the bench trial of the matter in a ruling by the Court issued from the bench on December 17, 2007 (the "Judgment").

2.    On December 17, 2007 the Court made Findings of Fact and Conclusions of Law, *inter alia*, that the April 6, 2006 notice of non-renewal was effective and will cause the Agreement to terminate in accordance with paragraph 1 as of December 31, 2007.

3.    Count I of Software AG's Counterclaims under Fed. R. Civ. P. 41(a)(1) is dismissed without prejudice.

4.    Software AG shall not re-file or otherwise raise the claims set forth in Count I of its Counterclaims unless the Judgment is reversed, reconsidered, vacated, remanded, overruled,, modified or otherwise changed in such a manner as to alter the effect of the Judgment that Software AG properly

and lawfully terminated the Agreement effective December 31, 2007.

5.     Consist's claims and Software AG's Counterclaims did not raise any claim of right to ownership of intellectual property, including without limitation, claims by Software AG to ownership, beneficial interest or transfer of registration of the trademarks "ADABAS" and "NATURAL". Any claims concerning ownership, beneficial interest or transfer of registration of any intellectual property alleged to be owned by Software AG are expressly excluded from the agreement set forth in Paragraph 4 above. In the event Software AG commences an action based on any such claims, Consist stipulates that it will not raise as a defense thereto res judicata, collateral estoppel or any similar issue preclusion defense based upon anything in or arising from this action. Consist reserves any and all other rights, claims and defenses it may have relating to ownership, registration or use of intellectual property or trademarks.

6.     Each party shall bear its own costs.

7.     This Stipulation and Final Judgment, together with the Court's Findings of Fact, Conclusions of Law and Verdict, is the "Judgment" of the Court under Fed. R. Civ. P. 54 from which an appeal lies.

Dated: New York, NY
          December 21, 2007

DUANE MORRIS LLP

By: _____
     Hyman L. Schaffer
     1540 Broadway
     New York, New York 10036
     (212) 692-1000

Attorneys for Plaintiff Consist Software
Solutions, Inc. f/k/a Consist International,
Inc.

BAKER & McKENZIE LLP

By: _____
     James David Jacobs
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 626-4100
     Attorneys for Defendant/Counter-Plaintiff
     Software AG, Inc. and Defendant Software
     AG

SO ORDERED AND ADJUDGED:

_____

12-21-07

-2-

# EXHIBIT 2

131

```
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    CONSIST SOFTWARE SOLUTIONS,
3    INC.,
4
4                    Plaintiff,
5
5            v.                              07 CV 7047 (CM)
6
6    SOFTWARE AG, INC. and SOFTWARE
7    AG,
7
8                    Defendants.
8
9    ------------------------------x
9
10                                   December 17, 2007
10                                   10:15 a.m.
11
11   Before:
12
12                  HON. COLLEEN MCMAHON,
13
13                                   District Judge
14
14                       APPEARANCES
15
15   DUANE MORRIS LLP
16        Attorneys for Plaintiff
16   BY:  HYMAN L. SCHAFFER
17        FRAN M. JACOBS
17        BRIAN DAMIANO
18
18   BAKER & MCKENZIE LLP
19        Attorneys for Defendants
19   BY:  JAMES D. JACOBS
20        MARCELLA BALLARD
20        FRANK GASPARO
21        JOHN BASINGER
22
22
23
24
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

176

1       AFTERNOON SESSION
2       4:00 p.m.
3           THE COURT:  The Court records findings of fact,
4   conclusions of law and verdict.
5           Plaintiff Consist Software Solutions, formerly known
6   as Consist International, Inc., is a corporation organized and
7   existing under the laws of the State of Delaware, with its
8   principal place of business in Delaware, maintains a New York
9   office at 10 East 53rd Street, New York, New York 10022.
10          Defendant Software AG, Inc., known as SAGA, is a
11  resident Virginia company and a wholly owned subsidiary of
12  defendant Software AG, SAG, located in Darmstadt, Germany.
13  Software AG has offices in 50 countries and over 4,000
14  customers in 70 countries and is the third largest integration
15  software vendor in the world.
16          This action was commenced in New York State Supreme
17  Court in and for the County of New York on August 3, 2007, and
18  was removed to this court on the basis of diversity of
19  citizenship.  Consist distributes computer software systems
20  providing support and maintenance for software products it
21  distributes.  Consist also develops and distributes its own
22  software applications, some of which use SAG technologies.
23          In the 1970s SAG developed a mainframe computer
24  data-based program, ADABAS, which, along with a proprietary
25  programming language, NATURAL, and other software programs are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

177

1   referred to as the systems.  SAGA is the exclusive licensee
2   from SAG of the systems worldwide, under a license that
3   expressly stipulates that it is perpetual.
4           Consist was started in 1972 by Natalio S. Fridman, who
5   is now Consist's president.  For the past 32 years, Consist or
6   its predecessor, known as PACS, has been the exclusive
7   distributor of technology developed by SAG in a territory
8   which, at first, included only Brazil but was subsequently
9   expanded to cover other countries in South America.  Today it
10  includes, in addition to Brazil, Argentina, Bolivia, Chile,
11  Paraguay, Peru, and Uruguay.  Brazil remains the country in
12  which Consist does most of its business.  Over the years,
13  Consist's rights and obligations as the exclusive distributor
14  of SAG technology in the territory have been memorialized in a
15  series of distributorship agreements.  Those are found in the
16  record at Plaintiff's Exhibits 1, 2, 18, 60, 105, 106, 108,
17  111, 112, 113, and 114.
18          The current agreement, Plaintiff's Exhibit 1, became
19  effective January 1, 1998.  This document is referred to
20  hereafter as the agreement.  The parties to the agreement are
21  Consist and SAGA.  At the time the agreement was signed, SAGA
22  was an independent company and was itself an exclusive
23  distributor of SAG technology.
24          Since 2000, SAGA has been a wholly owned subsidiary of
25  SAG.  SAG was not itself a party to the agreement and did not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

178

1  participate in its negotiations. The distributorship agreement
2  that preceded the agreement was dated as of January 1, 1995.
3  It's Plaintiff's Exhibit 2. It had a fixed term of three
4  years, and it provided that during the third year of its term,
5  the parties agreed to negotiate in good faith a new agreement.
6      Based on this provision in the second half of 1997,
7  Mr. Fridman began negotiating a new exclusive distributorship
8  with James Daly, who was then SAGA's general counsel and vice
9  president for international operations. The negotiations began
10  at a meeting that took place shortly prior to August 4, 1997.
11  Present at the meeting were Fridman, Daly, and Neil Rothberg,
12  SAGA's director of business management.
13      At the time the negotiations began, both sides were
14  highly motivated to reach an agreement. Consist's 20-year
15  relationship with SAGA would end in just five months, if no
16  agreement were reached, and Consist would lose the goodwill it
17  had built up over two decades serving as SAGA's exclusive South
18  American distributor. SAGA, for its part, was about to go
19  public. It preferred locking in a stable stream of revenue
20  from a known, if sometimes difficult, distributor to taking
21  back a large territory, something that had proved expensive and
22  difficult when done with another distributor.
23      At their initial meeting, Fridman announced that he
24  wanted any new agreement with SAGA to run in perpetuity. This
25  suggestion was immediately rejected by Daly. Someone, my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

179

1  suspicion is that it was Mr. Fridman, then suggested a term of
2  25 years, which, given my observation of where Mr. Fridman is
3  in his life, would have much the same effect as an agreement in
4  perpetuity.
5      Daly responded that any such long-term contractual
6  relationship would have to be subject to SAGA's right to
7  terminate the distributorship at shorter intervals. No
8  agreement was reached at the time.
9      During the meeting, the parties discussed other
10  disputed issues. SAGA had always been unhappy with Consist's
11  perceived deficiencies in reporting revenues and identifying
12  where those revenues came from. SAGA wanted the new agreement
13  to address those issues. Indeed, SAGA had actually terminated
14  its last agreement but one with Consist because of perceived
15  defaults in this regard. SAGA also wanted to end Consist's
16  practice of paying royalties owed to SAGA using both cash and
17  tax credits from the various countries in Consist's territory
18  and substitute for that a practice of paying royalties only in
19  cash.
20      Consist did not seem to have any great objection to
21  this but wanted to eliminate any requirement that it have to
22  report the identity of its customers or the terms of its
23  contracts to SAGA, a reason for termination of its prior
24  contract and the source for much friction between the parties.
25      Consist also wanted to tie its royalty payments not to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

180

1  its own sales but to sales by SAGA of SAG products in the
2  United States, a provision that seems absurd on its face but
3  that makes some sense in the context of no reporting of the
4  identity of Consist's customers or the terms of their
5  agreements with Consist.

6    All these issues were bandied about at this first
7  meeting without any agreements being reached. On August 4,
8  1997, Daly sent Fridman a proposal crafted by Daly and Rothberg
9  and based on the concepts discussed at the earlier meeting.
10 Plaintiff's Exhibit 40 is that proposal. Insofar as is
11 relevant to this lawsuit, it suggested a 25-year term that gave
12 SAGA the right to terminate the relationship for any reason
13 after the first five years upon giving 18 months' notice of
14 intent to terminate. The proposal also retained the
15 requirement that Consist report the identity of its customers
16 and the terms of its customer contracts to SAGA. Needless to
17 say, Mr. Fridman, who got very little of what he wanted from
18 this proposal, rejected it promptly. The parties continued
19 with their talks.
20    Mr. Fridman had a strong negative reaction to chopping
21 up the 25-year term at five-year renewable increments to which
22 Mr. Daly told Mr. Fridman, that there were some things that were
23 just not going to be doable, the sum of Mr. Fridman's demands
24 could not be acceded to by SAGA.
25    On August 21, 1997, Daly sent Fridman a draft
             SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                    181

1  agreement. That document is Plaintiff's Exhibit 41. This
2  document was not a standard form contract. Although the draft
3  no longer provided that SAGA could terminate Consist's
4  distributorship on 18 months' notice at the end of the first
5  five years, as the proposal had, Daly had revised it to provide
6  the initial term during which SAGA cannot terminate this
7  agreement except to ten years, with automatic renewal for five
8  years, unless one of us chooses to terminate after ten years
9  and 18 months' notice. That's at Plaintiff's Exhibit 41.
10    Mr. Daly stated in his cover letter that accompanied
11 the draft, SAGA is ready to execute this deal, and that he
12 would end send Fridman a signed copy if Daly gave his approval.
13 Since the cover letter has been mentioned, the August 21 draft
14 was indeed sent under cover of letter that said some other
15 things. Indeed, three of its five other operative paragraphs
16 made reference to the ten-year initial nonrenewable term.
17    One paragraph said, for example, "The initial amount,"
18 that's amount of royalty, "is U.S. $8 million. I know you want
19 U.S. $7 million, but as I mentioned, we cannot grant a
20 nonnegotiable ten-year agreement without compensation. If you
21 must have no less than ten years, SAGA must start at U.S. $8
22 million." Part of Plaintiff's Exhibit 41.
23    As I said, moreover, two other paragraphs of this
24 five-paragraph cover letter refer to the ten-year
25 noncancellation provision. One of those references ties "an
             SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                    182

1  exclusive for ten years" to Consist's refraining from selling
2  competing products.
3     This letter, together with the fact that what was sent
4  was a draft agreement rather than another proposal, fairly
5  implies that the parties, while having not come to an
6  agreement, have bridged the gap on some issues, at least
7  partially, including specifically the term within which the
8  agreement could not be cancelled without cause by SAGA.
9  Obviously there had been no agreement about reporting because
10 the August 21 draft included a reporting requirement that made

11  Consist account for all installations and the installations of
12  SAG products and Special Products within the territory, a
13  requirement that was specifically referenced in the cover
14  letter from Daly to Fridman.
15           Special Products are defined as those for which SAG
16  itself pays royalties.
17           The draft contract contained other terms that were
18  unacceptable to Consist.  Daly had used the 1995 agreement as a
19  template and had picked up terms to which Consist continued to
20  object.  Therefore, Fridman rejected the August 21 draft as
21  well.  It gave him far, far less than he had been negotiating
22  for, so the parties continued their discussions.  They met
23  sometime in early September, prior to September 9.  Rothberg
24  and Daly attended this meeting for SAGA and Fridman for
25  Consist.  I credit testimony that Fridman did not press for a

1   perpetual contract during that meeting and during those
2   discussions.
3            At some point during the discussions following the
4   August 21 meeting, a new issue surfaced.  Both the 1991 and
5   1994 agreements between the parties had provisions in them that
6   permitted SAGA to terminate the contract for material breaches
7   by Consist.  This term was important to SAGA because of
8   recurring problems involving issues of reporting and payment,
9   and it was important to Consist because it was the term that
10  had been relied upon to terminate its 1991 agreement.
11           Paragraph 8 of the August 21 draft incorporated into
12  the draft agreement that same language about material breach,
13  in the same form that it appeared in earlier drafts.  The
14  recurrence of this language was unacceptable to Fridman whose
15  previous contract had been terminated for a purported material
16  breach.
17           There came a point during these negotiations when both
18  parties had to move in order to come to the agreement that they
19  both desperately wanted to reach.  Fridman had to accept that
20  he could not have a perpetual contract or even a long-term
21  contract with no periodic out from SAGA.  But he was able to
22  extract two key concessions from SAGA that were highly
23  favorable to him and highly unfavorable to SAGA: a
24  no-reporting-of-customers requirement from SAGA, except as to
25  Special Products, and a provision tying his payment to SAGA's

1   sales of its own products in the United States rather than to
2   Consist's sales of SAGA's products in South America.
3            As a matter of logic, SAGA's acquiescence in the
4   no-reporting provision makes no sense unless it's viewed as a
5   quid pro quo for Fridman's acquiescence in the shorter term
6   with a periodic right of nonrenewal or termination or
7   sunsetting, or whatever you want to call it.  Fridman testified
8   that he wanted the no-reporting requirement so that SAGA could
9   not steal Consist's customers.  But if the new agreement were
10  indeed to run in perpetuity, then there was no way that SAGA
11  could steal Mr. Fridman's customers.  Indeed, it is precisely
12  because SAGA never wavered from its position that the agreement
13  could not be perpetual, that Fridman needed the no-reporting
14  provision and the concomitant provision about the basis for his
15  royalty payments.

16      Similarly, when there is no reporting, there is no way
17  to audit royalty payments, so while the provision making
18  Consist's payments a function of SAGA's sales performance
19  rather than Fridman's own seems on its face nonsensical, it
20  actually makes sense in the context of a no-reporting clause.
21      Daly was at all times the draftsman of the agreement,
22  and he made changes to the August 21 proposal based on the
23  discussions that the partners had after that day in order to
24  come up with the final product, which was the September 9
25  document that was signed, Plaintiff's Exhibit 1.

1       The first paragraph of that document contains what is
2   known as an evergreen provision, which provides the contract
3   will run for a term of ten years, followed by automatic renewal
4   for a period of five years, successive periods of five years,
5   unless either party notifies the other, 18 months in advance of
6   the expiration of the term, that it wished to end the
7   relationship. And I think the relationship was described as
8   terminating it.
9       This is the same formulation that was used in the
10  August 21 draft with one change. In the August 21 draft, there
11  was a sentence that required the parties to negotiate a new
12  agreement in good faith at the end of the first ten-year term.
13  That sentence was eliminated from the September 9 version of
14  the agreement. Having a renegotiation requirement in an
15  evergreen contract makes no sense because evergreen agreements
16  are agreements that continue to self-renew unless one party
17  decides to end the relationship. The elimination of that
18  sentence between August 21 and September 9, and that sentence
19  alone, with the rest of paragraph 1 surviving in haec verba
20  into the contract that was signed, suggests that the parties
21  agreed upon the use of what this Court recognizes as standard
22  evergreen language for paragraph 1.
23      Paragraph 1 does not contain any requirement that
24  termination be for cause. Having reviewed the evidence, I
25  expressly find that the parties never discussed tying the

1   evergreen provision to a requirement that termination
2   thereunder be for cause. There is no testimony from any
3   witness involved in the negotiations, not Fridman, not Daly,
4   and not Rothberg, that this subject tying termination for cause
5   to the evergreen provision was ever discussed either between
6   the two sides or between Daly and his superiors at SAGA. The
7   termination-for-cause provision that had been in prior
8   contracts between the parties and that was included in Plaintiff's
9   August 21 draft as paragraph 8 was also changed in Plaintiff's
10  Exhibit 1, in three ways.
11      First, paragraphs in the new contract draft will be
12  renumbered so this paragraph appears as paragraph 7.
13      Second, the entire first sentence was eliminated.
14      Third, the phrase "any such termination," which had
15  appeared in the second sentence of the August 21 draft,
16  paragraph 8, was changed to "any termination." So I want to
17  read into the record what this paragraph had been in the August
18  21 draft.
19      In the August 21 draft, it read:
20      "Paragraph 8:

21      "SAGA reserves the right to terminate this agreement
22 should PACS fail to perform any material conditions of this
23 agreement. Before such termination shall become effective,
24 SAGA shall give written notice to PACS describing in detail
25 what material conditions PACS has failed to perform and PACS

1 shall have 60 days in which to perform such conditions."
2      In the contract as finally signed, that paragraph
3 reads:
4      "Paragraph 7:
5      "Before any termination of this agreement shall become
6 effective, the terminating party shall give written notice to
7 the other party describing in detail what material conditions
8 the other party has failed to perform and the other party shall
9 have 60 days in which to perform such provisions."
10      Daly testified that he made these changes because
11 Fridman demanded that paragraph 7 be made mutual; that is, that
12 either party have the right to give notice of termination for
13 material breach of contract. Fridman testified at trial that
14 he never asked for that provision to be made mutual because he
15 wanted a perpetual agreement and termination for cause was
16 inconsistent with perpetuity. Transcript, around page 46.
17      He testified somewhat differently at his deposition,
18 which is in evidence, when he said at page 167 that he did, or
19 maybe did, ask that the termination-for-cause provision be made
20 mutual and that he had a good reason for doing so.
21      All parties testified that no one believed that
22 Fridman would ever have terminated the contract, so he
23 certainly did not have a strong motive for requesting that
24 paragraph 7 be made mutual. However, the record reveals no
25 other explanation for Daly's tinkering with the language of

1 paragraph 7 and, try as I might, I cannot think of one.
2      Daly's testimony about the changes to paragraph 7 is
3 attinged with the curse of a lawyer's natural reluctance to
4 admit that he made a mistake. But after watching and listening
5 to Daly, I do not believe that he was deliberately trying to
6 create an obfuscatory document, one whose termination provision
7 could be read favorably by either side. I credit Daly's
8 testimony that his tinkering with the language at paragraph 7
9 was a result of discussions with Fridman about that paragraph.
10      Since paragraph 7, as it now stands in the contract,
11 whatever else it may be, gives both parties, rather than just
12 SAGA, the right to terminate the contract on 60 days' notice
13 for an uncured material breach, I credit Daly's testimony that
14 he was trying to make mutual the ability to terminate the
15 contract for cause. I do not accept his self-described
16 statement that he is an excellent draftsman because Daly failed
17 to notice the way he chose to accomplish that result could be
18 read to tie paragraph 7 in to paragraph 1, not explicitly, but
19 because the word "terminate" or "termination" is used in both
20 paragraphs.
21      (Continued on next page)
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

189

Decision

1  THE COURT:  After seeing and hearing Daly testify, I
2  do not believe that he ever perceived that there was or might
3  be any connection between paragraph 1 and paragraph 7.
4       I do not credit Fridman's testimony about the
5  discussions concerning paragraph 7 because I do not believe
6  Mr. Fridman never strayed from the position that he wanted a
7  perpetual contract.  Fridman's testimony about the termination
8  for cause provision, that appeared in the August 21 draft, is
9  that he rejected it because "we wanted perpetual agreement."
10  That is transcript page 46.  "We don't want to cancel the
11  agreement, terminate the agreement."  Same page.
12       As Mr. Schaffer said this morning, that was always
13  Fridman's position.  He did not want the agreement to be
14  terminable, period, not on 18 months' notice, at years ten, 15
15  and 20, not on 60 days' notice, even for material breach.  He
16  did not want it to be terminable because he was looking for
17  perpetuity.  He says he never tried to get Daly to make the
18  termination for cause provision mutual.
19       But I have a problem with that testimony because if
20  that were the case, Daly would have had no reason to tinker
21  with the otherwise completely workable and favorable to SAGA
22  language at paragraph 7 between August 21 and September 9.
23  Either it would have remained in the contract as it was
24  originally drafted and as it had appeared in prior contracts
25  between the parties or it would have been taken out of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

190

Decision

1  contract entirely.  It was not taken out of the contract so
2  there must have been a reason why Daly tinkered with that
3  language.  That is, there must have been some discussion about
4  the text of paragraph 7 that was not related to perpetuity.
5       In order to discuss the logical issues relating to the
6  plaintiff's position in this lawsuit, I must interpret
7  paragraph 7 of the contract on a stand-alone basis.  The
8  literal language of paragraph 7 does not tie itself
9  specifically to paragraph 1 or limit itself to terminating the
10  contract, as that term is used in paragraph 1.  Thus, paragraph
11  7 read on its own:  Provides that either party may terminate
12  the agreement at any time during the life of the contract by
13  giving notice of termination for material breach and offering a
14  60-day cure period.
15       Notwithstanding the elimination of the first sentence
16  of the corresponding provision in the parties' prior contract,
17  a provision that provides for notice and an opportunity to cure
18  "before any termination of this agreement shall become
19  effective" necessarily implies a right to terminate for
20  material breach, especially in view of controlling law, which
21  is New York law, which provides for termination for material
22  breach unless the parties expressly contract otherwise.
23       Furthermore, nothing in paragraph 7 says that a party
24  can only give notice of termination for material breach 18
25  months prior to the date when the contract is up for automatic

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

191

Decision

1  renewal under paragraph 1, and I reject any such construction

2  of the language of paragraph 7.
3              Under its literal terms, paragraph 7, notice of
4  material breach, can be given at any time. Of course, a party
5  to a contract is not required to exercise his right to
6  terminate for material breach and often the wronged party will
7  have good and valid business reasons for not exercising the
8  right of termination. But it is clear enough that under this
9  contract either party can do so at any time, and if the notice
10 is properly delivered, something SAGA seems to have trouble
11 with, and the breach is not cured within 60 days, the contract
12 will terminate, period.
13             So the question before the court is whether paragraph
14 7 termination for cause procedures can be grafted onto
15 paragraph 1's evergreen language, even though I have found
16 based on the uniform and undisputed testimony of all the
17 negotiators that there was never any discussion of such a
18 concept during the negotiations that led up to the signing of
19 paragraph 1.
20             For reasons I will go into in a minute, I don't credit
21 Mr. Fridman's testimony that he thought that the two paragraphs
22 could and should be read together back in 1997. But he admits
23 that he never raised the point with Mr. Daly before signing the
24 document. His unilateral and unexpressed belief that the two
25 paragraphs be read together, assuming it to be true, cannot be

Decision
1  considered by the court because it is not admissible as
2  extrinsic evidence of intent. Only the party's objective
3  manifestations of intent are properly admitted as parol
4  evidence when construing an ambiguous contract. 17(b), C.J.A.
5  Contracts, Section 743.
6              The reason I do not credit this particular bit of
7  Mr. Fridman's testimony is that I do not believe that
8  Mr. Fridman would have sat silent and done nothing when he got
9  the notice of termination under paragraph 1, that was
10 admittedly sent to him in April of 2006, if he really thought
11 the contract had actually not been canceled.
12             As he testified, credibly, he had over 30 years
13 invested in his distributorship at that point in time.
14 Nevertheless, he did not utter a peep when he received the
15 notice of termination.
16             Moreover, as demonstrated by Defendant's Exhibit 170,
17 Fridman was made aware that SAG was representing to Consist
18 customers that Consist would "cease to exist," at least as a
19 SAG exclusive products distributor, in 2008. And his own
20 salespeople in the territory were telling customers, if they
21 were asked, that Consist was the exclusive distributor for SAG
22 products only through the end of 2007.
23             At the time DX170 was sent to Mr. Fridman, late in
24 July of 2006, it was already too late for SAG to exercise the
25 right of non-renewal under paragraph 1. That is assuming that

Decision
1  the April notice of non-renewal had not been effective. At
2  that point the only possible basis for ending the contract
3  would have been a notice of termination for material breach.
4  Yet, Mr. Fridman did nothing to correct the record in the minds
5  of either Consist, his own employees, or his understandably
6  confused customers. Confused is the word that Mr. Fridman used

7    to describe the situation.
8         Mr. Fridman testified that he thought it would harm
9    his market if his customers learned that the termination notice
10   from SAG was illegal, so he told clients that the two sides
11   were negotiating extensions.  But Mr. Fridman stated to this
12   court that SAG was creating "a lot of scare in the market."  It
13   was not in Consist's interest to allow that sort of scare to
14   persist for over a year without doing anything.
15         Moreover, Mr. Fridman's testimony is contradicted by
16   the contents of Defendant's Exhibit 170, which, as translated
17   by Mr. Fridman himself, state that customers who asked were
18   being told that Consist's exclusive representation of SAG would
19   continue through the end of 2007.
20         The fact that Fridman did nothing a year and a half
21   ago to dispel any misimpressions that he would continue as
22   SAG's exclusive South American distributor, whether in the
23   minds of his customers or in the minds of his own business
24   associates who were making these representations to customers,
25   compels me to conclude that in the summer of 2006 Fridman
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              194

                            Decision
1    thought SAG had ended his exclusive distributorship effective
2    January 1, 2008.  That is powerful objective extrinsic evidence
3    about how the parties understood the contract at the time.
4    Namely, that both sides understood paragraph 1 to be
5    independent from paragraph 7 and not to impose any requirement
6    of material breach if either side chose to chop down the
7    evergreen.
8         Most of the evidence in the exhibit binders, to which
9    I have not already alluded but which the parties have relied
10   on, I find unhelpful in reaching a decision on the lone
11   question before me.  The fact that SAG and SAGA had a perpetual
12   distribution agreement that could not be terminated does not in
13   any way imply that SAGA and Consist had such an agreement or
14   that they would have found remedies alternative to termination
15   to be sufficient to their relationship.
16        The fact that Exhibit A of Plaintiff's Exhibit 1 was
17   amended to include a specific reference to this perpetual
18   distribution agreement between SAG and SAGA does not suggest to
19   me that SAGA and Consist had also agreed to a perpetual
20   distribution agreement.  It is, however, consistent with
21   Consist's desire to assure itself that it, Consist, would not
22   lose its source of supply under the agreement that it did sign
23   an evergreen agreement that was good for ten years absent
24   material breach and might be good for considerably longer if
25   the parties chose not to end it.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              195

                            Decision
1         So I am back where I was in September and, frankly,
2    with only a little information that is of great use in
3    resolving this issue.  I thus fall back on logic.
4         Grafting paragraph 7 onto paragraph 1 makes paragraph
5    1 internally inconsistent.  As I have already found, paragraph
6    7 by its terms literally provides that the termination of the
7    contract for material breach will become effective if the
8    breach is not cured within 60 days.  However, paragraph 1
9    termination becomes effective only after the passage of 18
10   months from the giving of the sunset notice.
11        If notice under paragraph 1 had to be accompanied by

12    notice under paragraph 7, then the contract would not terminate
13    in 18 months but in 60 days, unless the breach were cured.
14    Termination in this case coming ahead of non-renewal, which is
15    the actual meaning of the word terminate as used in paragraph
16    1.  And if the breach were cured within 60 days, on plaintiff's
17    reading of the contract, the notice under paragraph 1 that had
18    been sent would cease to be effective, which would make the
19    18-month sunset provision a complete nullity.  It would never
20    come into effect whether the breach were cured or not.
21            I am hard-pressed to construe the contract in that
22    manner since I could not thereby make sense of each and every
23    provision in the contract.
24            There does not appear to be any dispute that the April
25    6, 2006 notice of non-renewal, which is Plaintiff's Exhibit 4,

              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              196

                    Decision
1     was properly sent in accordance with the terms of the
2     agreement.  It is therefore effective to and will cause the
3     agreement to terminate in accordance with paragraph 1 as of
4     December 31, 2007.
5            Conclusions of law.
6            One, the contract is to be construed in accordance
7     with New York law.
8            Two, Plaintiff's Exhibit 1 is not an impliedly
9     perpetual agreement.  New York law is clear that an agreement
10    will be deemed to be perpetual only if the parties so state in
11    express terms.  Boyle v. Readers Subscription, Inc., 481 F.Supp
12    156, 158 (S.D.N.Y. 1979).  See also 22(a), N.Y. Jur. 2d
13    Contracts Section 485 (2007).
14            Grafting various provisions of a contract together to
15    imply perpetuity, as Mr. Fridman argues he did, is inconsistent
16    with New York law.
17            Three, certain maxims of contract construction under
18    the law of the State of New York must be kept in mind in
19    construing Plaintiff's Exhibit 1.  Contracts have to be
20    construed so as to make sense.  22 N.Y. Jur. 2d, Contracts
21    Section 213.
22            Contracts will not be construed so as to create
23    ambiguities.  Sections 214 and 218.  Contracts will be
24    construed in a manner that gives effect to every provision
25    therein.  Section 252.

              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              197

                    Decision
1            Four, to accept plaintiff's proffered construction
2     would be to violate every one of the aforesaid maxims reading
3     the contract.  As plaintiff would have me do would effectively
4     render paragraph 1 a nullity by transforming what on its face
5     reads as a standard evergreen, non-renewal provision with 18
6     months' sunset notice into a termination for cause provision on
7     60 days' notice.  It would thus not give effect to paragraph 1
8     as written.
9            Reading the two paragraphs together actually creates
10    far more ambiguity than reading them separately, as two
11    separate and distinct provisions.  One that provides both sides
12    with a periodic option to let the otherwise evergreen agreement
13    sunset and one that provides for termination of the contract
14    for cause in accordance with New York law.
15            Five, ambiguities are of course to be construed
16    against the drafter of the contract, and SAGA was the drafter

17  of the contract. However, in this circuit courts applying New
18  York law "reluctantly" resort to contra preferentem only if
19  after considering the extrinsic evidence it is not possible to
20  construe the contract. International Multifoods Corp. v.
21  Commercial Union Insurance Company, 309 F.3d 76, 88, at note 7
22  (S.D.N.Y. 2002).
23          In this case, the credible evidence concerning the
24  negotiations, key points of which are undisputed, the credible
25  evidence concerning the parties' recent behavior and the maxims

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

198

Decision
1  of contract construction cited above support defendants'
2  reading of the contract rather than plaintiff's. For this
3  reason the plaintiff's application for a preliminary and
4  permanent injunction is denied, and I am not sure what I should
5  do with the rest of the complaint. I don't think I need to do
6  much of anything with it.
7          MR. JACOBS: Your Honor, do you want us to address the
8  court on that issue?
9          THE COURT: Well, obviously I want Mr. Schaffer to go
10  up if he wants to go up. So I would like to end this lawsuit.
11          MR. JACOBS: Your Honor, the preliminary injunction
12  issue --
13          THE COURT: This was a permanent injunction. This was
14  a trial on the merits. This was not a preliminary injunction
15  hearing. You agreed to that.
16          MR. JACOBS: Right. We did, your Honor. I believe
17  the entire injunction issue was withdrawn at an earlier stage,
18  both preliminary and permanent, by Mr. Schaffer and the only
19  issue that was presented at this trial, as we understood it,
20  was a final decision on the party's motion for a declaratory
21  judgment whether the April 6 notice was effective. As I
22  understood your Honor's decision and conclusions of law, you
23  have held that it was.
24          THE COURT: Yes.
25          MR. JACOBS: The only other remaining issue in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

199

Decision
1  case would be, as I see it, SAG and SAGA's claim for damages
2  for breach. But as I understand your Honor, you have held the
3  notice of a breach insufficient so it would not trigger a cure
4  period.
5          THE COURT: What I did, because we were pressed for
6  time, and for very good reasons, I said it was going to be my
7  ruling that any notice of breach under paragraph 7 that had not
8  been sent in accordance with the literal terms of paragraph 7
9  doting every I and crossing every T, as one is required to do
10  under notice provisions under New York law, was going to be
11  construed against you and against your client.
12          So, for example, the notice that got sent by e-mail
13  was going to be deemed ineffective. The notice that got sent
14  to some other address was going to be deemed ineffective. The
15  notice that was walked across the street was going to be deemed
16  ineffective. What I specifically said was I didn't know if
17  there were any notices left once you literally construed the
18  contract.
19          MR. JACOBS: Your Honor, I think the answer to that,
20  and we have not expressly discussed it with the client, but our
21  feeling as attorneys is that in fact there are no other issues

22    regarding the right to terminate under the notices.  But it
23    still leaves open the question of damages.
24        If Consist did breach the agreement, no notice is
25    necessary to collect damages, as I understand New York law.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

200

Decision
1        What we are willing to do, given the court's decision
2    this afternoon, is discuss with our client whether to withdraw
3    its claim for damages, and if it did, as I see it, that would
4    be the end of the case and the court can enter a final
5    judgment.
6        THE COURT:  Mr. Schaffer.
7        MR. SCHAFFER:  Your Honor, I don't think that
8    Mr. Jacobs is at all correct.  I think that there are no issues
9    left in this case.  There was a stipulation entered into this
10   case in which we decided we were trying all of these issues.
11   This is the judgment.  There are no issues of damages.  The
12   notices were ineffective.  There can't be any damages without a
13   notice of breach.
14       In any event, the stipulation itself said this was it.
15   There is nothing left in this case.  It is correct that we, I
16   believe, have a final judgment.
17       THE COURT:  OK.  Let me go back and read the
18   stipulation.
19       I actually have just a point of curiosity.  When
20   Mr. Streibich sent his letter of March 30, 2006, it said, so we
21   told SAGA to send you a notice of termination, but we would be
22   open to entering into some kind of a non-exclusive relationship
23   with you.  Part of what I find so passing strange about this
24   is, and the whole behavior of Consist following receipt of the
25   notice of termination, is that I guess nobody ever did anything

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

201

Decision
1    about that, that there were never any such discussions or
2    negotiations.  I spent enough time on this.  I am just curious
3    as to why.
4        MR. SCHAFFER:  There were discussions, your Honor.
5    They did not reach fruition.  But believe we have a final
6    judgment.
7        MR. JACOBS:  I can't hear him.
8        THE COURT:  You can't hear him.  He said there were
9    discussions.  They did not reach fruition.
10       All right.  Let me go pull out your stipulation.
11       MR. SCHAFFER:  Your Honor, I believe that even under
12   the court's earliest ruling here the court was going to sever
13   whatever it was, enter a final judgment, let us do what we were
14   going to do.  I think the stipulation actually covers every
15   issue in this case at this point.
16       THE COURT:  I will look at it, but I also think you
17   are right about the severance thing.  But even if the
18   stipulation didn't cover every issue, it would be my hope that
19   SAGA, SAG, whatever they are called now, would perhaps think
20   that enough was enough, which is what I understand Mr. Jacobs
21   said he was going to discuss with his client.
22       MR. JACOBS:  Exactly, your Honor.
23       THE COURT:  OK.
24       Well, it's been interesting and of course very well
25   tried, which is the joy of having you people.  So let me hang

SOUTHERN DISTRICT REPORTERS, P.C.

202

Decision

1   onto the exhibits for another couple of days if you don't mind.
2   Ordinarily I would tell you to take them home, but you have
3   enough stuff to take home, and I will be back in touch with you
4   tomorrow.
5        MR. SCHAFFER:   Thank you, your Honor.
6        MR. JACOBS:   Thank you, your Honor.   It also was a
7   pleasure for us to appear before your Honor.
8        (Trial concluded)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DUANE MORRIS LLP
Hyman L. Schaffer
Fran M. Jacobs
Brian Damiano
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Plaintiff Consist Software Solutions, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

CONSIST SOFTWARE SOLUTIONS, INC.,    :
f/k/a CONSIST INTERNATIONAL, INC.,    :
    :    07 CV 7047 (CM) (FM)
    Plaintiff,    :
    -against-    :
    :    **CERTIFICATE OF SERVICE**
SOFTWARE AG, INC. and SOFTWARE AG,    :
    :
    Defendants.    :
------------------------------------------------------------------x

      This is to certify that I caused the foregoing Notice of Appeal to be served on the counsel

for defendants in this action by regular mail, at the address listed below:

          James D. Jacobs, Esq.
          Frank M. Gasparo, Esq.
          Marcella Ballard, Esq.
          BAKER & McKENZIE LLP
          1114 Avenue of the Americas
          New York, New York 10036

This the 15th day of January, 2008.

                    _____
                         BRIAN DAMIANO